FILED
APR 30 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

JACK LADD and MARIE LADD, Husband and Wife, JOHN LADD and JOBETH LADD, Husband and Wife,

WILLIAM LINDSEY, JAMES A. LINDSEY, MICHAEL A. LINDSEY and GAIL A. LANHAM,

CHARLIE MILLER, RAYMOND and PAULINE MILLER, Husband and Wife

For Themselves and As Representatives of a Class of Similarly Situated Persons,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

**SUMMARY OF THIS CASE**

The Plaintiffs are citizens of the United States and of the State of Arizona. The Plaintiffs' are the fee owners of property in Cochise County, Arizona that lies just north of the Mexican boarder and along the San Pedro River. Much of this property has been owned by the Plaintiffs' and their families since the late 1800's. About 1903 the El Paso and Southwestern Railroad acquired an easement across the Plaintiffs' property. This railroad easement was granted for the operation of a railroad and not for any other purpose. Under the terms of the relevant easement instruments and under Arizona law, once the railroad ceased operating a railroad across the right-of-way the railroad easement was abandoned and the Plaintiffs' as fee owners regained their right to the exclusive use and physical possession of their property.

Section 8 (d) of the 1983 amendments to the National Trails System Act, 16 U.S.C. §1247(d) ("Trails Act"), provides the issuance of a Notice of Interim Trail Use

("NITU") by the Surface Transportation Board (STB) forestalls the Plaintiff Property owners[1] "reversionary" property rights and allows the Plaintiff's property to be transferred to a trail user notwithstanding whatever "reversionary" interest the Plaintiff's have to their property under state law. This is a taking of the Plaintiff's property for which the Fifth Amendment to the U.S. Constitution requires that the United States pay "just compensation" to the Plaintiff property owners.

This action is the claim by these U.S. citizens brought pursuant to the Fifth Amendment and the Tucker Act 28 U.S.C. § 1491 (a)(1) seeking "just compensation" for the value of their property taken from them by the federal government through operation of the Trails Act. The "just compensation" they seek includes compensation for the delay between the date their property was taken (or made subject to the Trails Act) and when the federal government ultimately pays them compensation.

For those citizens owning property subject to the NITU and for which their state law reversionary rights were forestalled by the Trails Act, but for which the negotiating period for the railroad and trail user to reach a Trail Use Agreement was not extended by the STB order of February 2007, these property owners seek (a) "just compensation" for that period during which their state law reversionary interests were forestalled; and, (b) a Declaratory Judgment pursuant to the Declaratory Judgment Act 28 U.S.C. §2201 that on January 22, 2007 their property was free of any future easement for recreational trail use or future railroad reactivation. They also seek the government to pay their attorney fees and expenses incurred in bringing this action pursuant to the Declarations of Taking Act 42 U.S.C. § 4654 (c)(2000).

---

[1] Plaintiff's use the term "reversionary" because such term was used in the generic sense by the Federal Circuit in *Barclay* and *Renewal Body Works*. Technically this is not a "reversion" of the property. Rather the Plaintiff's and their predecessors in title always held fee title to the property. Their fee title had been burdened by an easement for operation of a railroad. Upon the railroad's abandonment of this easement, their fee became "unburdened" by this easement to the extent that "reversionary _ " is used in this pleading it is used in the generic sense.

**COMPLAINT**

**JURISDICTION**

1. This court has jurisdiction pursuant to 28 U.S.C. § 1491(a)(1)"Tucker Act", in that this action presents a claim against the United States which is founded upon the Statutes and Constitution of the United States.

**STATUTES AND CONSTITUTIONAL PROVISIONS**

2. Plaintiffs' claim is governed by the following statute and constitutional provision:

(a) The Fifth Amendment to the United States Constitution which provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

(b) National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act")

(c) The Tucker Act, 28 U.S.C. § 1491(a)("Tucker Act") which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

(d) The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding.

(e) The Declaratory Judgment Act 28 U.S.C. . 2001 provide that this court may "declare the rights and legal relations" of the Plaintiff property owners as those rights are affected by the application of the Trails Act.

**Statement of Facts Applicable To All Counts.**

3. On October 17, 2005, the San Pedro Railroad Operating Company, LLC ("SPROC" or "Railroad"), which was the successor to the El Paso and Southwestern Railroad, filed with the STB a petition under 49 U.S.C. 10502 to abandon approximately a 76.2 mile long railroad corridor.

4. This railroad corridor begins in the north near Curtiss Flats, Arizona and runs along the eastern side of the San Pedro River heading south through the towns of Charleston and Hereford and then turns east and runs just north of the Mexican Border through the towns of Naco to Bisbee Junction and then to Douglas and Paul Spur. An additional section from Bisbee Junction north to Bisbee is also included in the abandoned right-of-way easement.

