# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

JACK LADD and MARIE LADD, Husband and Wife, JOHN LADD and JOBETH LADD, Husband and Wife,

WILLIAM LINDSEY, JAMES A. LINDSEY, MICHAEL A. LINDSEY and GAIL A. LANHAM,

CHARLIE MILLER, RAYMOND and PAULINE MILLER, Husband and Wife

VALENTIN CASTRO, III & DEBORAH ANN CASTRO REVOCABLE TRUST, VALENTIN and DEBORAH ANN CASTRO, Trustees,

SINGLETREE RANCH, LLC, AN ARIZONA LIMITED LIABILITY COMPANY,

JOSEPH LAWRENCE HEINZL,

MILLER FAMILY TRUST, COL. QUENTIN MILLER, TRUSTEE,

TAMMY WINDSOR-BROWN,

For Themselves and As Representatives of a Class of Similarly Situated Persons,

Plaintiffs,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

## PLAINTIFFS' FIRST AMENDED COMPLAINT

## SUMMARY OF THIS CASE

The Plaintiffs are citizens of the United States and of the State of Arizona. The Plaintiffs' are the owners of property in Cochise County, Arizona that lies just north of the Mexican boarder and along the San Pedro River. Much of this property has been owned by the Plaintiffs' and their families since the late 1800's. About 1903 the El Paso and Southwestern Railroad acquired an easement across the Plaintiffs' property. This railroad easement was granted for the operation of a railroad and not for any other purpose. Under the terms of the relevant easement instruments and under Arizona law, once the railroad ceased operating a railroad across the right-of-way the railroad easement was abandoned and the Plaintiffs' as fee owners regained their right to the exclusive use and physical possession of their property.

Section 8 (d) of the 1983 amendments to the National Trails System Act, 16 U.S.C. §1247(d) ("Trails Act"), provides the issuance of a Notice of Interim Trail Use ("NITU") by the Surface Transportation Board (STB) forestalls the Plaintiff property owners "reversionary"[1] property rights and allows the Plaintiff's land to be transferred to a trail user notwithstanding whatever reversionary interest the Plaintiff's have to their property under state law. This is a taking of the Plaintiff's property for which the Fifth Amendment to the U.S. Constitution requires that the United States pay "just compensation" to the Plaintiff property owners.

This action is the claim by these U.S. citizens and property owners brought pursuant to the Fifth Amendment and the Tucker Act 28 U.S.C. § 1491 (a)(1) seeking "just compensation" for the value of their property taken from them by the federal government through operation of the Trails Act. The "just compensation" they seek also includes compensation for the delay between the date their property was taken (or made subject to the Trails Act) and when the federal government ultimately pays them compensation. (This Claim is presented in Count I.)

---

[1] Plaintiff's use the term "reversionary" because such term was used in the generic sense by the Federal Circuit in *Barclay* and *Renewal Body Works*. Technically this is not a "reversion" of the property. Rather the Plaintiff's and their predecessors in title always held fee title to the property. Their fee title had been burdened by an easement for operation of a railroad. Upon the railroad's abandonment of this easement, their fee became "unburdened" by this easement to the extent that "reversionary _ " is used in this pleading it is used in the generic sense.

For one group of landowners, their property was subject to the NITU by which their state law reversionary rights were forestalled by the Trails Act, but the negotiating period for the railroad and trail user to reach a Trail Use Agreement was not extended by the STB order of February 2007. These property owners whose property is no longer subject to the NITU but whose title was clouded by the NITU, seek (a) "just compensation" for that period during which their state law reversionary interests were forestalled (This claim is presented in Count II); and, (b) a Declaratory Judgment pursuant to the Declaratory Judgment Act 28 U.S.C. §2201 that on January 22, 2007 their property was free of any future easement for recreational trail use or future railroad reactivation. (This claim is presented in Count III.) They also seek the government to pay their attorney fees and expenses incurred in bringing this action pursuant to the Declarations of Taking Act 42 U.S.C. § 4654 (c)(2000).

