# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **JACK LADD and MARIE LADD**, et al. | ) | |
| | ) | |
| For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 07-271L |
| | ) | |
| vs. | ) | Honorable Robert H. Hodges, Jr. |
| | ) | |
| **THE UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Defendant. | ) | |

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY CLASS ACTION

---

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
Lathrop & Gage, LC
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
613-2500 (Phone)
613-2550 (fax)
Thornet@ix.netcom.com
ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS


I. SUMMARY OF MOTION .......... 1

A. Introduction .......... 1

B. The Parties and the Property .......... 2

C. The STB's Action Taken Pursuant to the Trails Act .......... 3

D. The STB's Issuance of the NITU and Application of the Trails Act to the Plaintiff's Property is a per se Physical Taking of the Plaintiff's Property .......... 5

E. The "Temporary" and "Permanent" Taking Claims Arise From Common Facts and Law .......... 8

II. STATEMENT OF QUESTION INVOLVED .......... 10

III. THIS CASE SHOULD BE CERTIFIED AS AN OPT-IN CLASS ACTION. .......... 10

A. This Court has Authority to Certify a Class Action When Doing So Would Provide For the More Efficient Resolution of Litigation .......... 10

B. This Action Satisfies the Court of Federal Claims' Requirements for Certification of a Class Action. .......... 11

1. This Action Satisfies the Quinault Criteria for Certification of a Class Action. .......... 11

a. The Proposed Members Constitute a Large But Manageable Class. .......... 12

(1) Plaintiffs proposed class satisfies the "large" size criterion. .......... 12

(2) Plaintiffs' proposed class satisfies the "manageable" criterion. .......... 13

b. The Claims of All Potential Class Members Turn on Legal Issues Common to the Entire Proposed Class. .......... 15

c. The Common Legal Questions Predominate and Override Any Separate Factual Issues Affecting the Individual Members. ....17

(1) The proposed class members share common factual issues of title, and where these factual issues are unique, they are not significant. ....17

(2) Despite having claims of differing monetary amounts, the potential class members share common factual issues to establish such property valuation. ....18

d. The Claims of the Named Plaintiffs Are Typical of the Claims of the Class. ....20

e. The Government Has Acted on Grounds Applicable to the Whole Class: When the STB Issued the NITU it Took the Property of Each Class Member Simultaneously and in Like Manner. ....21

f. Some of the Class Members' Claims are Fairly Small, Creating Doubt that Individual Claims Would be Pursued if Certification was Denied ....22

g. The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class Without a Conflict of Interest. ....23

(1) The Plaintiff's Are Represented by Experienced Counsel ....23

(2) These Potential Class Members Have No Conflict of Interest. ....25

2. Class Certification is the Most Efficient Way to Proceed in this Case, and as such, Serves the Interests of Justice. ....26

3. This Court Has Granted Class Certification in Other Trails Act Cases. ....28

IV. CONCLUSION ....28

# TABLE OF AUTHORITIES

## Cases

Abel v. United States, 18 Cl. Ct. 477 (Cl. Ct. 1989)........................................................ 19

Armitage v. United States, 18 Cl. Ct. 310 (Cl. Ct. 1989) .................................... 21, 22, 27

Barclay v. United States, 443 F.3d 1368 (Fed. Cir. 2006)........................................... 7, 21

Berkley v. United States, 45 Fed. Cl. 224, 234 (1999)..................................................... 11

Caldwell v. U.S. 391 F.3d 1226 (2004) ................................................................... 15

Caldwell v. United States, 391 F.3d 1226 (Fed. Cir. 2004)......................................... 7, 21

Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.
450 U.S. 311 (1981).................................................................................................. 1

Christian, II v. United States, 46 Fed. Cl. 793 (2000) .................................................... 11

East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395 (1977) .................... 25

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) ................................................. 22, 27

Evans v. United States Pipe & Foundry Co., 696 F.2d 925 (11th Cir. 1983)................... 12

Glosemeyer v. U.S. (93-126L)........................................................................... 11, 27

Hannon v. United States, 31 Fed. Cl. 98, 103 (Fed. Cl. 1994)........... 13, 14, 18, 20, 21, 22

Hayfield Northern R. Co. v. Chicago & North Western Transp. Co.
467 U.S. 622 (1984)................................................................................................. 2

Hubbert v. U.S. (No. 99-396L) ....................................................................... 27

