pursuant the Trails Act and the STB's issuance of a NITU sought to acquire the right to use the Plaintiffs' property for a public-access recreational trail and possibly convert it to future railroad use. *See Caldwell v. U.S.* 391 F.3d 1226 (2004), *Barclay v. U.S.* 443 F. 3d 1368 (2006). These central questions of law and fact are common to all members of the proposed class.

The property interests for which potential class members seek compensation are defined by Arizona property law.[7] The Fifth Amendment to the U.S. Constitution requires the payment of "just compensation" for taking of private property for public use.

The common question of Arizona law is whether under the terms of the conveyance documents that created the easement, the SPROC Railroad held a right to use the Plaintiff's property for a public-access recreational trail. The interest acquired by SPROC's predecessor when the easement was constructed was expressly limited to the use the property for the operation of a railroad. The landowners retained fee title. For this reason, all landowners are united by a common legal issue because, even if the railroad held the greatest possible interest in the property short of actual fee ownership, the railroad did not, under Arizona law or under the terms of the conveyances, acquire the

---

[7] Justice O'Connor in *Presault v. Interstate Commerce Commission*, 494 U.S. 1 (1990) wrote: "As the [majority opinion] acknowledges, state law creates and defines the scope of the reversionary or other real property interests affected by the ICC's actions. In determining whether a taking has occurred, [we make] reference to state law…to determine whether a railroad right of way lapsed upon the conversion to trail use." [citations omitted]. 494 U.S. at 20.

When applying a state's statute, this Court is bound to accept the construction placed on the statute by the state's highest court. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 381, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992); *Medical Protective Co. v. Bell*, 912 F.2d 244, 245 (8th Cir. 1990), *cert. denied*, 498 U.S. 1090, 111 S.Ct. 970, 112 L.Ed.2d 1056 (1991).

right, nor have the ability to grant or convey an easement for a public-access recreation trail. This single legal issue is common to all members.

In *Preseault v. United States*, 100 F.3d at 1550 the Federal Circuit held that when an abandoned railroad right of way is converted by operation of the Trails Act into a public use trail the action was a taking of the "reversionary" property owners interest in the property. Therefore, both the state and federal issues are common to the entire proposed class and the second prong of the *Quinault* criteria is satisfied.

c. *The Common Legal Questions Predominate and Override Any Separate Factual Issues Affecting the Individual Members.*

As noted *supra*, the legal issues necessary to resolve these questions are identical for all class members. Furthermore, these issues of Arizona real property law and the Trails Act dominate this case and override separate factual issues.

(1) The proposed class members share common factual issues of title, and where these factual issues are unique, they are not significant.

Because the original grantors of the land were common and limited in number, there are few factual differences among class members title to the property. For instance, the descriptions of the property contained in original deeds would be similar for much of the proposed class members and the property interests in question lie along the same 76-mile stretch of land. Regardless of the nature of the conveyance to the railroad, as long as the railroad did not hold actual fee title, Arizona law provides the same legal answer: the railroad's interest is only an easement and this easement is extinguished when operation of the railroad over the property is abandoned. The subsequent conveyances (from the original property owners who held title when the railroad was built in the 1900's up to the present fee owners) would concern essentially irrelevant factual

differences between class members. The chain of title for many of the property owners would trace back to a common original fee owner who granted the railroad easement. However, as long as each class member can establish his or her own fee ownership, these *mesne* transactions would not be at issue in a resolution of the Government's liability for the taking.

(2) Despite having claims of differing monetary amounts, the potential class members share common factual issues to establish such property valuation.

The primary factual differences among the proposed class of fee owners concern (1) the extent of damages that each class member is entitled to recover for the value of his or her portion of the easement, and (2) whether the class member suffered a temporary or permanent taking. And, the difference between a temporary and permanent taking is, in practical effect, largely one concerning the amount of "just compensation" due the property owner. Neither of these differences prevent class certification.

