**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| JACK LADD and MARIE LADD, et al.<br><br>For Themselves and As Representatives of a Class of Similarly Situated Persons,<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 07-271L<br><br>Honorable Robert H. Hodges, Jr. |

---

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
Lathrop & Gage, LC
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
314.613.2500 (Phone)
314.613-2550 (fax)
Thornet@ix.netcom.com
ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

**Page**


I. SUMMARY OF THIS MOTION ....... 1

II. FACTUAL BACKGROUND ....... 2

A. The railroad right-of-way that crossed the Plaintiffs' land was an easement acquired in 1903 by the El Paso and Southwestern Railroad and this easement only allowed the railroad, as holder of the easement, to use the Plaintiffs' land for the operation of a railroad. ....... 2

B. The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to the El Paso and Southwestern Railroad. Each Plaintiff held fee title to their property abutting and underlying the former El Paso and Southwestern Railroad right-of-way on July 25, 2006, the date the STB issued a NITU. ....... 4

C. The successor to El Paso and Southwestern Railroad, the San Pedro Railroad Operating Company, LLC ("SPROC"), abandoned the railroad easement in 2005 ....... 4

D. On July 25, 2006, the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU") which *inter alia* precluded the Plaintiffs' reversionary rights to their property. ....... 7

III. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE UNDER RULE 56 RCFC ....... 10

IV. SUMMARY JUDGMENT RESTS UPON WELL-SETTLED PRINCIPLES OF FEDERAL LAW ....... 11

A. The Federal Trails Act Operates To Preclude Or Preempt The Abandonment And Reversion Of A Railroad Right-Of-Way That Would Have Otherwise Occurred By Operation Of State Law. ....... 11

B. The Settled Law After *Preseault* is that State Law Determines the Nature of a Property Interest Subject To the Trails Act and When the Owner's Enjoyment of That Interest is Delayed or Burdened, "Just Compensation" is Due. ....... 15

C. When The Federal Trails Act Operates To Preclude Or Preempt The Abandonment And Reversion Of A Railroad Right-Of-Way It Is A Taking of The Land Owner's Property For Which The Federal Government Must Pay "Just Compensation" ....... 16

D. The Property Owner's Interest in their Land Is Taken Under The Trails Act At The Time The STB Issues a NITU. ....22

V. SUMMARY JUDGMENT RESTS UPON WELL-SETTLED PRINCIPLES OF ARIZONA LAW ....28

A. Under Arizona Law, The El Paso And Southwestern Railroad Acquired Only An Easement For Its Railroad Right-Of-Way. ....28

B. An Railroad Easement Is Granted For The Limited Purpose of Operating A Railroad And When The Use Of The Property For This Purpose Is Abandoned, The Easement Is Extinguished. ....34

C. The SPROC Abandoned the 76 Mile Railroad Easement In 2005. ....37

VI. WHEN THE TRAILS ACT PRECLUDES A PROPERTY OWNER FROM ENJOYING THEIR "REVERSIONARY" RIGHT TO PROPERTY, WHICH THE OWNER ENJOYS UNDER STATE LAW, IT IS A *PER SE* TAKING OF THAT PROPERTY OWNER'S LAND FOR WHICH THE FIFTH AMENDMENT REQUIRES THE FEDERAL GOVERNMENT TO PAY "JUST COMPENSATION" ....39

A. When the Trails Act precludes a property owner's "reversionary" right to property, it is a taking that requires payment of "just compensation" to the property owner. ....39

B. When The Trails Act Imposes New Burdens And Servitudes Upon A Land Owners Property Such As An Easement For The Possible Creation Of A Public-Access Recreational Trail, As Well As A Future Easement For Railroad Use, It Is A Substantial *Per Se* Physical Taking Of That Property Owner's Property. ....40

V. CONCLUSION ....44

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Liberty Lobby*,
477 U.S. 242 (1986) ........ 13

*Armstrong v. United States*,
364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) ........ 44

*Atlantic & P.R. Co. v. Lesueur*,
19 P. 157 (Ariz. Terr. 1888) ........ 31, 32, 33, 36

