use 'shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.'"

The United States Congress has made clear that the 1983 Amendments to the Trails Act were intended to pre-empt state law and that when they did, "just compensation" would be paid to property owners. Congressmen Barr, Chairman of the House Judiciary sub-committee holding hearings into this legislation noted,

> [a]t first glance, it may appear Congress did not consider the fact that if the railroad land was not transferred in fee simple it may belong to the property owner, and not the railroad. However, Congress intended the railbanking aspect of this Federal law would preempt State law and hold the land essentially in perpetuity, until possible rail reactivation. In the 1996 *en banc* decision in *Preseault v. United States*, involving the same plaintiffs as in the Supreme Court case I just mentioned, the U.S. Court of Appeals for the Federal Circuit held that railroad abandonment constituted a per se taking, and therefore would require payment of just compensation to the affected land owners, under the Fifth Amendment.[45]

*b. The Supreme Court's Landmark Decision in* Preseault v. United States *Recognized That Congress Intended To Preclude Property Owner's 'Reversionary Rights' Even Though Doing So Was A Compensable Taking Under The Fifth Amendment*

The Preseaults owned fee title to land underlying an abandoned railroad easement in Vermont.[46] The railroad was converted to interim trail use by the ICC's issuance of a Notice of Exemption pursuant to the Trails Act.[47] The Preseaults challenged this action by claiming that Congress's preemption of state law by passing the Trails Act was an act beyond Congress's constitutional authority.[48] The Preseaults contended that the Trails Act preemption of the rights they enjoyed in their property under Vermont law violated the Commerce Clause and the Fifth

---

[45] U.S. House of Representatives, Judiciary Committee, Subcommittee on Commercial and Administrative Law, "Litigation and Its Effect on the Rails-to-Trails Program," June 20, 2002.

[46] *Preseault v. United States*, 494 U.S. 1, 9 (1990).

[47] *Id.*

[48] *Id.* at 10.

Amendment.[49] The Supreme Court held that the Trails Act amendments were not an unconstitutional act by Congress but a constitutional exercise of eminent domain by Congress.[50] The Court further held that, to the extent the Trails Act preempted any property owner's reversionary right to their property enjoyed under state law, the federal government was required to pay "just compensation."[51]

The Supreme Court then held that the Tucker Act provided this Court with jurisdiction to award "just compensation" when the Trails Act worked such a taking.[52] As the Court recognized,

> This language [the 1983 Trails Act Amendment] gives rise to a takings question in the typical rails-to-trails case because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests . . . .[53]

The Court noted Congress's intent to preclude the right of property owners to their property under state law, stating that,

> The key finding of this amendment is that interim use of a railroad right-of-way for trail use, when the route itself remains intact for future railroad purposes, shall not constitute an abandonment of such rights-of-way for railroad purposes. This finding alone should eliminate many of the problems with this program. The concept of attempting to establish trails only after the formal abandonment of a railroad right-of-way is self-defeating; once a right-of-way is abandoned for railroad purposes there may be nothing left for trail use. This amendment would ensure that potential interim trial use will be considered prior to abandonment.[54]

As the legislative history quoted by Justice Brennan notes, the "problems with the program" prior to the 1983 Amendment were that under state law a "railroad purpose" did not

---

[49] *Id.*
[50] *Id.* at 17-19.
[51] *Id.*
[52] *Id.*
[53] *Id.* at 8.
[54] *Preseault*, supra, note 79, at 9, *citing* H. R. Rep., at 8-9.

include "railbanking" or "interim trail use" and the fee owners of the property regained their right to the property when railroad service over the property was abandoned.[55] As Justice Brennan observed, "because many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. *** [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations."[56]

Congress's intent to preserve these otherwise abandoned railroad corridors was being frustrated by state law. So, Congress adopted the 1983 amendments to preclude the operation of state law. This preclusion or forestalling of state law property rights is what gave rise to a taking.

---

[55] The word "abandonment" is a term of art in the context of railroad real estate title and regulation. "Abandonment" is used in very different ways depending upon the context.

First, "abandonment" is used in the context of state property rights to refer to the loss of a railroad's right to use specific property for the operation of a railroad. A railroad's right to use specific property is defined by the real estate and property law of the relevant state. If a railroad holds only an easement to use the property for a specific purpose – which is customarily the manner in which railroads obtained the right to use property for operation of a railroad – this right can be lost by being "abandoned". Whether the railroad has "abandoned" its right to use the property is determined by reference to the relevant state's real estate law. "Many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests." *Preseault I,* supra, note 63, at 8.