5. The right-of-way easement varies in width from 100 feet to 200 feet.

6. The San Francisco-based organization, the Trust for Public Land, a California not-for-profit corporation, filed a request for a public use condition and for issuance of a NITU with the STB on January 27, 2006.

7. The Trust for Public Land is a national, nonprofit, land conservation organization. The Trust for Public Land is not a railroad and is not authorized by any state or by the federal Surface Transportation Board to operate a railroad.

8. On July 25, 2006 the STB issued a Notice of Interim Trail Use (NITU) authorizing the conversion of this abandoned railroad right-of-way to public recreational

trail use and preserved STB jurisdiction over the easement for possible future railroad reactivation. The SPROC has since removed the rails and ties from the right-of-way. (A copy of that NITU is attached as Exhibit A).

9. The National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act") provide, "in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

10. But for operation of the Trails Act the Plaintiffs would have the exclusive right to physical ownership, possession and use of their property free of any easement for recreational trail use or future railroad use.

11. The United States Supreme Court in *Preseault v. United States* (*Preseault I*), 494 U.S. 1 (1990) held that Congress possessed the constitutional authority to enact the Trails Act and to take the Plaintiffs' property for conversion to a public-access recreational trail and preservation of a railroad easement for a possible future railroad corridor.

12. The Supreme Court in *Preseault I* and the Federal Circuit sitting *en banc* in *Preseault* v. United States, (*Preseault II*), 100 F.3d 1525 (Fed. Cir. 1996) held that the Fifth Amendment to the United States Constitution requires the United States to pay the property owners for the value of that property taken by operation of Section 8(d) of the Trails Act. To wit, Justice O'Connor wrote in *Preseault I*, "[the Trails Act] provides that interim trail use 'shall not be treated, for any purposes of any law or rule of law, as an

abandonment of the use of such rights-of-way for railroad purposes.' This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests. By deeming interim trail use to be like discontinuance rather than abandonment, Congress prevents property interests from reverting under state law." *Preseault I* at 8.

13. The U.S. Court of Appeals for the Federal Circuit in *Preseault II*, held "We conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. *** In the case before us there was a similar physical entry upon the private lands of the [property owners], acting under the Federal Government's authority pursuant to the ICC's [now STB's] Order. That it was for a valued public use is not the issue. We have here a straightforward taking of private property for a public use for which just compensation must be paid." *Preseault II* at 1551.

14. The ranch land and other property over which the abandoned SPROC right-of-way is located is valuable property because it enjoys the benefit of being in the San Pedro riparian and drainage basin.

15. Creating a public access trail across the Plaintiffs' property has taken from the Plaintiffs not just the value of the land physically appropriated for this trail corridor (which varies in width between 100 and 200 feet) but has also greatly diminished the value of the Plaintiffs' property adjoining this trail corridor.

16. One significant factor diminishing the value of the Plaintiffs' adjoining property is the fact that this trail corridor across the Plaintiffs' property will provide a route facilitating illegal immigration and drug trafficking from Mexico into the United States. The U.S. Border Patrol has stated that this trail would be a "highway for illegals" coming into the United States. This has the effect of substantially diminishing the value of the Plaintiff's adjoining property.

17. The value of the property taken from the Plaintiffs' (both that physically appropriated for a public trail and that diminished value of the Plaintiffs adjoining property) is very substantial.

18. The Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) and *Barclay v. United States*, 443 F.3d 1368 (2006) held that this claim for compensation has arisen upon the date that the Surface Transportation Board issued the NITU. Specifically, Judge Dyk of the Federal Circuit wrote, "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked 'when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)' of the Trails Act. We concluded that '[t]he issuance of the NITU is the only government action in the rail banking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way.' Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU." *Barclay v. United States*, 443

F.3d 1368 (2006) (emphasis in original) (Judge Dyk cited his own prior decision in *Caldwell v. United States* as authority.)

19. To the best of Plaintiff's knowledge and belief, as of January 22, 2007, no Trail Use Agreement had been negotiated between the SPROC and the Trust for Public Land.

20. The negotiating period for the railroad and the Trust for Public Land to reach a Trail Use Agreement expired on January 22, 2007. The STB extended the negotiating period to allow a Trail Use Agreement to be reached in its order of February 14, 2007. (A copy is attached as Exhibit B.)

21. In its February 14th Order, the STB has only extended the negotiating period for a portion of the abandoned right-of-way that was subject to the NITU. Specifically, that portion from Curtiss Flats on the north running south to the intersection of the abandoned railroad right-of-way and State Highway 92.