# COMPLAINT

## JURISDICTION

**COMES NOW** the Plaintiffs for themselves and for similarly situated property owners, and for their First Amended Complaint against the United States state as follows:

1. This court has jurisdiction pursuant to 28 U.S.C. § 1491(a)(1) "Tucker Act", in that this action presents a claim against the United States which is founded upon the Statutes and Constitution of the United States.

## STATUTES AND CONSTITUTIONAL PROVISIONS

2. Plaintiffs' claim is governed by the following statute and constitutional provision:

(a) The Fifth Amendment to the United States Constitution which provides, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

(b) National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act")

(c) The Tucker Act, 28 U.S.C. § 1491(a) ("Tucker Act") which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

(d) The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) provides that just compensation

includes, “reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding.

(e) The Declaratory Judgment Act 28 U.S.C. . 2001 provides that this court may "declare the rights and legal relations" of the Plaintiff property owners as those rights are affected by the application of the Trails Act.

**Statement of Facts Applicable To All Counts.**

3. On October 17, 2005, the San Pedro Railroad Operating Company, LLC (“SPROC” or “Railroad”), which was the successor to the El Paso and Southwestern Railroad, filed with the STB a petition under 49 U.S.C. 10502 to abandon approximately a 76.2 mile long railroad corridor.

4. This railroad corridor begins in the north near Curtiss Flats, Arizona and runs along the side of the San Pedro River heading south through the towns of Charleston and Hereford and then turns east and runs just north of the Mexican Border through the towns of Naco to Bisbee Junction and then to Douglas and Paul Spur. An additional section from Bisbee Junction north to Bisbee is also included in the abandoned right-of-way easement.

5. The right-of-way easement varies in width from 100 feet to 200 feet.

6. The San Francisco-based organization, the Trust for Public Land, a California not-for-profit corporation, filed a request for a public use condition and for issuance of a NITU with the STB on January 27, 2006.

7. The Trust for Public Land is a national, nonprofit, land conservation organization. The Trust for Public Land is not a railroad and is not authorized by any state or by the federal Surface Transportation Board to operate a railroad.

8. On July 25, 2006 the STB issued a Notice of Interim Trail Use (NITU) authorizing the conversion of this abandoned railroad right-of-way to public recreational trail use and preserved STB jurisdiction over the easement for possible future railroad reactivation. The SPROC has since removed the rails and ties from the right-of-way. (A copy of that NITU is attached as Exhibit A).

9. The National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act") provide, "in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

10. But for operation of the Trails Act the Plaintiffs would have the exclusive right to physical ownership, possession and use of their property free of any easement for recreational trail use or future railroad use.

11. The United States Supreme Court in *Preseault v. United States* (*Preseault I*), 494 U.S. 1 (1990) held that Congress possessed the constitutional authority to enact the Trails Act and to take the Plaintiffs' property for conversion to a public-access recreational trail and preservation of a railroad easement for a possible future railroad corridor.

12. The Supreme Court in *Preseault I* and the Federal Circuit sitting *en banc* in *Preseault v. United States*, (*Preseault II*), 100 F.3d 1525 (Fed. Cir. 1996) held that the Fifth Amendment to the United States Constitution requires the United States to pay the property owners for the value of that property taken by operation of Section 8(d) of the

Trails Act. To wit, Justice O'Connor wrote in *Preseault I*, "[the Trails Act] provides that interim trail use 'shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.' This language gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests. By deeming interim trail use to be like discontinuance rather than abandonment, Congress prevents property interests from reverting under state law." *Preseault I* at 8.

13. The U.S. Court of Appeals for the Federal Circuit in *Preseault II*, held "We conclude that the taking that resulted from the establishment of the recreational trail is properly laid at the doorstep of the Federal Government. *** In the case before us there was a similar physical entry upon the private lands of the [property owners], acting under the Federal Government's authority pursuant to the ICC's [now STB's] Order. That it was for a valued public use is not the issue. We have here a straightforward taking of private property for a public use for which just compensation must be paid." *Preseault II* at 1551.