International News Service v. Associated Press, 248 U.S. 215 (1918) ............................. 6

Kaiser Aetna et al. v. United States, 444 U.S. 164 (1979).................................................. 6

Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982) ........................... 6

Medical Protective Co. v. Bell, 912 F.2d 244 (8th Cir. 1990)
cert. denied, 498 U.S. 1090, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991)........................ 16

Miller v. United States, No. 03-2489L
(Docket # 124, November 17, 2006 at 4.) ........................................... 14, 19, 23, 24, 27



STLDOCS 208718v1

O'Hanlon v. United States, 7 Cl. Ct. 204 (Cl. Ct. 2004) ..... 19

Portsmouth Co. v. United States, 260 U.S. 327 (1922) ..... 6

Preseault v. United States, 494 U.S. 1 (1990) at 8 ..... 1, 2, 6

Preseault v. United States, 100 F.3d 1525 (Fed. Cir. en banc 1996) ..... 6

Quinault Allottee Association and Individual Allottees v. United States 453 F.2d 1272 (Cl. Ct. 1972) ..... 9, 10, 11, 12, 15, 17, 19, 20, 22, 23, 25, 27, 28

R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ..... 16

Saunooke v. United States, 8 Cl. Ct. 327 (Cl. Ct. 1985) ..... 12, 23, 24

Schlesinger v. Reservists to Stop the War, 418 U.S. 208 (1974) ..... 25

Testwuide v. United States, 56 Fed. Cl. 755 (Fed. Cl. 2003) ..... 11, 12

United States v. Causby, 328 U.S. 256 (1946) ..... 6

Waller v. International Harvester Co., 98 F.R.D. 560 (N.D.Ill. 1983) ..... 13

## Other Authorities

28 U.S.C. § 1295 (1994) ..... 12

National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d).. 2, 3, 4, 5, 6, 7, 8, 9, 10, 14, 15, 16, 17, 18, 19, 20, 21, 24, 28

Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.) ..... 1

Rogers v. U.S. (No. 07-273L) ..... 28

San Pedro Railroad Operating Company, LLC, February 3, 2006, Docket No. AB-1081-X.) ..... 4

STB decision "Granting SPROC's Request For Extension of Time", July 26, 2008, Docket No. AB-1081-X ..... 9

The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) ..... 27

Tucker Act ..... 7, 10, 11

## Rules

RCFC 23 ..... 10, 11, 28

# I. SUMMARY OF MOTION

## A. Introduction

The named Plaintiffs are fee owners of property located in Cochise County, Arizona. More than a decade ago the El Paso and Southwestern Railroad acquired an approximately 76 mile long easement across the Plaintiffs' property (the "easement"). The easement was granted for the express purpose of the construction and operation of a railroad and not for any other purpose. The San Pedro Railroad Operating Company, LLC ("SPROC") is the successor railroad to the El Paso and Southwestern Railroad. In 2005 the SPROC abandoned railroad service over this easement and has since removed the rails and ties from the property.[1] Under Arizona law and the terms of the conveyance

[1] The word "abandonment" is a term of art in the context of railroad real estate title and regulation. "Abandonment" is used in very different ways depending upon the context. There are two contexts in which the same word "abandonment" is used.

First, "abandonment" is used in the context of state property rights to refer to the loss of a railroad's right to use specific property for the operation of a railroad. A railroad's right to use specific property is defined by the real estate and property law of the relevant state. If a railroad holds only an easement to use the property for a specific purpose – which is customarily the manner in which railroads obtained the right to use property for operation of a railroad – this right can be lost by being "abandoned". Whether the railroad has "abandoned" its right to use the property is determined by reference to the relevant state's real estate law. "Many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests." *Preseault v. United States (Preseault I)*, 494 U.S. 1 (1990) at 8.

The second use of "abandonment" is in the context of federal regulation of interstate railroads. (*See*, Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.).) In this context the term "abandonment" refers not to the railroad's title or interest in the real estate over which it provides railroad service but to the obligation of the railroad to provide interstate railroad service over a given corridor or route. A railroad may not cease, or "abandon", its obligation to provide railroad service over a given railroad corridor without first obtaining the permission of the STB to terminate such interstate railroad service.

instruments by which the easement was established, the Plaintiff's property would be free of any easement for current or future railroad use. The Plaintiff's property has never been subject to an easement for use of their property as a public-access recreational trail. However, the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d) ("Trails Act") and the Surface Transportation Board's ("STB's") issuance of a Notice of Interim Trail Use ("NITU") on July 25, 2006 has precluded the Plaintiff's from enjoying their state law "reversionary" right to use and occupy their property and has imposed an additional servitude upon the Plaintiff's property allowing the Trust for Public Land (or some other "trail user") to use the Plaintiff's property for a public-access recreational trail.