Once the liability phase has been completed, the determination of damages for separate plaintiffs can be completed. This court has held that class action status should not be ruled out if liability has been established "and quantification of the amount of each plaintiff's damages remains the sole issue... ." *Hannon*, 31 Fed. Cl. at 103. The holding is directly on point in this case because the precise dollar amount of each class member's recovery will differ depending on the size and nature of the taking and the severance damages.

The *Hannon* court explained further that differing facts concerning damages did not prevent class certification because "[i]n all likelihood, such damages could be computed mechanically." *Id.* Such a mechanical determination of damages could be applied to this case, as discussed in *Hannon*. In other Trails Act cases, the Justice

Department and Plaintiffs' counsel have agreed upon a property valuation approach that uses a formula to assist in determining efficiently and fairly the amount of compensation for each class member based upon the location of the property and the amount of acreage affected. The character of much of the property is similar, the 40 to 60 parcels on the North - South segment of the abandoned right-of-way share common factors in appraising the value of the interest taken. Similarly, the 40 to 60 parcels on the East - West segment of the right-of-way share similar traits affecting the value of the interest taken.

While discussing the possibility of allowing joinder of 1,218 plaintiffs the court in *Abel v. United States*, 18 Cl. Ct. 477 (Cl. Ct. 1989), remarked that it "has never expressed any concern nor had any difficulty dealing with cases involving hundreds of party plaintiffs… ." 18 Cl. Ct. at 479 (quoting *O'Hanlon v. United States*, 7 Cl. Ct. 204, 206-207 (Cl. Ct. 2004)). By this statement, the court implicitly recognized that the determination of damages for the various class members should not render a class action unworkable. Thus, the differing damages between the class members are, in a sense, expected and do not override the common legal issues.

Because there are few factual differences in each class member's case and because the differences that exist go to facts which do not prevent class certification, the common legal issues predominate and override those differences. Plaintiffs, therefore, have satisfied the third prong of the *Quinault* criteria.

Further, in other takings cases under the Trails Act, in which Plaintiff's counsel has represented property owners (*Illig v. United States* and *Miller v. United States*) efficient methods to value each class members' property were developed by agreement

between Plaintiffs' counsel and the Justice Department. The parties selected representative parcels for certain general classes and agreed to use the designated parcels as a proxy to establish a value that could be applied to other like parcels (e.g., similar sized residential parcels in the same neighborhood). This meant that not every parcel needed to be separately appraised. This was a substantial savings of time and money. Plaintiff's counsel believes that a similar valuation approach would be appropriate in this matter should this be certified as an opt-in class action.

d. *The Claims of the Named Plaintiffs Are Typical of the Claims of the Class.*

*Quinault* requires that the claims of the named Plaintiffs be typical of the claims of the potential class. This criterion is satisfied by the common factual and legal issues noted *supra*.

The Court of Federal Claims has not provided extensive guidance concerning what factors contribute to the analysis of this criterion. In *Hannon*, however, the court held that because the named Plaintiffs had causes of action under the same statutes as the class members, this criterion was satisfied. 31 Fed. Cl. at 104. *Hannon* also applies in this case where all of the named Plaintiffs and the class members are bringing claims premised upon common legal theories of recovery under Arizona real property law and by operation of the Trails Act which worked a taking of their property.

Further, all Plaintiffs' claims (whether for a permanent or a temporary taking) arose upon the STB's issuance of a single NITU that applied equally to all claims. The factual similarities between the named Plaintiffs and the proposed class members also indicate that this criterion is satisfied. Each of these Plaintiffs, named and unnamed, owns fee simple title to land along right of way in issue. As a group, the named Plaintiffs represent one geographic area. In other words, the named Plaintiffs mirror the entire

class factually. The named Plaintiffs include those who have a claim for the temporary taking and those with a claim for the permanent taking of their property. In this case, consequently, where factual similarities abound, and the named Plaintiffs are bringing a cause of action premised on the same legal theories, the criterion of typicality—that the named Plaintiffs' claims be typical of the claims of the potential class—is satisfied.

e. *The Government Has Acted on Grounds Applicable to the Whole Class: When the STB Issued the NITU it Took the Property of Each Class Member Simultaneously and in Like Manner.*

The enactment of the Trails Act by Congress and its specific application to the particular real estate underlying the former El Paso and Southwestern Railroad right-of-way easement, was triggered on July 25, 2006 when the STB issued the NITU. (See *Barclay* and *Caldwell*, supra.) This action by the STB is applicable to and had a common effect upon the entire class and all property subject to the July 25, 2006 NITU.