*Barclay v. U.S.*,
127 S.Ct. 1328 (U.S. Feb. 20, 2007) ........ 29

*Barclay v. United States*,
443 F.3d 1368 (2006) ........ 28, 29, 30, 42

*Beres v. United States*,
64 Fed. Cl. 403 (2005, Judge Horn) ........ 23, 35

*Blendu v. United States*,
75 Fed. Cl. 543 (2007, Judge Hewitt) ........ 23, 35

*Board of Regents v. Roth*,
408 U.S. 564 (1972) ........ 18

*Boyd v. Atchison, T. & S.F. Ry. Co.*,
4 P.2d 670 (1931) ........ passim

*Boyd v. U.S.*,
116 U.S. 616 (1886) ........ 46

*Boyles v. Missouri Friends of the Wabash Trace Nature Trail, Inc.*,
981 S.W.2d 644 (Mo.App.W.D. 1998) ........ 40, 42

*Brower v. County of Inyo*,
489 U.S. 593 (1989) ........ 46

*Caldwell v. United States*,
391 F.3d 1226 (Fed. Cir. 2004) ........ passim

*Campbell v. Willard*,
45 Ariz. 221, 42 P.2d 403 (1935) ........ 31

*Celotex Corporation v. Cattrett*,
477 U.S. 317 (1986) .......... 13

*City of Scottsdale v. Thomas*,
753 P.2d 1207 (Ariz. App. 1988) .......... 38

*Clark v. New Magma Irrigation and Drainage Dist.*,
92 P.3d 876 (Ariz. App. 2004) .......... 36

*Davis v. MCI*,
606 So 2d 734 (Fl. App., 1992) .......... 31

*Drazich v. Lasson*,
964 P.2d 324 (Utah App. 1998) .......... 37, 41

*Ellamae Phillips Co. v. United States*,
77 Fed. Cl. 387 (2007, Judge Baskir) .......... 23, 35

*Entick v. Carrington 19 Howell's State Trials 1029*,
95 Eng. Rep. 807 (C.P. 1765) .......... 46

*EP&S.W. System v. United States,*
60 Ct. Cl 978 (1925) .......... 6

*Glosemeyer v. United States*,
45 Fed. Cl. 771 (2000) .......... passim

*Grantwood Village v. United States,*
95 F.3d 654 (1996) .......... 21, 47

*Great Northern Ry. Co. v. United States*,
62 S.Ct. 529 (1942) .......... 31, 34

*Harvest Queen Mill & Elevator Co. v. Sanders*,
370 P.2d 419 (Kan. 1962) .......... 37

*Hash v. United States*,
2007 WL 1309548 (Feb. 1, 2007) .......... 21

*Hash v. United States*,
403 F.3d 1308 (Fed. Cir, 2005) .......... passim

*Hennick v. Kansas City Southern Ry. Co.*,
269 S.W.3d 646 (1954) .......... 40

*Huff v. Langman*,
646 N.E.2d 730 (Ind. App. 1995) .......... 37

*Hunt v. Richardson*,
163 P.3d 1064 (Ariz. App. 2007) ........ 38

*Illig v. United States*,
58 Fed. Cl. 619 (2003) ........ 22, 28, 47

*International News Service v. Associated Press*,
248 U.S. 215 (1918) ........ 45

*John R. Sand & Gravel Co. v. United States*,
127 S.Ct. 2877 (2007) ........ 28

*Kaiser Aetna et al. v. United States*,
444 U.S. 164 (1979) ........ 45

*Lawson v. State*,
107 Wash.2d 444, 730 P.2d 1308 (1986) ........ 38

*Love v. U.S.*,
889 F. Supp. 1548 (E.D.N.C. 1994) ........ 37

*Loveland v. CSX Transp., Inc.*,
622 So.2d 1120, 122 (Fla.App. 1993) ........ 38

*Michigan Dept. of Natural Resources v. Carmody-Lahti Real Estate, Inc.*,
699 N.W.2d 272 (Mich. 2005) ........ 37

*Miller v. United States,*
67 Fed.Cl. 542 (2005) ........ 29

*Moore v. United States,*
63 Fed.Cl. 781 (2005) ........ 21, 47

*Nat'l Assoc. of Reversionary Property Owners v. Surface Transp. Bd.*,
158 F. 3d 135 (D.C. Cir. 1998) ........ 24