The second use of "abandonment" is in the context of federal regulation of interstate railroads. (*See*, Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.).) In this context the term "abandonment" refers not to the railroad's title or interest in the real estate over which it provides railroad service but to the obligation of the railroad to provide interstate railroad service over a given corridor or route. A railroad may not cease, or "abandon", its obligation to provide railroad service over a given railroad corridor without first obtaining the permission of the STB to terminate such interstate railroad service.

[56] *Preseault*, supra, note 79, at 9.

"The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights."[57] Any other conclusion would convert the ICC's power to pre-empt conflicting state regulation of interstate commerce into the power to pre-empt the rights guaranteed by state property law, a result incompatible with the Fifth Amendment. *See Ruckelshaus v. Monsanto Co.*, 467 U.S., at 1012 ("If Congress can `pre-empt' state property law in the manner advocated by EPA, then the Taking Clause has lost all vitality. [A] sovereign, `by *ipse dixit*, may not transform private property into public property without compensation . . . . This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent'"), quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S., at 164 *Preseault I*, 494 U.S. at 23. (concurring opinion of O'Connor).

**B. The Settled Law After *Preseault* is that State Law Determines the Nature of a Property Interest Subject To the Trails Act and When the Owner's Enjoyment of That Interest is Delayed or Burdened, "Just Compensation" is Due.**

The settled law after the U.S. Supreme Court's decision in *Preseault* was described succinctly by the Federal Circuit, "[i]n *Preseault [I]*, the Court held that if abandonment of railway use and application of the Trails Act effects a taking when the easement would otherwise revert to the owner of the servient estate, the landowner may sue for compensation under the Tucker Act. 494 U.S. at 4-5, *** *See also Preseault v. United States,* 100 F.3d 1525 (Fed.Cir.1996) (*en banc*) [(*Preseault II*)] (applying state law of reverter to determine rights of the owner of the servient estate)." *Hash v. United States*, 403 F.3d 1308 (Fed. Cir, 2005).

It is a long-settled point of law that "state law creates and defines the scope of the reversionary or other real property interests affected by the ICC's actions pursuant to the Trails Act." In *Preseault I*, the U.S. Supreme Court stated,

---

[57] *See id.* at 22.

> In determining whether a taking has occurred, "we are mindful of the basic axiom that '[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1001 (1984), *quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980) (internal quotation omitted). *** Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the ICC's recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim. *See Ruckelshaus v. Monsanto Co.*, supra, at 1001-1004.[58]

We noted above Justice Brennan and Justice O'Connor's direction that state law defines the nature and extent of any property interest taken by application of the Trails Act. This has been followed by the Federal Circuit, this Court, and federal district courts, in cases finding that the Trails Act and the ICC's (now STB's) issuance of a NITU took an interest in a property owner's land.

## C. When The Federal Trails Act Operates To Preclude Or Preempt The Abandonment And Reversion Of A Railroad Right-Of-Way It Is A Taking of The Land Owner's Property For Which The Federal Government Must Pay "Just Compensation".

Every court to consider the issue has held that when the Trails Act precludes a property owner from regaining the "reversionary" rights which the owner possesses under state law it is taking of the owner's property for which the federal government must pay "just compensation."

### 1. <u>The U.S. Federal Circuit Has Repeatedly Held That The Federal Government is Obligated to Pay "Just Compensation" in Trails Act Taking Cases.</u>

The Federal Circuit has repeatedly held that when the Trails Act precludes a property owner from regaining the "reversionary" rights that the owner possesses under state law, it is a taking of the owner's property for which the federal government must pay "just compensation."

---

[58] *Preseault I*, 494 U.S. at 20-21 (concurrence by Justice O'Connor joined by Justices Scalia and Kennedy); *see also*, *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) (holding that "[p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law).