22. The United States Constitution requires the federal government to pay "just compensation" to all those property owners' holding fee title to property that was subject to the NITU.

23. To the extent that the February 14th order of the STB meant that a interim recreational trail and future railroad easement will not be created over a portion of the property subject to the NITU, compensation is still due these property owners for the period during which their "state law reversionary property rights" were precluded from vesting.

24. To the best of the Plaintiff's information and belief, sometime after February 2007 a Trail Use Agreement was reached between the SPROC and the Trust for

Public Land and this Trail Use Agreement affects only that portion of the property that is subject to the NITU and was also subject to the STB's extension of the negotiation period in its February 14th Order.

**THE PARTIES**

**Jack and Marie Ladd and John and JoBeth Ladd**

25. Plaintiffs Jack and Marie Ladd were are husband and wife. The Ladd's are residents and citizens of the State of Arizona and have lived their entire lives on property they own in Cochise County, Arizona. The Ladd's operate a cattle ranch on this property.

26. John Ladd, is the son of Jack and Marie Ladd and he and his wife Jobeth and their family live on the Ladd property.

27. Marie Ladd's grandparents moved from Missouri to Arizona and acquired a portion of the property as a homestead by land patents from the United States including that portion acquired by Marie Ladd's grandmother Ella M. Fike by Homestead Certificate signed by President Theodore Roosevelt. Other portions of the property that are not part of the original Ladd Property were purchased by members of the Ladd family over the subsequent years. Copies of those land patents and the deed by which the Ladd's forbearers acquired title to the property are attached as Exhibit "C"

28. The entire Ladd ranch, as owned by Jack and Marie Ladd and by John and Jobeth Ladd on July 25, 2006 (the date of the NITU) is shown on the Cochise County Assessors map which is attached as Exhibit "D". This property is referred to as the "Ladd Property".

29. A portion of the Ladd property is owned by Jack and Marie's son John and John's wife, Jobeth.

30. That portion of the abandoned railroad right-of-way subject to the NITU which burdens the Ladd Property is approximately six (6) miles long and is also shown on the Cochise County Assessors Map attached as Exhibit "D". This abandoned right-of-way passes about 300 feet from the Ladd's home.

31. The Ladd Property was subject to the NITU but that portion of the abandoned railroad right-of-way for which the STB extended the negotiating period for the SPROC and the Trust for Public Land to reach a Trail Use Agreement did not include those portions of the abandoned right-of-way that were on the Ladd's property.

**The Lindsey Family's Property**

32. In 1962 William Lindsey and his brother Howard Lindsey and Howard Lindsey's wife, Helen, purchased fee title to more than 60 acres of property in Cochise County, Arizona. The Lindsey's acquired title to this property by those deeds attached as Exhibit "E". (The "Lindsey Property".)

33. The location of the Lindsey Property is just south of Charleston, Arizona and is shown on the attached copy of the Assessor's maps attached as Exhibit "F."

34. William Lindsey still holds title to his interest in the Lindsey Property individually.

35. Howard Lindsey and Helen Lindsey transferred their interest in the Lindsey Property to the Harold A. Lindsey Revocable Trust dated March 30, 1994. Since that transfer Harold Lindsey has died.

36. On October 30, 2002, the portion of the Lindsey Property owned by Harold Lindsey's Revocable Trust was conveyed to his three children individually. (A

copy of the conveyance from the Trust to Harold Lindsey's children individually is included in as Exhibit "E."

37. Currently Harold Lindsey's children, Michael A. Lindsey, Gail A. Lanham and James A. Lindsey each hold an undivided one-third fee interest in the Lindsey Property that was originally acquired by their parents in 1962.

38. The SPROC held an easement across the Lindsey Property for the operation of a railroad.

39. The SPROC has abandoned its interest in the portion of the railroad easement across the Lindsey Property.

40. The portion of the abandoned SPROC railroad easement that crosses the Lindsey Property is subject to the NITU issued by the STB.

41. A portion of the abandoned right-of-way that is subject to the STB's February 2007 Order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate a Trail Use Agreement is located on the Lindsey Property.

**The Miller Family's Property**

42. Charles Raymond Miller and Pauline Miller, husband and wife, individually and through their revocable trusts (the "Miller Family".) own fee title to a number of parcels of separately described property in Cochise County, Arizona.

43. Specifically, the Miller Family members acquired title to this property by those deeds attached as Exhibits "G.". (The "Miller Property".)

44. The portion of the abandoned SPROC railroad easement that crosses the Miller Property is subject to the NITU issued by the STB.