14. The ranch land and other property over which the abandoned SPROC right-of-way is located is valuable property because it enjoys the benefit of being in the San Pedro riparian and drainage basin.

15. Creating a public access trail across the Plaintiffs' property has taken from the Plaintiffs not just the value of the land physically appropriated for this trail corridor

(which varies in width between 100 and 200 feet) but has also greatly diminished the value of the Plaintiffs' property adjoining this trail corridor.

16. One significant factor diminishing the value of the Plaintiffs' adjoining property is the fact that this trail corridor across the Plaintiffs' property will provide a route facilitating illegal immigration and drug trafficking from Mexico into the United States. The U.S. Border Patrol has stated that this trail would be a "highway for illegals" coming into the United States. This has the effect of substantially diminishing the value of the Plaintiff's adjoining property.

17. The value of the property taken from the Plaintiffs' (both that physically appropriated for a public trail and that diminished value of the Plaintiffs adjoining property) is very substantial.

18. The Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) and *Barclay v. United States*, 443 F.3d 1368 (2006) held that this claim for compensation has arisen upon the date that the Surface Transportation Board issued the NITU. Specifically, Judge Dyk of the Federal Circuit wrote, "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked 'when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)' of the Trails Act. We concluded that '[t]he issuance of the NITU is the only government action in the rail banking process that operates to prevent abandonment of the corridor and to preclude the vesting of state

law reversionary interests in the right of way.' Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU." *Barclay v. United States*, 443 F.3d 1368 (2006) (emphasis in original) (Judge Dyk cited his own prior decision in *Caldwell v. United States* as authority.)

19. To the best of Plaintiff's knowledge and belief, as of January 22, 2007, no Trail Use Agreement had been negotiated between the SPROC and the Trust for Public Land.

20. The negotiating period for the railroad and the Trust for Public Land to reach a Trail Use Agreement expired on January 22, 2007. The STB extended the negotiating period to allow a Trail Use Agreement to be reached in its order of February 14, 2007. (A copy is attached as Exhibit B.)

21. In its February 14th Order, the STB has only extended the negotiating period for a portion of the abandoned right-of-way that was subject to the NITU. Specifically, that portion from Curtiss Flats on the north running south to the intersection of the abandoned railroad right-of-way and State Highway 92.

22. On June 6, 2007 the STB issued a decision extending the SPROC's time to exercise the abandonment for a portion of the right-of-way to July 26, 2008. (A copy of this decision is attached as Exhibit C.)

23. The United States Constitution requires the federal government to pay "just compensation" to all those property owners' holding fee title to property that was subject to the NITU.

24. To the extent that the February 14th order of the STB meant that a interim recreational trail and future railroad easement will not be created over a portion of the

property subject to the NITU, compensation is still due these property owners for the period during which their "state law reversionary property rights" were precluded from vesting.

25. To the best of the Plaintiff's information and belief, sometime after February 2007 a Trail Use Agreement was reached between the SPROC and the Trust for Public Land and this Trail Use Agreement affects only that portion of the property that is subject to the NITU and was also subject to the STB's extension of the negotiation period in its February 14th Order.

**THE PARTIES**

**The Ladd Family Property**

26. Plaintiffs Jack and Marie Ladd were are husband and wife. The Ladd's are residents and citizens of the State of Arizona and citizens of the United States and have lived their entire lives on property they own in Cochise County, Arizona. The Ladd's operate a cattle ranch on this property.

27. John Ladd, is the son of Jack and Marie Ladd and he and his wife Jobeth and their family live on the Ladd property.

28. Marie Ladd's grandparents moved from Missouri to Arizona and acquired a portion of the property as a homestead by land patents from the United States including that portion acquired by Marie Ladd's grandmother Ella M. Fike by Homestead Certificate signed by President Theodore Roosevelt. Other portions of the property that are not part of the original Ladd Property were purchased by members of the Ladd family over the subsequent years. (Copies of those land patents and the deed by which the Ladd's forbearers acquired title to the property are attached as Exhibit "D".)