**B. The Parties and the Property**

The 76 mile former railroad corridor ran across the property of approximately 100 property owners. This corridor is comprised of essentially two segments. One segment of about 40 miles in length runs north and south along the San Pedro River. Near the intersection with State Highway 92 the former railroad turned east and runs east and west just north of the Mexican border. (A map showing the abandoned railroad right-of-way

---

Thus, whether a railroad has the right to use a specific strip of real estate for operation of a railroad – and what uses can be made of this real estate pursuant to this right - is exclusively a question of the relevant state's real property law. Whether a railroad has the obligation to continue providing interstate railroad service over a specific railroad corridor is a matter determined exclusively by the STB and federal law. "State law generally governs the disposition of reversionary interests, subject of course to the ICC's 'exclusive and plenary' jurisdiction to regulate abandonments, *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981), and to impose conditions affecting post abandonment use of the property. See *Hayfield Northern R. Co. v. Chicago & North Western Transp. Co.*, 467 U.S. 622, 633 (1984). By deeming interim trail use to be like discontinuance rather than abandonment, see n. 3, supra, Congress prevented property interests from reverting under state law." *Preseault I* at 3.

is attached as Exhibit "A". This map is that attached to the STB's Environmental Review 11/9/2005, STB DOCKET No. AB-1081X).

Plaintiff counsel's initial review of the records of the Cochise County Tax Assessor and Recorder of Deeds suggests that there are approximately 40 to 60 owners of fee title to property along the North - South segment of the abandoned right-of-way and an additional 40 to 60 owners of fee title to property along the East - West branch of the abandoned right-of-way. Several of these properties are owned by the same family or entity and other parcels are owned by more than a single person.

### C. <u>The STB's Action Taken Pursuant to the Trails Act</u>

The STB found that the SPROC "acquired the line with the intent of restoring transborder rail service with the Mexican rail system at Naco, AZ, and developing NAFTA-related traffic, but that this plan never materialized. SPROC indicates that it has carried coal and coke for Chemical Lime, the only on-line shipper, but that Chemical Lime's projected level of traffic—between 380 and 500 carloads per year—is inadequate to sustain the railroad. SPROC states that it decided to abandon the line in March 2005 due to limited freight business and the lack of prospects for future traffic increases. According to SPROC, on June 10, 2005, it received a letter from the Federal Railroad Administration (FRA) recommending that SPROC cease operations over the line due to the poor condition of a bridge at milepost 1044.4 at the northern end of the Douglas Branch. Thereafter, SPROC states that it filed an embargo notice with the Association of American Railroads (AAR) on June 16, 2005, and renewed the embargo on September 22, 2005. SPROC also states that, in August 2005, heavy rains damaged substantial segments of the line between milepost 1061.9 and milepost 1077.9." (Decision of STB, "*San Pedro Railroad Operating Company, LLC, Granting An Exemption Under 49*

*U.S.C. 10502 From The Prior Approval Requirements Of 49 U.S.C. 10903 To Abandon Approximately 76.2 Miles Of Railroad Line In Cochise County, AZ.*" February 3, 2006, Docket No. AB-1081-X.)

On January 27, 2006, the Trust for Public Land, a California not-for-profit corporation, filed a request for a public use condition and issuance of a NITU with the STB. This request for conversion of the abandoned railroad right-of-way to a public-access recreational trail was made pursuant to the Trails Act.

The Trails Act provides, "in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."