According to *Armitage*, the key to this criterion is that the Government action cannot "implicate matters unique" to an individual plaintiff in the liability phase. 18 Cl. Ct. at 313. *Hannon* concluded that this criterion was met when the Government action had the same general impact upon the class. 31 Fed. Cl. at 103. This case, in the same way, meets the standards set out in both of these decisions. The property interest of each class member in the railroad right-of-way was taken without any compensation. The STB's action issuing the NITU "operate[d] to prevent abandonment of the corridor and to preclude the vesting of state law 'reversionary' interests in the right of way" has affected each potential class member in the same manner. Each class member has been denied the right to enjoy his or her own property.

f. *Some of the Class Members' Claims are Fairly Small, Creating Doubt that Individual Claims Would be Pursued if Certification was Denied.*

There is doubt that some individual claims would be pursued if certification is denied because some of the potential class members' claims and respective amounts in controversy are fairly small relative to the cost necessary to individually present these claims. According to *Armitage*, the application of this criterion may be framed as follows: "Is a class action the only viable way for most putative class members to bring their claim?" 18 Cl. Ct. at 313.

A number of the class members own small parcels of land that are traversed by the right-of-way. Some of these claims (especially for the property in the town of Naco, Arizona) involve land encumbered by the easement a few hundred feet (or less) in length. Because the area of these smaller parcels is small, the attorney fees and other costs of bringing the action for the individual claim would greatly exceed the value of the claim. In *Hannon* in which the court concluded that claims under one thousand dollars ($1,000) each were insufficient to encourage individual litigation. 31 Cl. Ct. at 103-104. *See also, Armitage*, 18 Cl. Ct. at 313 (estimate that the average claim of $500 to $1000 probably justifies class action). It is not feasible for many of these smaller landowners to separately initiate litigation against the United States Government. Litigation costs would easily exceed the amount of individual owner's damages and, therefore, it is doubtful that class members would pursue their individual claims. Consequently, a class action is the only vehicle by which many class members (especially the residential property owners) will be able to bring their respective claims.

g. *The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class Without a Conflict of Interest.*

The named Plaintiffs will fairly and adequately protect the interests of the class. In order to satisfy this criterion, a plaintiff must demonstrate that the counsel for the class is adequate and that the named Plaintiffs do not have any conflicts of interest with class members. According to *Quinault*, "counsel must be qualified, experienced, and generally able to conduct the proposed litigation" in order for this criterion to be satisfied. 453 F.2d at 1276 (*quoting Eisen*, 391 F.2d at 562). Additionally, there must be no significant conflicts between the named Plaintiffs and the potential class members. *Saunooke*, 8 Cl. Ct. at 333.

(1) The Plaintiff's Are Represented by Experienced Counsel

The named Plaintiffs are represented by experienced and highly skilled counsel who meets the standard set by *Quinault*. The Plaintiff's lead counsel, Mark F. (Thor) Hearne, II, is a member and principle with the law firm Lathrop & Gage L.C.. Mr. Hearne has more than twenty years of experience in real estate, land use regulation, and related federal and state litigation. Mr. Hearne is admitted to practice before the United States Supreme Court, the Supreme Courts of Michigan and Missouri and the United States Courts of Appeals for the Eighth, Seventh, Sixth and Second Circuits and in the Court of Appeals for the Federal Circuit. Mr. Hearne has received an "AV" rating from Martindale-Hubbell and has been selected as a Missouri/Kansas "Superlawyer" for 2005, 2006 and 2007 and was recently named one of Missouri's "Top Lawyers" by the *Missouri Lawyer Weekly*. Mr. Hearne has represented clients in numerous federal civil rights litigation involving constitutional (including Fifth Amendment) claims. Mr. Hearne has testified concerning constitutional and civil rights matters before the United

States Senate Judiciary Committee, United States House of Representatives Committee on Administration and various other federal agencies including the United States Commission on Civil Rights.