*Neider v. Shaw*,
65 P.3d 525 (Idaho 2003) ........ 37

*Oregon v. Elstad*,
470 U.S. 298 (1985) ........ 12

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ........ 44

*Pinkerton v. Pritchard*,
223 P.2d 933 (Ariz. 1950) ........ 38

*Pollnow v. Department of Natural Resource,*
276 N.W.2d 738 (1979) ........................................................................................... 41

*Portsmouth Co. v. United States*,
260 U.S. 327 (1922)................................................................................................. 45

*Preseault v. United States,*
100 F.3d 1525 (Fed.Cir. en banc 1996) ...................................................................passim

*Preseault v. United States*,
494 U.S. 1 (1990).....................................................................................................passim

*Renewal Body Works, Inc. v. United States*,
443 F.3d 1368 (2006)....................................................................................... 28, 30, 42

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984)............................................................................................ 17, 18

*Schmitt v. United States*,
203 F.R.D. 387 (S.D. Ind., 2001)....................................................................... 23, 24

*Seventy-Ninth Street Improv. Corp. v. Ashley*,
509 S.W.2d 121 (Mo. 1974) ..................................................................................... 38

*Silverman v. United States*,
365 U.S. 505 (1961)................................................................................................. 46

*Southern Pacific Transportation Co. v. Commissioner of Internal Revenue*,
75 T.C. 497 Tax Court (1980) ..................................................................................... 6

*Swisher v. United States*,
176 F. Supp.2d 1100 (D. Kan, 2001)......................................................................... 24

*Territory of Arizona v. Richardson* et al.,
8 Ariz. 336, 76 P. 456 (1904)..................................................................................... 31

*Toews v. United States*,
53 Fed. Cl. 58 (2002) .................................................................................................passim

*Towes v. United States,*
376 F. 3d 1371 (2004)............................................................................... 1, 20, 45, 47

*United States v. Causby*,
328 U.S. 256 (1946)................................................................................................. 45

*United States v. Lefkowitz*,
285 U.S. 452 (1932)................................................................................................. 46

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
449 U.S. 155 (1980) ........ 17, 18

*Zoltek Corp. v. U.S.*,
442 F.3d 1345 (2006) ........ 12

**Statutes**

16 U.S.C. §1241 et seq. (Supp. II 1996) ........ 1

1906 Act ........ 29, 33

1983 Trail Act ........ 41

28 U.S. C. § 1346 (a)(2) ........ 21

28 U.S.C. § 1491(a) ........ 10

43 U.S.C. § 944 (2000) ........ 33

43 U.S.C. §§ 934-39 (2000) ........ 3

49 U.S.C. § 10502 ........ 6, 38

5 Restatement of Property § 482 ([A.L.I. ed.] 1944) ........ 35

Ariz. Rev. Stat § 40-814 ........ 38

Ariz. Rev. Stat § 40-814 (2007) ........ 37

General Railroad Right-of-Way Act of 1875 ........ 3, 29, 32, 33

General Right-of-Way Act of 1865, 43 U.S.C. § 944 (2000) ........ 36

Homestead Act of 1862 ........ 18

Paragraph 2151, subd. 4, Rev. St. Ariz. 1913 (Civil Code) ........ 38

Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210,
90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.) ........ 14

Restatement of Property § 504 ........ 37

**Other Authorities**

Jon. W. Bruce and James W. Ely, Jr., The Law of Easements and Licenses in Land ¶
8.02[1], at 8-3 (rev. ed. 1995) ........ 35

U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "Litigation and Its Effect on the Rails-to-Trails Program," June 20, 2002 ........ 12

**Rules**

RCFC 56 ........ 1

RCFC 56(c) ........ 10

## I. SUMMARY OF THIS MOTION

This case is a claim by eight Arizona landowners[1] seeking the "just compensation" they are due under the Fifth Amendment to the United States Constitution for the federal government's taking of their property.[2] The Plaintiffs have filed this motion under the Rule 56 of the Court of Federal Claims ("RCFC") requesting that this Court enter partial summary judgment against the Defendant, the federal government, on the issue of the government's obligation to pay the Plaintiffs for taking their property.