In *Preseault II,*[59] the Federal Circuit identified two alternative means by which the Trails Act had taken the landowner's interest in their property. Judge Plager wrote,

> [I]f the Preseaults have interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation. The record establishes two bases on which the Preseaults are entitled to recover. One, if the [recreational trail] easements were in existence in 1983 when, pursuant to ICC Order, the City of Burlington established the public recreational trail, its establishment could not be justified under the terms and within the scope of the existing easements for railroad purposes. The taking of possession of the lands owned by the Preseaults for use as a public trail was in effect a taking of a new easement for that new use, for which the landowners are entitled to compensation. As discussed previously, some courts consider that the establishment of a use outside the scope of an existing easement has the effect of causing an abandonment, and thus termination, of the existing easement. Either way, the result is the same-a new easement for the new use, constituting a physical taking of the right of exclusive possession that belonged to the Preseaults.
>
> Two, as an alternative basis, in 1983 when the ICC issued its Order authorizing the City to establish a public recreational biking and pedestrian trail on Parcels A, B, and C, there was as a matter of state law no railroad easement in existence on those parcels, nor had there been for more than ten years. The easement had been abandoned in 1975, and the properties were held by the Preseaults in fee simple, unencumbered by any former property rights of the Railroad. When the City, pursuant to federal authorization, took possession of Parcels A, B, and C and opened them to public use, that was a physical taking of the right of exclusive possession that belonged to the Preseaults as an incident of their ownership of the land.[60]

More recently, the Federal Circuit affirmed Judge Bruggink's decision in *Toews v. United States*, 53 Fed. Cl. 58 (2002). The government appealed Judge Bruggink's decision. The Federal Circuit rejected the government's argument on appeal and noted,

> [t]he Government contends that, as a matter of California law, use of these railroad rights of way for railbanking and interim use as a recreational trail did not go beyond the scope of the easements. Further, it is the Government's view that, under California law, there was no abandonment or extinguishment of the easements caused by the federal actions under § 8(d) of the National Trails System Act. And thirdly, the Government states that these questions should not

---

[59] *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. *en banc* 1996).
[60] *Id.* at 1551.

be subject to decision by the federal courts but should be referred to the California courts for resolution.[61]

The Federal Circuit rejected all three of the government's contentions. The Federal Circuit reaffirmed the analysis to be applied in a Trails Act taking as follows.

> It is elementary law that if the Government uses (or authorizes the use of-a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new use does not change the equation-the railroad cannot give what it does not have.
>
> And it appears beyond cavil that use of these easements for a recreational trail-for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway-is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.
>
> Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other. Under the law, it is the landowner's intention as expressed in the grant that defines the burden to which the land will be subject.[62]

A subsequent Federal Circuit decision in *Hash v. United States*[63] involved approximately 200 successors to homesteaders who were granted land patents pursuant to the Homestead Act of 1862.[64] The plaintiffs' predecessors had conveyed easements to the Idaho Northern Railroad Co. to construct a right-of-way during the period between 1899 and 1911.[65] In 1995, the railroad that had run across the *Hash* property owner's land had been authorized by the ICC to discontinue

---

[61] *Towes v. United States* 376 F.3d 1371, 1375 (2004).
[62] *Id.* at 1376-77.
[63] 403 F.3d 1308 (Fed. Cir, 2005).
[64] *Id.* at 1312.
[65] *Id.* at 1311.

part of its railroad operations in Idaho and, later that year, the 83.1 mile longer former railroad corridor was converted into a trail.[66] The Federal Circuit held that the fee title these land owners acquired under their title going back to the original land patents "were taken for public use in accordance with the principles set forth in the *Preseault* cases."[67] The Federal Circuit remanded the case back to the district court[68] in order to determine the amount of "just compensation" that the federal government owed each of these landowners for the taking of their property.

2. <u>The U.S. Court of Federal Claims Has Repeatedly Held that The Federal Government is Obligated to Pay "Just Compensation" in Trails Act Taking Cases.</u>

This Court has held that property owners are entitled to "just compensation" for the taking of the Property when their state law "reversionary" rights are precluded or forestalled by the Trails Act.

*Glosemeyer v. United States*[69] involved three Missouri cases consolidated for decision on the question of the government's liability. In addition to the class of property owners in *Glosemeyer*, the decision included the claims of the class in *Moore v. United States* and *Grantwood Village v. United States*. In *Glosemeyer*, this Court considered and rejected the government's contention that under Missouri law, "railbanking" is a "railroad purpose" permitted within the scope of an easement for railroad use.[70] In *Glosemeyer*, this Court rejected the government's argument that a public-access recreational trail was the same as a railroad.