29. The entire Ladd ranch, as owned by Jack and Marie Ladd and by John and Jobeth Ladd on July 25, 2006 (the date of the NITU) is shown on the Cochise County Assessors map which is attached as Exhibit "E". This property is referred to as the "Ladd Property".

30. A portion of the Ladd property is owned by Jack and Marie's son John and John's wife, Jobeth.

31. That portion of the abandoned railroad right-of-way subject to the NITU which burdens the Ladd Property is approximately six (6) miles long and is also shown on the Cochise County Assessors Map attached as Exhibit "E". This abandoned right-of-way passes about 300 feet from the Ladd's home.

32. The Ladd Property was subject to the NITU but that portion of the abandoned railroad right-of-way for which the STB extended the negotiating period for the SPROC and the Trust for Public Land to reach a Trail Use Agreement did not include those portions of the abandoned right-of-way that were on the Ladd's property.

**The Lindsey Family's Property**

33. In 1962 William Lindsey and his brother Howard Lindsey and Howard Lindsey's wife, Helen, purchased fee title to more than 60 acres of property in Cochise County, Arizona. The Lindsey's acquired title to this property by those deeds attached as Exhibit "F". (The "Lindsey Property".)

34. The location of the Lindsey Property is just south of Charleston, Arizona and is shown on the attached copy of the Assessor's maps attached as Exhibit "G."

35. William Lindsey still holds title to his interest in the Lindsey Property individually.

36. Howard Lindsey and Helen Lindsey transferred their interest in the Lindsey Property to the Harold A. Lindsey Revocable Trust dated March 30, 1994. Since that transfer Harold Lindsey has died.

37. On October 30, 2002, the portion of the Lindsey Property owned by Harold Lindsey's Revocable Trust was conveyed to his three children individually. (A copy of the conveyance from the Trust to Harold Lindsey's children individually is included in as Exhibit "G.")

38. Currently Harold Lindsey's children, Michael A. Lindsey, Gail A. Lanham and James A. Lindsey each hold an undivided one-third fee interest in the Lindsey Property that was originally acquired by their parents in 1962.

39. The SPROC held an easement across the Lindsey Property for the operation of a railroad.

40. The SPROC has abandoned its interest in the portion of the railroad easement across the Lindsey Property.

41. The portion of the abandoned SPROC railroad easement that crosses the Lindsey Property is subject to the NITU issued by the STB.

42. A portion of the abandoned right-of-way that is subject to the STB's February 2007 Order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate a Trail Use Agreement is located on the Lindsey Property.

**The Miller Family's Property**

43. Charles Raymond Miller and Pauline Miller, husband and wife, individually and through their revocable trusts (the "Miller Family".) own fee title to a number of parcels of separately described property in Cochise County, Arizona.

44. Specifically, the Miller Family members acquired title to this property by those deeds attached as Exhibits "H.". (The "Miller Property".)

45. The portion of the abandoned SPROC railroad easement that crosses the Miller Property is subject to the NITU issued by the STB.

46. The Miller Property is subject to the NITU but does not include property that is subject to the February 2007 Order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate a Trail Use Agreement.

**Valentin and Deborah Ann Castro**

47. The Valentin Castro III and Deborah Ann Castro Revocable Trust, Valentin and Deborah Castro Trustees ("Castro"), owns fee title to property in Cochise County, Arizona. (A copy of the deed by which the Castros acquired this property is attached as Exhibit "I".)

48. The Castros' property includes a portion of the abandoned SPROC railroad easement that is now subject to the NITU and is subject to the February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.

**Singletree Ranch**

49. John S. and Mary E. Gay, husband and wife, owned fee title to property in Cochise County, Arizona.

50. The Gays transferred title to the property to Singletree Ranch, LLC., an Arizona Limited Liability Corporation, the beneficial ownership of which is held by John and Mary Gay and other members of the Gay family. (A copy of the deed by which Singletree Ranch, LLC acquired this property is attached as Exhibit "J".)

51. The Singletree Ranch property includes a portion of the abandoned SPROC railroad easement that is now subject to the NITU and is subject to the February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.