The STB issued the NITU on July 25, 2006. (A copy of this NITU is attached as Exhibit "B"). The STB's NITU provided, "the [Public] Trust [for Land] submitted a request for issuance of a notice of interim trail use (NITU) for the subject line under the Trails Act, in order to negotiate with SPROC for acquisition of the right-of-way for interim trail use. The Trust at that time also submitted a statement of willingness to assume financial responsibility for the right-of-way and acknowledged that use of the right-of-way is subject to future reconstruction and reactivation for rail service as required under 49 CFR 1152.29. However, because SPROC had not indicated whether it was willing to enter into negotiations, the Board did not issue a NITU in its February 3 decision. Because SPROC has since notified the Board of its willingness to enter into trail use negotiations with the Trust, a 180-day period will now be authorized for the

parties to negotiate an interim trail use/rail banking agreement. Moreover, the Trust had simultaneously submitted a request for a public use condition under 49 U.S.C. 10905 for 180 days, which the Board authorized in its February 3 decision." (STB, *NITU*, July 25, 2006, Docket No. AB-1081-X.)

This NITU applied to the entire "approximately 76.2 miles of railroad line in Cochise County, AZ, [described] as follows: (1) the Bisbee Branch, between milepost 1085.0 at Bisbee Junction and milepost 1090.6 at Bisbee, a distance of 5.6 miles; and (2) the Douglas Branch (a) between milepost 1097.3 near Paul Spur and milepost 1106.5 near Douglas, a distance of 9.2 miles, (b) between milepost 1055.8 near Charleston and milepost 1097.3 near Paul Spur, a distance of 41.5 miles, and (c) between milepost 1040.15 near Curtiss and milepost 1055.8 near Charleston, a distance of 19.9 miles." (STB, *NITU*, July 25, 2006, Docket No. AB-1081-X.)

The NITU authorized the conversion of the entire 76.4 mile long abandoned railroad right-of-way to a public-access recreational trail use and preserved STB jurisdiction over the property providing for possible reactivation of a future railroad corridor across the property.

The SPROC has since removed the rails and ties from the entire length of the former railroad corridor.

**D. <u>The STB's Issuance of the NITU and Application of the Trails Act to the Plaintiff's Property is a per se Physical Taking of the Plaintiff's Property</u>**

Under Arizona law and the terms of those instruments by which the El Paso and Southwestern Railroad acquired an easement to operate a railroad over the property now owned by the Plaintiffs, the railroad's easement was abandoned and (but for the Trails Act) the Plaintiff's interest in their property would now longer be burdened by any

easement for current or future railroad use. Additionally, at no time was the Plaintiff's property ever subject to any easement for a public-access recreational trail. However, by operation of the Trails Act and the STB's issuance of a NITU, the Plaintiff's right under Arizona law to use and occupy their property was "blocked and suspended" when the STB issued an NITU that "precluded abandonment" and provided for conversion of the right-of-way to a public-access recreational trail. The Trails Act took from the Plaintiffs their right to use, possess and enjoy their property and also imposed two new servitudes – an easement for a public-access recreational trail and an easement for the possible future operation of a railroad – upon their property as well.

As such, the Trails Act and the STB's issuance of a NITU is a *per se* physical taking of the Plaintiff's property for which the Fifth Amendment requires that the Plaintiffs be paid "just compensation". See, *Kaiser Aetna et al. v. United States*, 444 U.S. 164 (1979). "[W]e hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation. This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina. And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation. See *United States v. Causby*, 328 U.S. 256, 265 (1946); *Portsmouth Co. v. United States*, 260 U.S. 327 (1922). At 180. (Several citations omitted) (Citing for additional authority at footnote 11, "As stated by Mr. Justice Brandeis, '[a]n essential element of individual property is

the legal right to exclude others from enjoying it.' *International News Service v. Associated Press*, 248 U.S. 215, 250 (1918)) *See also, Preseault I, supra, Preseault v. United States, (Preseault II)*, 100 F.3d 1525 (Fed. Cir. *en banc* 1996) and *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).

The Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) and *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006) held that "[t]he taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. Abandonment is suspended and the reversionary interest is blocked 'when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)' of the Trails Act. We concluded that '[t]he issuance of the NITU is the only government action in the rail banking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right of way.' Thus, a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU." *Barclay v. United States*, 443 F.3d 1368 (Fed. Cir. 2006) (emphasis in original).

Plaintiffs seek "just compensation" for the *per se* physical taking of their property that, but for operation of the Trails Act and the STB's issuance of a NITU, would be theirs to enjoy free of any easement for public-access trail use or the possible future operation of a railroad. Plaintiffs' claim for an uncompensated taking is brought against the United States Government under the Tucker Act, 28 U.S.C. § 1491(a)(1) and is

premised upon the Fifth Amendment to the United States Constitution because the taking of their interest in the property occurred by reason of the federal Trails Act.