Further, and of particular relevance to this action, Mr. Hearne has extensive experience practicing before this Court representing property owners in Trails Act taking cases. Mr. Hearne has represented (or is currently representing) property owners in eight different Trails Act taking cases. (*Illig v. United States, Miller v. United States, The Town of Grantwood Village v. United States, Ladd v. United States, Birdbay Executive Golf Course v. United States, Pankratz v. United States, and Biery v. United States.*) Two of these cases, *Miller* and *Illig*, were certified as class actions in the U.S. Court of Claims and each included claims by approximately 100 landowners. *Miller v. United States*, involved a similar class action Trails Act taking case in which the class of approximately 100 property owners were represented by Mr. Hearne. At the conclusion of that almost three year case, Judge Bruggink wrote of Mr. Hearne and his co-counsel, "Counsel, moreover, did an excellent job throughout the litigation." *Miller v. United States*, No. 03-2489L, Order approving class settlement in excess of $8.15 Million and awarding attorney fees and costs. (Docket # 124, November 17, 2006 at 4.)

Mr. Hearne is a member of the Lathrop & Gage L.C. law firm, a firm with approximately 250 attorneys, many with extensive real estate experience, especially experience with the unique issues of real estate law related to railroad land title. Lathrop & Gage maintains an office in Washington, D.C. just blocks from the U.S. Court of Claims and routinely handles cases in both the U.S. Court of Claims and The Court of

Appeals for the Federal Circuit. Mr. Hearne's firm possesses the financial and personnel resources necessary to represent the Plaintiffs and the class in this case.

(2) These Potential Class Members Have No Conflict of Interest.

None of the named Plaintiffs has a conflict of interest concerning this matter. In *Saunooke*, the court held that this factor was not satisfied when the named Plaintiffs sought to litigate legal issues peculiar to only themselves, with no consideration to potential issues that could be raised by other members of the proposed class. 8 Cl. Ct. at 333.

The Supreme Court's denial of class certification in *Amchem Products, Inc. v. Windsor* is instructive as to what constitutes a conflict between class representatives and the class members. 117 S.Ct. 2231 (1997). In that case, the Court held that representatives must possess the same interest and suffer the same injury as the class members. *Id.* at 2250-2251, quoting *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) quoting *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 216 (1974). The conflict in *Amchem Products* existed because class members already suffering from asbestos diseases had an interest in seeking the maximum immediate payments, thereby diminishing funds available to class members who were exposed to asbestos but who had not yet suffered any malady, and might not for years or even decades. *Id.* at 2251.

All damage that could possibly be done to each class member in this case has already occurred; no further damages could happen to one member thereby creating a separate cause of action for that class member, as was the case in *Amchem Products*. Each named Plaintiff here seeks the same objective as the other class members—to

recover "just compensation" the appropriate award for property taken from them by the U.S. Government.

Because the named Plaintiffs are represented by skilled counsel and do not have any conflicts of interest with prospective class members, the seventh *Quinault* criterion is satisfied. Therefore, all of the *Quinault* criteria are satisfied and class action should be certified.

### 2. ***Class Certification is the Most Efficient Way to Proceed in this Case, and as such, Serves the Interests of Justice.***

Certification in this case would serve the interests of justice. The class size, litigation efficiencies, and proposed "opt in" class method are all attributes justifying class certification.