The federal government took the Plaintiffs' property when Section 8(d) of the 1983 Amendments to the National Trails System Act ("Trails Act")[3] "precluded" or prevented them from enjoying their "reversionary"[4] right to their land which they enjoyed under Arizona law, and imposed two new easements upon their property, one easement allowing for the creation of a public-access recreational trail, and a second easement allowing the Plaintiffs' property to be used in the future for operation of a railroad. Summary judgment should be entered against the Defendant on the basis of two uncontested facts: (1) on July 25, 2006, the Plaintiffs held fee title to land in Arizona which was (or had been) subject to an easement for a railroad right-of-way;

---

[1] Several of the property owners are husband and wife, family trusts, or other entities. We group these together as a common owner for purposes of this memorandum.

[2] Plaintiffs' Motion for Class Certification, which proposes a class size of approximately one hundred similarly situated Cochise County landowners, is currently pending before this Court. The Defendant does not oppose the class certification.

[3] Pub. L. 98-11, 97 Stat. 48, to the National Trails System Act, Pub. L. 90-543, 82 Stat. 919 (codified, as amended, at 16 U.S.C. §1241 et seq. (Supp. II 1996)).

[4] Plaintiffs use the term "reversionary" or "reversion" in this memorandum in the generic sense to describe the Plaintiff's property interest. We employ the term in this generic sense because it is commonly used in this manner by courts considering Trails Act taking cases. This is not a technically correct use of the term. As the Federal Circuit has noted, "as a matter of traditional property law terminology, a termination of the easements would not cause anything to "revert" to the landowner. Rather, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden." *Towes v. United States,* 376 F. 3d 1371, 1376 (2004).

and (2) on July 25, 2006, the STB issued a NITU that "forestalled" the Plaintiffs' reversionary right to property over which this railroad right-of-way ran.

On the basis of two uncontested facts and well-settled law, judgment should be entered against the Defendant on its obligation to pay "just compensation" to the Plaintiffs for the taking of their property when the Trails Act precluded the Plaintiffs from enjoying their reversionary rights to property they owned under Arizona law and imposed upon that property an easement for the possible creation of a public-access recreational trail and an easement for a possible future railroad.

## II. FACTUAL BACKGROUND

### A. The railroad right-of-way that crossed the Plaintiffs' land was an easement acquired in 1903 by the El Paso and Southwestern Railroad and this easement only allowed the railroad, as holder of the easement, to use the Plaintiffs' land for the operation of a railroad.

#### 1. How the Right-of-Way Was Established.

Beginning in 1903, the El Paso and Southwestern Railroad acquired a seventy-six mile long right-of-way to construct and operate a railroad from Benson, Arizona south along the San Pedro River to a point several miles north of the Mexican boarder where this right-of-way then turned east and ran to the towns of Bisbee and Douglas. "Once known as 'the Queen of the Copper Camps,' this Old West mining camp proved to be one of the richest mineral sites in the world, producing nearly three million ounces of gold and more than eight billion pounds of copper, not to mention the silver, lead and zinc that came from these rich Mule Mountains."[5] By the early 1900s, Bisbee was the largest city between St. Louis and San Francisco.[6]

---

5 "Bisbee History," Bisbee Visitor Center, accessible online at www.discoverbisbee.com/about_hist.htm. *See also* Boyd Nichol, *Bisbee Arizona Then and Now*, Cowboy Miner Productions, 2003.

6 *Id.*

This right-of-way was acquired by conveyances from private property owners over whose land the right-of-way crossed and from the United States over land then owned by the United States. Since the railroad was established in 1903, some of the property originally owned by the United States was transferred by land patent to private property owners.

*(a) The right-of-way grants from the federal government were only a grant of an easement for the purpose of operating a railroad.*

In 1875, Congress passed the General Railroad Right-of-Way Act of 1875 ("1875 Act"),[7] which authorized the federal government to convey federal grants of right-of-way to encourage development of the western states and territories.