In *Glosemeyer*, Judge Bruggink entered summary judgment against the government on the government's constitutional obligation to pay "just compensation" for taking the plaintiffs' property. Judge Bruggink described the relevant question as simply, "[h]aving established that

---

[66] *Id.*
[67] *Id.* at 1318.
[68] *Hash v. United States*, 2007 WL 1309548 (Feb. 1, 2007).
[69] 45 Fed. Cl. 771 (2000).
[70] *Id.* at 780.

the easements would have been extinguished, and thus that, but for the application of the Rails-to-Trails Act, the plaintiffs would have been seized of their lands without any restrictions, we have little difficulty concluding that a taking has occurred."[71] This same question is now before this Court on the facts of this case.

In *Illig v. United States*,[72] this Court explained the nature of the easement imposed upon the owner's property. "What [the Trails Act] imposed on plaintiff's land was a new easement which purported to preserve railroad use. The Trails Act was enacted in order to 'to preserve established railroad rights-of-way for future reactivation of rail service, [and] to protect rail transportation corridors."[73] Although this Court has found that interim trail use, or "railbanking," was not a legitimate railroad purpose,[74] the government's stated intent in creating the Trails Act was to preserve railroad rights-of-way as they existed.[75] "Although interim trail use of the railroad corridor was authorized by the Trails Act through the NITU issued here, the use of the easement for trail purposes is subject to the future restoration of rail services."[76]

In other Trails Act taking cases, this Court has held that when property owners trace their chain of title to a homesteading statute, which conveyed title after the railroad had already acquired its right-of-way traversing public land, the property owner still held fee title and the railroad held only an easement. The government did not retain fee to the property underlying the

---

71 *Id.* at 781.
72 58 Fed. Cl. 619 (2003).
73 *Id.*; *see* 16 U.S.C. § 1247(d).
74 *Glosemeyer v. United States,* 45 Fed.Cl. 771 (2000).
75 *See* 16 U.S.C. § 1247(d) (stating that "if ... interim trail use is subject to restoration and reconstruction for railroad purposes, such interim use shall not be treated ... as an abandonment of the use of such rights-of-way for railroad purposes.")
76 *Illig*, 58 Fed. Cl. at 629.

right-of-way.[77] These three cases concern issues related to the nature of title transferred under land patents and addressed by the Federal Circuit in *Hash v. United States.*[78] In all three cases, this Court affirmed the principle that the Trails Act effects a compensable taking of a landowner's property when it precludes the land owner from regaining their reversionary right to their property.

3. The U.S. District Courts Have Repeatedly Held that The Federal Government is Obligated to Pay "Just Compensation" in Trails Act Taking Cases.

Federal district courts also have jurisdiction to consider Trails Act taking claims under the "Mini-Tucker Act."[79]

In *Swisher v. United States*,[80] the court held, "under the Trails Act, the conversion from railroad use to trail use blocks the abandonment of the right-of-way even though conditions for abandonment under state law may otherwise be met. 'But for the negotiation of a trail use agreement, state property law would be revived and, possibly, trigger extinguishment of rights-of-way and the vesting reversionary interest.' In such circumstances, when a reversionary interest is blocked, the interim trail is deemed a taking. Accordingly, the holder of a reversionary interest that does not vest because of trail use (such as the plaintiffs in this case) is entitled to compensation."[81] (See also, *Schmitt v. United States*)[82]

---

[77] *Ellamae Phillips Co. v. United States*, 77 Fed. Cl. 387 (2007, Judge Baskir), *Blendu v. United States*, 75 Fed. Cl. 543 (2007, Judge Hewitt), *Beres v. United States*, 64 Fed. Cl. 403 (2005, Judge Horn).

[78] 403 F. 3d 1308 (Fed. Cir. 2005).

[79] 28 U.S. C. § 1346 (a)(2).

[80] 176 F. Supp.2d 1100 (D. Kan, 2001).

[81] *Id.* at 1101-02, *citing*, *Nat'l Assoc. of Reversionary Property Owners v. Surface Transp. Bd.*, 158 F. 3d 135, 139 (D.C. Cir. 1998), *Preseault II*, at 1550, 1551 and *Glosemeyer v. United States*, 45 Fed. Cl. 771, 781 (2000).