**Joseph Lawrence Heinzl**

52. Joseph Lawrence Heinzl owns fee title to property in Cochise County, Arizona. (A copy of the deed by which he acquired this property is attached as Exhibit "K".)

53. Joseph Lawrence Heinzl's property includes a portion of the abandoned SPROC railroad easement that is now subject to the NITU and is subject to the February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.

**The Miller Family Trust**

54. The Miller Family Trust, Col. Quentin Miller, Trustee, owns fee title to property in Cochise County, Arizona. (A copy of the deed by which the Miller Family Trust acquired this property is attached as Exhibit "L".)

55. The Miller Family Trust property includes a portion of the abandoned SPROC railroad easement that is now subject to the NITU and is subject to the February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.

**Tammy Windsor-Brown**

56. Tammy Windsor-Brown owns fee title to property in Cochise County, Arizona. (A copy of the deed by which she acquired this property is attached as Exhibit "M".)

57. Tammy Windsor-Brown's property includes a portion of the abandoned SPROC railroad easement that is now subject to the NITU and is subject to the February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.

**The United States of America**

58. The Defendant is the United States of America.

**The Named Plaintiffs Seek To Represent Other Similarly Situated Cochise County, Arizona Property Owners**

59. The Plaintiffs bring this action in their individual capacity as property owners whose land has been taken by the federal government and also as a class action as representative parties on behalf of themselves and all other similarly situated landowners who own property in Cochise County, Arizona subject to the NITU.

60. To the best of Plaintiffs' information and belief, there are more than one hundred (100) other landowners along the approximately Seventy-Six (76) mile length of abandoned right-of-way described in the NITU who hold fee title to property for which their state law "reversionary" property rights were forestalled and, for some, their property is now subject to an easement for recreational trail use and possible future railroad use by reason of the NITU.

61. There are questions of law and fact common to the class; Plaintiffs' claims are typical of the claims of the class; and Plaintiffs will fairly and adequately protect the interests of the class.

**THE TRAILS ACT IS A TAKING OF THE PLAINTIFFS' PROPERTY BY THE FEDERAL GOVERNMENT**

62. Part of the property owned in fee by each of the Plaintiffs was formerly subject to an easement for railway purposes. This railroad easement provided that the El Paso and Southwestern Railroad could use the designated portion of the Plaintiffs' land for the purpose of operating an active railroad.

63. The easement did not provide the El Paso and Southwestern Railroad, or any other person or entity, the right to use the Plaintiff's property for a public access recreational trail.

64. It is long-settled Arizona law that a grant of property to a railroad for a right-of-way is not a grant of fee title but only an easement for use of the property to operate a railroad. Should the railroad abandon operation of the railroad on the right-of-way the property "reverts" to the fee owner. *Atlantic & Pacific Railroad Co. v. Lesueur*, 2 Ariz. 428, 19 P. 157 (1888) and *Boyd v. Atchison, T.& S. F. RY. Co*, 39 Ariz. 154, 4 P 2d 670 (1931).

65. The railroad easement was expressly limited to use of the property "as and for a right-of-way for [the El Paso and Southwestern] Railroad" for the purpose of operating an active railroad.

66. Under the terms of the relevant easement and under Arizona law, when the railroad abandoned operation of a railroad over the property, the easement was

abandoned and the Plaintiffs' regained the right to use and possess their property free of any easement.

67. The Trails Act allows the conversion of abandoned railroad rights-of-way for use as interim recreational trails and preserves the right-of-way for possible future reactivation as a railroad. The Trails Act further provides that such conversion to trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes" 16 U.S.C. § 1247 (d).

68. On October 17, 2005, the SPROC filed a Petition for Exemption under 49 C.F.R. § 10502 with the Surface Transportation Board ("STB") seeking authorization to abandon railroad service over the 76.2 mile long San Pedro Railroad corridor.