The July 25, 2006 NITU "preclude[d] the vesting of state law reversionary interests in the right of way" for a 180 day period to allow the SPROC and the Trust for Public Land to negotiate a Trail Use Agreement. This negotiating period was set to expire January 22, 2007. Upon expiration of the negotiating period without a Trail Use Agreement, the railroad would consummate its obligation to maintain railroad service and the STB would no longer have jurisdiction over the corridor. However, the STB extended the negotiating period but for only the North-South segment of the right-of-way. (From Curtiss on the North to State Highway 92 on the South.) The East-West segment was excluded from the extension of the negotiating period. The STB also noted that, as of January 29, 2007, the SPROC had "consummated" abandonment of the East-West section of the former right-of-way. (A copy of the STB's order is attached as Exhibit "C").

### E. <u>The "Temporary" and "Permanent" Taking Claims Arise From Common Facts and Law</u>

The Plaintiffs in this matter consist of both those property owners who sustained a "temporary" taking of their property as well as those property owners who sustained a "permanent" taking. The owners of property on the East-West portion of the abandoned right-of-way suffered a temporary taking of their property when the Trails Act and the STB's issuance of the July 25, 2006 NITU precluded their state law "reversionary" property rights from vesting until January 22, 2007 at which time the negotiating period expired for the East-West portion of the right-of-way. The owners of property on the North-South section of the right-of-way have sustained a permanent taking of their

property because the Trails Act and the STB's issuance of the July 25, 2006 NITU has precluded – and continues to preclude - their state law "reversionary" property rights from vesting.[2]

Each taking, whether temporary or permanent, arose from the same set of operative facts. The July 25, 2006 NITU which applied to the entire 76 mile long right-of-way and the Trails Act. The government's liability for the claims (whether permanent or temporary) turns upon the same issue of underlying Arizona law and set of conveyances by which the El Paso and Southwestern Railroad in 1903 acquired a right to operate a railroad across property now owned by the Plaintiffs. As such, the property owners (whether suffering a temporary or a permanent taking) share common issues of fact and law and should therefore be combined in the same class for which Plaintiffs are seeking certification.

Because these common questions of fact and law are shared by all property owners whose land was used for the now abandoned right-of-way and was subject to the July 25, 2007 NITU and the continuing jurisdiction of the STB, certification as a class action under Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC") serves the interests of justice, judicial economy, and efficiency. Certification of this matter as a class action also satisfies each of the specific criteria established by the U.S. Court of Claims in its decision, *Quinault Allottee Association and Individual Allottees v. United States*, 453 F.2d 1272 (Cl. Ct. 1972).

[2] On June 8, 2007 the STB further extended the deadline. "SPROC's request for an extension of time to exercise the abandonment authority for that portion of the line from milepost 1040.15 near Curtiss to milepost 1084.0 is granted." The STB's deadline for SPROC consummating abandonment or negotiation a Trail Use Agreement was extended until July 26, 2008. (STB decision "*Granting SPROC's Request For Extension of Time*", July 26, 2008, Docket No. AB-1081-X.)

## II. STATEMENT OF QUESTION INVOLVED

Does Rule 23 RCFC allow for opt-in class certification of the claims by more than 100 owners of property in the same county who each have a similar Tucker Act claim under the Fifth Amendment for the federal government's temporary or permanent taking of their property when the federal Trails Act "preclude[d] the vesting of state law reversionary interests in the [abandoned] right of way" and imposed new servitudes upon their property in the form of an easement for recreational trail use and an easement for possible future railroad reactivation upon their property and when each landowners' claim arose by reason of the same NITU issued by the Surface Transportation Board?

## III. THIS CASE SHOULD BE CERTIFIED AS AN OPT-IN CLASS ACTION.

### A. <u>This Court has Authority to Certify a Class Action When Doing So Would Provide For the More Efficient Resolution of Litigation</u>

Rule 23 of the Rules of United States Court of Federal Claims ("RCFC 23") gives this Court the authority to certify class actions. The rule states that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether [a class action] is to be so maintained."[3] In *Quinault Allottee Association and Individual Allottees v. United States*, the United States Court of Claims explained that "there is nothing in the type of jurisdiction we have ... to deprive us of this modern aid to speedier and less repetitious litigation." 453 F.2d 1272, 1274 (Cl. Ct. 1972).