The proposed class represents approximately 100 potential individual cases against the U.S. Government all seeking compensation resulting from the temporary or permanent taking of private property along the same 76 mile stretch of property. As such, certification of a class action is clearly the most efficient way to proceed. Instead of having close to 100 different cases, with multiple counsel and experts assigned to different trial judges, there will be one Plaintiffs' counsel working with common experts before one judge. Additional efficiencies are gained through the use of common title research and a unified approach to the appraisal of property values. There will be only one action to resolve the common factual and legal questions. The most substantial benefit of class certification is enjoyed by the Government since class certification provides an efficient method for the class members to present their claims and for the Government to answer those claims and resolve legitimate claims in a cost-efficient manner with limited attorney fees and expenses.

The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. §4654 (c)(2000) provides that the Government is required to pay the Plaintiff's attorneys' fees and costs. The attorneys' fees, costs, expert witness and appraisal fees for 100 separate actions would greatly exceed the expense for one combined class action. The certification of this case as a class action, therefore, benefits the Government by reducing the potential amount of the Government's liability for Plaintiffs' attorney's fees and other costs.

The Plaintiffs propose an "opt-in" class which is the only type of class action that this Court will certify.[8] Certification of an "opt in" class means that potential members will not be included unless they take affirmative steps to join the suit after receiving notice. Plaintiffs and their counsel bear the burden (and the initial expense) of notifying the potential class members. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). The Court of Federal Claims has indicated its disfavor of "opt-out" classes in which potential class members are automatically included unless they take action to remove themselves as participants in the suit. *Armitage v. United States*, 18 Cl. Ct. 310, 312 (Cl. Ct. 1989); *Quinault*, 453 F.2d at 1276-1277. Should a potential class member desire, they can choose not to opt-in to this case and they would remain free to initiate their own independent action.

---

[8] *See* Rules Committee Note to RCFC 23: "Additionally, unlike the federal rule, the court's rule contemplates only opt-in class certifications, not opt-out classes. The latter were viewed as inappropriate here because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers—the typical focus of an opt-out class—are more limited than those of a district court."

For the foregoing reasons, the interests of justice are served because the interests of judicial economy and efficiency are served. Consequently, certification of the class is warranted.

### 3. ***This Court Has Granted Class Certification in Other Trails Act Cases.***

Not only does this matter clearly satisfy the Court's requirements for certification of a class action, but this Court has already certified numerous other class actions involving similar takings claims under the Fifth Amendment and the Trails Act. *See, Miller v. U.S.* (No. 03-2489); *Hubbert v. U.S.* (No. 99-396L); *Illig v. U.S.* (No. 98-934L); *Moore v. U. S.* (No. 93-134L); and, *Glosemeyer v. U.S.* (93-126L). Likewise, the Defendant has not opposed class certification in the recently filed Trails Act taking case *Rogers v. U.S.* (No. 07-273L).

## IV. CONCLUSION

In *Quinault*, this Court stated that "[t]here is no reason why this court cannot use [class action lawsuits] if [they are] appropriate." *Quinault*, 453 F.2d at 1274. As this Memorandum demonstrates, Plaintiffs' case is particularly suited to class action certification. Certifying this matter as an opt-in class action pursuant to Rule 23 will: (1) serve judicial economy and efficiency; (2) satisfy all of the *Quinault* criteria; and, (3) provide the most effective means to resolve the common issues of Arizona real property law and the other common factual issues.

For all of the foregoing reasons, this case should be certified as a class action pursuant to Rule 23.

Respectfully submitted,

LATHROP & GAGE L.C.

Date: Oct 15, 2007 By ______________________________

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
(*admission pending*)
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
613-2500
613-2550 (fax)
Thornet@ix.netcom.com
ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this 15th day of October 2007, a true and correct copy of the foregoing document was sent by first class mail postage prepaid and by e-mail to the following counsel of record .

Rachel A. Dougan
Attorney for Defendants
Resurces Division
Natural Resources Section
Benjamin Franklin Station, P.O. Box 663
Washington, D.C. 20044-0663
Dougan@usdoj.gov

Mark F. (Thor) Hearne II