Pursuant to the 1875 Act, the federal grants of right-of-way within the state of Arizona were intended to convey merely an easement for railroad purposes. Private individuals who later acquired this land over which the right-of-way passed acquired fee simple title to the land, including fee simple title to that land under the right-of-way, subject only to the railroad's easement for a right-of-way. Pursuant to the 1875 Act, when these right-of-ways were abandoned, they were to revert back to the fee owners of the property (the successors in title to the settlers or entry men who had acquired fee title to the underlying property).

*(b) The right-of-way grants from private owners were only a grant of an easement for the purpose of operating a railroad.*

The remaining portions of the right-of-way were acquired by easement conveyances from individual land owners, which were similarly limited to use of the property for operation of a railroad.[8] These conveyances explicitly state that the easement was granted solely "for a right-of-way of the El Paso & Southwestern Railroad, through, along and over the same" land and that

---

[7] 43 U.S.C. §§ 934-39 (2000).

[8] *See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraphs 3(a)-3(k) and Tabs A-K, for a complete recital of these additional easement conveyances by which the right-of-way was established.

the railroad was "to have and to hold the said tract, pieces and parcels of land and premises, as and for a right-of-way for said railroad."[9] These conveyances did not convey any rights or interests to the land other than a right-of-way "through, along, and over" the land for the purpose of operating a railroad.

**B. The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to the El Paso and Southwestern Railroad. Each Plaintiff held fee title to their property abutting and underlying the former El Paso and Southwestern Railroad right-of-way on July 25, 2006, the date the STB issued a NITU.**

The Plaintiffs are a group of eight families, individuals, and associations that own property in Cochise County, Arizona. Each of the Plaintiffs held fee title to property that was once burdened by an easement originally granted to the El Paso and Southwestern Railway for the limited purpose of operating a railroad across the property. For most of the Plaintiffs, their property is their home or ranch where they earn their living. For several, their property has been in their family since their ancestors originally acquired the property by land patents from the United States.[10]

**C. The successor to El Paso and Southwestern Railroad, the San Pedro Railroad Operating Company, LLC ("SPROC"), abandoned the railroad easement in 2005.[11]**

The original El Paso and Southwestern Railroad was part of the El Paso and Southwestern System of Railroads.[12] The El Paso and Southwestern subsequently merged into

---

[9] *See id.*

[10] *See* Appendix 1 for a fuller description of each property owner and how they acquired their land and each property owner's title on July 25, 2006.

[11] We note that the Defendant concedes that a taking of a landowner's property occurs upon the STB's issuance of the NITU whether or not the railroad has abandoned the right-of-way. (*See*, Appendix 5).

[12] *See EP&S.W. System v. United States,* 60 Ct. Cl 978 (1925) for a discussion of the El Paso and Southwestern System of Railroad's ownership (Involving a claim for fares related to military traffic under an agreement with the federal government).

the Southern Pacific Company.[13] In November 2003, The San Pedro Railroad Operating Company, LLC ("SPROC") acquired the right-of-way from SWKR Operating Company, the successor to the Southern Pacific.[14]

The SPROC acquired the right-of-way with the intent of operating a rail line providing NAFTA-related freight service to Mexico.[15] This plan required that the railroad line obtain a border crossing at Naco, Arizona from Ferromex, the Mexican railroad on the other side of the US/Mexican border at Naco.[16] SPROC failed to persuade Ferromex to restore that gateway.[17] On January 25, 2005, Ferromex emailed SPROC's David Parkinson stating that it was not willing to consider re-establishing the international connection at Naco, stating, "[a]t this time, we are not considering the opening of a new gateway at Naco because the potential volume does not justify investment and operating expenses."[18]

The SPROC's plan "never materialized."[19] Instead, the SPROC carried coal and coke for Chemical Lime, the only on-line shipper, for approximately eight months.[20] SPROC subsequently determined that "Chemical Lime's projected level of traffic – between 380 and 500 carloads per year – is inadequate to sustain the railroad."[21] As such, the SPROC "decided to