[82] In *Schmitt v. United States*, 203 F.R.D. 387 (S.D. Ind., 2001), the court found that landowners adjoining an abandoned railroad right-of-way held fee title to property underlying a railroad right-of-way subject to the Trails Act. The court found that the railroad held only easement and certified the matter as a class action. The court then granted the Plaintiff's motion for summary

## D. The Property Owner's Interest in their Land Is Taken Under The Trails Act At The Time The STB Issues a NITU.

Major-General William B. Caldwell, III[83] and his family owned property in Columbus, Georgia.[84] A portion of the Caldwell family property was subject to a railroad easement that the Norfolk Southern used for operation of a railroad.[85] The Norfolk Southern abandoned this easement but the federal government appropriated the Caldwell property by operation of the Trails Act to be part of the "CATS" plan, which included construction of pedestrian walkways and bikeways across the Caldwell property and also created an easement for operating a railroad or light rail across the Caldwell property in the future.[86]

The Justice Department successfully prevented the Caldwell family from receiving their constitutional right to "just compensation" for this taking of their property by arguing that the statute of limitations had run on the Caldwell's ability to make a claim for compensation. The taking of the Caldwell's property provided the Federal Circuit opportunity to determine at what point the Trails Act takes a landowner's property and when the landowner's claim for compensation arises.[87]

---

judgment and found the government liable for a taking of the Plaintiff's property for which "just compensation" was due. The court found, "[h]aving established that the easements would have been extinguished, and thus, but for the application of the Rails-to-Trails Act, the railroad corridor would have reverted back to the Plaintiffs in fee, the court finds that a taking under the Fifth Amendment has occurred." *Schmitt v. United States*, 2003 WL 21057368, *8 (2003).

83 Major General Caldwell's son, Lieutenant General William B. Caldwell IV followed in his footsteps. Until June 2007, General Caldwell, IV served as chief spokesman and Deputy Chief of Staff for Strategic Effects for the Multi-National Force in Iraq. General William B. Caldwell IV currently serves as the Commanding General of the Combined Arms Center at Fort Leavenworth, Kansas.

84 *See Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004).

85 *Id.*

86 *Id.*

87 We provide a detailed statement of facts upon which the *Caldwell* arose in Appendix 3. This statement of the facts in *Caldwell* is taken directly from the Department of Justice brief, which they filed with the Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004). (The brief is attached as Exhibit 1).

The Caldwell's argued that their claim for a taking of their property accrued when the deed from the railroad to the Public Trust for Land was recorded.[88] "Caldwell asserts that his claim did not accrue until title to the rail corridor changed hands in October, 1996. *** On appeal, Caldwell contends that the potential taking occurs when 'the railroad actually turns the easement over to trail use.'"[89]

The Justice Department argued that a property owner's claim for a taking of their property by operation of the Trails Act occurred when the railroad and the trailuser reached a trail use agreement and the NITU was consummated with the creation of a recreational trail. "[T]he government's liability (if a taking occurred) was fixed when the City and Norfolk Southern entered into a trail use agreement, not when the ICC issued the NITU and not when the deed to the corridor changed hands."[90]

Judge Christine Miller ruled, "that the statute of limitations began to run on Caldwell's taking claim on July 5, 1996, when the City notified the ICC that it had reached a trail use agreement with Norfolk Southern. The court reasoned that 'the NITU takes effect only if the right-of-way meets the criteria for abandonment and negotiation of trail use occurs.' It is when the parties reach a trail use agreement that the "taking becomes fixed * * *. Before that date the outcome of the Government action is not certain, so the taking has not been effected."[91]

The Justice Department agreed. "The trial court held correctly that Caldwell's taking claim accrued when Norfolk Southern and the City reached a trail use agreement, no later than

---

[88] *Caldwell*, 391 F.3d 1226.
[89] Exhibit 1, DOJ's *Caldwell* brief, at 16.
[90] *Id.* at 13.
[91] *Id.* at 11.

July 5, 1996. It is when the parties reach a trail use agreement (if ever) that the underlying landowner's reversionary rights are preempted by federal law."[92]

"In other words, the NITU provides time for the parties to negotiate, but until they reach an interim trail use agreement the NITU is effectively inchoate; the underlying landowner's reversionary rights might still vest after the negotiation period ends if there is no trail use agreement and the rail carrier abandons the line. Accordingly, the CFC held correctly that it is when the parties reach a trail use agreement that the underlying landowner's reversionary rights are preempted, if ever."[93] "Here, however, there was no agreement when the NITU was issued, and, therefore, the CFC held correctly that the taking claim accrued (if at all) when the parties reached a trail use agreement. It was then (if ever) that federal law preempted Caldwell's reversionary rights under state law."[94]