69. On January 27, 2006 the Trust for Public Land ("Trust") submitted a request for public use condition and for issuance of a NITU. The Trust at that time also submitted a statement of willingness to assume financial responsibility for the right-of-way and acknowledged that use of the right-of-way is subject to future reconstruction and reactivation for rail service as required under 49 C.F.R. 1152.29.

70. The Trust is a national, nonprofit, land conservation organization. The Trust for Public Land is not a railroad and is not authorized by any state or by the federal Surface Transportation Board to operate a railroad. The Trust does not possess the legal authority to operate a railroad in Arizona.

71. On July 20, 2006, SPROC filed a letter with the STB indicating its willingness to enter into trail use negotiations previously requested by the Trust under section 8(d) of the Trails Act.

72. On July 25, 2006 the STB issued an NITU for the "approximately 76.2 miles of railroad line in Cochise County, AZ, as follows: (1) the Bisbee Branch, between milepost 1085.0 at Bisbee Junction and milepost 1090.6 at Bisbee, a distance of 5.6 miles; and (2) the Douglas Branch (a) between milepost 1097.3 near Paul Spur and milepost 1106.5 near Douglas, a distance of 9.2 miles, (b) between milepost 1055.8 near Charleston and milepost 1097.3 near Paul Spur, a distance of 41.5 miles, and (c) between milepost 1040.15 near Curtiss and milepost 1055.8 near Charleston, a distance of 19.9 miles." (A copy of this NITU is attached as Exhibit "O".)

73. The SPROC had ceased and abandoned use of this property as a railroad corridor for the operation of any trains or other aspect of operating a railroad which, under applicable Arizona state law and the terms of the easement instruments, meant that the underlying fee owners' property was no longer burdened by any easement for railroad use.

74. The SPROC has removed the rails and ties from the former right-of-way.

75. The Plaintiffs property had never – at any time – been subject to an easement allowing the public to use the Plaintiff's property for a recreational trail.

76. The Plaintiffs' property has never been subject to a general right of the public to cross or make use of the Plaintiffs' property for any purpose.

77. Under Arizona law, the railway easement across Plaintiffs' and the similarly situated class members' property was extinguished when the SPROC abandoned use of the property for railroad purposes.

78. The federal government, through operation of the Trails Act and issuance of the NITU has: (a) forestalled or taken the Plaintiffs state law "reversionary" right to

their property; (b) appropriated an easement for interim public recreational trail use; and (c) appropriated an easement for potential future railroad reactivation across the Plaintiff's property; and (d) has taken from the Plaintiffs' the right they enjoy under Arizona law to the exclusive use and physical occupation of their land.

79. Pursuant to the decision of the Federal Circuit in *Caldwell v. United States,* 391 F.3d 1226 (Fed. Cir. 2004) and *Barclay v. United States,* 443 F.3d 1368 (Fed. Cir. 2006), the taking of the Plaintiff's property occurred when the STB issued the NITU on July 25, 2006.

80. On February 12, 2007 the STB issued an order providing that, as of February 14, 2007, the negotiating period for the railroad and Trust for Public Land to reach a Trail Use Agreement was extended, but this extension applied to only a portion of the former SPROC right-of-way that was subject to the NITU. Specifically, the negotiating period was extended for that portion running from Curtiss on the north through the intersection of the abandoned railroad right-of-way and state Highway 92.

81. The United States has neither instituted any condemnation proceeding against Plaintiffs or the other class members, nor paid, nor offered to pay the Plaintiff's for the property it has taken from them.

## SPECIFIC CLAIMS FOR RELIEF

## COUNT ONE

***(A Claim For "Just Compensation" For The Permanent Physical Taking Of property owned by the Lindsey Family, Singletree Ranch, LLC, Castro Trust, Miller Family Trust, Joseph Heinzl, Tammy Windsor-Brown And Those Similarly Situated Land Owners Whose Property Is Subject To The NITU And Also Subject To The STB's Order Extending The Negotiating Period For A Trail Use Agreement To Be Reached. )***

**COMES NOW** the Lindsey Family, Miller Family Trust, Singletree Ranch, LLC, Castro Trust, Joseph Heinzl, Tammy Windsor-Brown, and other similarly situation property owners, the Plaintiffs state for Count One of their Complaint state the following.

82. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1 through 81 of this complaint.

83. The Fifth Amendment to the Constitution of the United States, "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

84. The Fifth Amendment prohibits the United States from taking private property from a citizen without paying that citizen "just compensation".

85. The Fifth Amendment requirement of paying "just compensation" to a property owner from whom the government takes property includes the obligation of the government to pay the property owner: (a) the fair market value for the property taken as of the date it was appropriated by the federal government – this fair market value includes not only the value of the land actually physically confiscated but also any "severance damages" or loss in value to the property owner's entire parcel caused by the government's taking, (b) payment of an additional amount of delay damages necessary to compensate the property owner for the government's delay in paying compensation.

86. The Tucker Act, 28 U.S.C. § 1491(a)(1) which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

87. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) provides that just compensation

includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

88. The actions of the United States have resulted in the taking of Plaintiffs' and the class members' property, by reason of the direct physical taking of Plaintiffs' and similarly situated property owners' land and by reason of the damage to Plaintiffs' and class members' remaining adjacent property which has suffered a loss of privacy and other severance damages as a result of the proximity of the public on the adjoining trail. The remaining property is also less valuable by reason of being divided into smaller separate parcels by the easement for trail use.

**SPECIFIC RELIEF REQUESTED**

Plaintiffs respectfully request a judgment in favor of Plaintiffs:

1. Certifying that this action may be maintained as a class action on behalf of similarly situated property owners pursuant to Rule 23 of the Rules of the U.S. Court of Federal Claims ("RCFC");

2. Awarding Plaintiffs' the full fair market value of the property taken by the government on the date it was taken (including any "severance damages" suffered by the Plaintiff in loss of value to the Plaintiffs' remaining property not actually physically taken but affected by the taking);

3. Compensation for the delay between the date of the government's taking of the Plaintiffs' property (which is the date of the original NITU according to the Federal Circuit's opinion in *Caldwell v. United States*, 319 F.3d 1226 (Fed. Cir. 2004)) and the actual date when the government finally pays "just compensation" to the Plaintiffs';

4. Paying the Plaintiffs' costs and attorneys' fees incurred pursuant to The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) which provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

5. Such further relief as this Court may deem just and proper.

**COUNT TWO**

***A Claim For "Just Compensation" For The Temporary Taking Of the Ladd and the Charles Miller Family's Property and Similarly Situated Property Owners By Reason Of The NITU Forestalling their State Law "Reversionary" Right To Their Property***

**COMES NOW** the Ladd and Charles Miller Families and on their behalf and on behalf of other similarly situated property owners, state for Count Two of their Complaint the following:

89. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1-88 of this complaint.

90. The Plaintiffs: as fee owners of their property would have enjoyed the right to possess and occupy their property under Arizona law on July 2006 but for operation of the Trails Act.

91. According to the United States Court of Appeals for the Federal Circuit, the STB's issuance of the NITU had the effect of suspending the railroad's abandonment and blocking the landowners state law "reversionary" interests from vesting "entitling the Plaintiff's to institute an action" for a taking of their property. See, *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006).

92. For the Ladd and Charles Miller Families and those similarly situated property owners whose land was subject to the NITU but whose land is not part of the right-of-way described in the February 2007 order of the STB extending the Trail Use Agreement negotiating period, the federal government must pay "just compensation" for that period of time during which the STB's issuance of a NITU blocked or forestalled these property owners' "state law reversionary property interests".

93. The Fifth Amendment to the Constitution of the United States, provided that "No person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

94. The Fifth Amendment prohibits the United States from taking private property from a citizen without paying that citizen "just compensation".

95. The Fifth Amendment requirement of paying "just compensation" to a property owner from whom the government takes property includes the obligation of the government to pay the property owner: (a) the fair market value for the property taken as of the date it was appropriated by the federal government – this fair market value includes not only the value of the land actually physically confiscated but also any "severance damages" or loss in value to the property owner's entire parcel caused by the government's taking, (b) payment of an additional amount of delay damages necessary to compensate the property owner for the government's delay in paying compensation.