Certification of this proceeding as an opt-in class action pursuant to Rule 23 would conserve substantial resources of this court and the parties and provide for the much more efficient and cost-effective resolution of this litigation.

---

[3] RCFC 23(c)(1).

### B. **This Action Satisfies the Court of Federal Claims' Requirements for Certification of a Class Action.**

Rule 23 of the Court of Federal Claims sets forth the requirements for certifying and maintaining a class action. According to the rule, the class action must satisfy the seven criteria as set forth in *Quinault Allottee Association and Individual Allottees v. United States*[4], the seminal class on class certification. *Testwuide v. United States*, 56 Fed. Cl. 755, 761 (Fed. Cl. 2003). In addition, a court reviewing certification should ask whether certification "would serve the interests of justice by addressing possible statute of limitations problems or other concerns." *Favreau, II v. United States*, 48 Fed. Cl. 774, 776-777 (Fed. Cl. 2000). This case clearly meets Rule 23's requirements for certification of a class action.

#### 1. ***This Action Satisfies the Quinault Criteria for Certification of a Class Action.***

The criteria as set forth in *Quinault* are as follows:

> (i) [the members must] constitute a large but manageable class, (ii) there is a question of law common to the whole class, (iii) this common legal issue is a predominant one, overriding any separate factual issues affecting individual class members, (iv) the claims of the present plaintiffs are typical of the claims of the class, (v) the Government has acted on grounds generally applicable to the whole class, (vi) the claims [of the class members] are so small that it is doubtful that they would be pursued other than through this case, (vii) the current plaintiffs will fairly and adequately protect the interests of the class without conflict of interest, and (viii) the prosecution of individual actions by members of the class, some in district courts and some in this court, would create a risk of inconsistent or varying adjudications. *Id.*

[4] The *Quinault* opinion set out an eighth factor—whether individual suits would create a risk for inconsistent adjudications. Given the Federal Circuit's appellate jurisdiction over Tucker Act and "little Tucker Act" decisions, the eighth factor is not applicable here. See *Christian, II v. United States*, 46 Fed. Cl. 793, 816 (2000) (*citing Berkley v. United States*, 45 Fed. Cl. 224, 234 (1999).

*Quinault*, 453 F.2d at 1276. Despite the foregoing, the *Quinault* court declined to articulate a general rule of standards for certifying class actions and suggested proceeding on a case by case basis. *Glosemeyer*, 45 Fed. Cl. at 230 citing *Quinault*. Additionally, the eighth criterion concerning inconsistent adjudications no longer applies in takings cases.[5] *Moore*, 41 Fed. Cl. at 400.

The decision in *Quinault* stands as the "seminal case in this court regarding class certification." *Testwuide*, 56 Fed. Cl. at 761.[6] Plaintiffs meet all of the *Quinault* criteria, and thus, their Motion to Certify a Class should be granted. We consider each criterion *seriatim* below.

a. *The Proposed Members Constitute a Large But Manageable Class.*

The court is given "wide discretion to determine on a case by case basis if the numerosity requirement is met." *Favreau*, II, 48 Fed. Cl. at 777; *Taylor v. United States*, 41 Fed. Cl. 440, 445 (Fed. Cl. 1998). "In deciding whether a proposed class is manageable, the court considers whether the members are readily identifiable and reachable." *Id.*

(1) Plaintiffs proposed class satisfies the "large" size criterion.

There is no definite rule as to how large a class must be to qualify for certification, but prior cases in this Court have implied that a proposed class size of fifty members or less was too small. *Saunooke v. United States*, 8 Cl. Ct. 327, 333 (Cl. Ct. 1985). The present proposed class size which exceeds fifty or more members is considerable and based upon a sound estimate of an ascertainable number of class

---

[5] This is so because the Court of Appeals for the Federal Circuit "now hears appeals from both the district courts and this court in cases seeking compensation for a taking." *Moore v. United States*, 41 Fed. Cl. 394, 400. *See* 28 U.S.C. § 1295 (1994).