---

[13] *See Southern Pacific Transportation Co. v. Commissioner of Internal Revenue*, 75 T.C. 497 Tax Court (1980).
[14] STB, Docket No. AB-1081X, November 9, 2005 decision. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 41, Tab DD.)
[15] STB, Docket No. AB-1081X, February 3, 2006 decision. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 42, Tab EE.)
[16] *See* Tab DD, STB's November 9, 2005 decision.
[17] E-mail correspondence from Ferromex to SPROC's David Parkinson, dated January 25, 2005. (*See* Plaintiffs Proposed Findings of Uncontroverted Fact paragraph 44, Tab FF.)
[18] *Id.*
[19] *See* Tab EE, STB's February 3, 2006 decision.
[20] *Id.*
[21] *Id.*

abandon the line in March 2005 due to limited freight business and the lack of prospects for prospects for future traffic increases."[22]

Three months after the SPROC decided to abandon the line, it received notification from the Federal Railroad Administration "recommending that SPROC cease railroad operations over the line due to the poor condition of a bridge at milepost 1044.4 at the northern end of the Douglas Branch."[23] Accordingly, the SPROC "filed an embargo notice with the Association of American Railroads on June 16, 2005, and renewed the embargo of September 22, 2005."[24] The SPROC has not operated any railroad cars on this line since June 16, 2005.

"SPROC also states that, in August 2005, heavy rains damaged substantial segments of the line."[25] SPROC subsequently advised Chemical Lime of the need to make "other transportation options."[26] During its eight months of operation, the SPROC calculates that it incurred a loss of $251,410 and would incur an additional loss of $277,736 the following year if it continued to operate.[27]

For these reasons, SPROC filed a petition on October 17, 2005 with the STB seeking an exemption under 49 U.S.C. 10502 to abandon the obligation to provide railroad service over the seventy six mile long railroad line.[28]

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.* Further, "it would need to invest approximately $710,030 in rehabilitation work to bring the line up to FRA class 1 track standards…it would cost $731,500 to repair all bridges on the line, including $136,496 to repair the bridge at milepost 1044.4…[and the SPROC] estimates the subsidy, including capital cost to restore the line to operations, at $1,798,221 and an annual opportunity cost of $19,974." *Id.*
[28] STB, Docket No. AB-1081X, November 4, 2005 decision. (See Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 56, Tab GG.) The abandoned railroad line was described as:

On November 9, 2005, the STB found that:

> The subject line currently carries no commodities because the condition of a railroad bridge located at MP 1044.4 has deteriorated so substantially that the Federal Railroad Administration instructed SPROC to suspend operations over the bridge, effectively ending all rail service . . . An embargo was posted on June 16, 2005, renewed on September 22, 2005. Flooding on the line in August, 2005 seriously damaged track and structures over a 16 mile segment of the line….[29]

**D. On July 25, 2006, the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use or Abandonment ("NITU") which *inter alia* precluded the Plaintiffs' reversionary rights to their property.**

"On January 27, 2006, the Trust for Public Land (the Trust), a non-profit California public benefit corporation, filed a request for a public use condition and for issuance of a notice of interim trail use (NITU)."[30] The Trust's request was made "in order to negotiate with SPROC for acquisition of the right-of-way for interim trail use. The Trust at that time also submitted a statement of willingness to assume financial responsibility for the right-of-way and acknowledged that use of the right-of-way is subject to future reconstruction and reactivation for rail service."[31]

The STB issued a NITU on July 25, 2006 stating that "[b]ecause SPROC has since notified the Board of its willingness to enter into trail use negotiations with the Trust, a 180-day

---

(1) the Bisbee Branch, between milepost 1085.0 at Bisbee Junction and milepost 1090.6 at Bisbee, a distance of 5.6 miles; and (2) the Douglas Branch (a) between milepost 1097.3 near Paul Spur and milepost 1106.5 near Douglas, a distance of 9.2 miles, (b) between milepost 1055.8 near Charleston and milepost 1097.3 near Paul Spur, a distance of 41.5 miles, and (c) between milepost 1040.15 near Curtiss and milepost 1055.8 near Charleston, a distance of 19.9 miles. *Id.*

[29] *See* Tab DD, STB's November 9, 2005 decision.

[30] *See* Tab EE, STB's February 3, 2006 decision.