The Justice Department argued that, while its position may deny General Caldwell and his family "just compensation", it nonetheless was in the best interest of other property owners. The Justice Department argued that, "Under Caldwell's view [that a taking occurred only after the deed from the railroad to the trail user had been recorded], land owners might be forced to wait for years after a Trails Act agreement is reached until a trail is fully developed before they can file takings claims alleging that their reversionary interests have been preempted. That approach might be in Caldwell's interest in this case, but it does not benefit land owners whose attorneys file timely complaints."[95]

The Federal Circuit did the unexpected. On December 14, 2004 it rejected Judge Christine Miller's and the Justice Department's position that the taking occurs when a Trail Use

---

[92] *Id.*
[93] *Id.* at 14.
[94] *Id.* at 15.
[95] *Id.* at 17.

Agreement is reached. The Federal Circuit also rejected General Caldwell's position that the taking did not occur until the deed was recorded and title to the property transferred.

Rather, Judge Dyk, joined by Judge Prost, wrote,

> Caldwell urges that a taking under the Trails Act did not occur until the railroad line right-of-way was actually converted into a trail for interim trail use *** We disagree. The taking, if any, when a railroad right-of-way is converted to interim trail use under the Trails Act occurs when the state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. The question, then, is in the context of an exemption proceeding, when are state law reversion interests forestalled by operation of section 8(d) of the Trails Act? We conclude that this occurs when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d). At 1233. (citing *Preseault* and *Toews*).

Judge Dyk reiterated this conclusion when he wrote, "We hold that the Fifth amendment taking, if any, under the Trails act is accomplished when an NITU is issued and state law reversionary interest that would otherwise take effect pursuant to normal abandonment proceedings are forstalled."[96]

General Caldwell sought re hearing *en banc* which was denied by the Federal Circuit. General Caldwell then appealed to the U.S. Supreme Court. The Supreme Court denied *certiori*.[97]

---

96 *Caldwell*, 391 F.3d at 1236. Judge Newman disagreed. She authored a dissent which concluded that, "All authority is contrary to this position [of the majority]". *Id.*

97 546 U.S. 826 U.S., 126 S. Ct. 366, 163 L. Ed. 2d 72 (2005) (mem.). After the *Caldwell* decision was issued, the Justice Department abandoned its view that the Trail Use Agreement was the "date of taking" in a Trails Act case. The Justice Department embraced the view of the *Caldwell* majority and applied that ruling retroactively to defeat the right of property owners to receive "just compensation" in three other Trails Act cases that were pending when *Caldwell* was decided. *Illig v. United States*, 98-934L, *see* July 27, 2005 order filed by Judge Bruggink (*Illig* remains on appeal before the Federal Circuit stayed pending the U.S. Supreme Court's decision in *John R. Sand & Gravel Co. v. United States*, 127 S.Ct. 2877 (2007)), *Barclay v. United States*, 443 F.3d 1368 (2006) and *Renewal Body Works, Inv. v. United States* 643 F.3d 1368 (2006). Counsel for the property owners in this case, are also counsel for the property owners in *Illig*. The position of counsel in this case acknowledging that *Caldwell, Barclay* and *Renewal Body*

The same panel (Judges Dyk, Prost and Newman) had opportunity to reconsider this question in two cases consolidated for appeal. *Barclay v. United States*, 443 F.3d 1368 (2006) and *Renewal Body Works, Inc. v. United States*, 443 F.3d 1368 (2006). These cases concerned Trails Act taking cases in California (in the case of *Renewal Body Works*) and Kansas (in the case of the *Barclay* property owners).[98]

In *Barclay*, Judge Dyk again authored the majority decision joined by Judge Prost over Judge Newman's dissent. The majority reaffirmed, "we adhere to *Caldwell* and hold that the issuance of the original NITU triggers the accrual of the cause of action."[99] The court held to the original NITU as establishing the date of taking even though it was modified by subsequent NITU's and subsequent decisions of the STB:

> The Barclay appellants contend that their claim did not accrue until the petition to reopen [abandonment proceedings] was finally denied on May 8, 2001, even though the original NITU as extended by the replacement NITU never ceased to be effective. This is merely another version of the argument – rejected in Caldwell – that the original NITU should not be viewed as the taking because subsequent events might render the NITU only temporary. The [property owner's] claims accrued when the original NITU issued, regardless of the petition to reopen.[100]

All parties agree that the "date of taking" is important not only to determine the date when a cause of action accrues for purposes of the statute of limitations but "the question of when the taking occurred, however, also relates to certification of the class in that the class will include only those persons who owned property on the date of taking, and it relates to the amount

---

*Works* are the current law of the Federal Circuit, does not mean that counsel agrees with the decision of the majority in *Caldwell, Barclay* and *Renewal Body Works*.