96. The Tucker Act, 28 U.S.C. § 1491(a)(1) which provides in relevant part, "The United States Court of Federal Claims shall have jurisdiction to render judgment on any claim against the United States founded upon the Constitution."

97. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

98. The actions of the United States have resulted in the taking of Plaintiffs' and the class members' property by reason of the NITU forestalling the property owners' state law "reversionary" rights to their property.

**SPECIFIC RELIEF REQUESTED**

Plaintiffs respectfully request a judgment in favor of Plaintiffs:

1. Certifying that this action may be maintained as a class action on behalf of similarly situated property owners pursuant to FRCP 23.

2. Awarding Plaintiffs' the full fair market value of the property taken by the government for that period of time that the Plaintiff's state law "reversionary" interests were forestalled by reason of the NITU and Trails Act.

3. Compensation for the delay between the date of the government's taking of the Plaintiffs' property (which is the date of the NITU according to the Federal Circuit's opinion in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004)) and the actual date when the government finally pays "just compensation" to the Plaintiffs';

4. Paying the Plaintiffs' costs and attorneys' fees incurred pursuant to The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c) (2000) which provides that just compensation includes, "reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of [the] proceeding."

5. Such further relief as this Court may deem just and proper.

## COUNT THREE

***A Claim For Declaratory Judgment Pursuant To The Declaratory Judgment Act, 28 U.S.C. §2201, For The Ladd And Charles Miller Families And Similarly Situated Property Owners.***

**COMES NOW** the Ladd and Charles Miller Families and on their behalf and on behalf of other similarly situated property owners, state for count three the following:

99. Plaintiffs hereby reallege and incorporate by reference the allegations set forth in paragraphs 1- 98 of this complaint.

100. The Plaintiff's, as fee owners of their property would have enjoyed the right to possess and occupy their property under Arizona law but for the STB's issuance of the NITU and operation of the Trails Act.

101. According to the United States Court of Appeals for the Federal Circuit, the STB's issuance of the NITU in July 2006 had the effect of suspending abandonment and blocking the landowners state law "reversionary" interests from vesting "entitling the Plaintiff's to institute an action" for a taking of their property. See, *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006).

102. For those property owners whose land was subject to the NITU but whose land is not subject to that part of the abandoned right-of-way for which the STB extended the negotiating period for the SPROC and Trust for Public Land to reach a Trail Use Agreement, they regained their state law "reversionary" rights free of any easement for recreational trail use and free of any easement for future or reactivated railroad use upon expiration of the negotiating period which occurred on January 22, 2007.

103. The STB's issuance of the NITU has clouded these Plaintiff property owner's title to their land and this declaratory judgment is necessary to remove this cloud on the property owners title.

**SPECIFIC RELIEF REQUESTED**

Plaintiffs respectfully request a judgment in favor of Plaintiffs specifically:

1. An Order of this Court declaring that the Ladd and Miller families (and that land owned by similarly situated property owner's whose land was subject to the NITU but for which the negotiating period was not extended by the February 14th Order) is: (a) free of the STB jurisdiction as of January 22, 2007, (b) the Trails Act did not create an easement for recreational trail use and did not preserve or "railbank" this portion of the railroad corridor for possible future reactivation as a railroad right-of-way; and (c) this property is now free of any easement for a public access recreational trail or current or future railroad use.

2. Their Attorney fees and expenses incurred in this proceeding.

3. Such further relief as this Court may deem just and proper.

Respectfully submitted,

LATHROP & GAGE, L.C.

Date: June 27, 2007

By: ______________________

Mark F. Hearne, II
The Equitable Building
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
Telephone: (314) 613-2500
Facsimile: (314) 613-2550

Franklin Square, Suite 1050 East
1300 Eye Street, NW
Washington, D.C. 20005
Telephone: (202) 962-0032
Facsimile: (202) 962-0357

Attorney for Plaintiffs