[6] *See also Favreau, II v. United States*, 48 Fed. Cl. 774, 776.

members. *See Evans v. United States Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983) (showing of precise numbers is not required, but mere allegations of numerosity are inadequate) and *Waller v. International Harvester Co.*, 98 F.R.D. 560, 563 (N.D.Ill. 1983) (numerosity requirement not satisfied where class size is purely speculative). Since the proposed class will be made up of those fee landowners who own parcels of property included sections of the 76 mile long easement as of the July 25, 2006 NITU date, prospective class members can be identified by a search of the land title records of the Cochise County Tax Assessor and Recorder of Deeds. The Plaintiff estimates that there are approximately 100 individuals or entities who own fee parcels which include sections of the easement. Some individuals may own more than one parcel.

(2) Plaintiffs' proposed class satisfies the "manageable" criterion.

The Court has required that the class be manageable. By "manageable," the Court "considers whether the members are identifiable and reachable." *Favreau, II*, 48 Fed. Cl. at 777. And in *Hannon v. United States*, the court concluded that plaintiffs met the manageability prong because "[p]laintiffs' counsel has assured that each of the ... plaintiffs could be reached in order to be notified of the pending suit... ." *Hannon v. United States,* 31 Fed. Cl. 98, 103 (Fed. Cl. 1994). This notification could easily be achieved for the proposed class in this case. As mentioned above, the entire class in this case is ascertainable through a search of the records of the Cochise County Tax Assessor and the Recorder of Deeds. The search can retrieve the names and addresses of all those individuals or entities shown to be fee owners of property which included sections of property underlying the abandoned railroad easement on the July 25, 2006 NITU date. Plaintiff's counsel has already undertaken the initial research to identify the number and identity of potential class members.

In prior class certified Trails Act cases this Court required that notice of the lawsuit and right to participate as an opt-in class member shall be sent by first class mail to all fee owners of the land who held title on the date of taking and published in the local community newspaper. This publication is calculated to reach a broad circulation of the community and local landowners. A similar class notification procedure was agreed to by Plaintiff's counsel and Justice Department and ordered by this Court in *Illig v. United States* and *Miller v. United States*. The Plaintiff's anticipate a similar procedure in this case.

The great body of facts common to each landowner's claim further enhances the manageability of this proposed class. All of the proposed class members held fee title to the real estate underlying the abandoned railroad corridor on the July 25, 2006 date of the NITU. All of this property is located along a defined 76 mile stretch of land in Cochise County, Arizona. All the land ownership and tax records are in a common Recorder of Deeds and Assessors Office which maintains title, tax and land records for all parcels.

Further, the pivotal issue in determining the government's liability is common to all potential class members. Namely, what legal interest did the El Paso and Southwestern Railroad have in the property upon which the railroad was constructed in 1903. Many of the potential class members share a common derivation of ownership of the land. (i.e. In 1903 property that today is owned by several fee owners was then owned in a larger tract by a common owner. The conveyance between this common owner and the El Paso and Southwestern Railroad is what established and defined the railroad easement.) This common derivation of title factually unites many of the current landowners and creates a class in which most class members share common factual and

legal title issues. *Hannon*, 31 Fed. Cl. at 101-103 (factual similarities made class more manageable). The railroad right-of-way was established, in large part, by a limited number of conveyances that were recorded in 1903 and are applicable to multiple parcels. The proposed class is not overly large and is manageable. Thus, the first prong of *Quinault* is satisfied.

b. *The Claims of All Potential Class Members Turn on Legal Issues Common to the Entire Proposed Class.*

*Quinault's* second criterion requires that there exist common questions of law for the entire class. The principal legal issue in this case is whether the STB's issuance of the July 25, 2006 NITU "operate[d] to prevent abandonment of the corridor and to preclude the vesting of state law 'reversionary' interests in the right of way." If so, it is a taking of the Plaintiff's and class member's property under the Fifth Amendment of the United States Constitution and requires that they be paid "just compensation".

Two specific legal questions flow from this fundamental question: (1) What interest did the El Paso and Southwestern Railroad hold under Arizona law and the terms of the conveyances that created the railroad corridor? (2) Did operation of Trails Act take the owners' right to use and occupy their property? Both queries are answered by two events common to all fee owners. The first question is answered by Arizona property law and the terms of the conveyances by which the El Paso and Southwestern Railroad acquired a right to operate a railroad across the property in 1903. Whatever rights SPROC had to use the property in 2006 is defined by the interested originally acquired by the El Paso and Southwestern Railroad in 1903.

The second question concerns the legal effect of the events in and around 2006 when the SPROC abandoned the railroad corridor and The Trust for Public Land,