[31] STB, Docket No. AB-1081X, July 25, 2006 NITU. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 60, Tab HH.). The Trust for Public Land is a tax-exempt public charity. *See* the website for The Trust for Public Land: http://www.tpl.org/tier2_sa.cfm?folder_id=170; a print-out is attached as Tab JJ. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 63, Tab II). The Trust for Public Land is not a railroad, nor does it possess the legal authority to operate a railroad. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 64, Tab II).

period will now be authorized for the parties to negotiate an interim trail use/rail banking agreement."[32] On January 22, 2007, the Trust filed a request for a 30-day extension of the NITU negotiating period.[33] According to the Trust, the subject right-of-way would not include certain portions of the railroad line designated under the original abandonment and NITU.[34]

"In a letter filed January 25, 2007, SPROC acknowledged receipt of the Trust's extension request and consented to the extension for those portions of the property in the subject right-of-way identified by the Trust."[35] "On January 29, 2007, SPROC filed a letter stating that it had consummated the abandonment of a portion of the line.[36] With regard to the remaining sections, the STB stated that "[w]here, as here, the carrier has not consummated the abandonment at the end of the previously imposed negotiating period and has indicated its willingness to continue negotiations by requesting an extension…the NITU negotiating period may be extended."[37] As such, the STB ordered that "[t]he NITU negotiating period is extended until February 21, 2007, for the portion of the line: (a) between milepost 1040.15 near Curtiss and milepost 1055.8 near

---

[32] *Id.*

[33] STB, Docket No. AB-1081X, February 14, 2007 Decision. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 65, Tab JJ.). The Trust state[d] that it and SPROC [were] in the process of completing negotiations on an option for the Trust's purchase of the portions of the subject right-of-way owned by SPROC in the Douglas Branch as follows: (a) between milepost 1040.15 near Curtiss and milepost 1055.8 near Charleston, and (b) between milepost 1055.8 near Charleston and approximately milepost 1074.3 at the intersection of the rail line with State Highway 92 (subject right-of-way). *Id.*

[34] The portion of the line not subject to extending negotiating period were described as: (1) the Bisbee Branch, between milepost 1085.0 at Bisbee Junction and milepost 1090.6 at Bisbee, and (2) portions of the Douglas Branch, specifically (a) between milepost 1097.3 near Paul Spur and milepost 1106.5 near Douglas, and (b) between approximately milepost 1074.3 at the intersection with State Highway 92 and milepost 1097.3 near Paul Spur. *Id.* According to the Trust, SPROC has indicated that it desires to remove these portions of the right-of-way from continued trail use negotiations. *Id.*

[35] *Id.*

[36] *Id.* This is the portion of the line between: (1) milepost 1084.0 and milepost 1097.3 at Paul Spur, (2) milepost 1097.3 at Paul Spur and milepost 1106.5 near Douglas, and (3) milepost 1085.0 at Bisbee Junction and milepost 1090.6 at Bisbee. *Id.*

[37] *Id.*

Charleston, and (b) between milepost 1055.8 near Charleston and approximately milepost 1074.3 at the intersection of the rail line with State Highway 92."[38] "On May 11, 2007, SPROC filed a request to postpone for one year, until July 26, 2008, the deadline to consummate abandonment of the remaining portion of the line (from milepost 1040.15 near Curtiss to milepost 1084.0);" the SPROC's request was granted by the STB on June 6, 2007.[39]

The residents of Cochise County, including Plaintiff Jack Ladd, have voiced their opposition to the potential creation of a public recreational trail running across their property:

> The Ladd family would be directly affected by the trail because it cuts through the ranch just 300 feet from Jack Ladd's home. Besides health concerns for his cattle and diseases that may be brought in from equine, he believes safety in general is a big obstacle.
>
> 'It's an open corridor running through our ranch. People would be well-advised to be careful,' Ladd said. 'It would provide a useful avenue for drug smugglers and illegals. The Border Patrol is not in favor of it from what I understand. I love my ranch, but to be honest, it isn't very scenic. People wouldn't miss much. Only thing to see is some ornery cows.'
>
> He also noted the financial obligation of a trail with fence maintenance, garbage pick-up and water facilities.
>
> 'It's going to cost money to police it, and there's liability. It's a big responsibility,' he said.
>
> He suggested leaving the area south of Highway 92 alone.
>
> The Border Patrol, represented by supervisor Dion G. Ethell, said an open corridor like the trail could be a highway for illegals.
>
> 'There is always the possibility of encountering illegals so near the border. Railroads are highly trafficked by illegals entering the country,' Ethell said. 'There would need to be enforcement, and we would need to patrol the route regularly. I have concerns about the close proximity of the border and the possibility of encounters between civilians and illegal.'[40]

---

[38] *Id.*

[39] STB, Docket No. AB-1081X, June 8, 2007 Decision. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph 71, Tab KK.)