[98] *Renewal Body Works* involved a stretch of the same abandoned railroad easement that was involved in *Toews*.

[99] *Barclay*, 443 F.3d at 1378.

[100] *Id.* Judge Newman again dissented. The *Barclay* property owners appealed to the U.S. Supreme Court but cert was denied. *Barclay v. U.S.*, 127 S.Ct. 1328 (U.S. Feb. 20, 2007) (No. 06-816)).

of compensation and the calculation of pre-judgment interest. Thus, the issue in this case extends beyond the narrow circumstances presented here."[101]

In *Caldwell, Barclay* and *Renewal Body Works*, the Federal Circuit concluded that the federal government has taken an interest in the Plaintiff's land and the Plaintiff's right to "just compensation" arose immediately upon the STB's issuance of the original NITU. In this case, that occurred on July 25, 2006.

The Federal Circuit has determined that the NITU gives rise to a taking notwithstanding whether or not the railroad and the trail user reach an agreement to use the abandoned railroad right-of-way for a public access recreational trail in the future. The federal government admits this point, "So I really don't think, regardless of when state-law abandonment occurs, whether it is before the [NITU] or something that would have occurred but-for the [NITU] at a latter date, the [NITU] still becomes the trigger point in terms of claim accrual."[102]

According to the Federal Circuit, the federal government's taking of the Plaintiff's property occurred when the NITU was issued. In this case, that means every property owner in Cochise County, Arizona whose land was subject to the July 25, 2006 NITU had their state law reversionary right to their property precluded or forestalled on this date. This is so even though the STB decision of February 14, 2007 extended the negotiating period for a Trail Use Agreement for only that portion of the abandoned right-of-way between Curtiss and Highway 92. Every property owner whose land was subject to the July 25, 2006 NITU had their reversionary

---

[101] Exhibit 1, DOJ *Caldwell* brief, P. 13, n.5. See also, *Miller v. United States* where the "change in the law" announced by the Federal Circuit in *Caldwell* required that the class be recertified with a new date of taking and new notice and entry by those property owners which held title on the date of the NITU not the later date of the Trail Use Agreement, as had been earlier certified in the case prior to *Caldwell*. This was so even though a statute of limitations question was not included in that case.

[102] DOJ's statement in the June 17, 2005 hearing before Judge Bruggink in *Illig v. United States*, 58 Fed. Cl. 619 (2003). Excerpts from this transcript are attached as Appendix 5.

right to their property "precluded" and "forestalled" by operation of the Trails Act. All these property owner's are entitled to "just compensation".

The subsequent decision of the Trust for Public Land (a non-government entity) to pursue a Trail Use Agreement for a portion of the abandoned railroad does not, under *Caldwell, Barclay* and *Renewal Body Works*, change the fact that the federal government took an interest in all those property owner's land when the STB issued the July 25, 2006 NITU. At most, this means that for those property owner's whose land was subject to the July 25, 2006 NITU but for which the Trust for Public Land later decided not use for a public trail, there was a temporary taking of their property for the period between the July 25, 2006 NITU and the date when STB jurisdiction over the property terminated on January 29, 2007 (the date the negotiating period for a trail use agreement expired and an extension was granted by the STB for only a portion of the right-of-way). For those property owners whose land remains subject to the NITU, the STB's action is a permanent taking of their property.

In short, after *Caldwell*, *Barclay*, and *Renewal Body Works*, the federal government's liability for a Trails Act taking of property is fixed on the date of the original NITU. Subsequent developments go to, at most, the issue of damages, not to the government's liability.

## V. SUMMARY JUDGMENT RESTS UPON WELL-SETTLED PRINCIPLES OF ARIZONA LAW

### A. Under Arizona Law, The El Paso And Southwestern Railroad Acquired Only An Easement For Its Railroad Right-Of-Way.

#### 1. Under Arizona Law, The Grant Of A "Right-Of-Way" To A Railroad Conveys Only An Easement And Not Fee Title To The Land.