[40] "Rails-to-trails idea debated," *Sierra Vista Herald*, March 4, 2007.

Despite the property owners' objections, by reason of the Trails Act, the Plaintiffs' land became subject to the July 25, 2006 NITU issued by the STB. The NITU operated to: (1) preclude the Plaintiff's "reversionary" right to their property under Arizona law; (2) impose an easement for the creation of a possible public-access recreational trail across their property; and (3) impose a second easement for possible future railroad use across the Plaintiffs' land.

The Plaintiffs have never received "just compensation" for this taking of their property and the federal government has never offered to pay the Plaintiffs any compensation for this taking of their property.

## III. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE UNDER RULE 56 RCFC

On April 30, 2007, the Plaintiffs filed this action seeking "just compensation" for the taking of their property. The Fifth amendment is self-executing.[41] This Court has jurisdiction to hear such a claim pursuant to the Tucker Act.[42]

The Plaintiffs have filed this motion for partial summary judgment on the question of the government's liability for taking their property in violation of the Fifth Amendment pursuant to Rule 56 RCFC.

Summary judgment motions isolate and eliminate factually unsubstantiated cases and are appropriate in cases when the pleadings, depositions, formal discovery requests, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[43] A "genuine issue" of fact exists only if a "reasonable jury" could find in favor of the non-moving party.[44]

---

[41] *Oregon v. Elstad*, 470 U.S. 298, 350 (1985); *Zoltek Corp. v. U.S.*, 442 F.3d 1345, 1376 (2006).
[42] Tucker Act, 28 U.S.C. § 1491(a).
[43] RCFC 56(c); *Celotex Corporation v. Cattrett*, 477 U.S. 317, 323 (1986).
[44] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

As Plaintiffs demonstrate below, there are no genuine issues of material fact and the Court should enter summary judgment finding that the federal government, by operation of the Trails Act and the STB's issuance of a NITU, has precluded the Plaintiff's reversionary property rights and has taken two easements across the Plaintiffs' property without paying "just compensation," in violation of the Fifth Amendment to the U.S. Constitution.

## IV. SUMMARY JUDGMENT RESTS UPON WELL-SETTLED PRINCIPLES OF FEDERAL LAW

### A. The Federal Trails Act Operates To Preclude Or Preempt The Abandonment And Reversion Of A Railroad Right-Of-Way That Would Have Otherwise Occurred By Operation Of State Law.

1. Congress Intended the 1983 Trails Act Amendments to Preclude Property Owners "Reversionary" Rights Under State Law

   a. *The Trails Act Amendments of 1983 Were Adopted By Congress With The Express Intention Of Preventing Abandonment of Railroad Rights-of-Way that Would Otherwise be Abandoned Under State Law*

The plight of the El Paso and Southwestern Railroad, and its successor the SPROC, was not unique. As Justice Brennan recounted in his introduction to the Court's opinion in *Preseault v. United States*, 494 U.S. 1 (1990) (*Preseault I)*, Congress became concerned about the nation's loss of railroad right of way. Justice Brennan's summary of the legislative history underlying the 1983 Amendments to the Trails Act is included in the Appendix. (*See* Appendix 2).

As Justice Brennan noted, it was Congress's intent to create a result under federal law (precluding a property owner's right to regain their property, the preservation of the railroad corridor for future railroad use and interim recreational trail use) that was not possible under existing state law. Congress did this by preempting or precluding the abandonment of railroad rights-of-way under state law. This preclusion of state law abandonment of railroad corridors was why Congress in 1983 adopted section 8(d) of the Trails Act to provide, "that interim trail