The title to railroad rights-of-ways in Arizona is the same as in most other states where, as Justice Brennan observed in *Preseault I,* "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. While the terms of

these easements and applicable state law vary, frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations. State law generally governs the disposition of reversionary interests . . . ."[103]

Arizona law is settled and unambiguous. A property owner holds title to their property and others do not have the right to cross that property. As the Arizona Supreme Court noted, "Under the law of Arizona, a private right of way across the lands of another can only be obtained by grant, condemnation, or prescription."[104]

Whether created by a grant of a right-of-way from the federal government,[105] an easement from a private party, condemning a right-of-way by eminent domain, or by simply constructing the railroad over a landowner's property without first obtaining any consent of the land owner, the result is the same, the railroad acquires only an easement. Further, a railroad acquiring a right-of-way easement may only use that easement for the purpose of operating a railroad. When the purpose for which the easement was established (operating a railroad) ceases, the easement is abandoned and the owners' land is no longer encumbered by the easement.

Arizona law has been settled on this issue since before Arizona was even a state. In 1888, the Supreme Court of the Territory of Arizona considered whether "the title acquired by

---

[103] *Id.* at 8. This is common throughout the nation. Other jurisdictions have also noted what Justice Brennan observed, namely that most railroads do not own fee title to their rights-of-way but only hold an easement to use the property for a right-of-way. "Except to site a station house or similar land use here and there, the railroads had no need or desire for any interest except 'right-of-way.'" *Davis v. MCI*, 606 So 2d 734, 738 (Fl. App., 1992). *See* Appendix 4, for a more detailed account of similar holdings in other states.

[104] *Campbell v. Willard* (1935) 45 Ariz. 221, 42 P.2d 403 (1935) at 404. (citing *Territory of Arizona v. Richardson* et al., 8 Ariz. 336, 76 P. 456 (1904)).

[105] A grant of right-of-way from the government depends upon the specific terms of the grant. As we note above, the grant of a right-of-way in this case involve the 1875 Act and the 1906 Act. Under these Acts, as noted by the Supreme Court in *Great Northern Ry. Co. v. United States*, 62 S.Ct. 529, 534-35 (1942), the grant conveyed only an easement to the railroad.

the railroad company to its right of way was in fee simple or merely an easement." *Atlantic & P.R. Co. v. Lesueur*, 19 P. 157 (Ariz. Terr. 1888). In *Lesueur* the court held:

> It is further urged with great force, skill, and ability [by the railroad] that the grant of right of way to a railway is *sui generis*, and is in fact a grant of the fee; and, if so, to exempt the fee so granted exempts the superstructure. It is said that the term 'right of way' is used to describe the land granted,-that is, that these are words of description, rather than of tenure. We cannot concur with this view, and no authority can be found which so holds. We must conclude that the words are used in their common, well-known, and universally accepted legal meaning, and that it was a grant of an easement as defined by the law. It was not a grant of the fee.[106]

In *Lesueur*, the Supreme Court for the Arizona Territory defined the nature of a railroad's interest in land described as a "right-of-way" in the grant to the railroad. The outcome of *Lesueur* turned upon construction of "the term 'right of way' [as] used to describe the land granted [to a railroad]". Specifically, did a grant of "right-of-way" convey fee title or only an easement?

The railroad argued "with great force, skill, and ability" that a "grant of right of way to a railroad is *sui generis*, and is in fact a grant of the fee." The Arizona Supreme Court rejected this construction and held, "We must conclude that the words ['right-of-way'] are used in their common, well-known, and universally accepted legal meaning, and that *it was a grant of an easement as defined by the law. It was not a grant of the fee.*"[107]

After becoming a state, the Arizona Supreme Court reconsidered this question in 1931 in *Boyd v. Atchison, T. & S.F. Ry. Co.*, 4 P.2d 670 (1931). *Boyd* arose as a title dispute between an Arizona landowner and the Atchison, Topeka and Santa Fe Railroad. The railroad built a railroad line across land without obtaining (or condemning) a right-of-way.[108]

---

[106] *Atlantic & P.R. Co. v. Lesueur*, 19 P. 157, 160 (Ariz. Terr. 1888)

[107] *Id.* (emphasis supplied).

[108] The railroad right-of-way in *Boyd* involved two different parallel railroad lines – one west-bound and a newly constructed east-bound line. The original "west-bound" line was originally