The Arizona Supreme Court resolved this dispute by quieting title in the fee owner and holding that the railroad acquired only an easement of the same nature and dimensions that the railroad would have acquired had they proceeded to acquire the right-of-way under Arizona's eminent domain statute.

In reaching its conclusion in *Boyd*, the Court quoted the above language from the *Lesueur* decision and wrote further, "The precise point passed on in the *Lesueur* Case, to wit, whether the title acquired by the railroad company to its right of way was in fee simple or merely an easement *** The ruling in the *Lesueur* Case, above set forth, was, and still is, the law of Arizona. For this reason we think the [property owners] were entitled to have their reversionary interest in the premises in controversy quieted."[109] The court then went on to direct that the property owner held fee title to the land underlying the disputed railroad right-of-way and the railroad held only an easement.

In this case, the El Paso and Southwestern Railroad acquired its right-of-way from two sources: (1) land patents from the federal government; and (2) conveyances from private individuals. In both cases, under Arizona law, the railroad acquired only an easement.

2. <u>The Right-of-Way Acquired By The El Paso and Southwestern Railroad Under the Act of 1875 Conveyed Only An Easement To Use The Property For A Railroad And Did Not Convey Fee Title</u>.

The federal government conveyed rights-of-way to railroads (including portions of the El Paso & Southwestern Railroad right-of-way at issue in this case) pursuant to the General

---

constructed by the railroad on property that the railroad obtained in fee under "provisions of the Act of Congress of July 27, 1866 (14 Stat. 292, 294)." *Boyd v. Atchison, T. & S.F. Ry. Co.*, 4 P.2d 670, 670 (1931). The ownership of the property upon which this original west-bound line was constructed was not in dispute.

[109] *Id.* at 671.

Railroad Right-of-Way Act of 1875.[110] As the U.S. Supreme Court explained, these land grants were merely intended to convey an easement for a railroad right-of-way:

> After 1871 outright grants of public lands to private railroad companies seem to have been discontinued. But, to encourage development of the Western vastnesses, Congress had to grant rights to lay track across the public domain, rights which could not be secured against the sovereign by eminent domain proceedings or adverse user. For a time special acts were passed granting to designated railroads simply 'the right of way' through the public lands of the United States. That those acts were not intended to convey an[y] land is inferable from remarks in Congress by those sponsoring the measures. For example, in reporting a bill granting a right of way to the Dakota Grand Truck Railway (17 Stat. 202), the committee chairman said: 'This is merely a grant of the right of way.' Likewise, in reporting a right of way bill for the New Mexico and Gulf Railway Company (17 Stat. 343), Mr. Townsend of Pennsylvania, the same Congressman who sponsored the Act of 1875, observed: 'It is nothing but a grant of the right of way.'
>
> The burden of this special legislation moved Congress to adopt the general right of way statute now before this Court. Since it was a product of the sharp change in Congressional policy with respect to railroad grants after 1871, it is improbable that Congress intended by it to grant more than a right of passage, let alone mineral riches. The presence in the Act of Section 4, which, as has been pointed out above, is so inconsistent with the grant of a fee, strongly indicates that Congress was carrying into effect its changed policy regarding railroad grants.[111]

In passing the 1875 Act, Congress specifically intended that upon abandonment of a railroad right-of-way, the right-of-way was to revert back to the fee owner of the land. In those cases where the U.S. government was still the fee owner of the property at the time the right-of-way was abandoned, the Supreme Court noted, "Congress itself in later legislation has interpreted The Act of 1875 as conveying but an easement...declaring a forfeiture of unused

---

[110] Right of Way acquired under the Act of 1875 is different that the interest in land a railroad may have acquired under other federal grants such as the Act of Congress of July 27, 1866 which was involved in *Boyd*.

[111] *Great Northern Ry. Co.*, 62 S.Ct. at 534-35.

rights of way, provides in part that 'the United States hereby resumes the full title to the lands covered thereby (by the right of way) freed and discharged from such easement.'"[112]

In 1906, Congress passed a similar act, which specifically pertained to the rights-of-way acquired under the 1875 Act in the Territories of Arizona and Oklahoma ("1906 Act"). The 1906 Act states as follows:

> Where...railroads have been constructed and were on June 26, 1906, in operation in Oklahoma or Arizona which passed through any of the lands theretofore reserved for said Territories, such lands shall be disposed of subject to such railroad right or easement, but only to the extent of the right of way conferred by the said sections for such railroad purposes.[113]

With respect to the 1906 Act, the U.S. Supreme Court stated that,

> [i]n 1906 an act was passed confirming the rights of way which certain railroads acquired under the 1875 Act in the Territories of Oklahoma and Arizona. The House committee report on this bill said: 'The right as originally conferred and as proposed to be protected by this bill simply grants an easement or use for railroad purposes. Under the present law whenever the railroad passes through a tract of public land the entire tract is patented to the settler or entryman, subject only to this easement.'

Pursuant to the 1875 Act, the federal grants of right-of-way within the state of Arizona were intended to convey merely an easement for railroad purposes.[114] Private individuals who later acquired this public land over which the right-of-way passed acquired fee simple title to the land, including that land under the right-of-way, subject only to the railroad's easement for a right-of-way.[115] Pursuant to the 1875 Act, when these right-of-ways were abandoned, they were to revert back to the fee owners of the property (the settler or entryman who acquired fee title to the underlying property). *See* discussion of *Hash v. United States*, *Ellamae Phillips Co. v. United States*, *Blendu v. United States*, and *Beres v. United States*, supra, section IV, C.

---

[112] *Id.*
[113] 43 U.S.C. § 944 (2000).
[114] *Id.*
[115] *Id.*

3. The Right-of-Way Acquired By The El Paso and Southwestern Railroad From Private Individuals Conveyed Only An Easement To Use The Property For A Railroad And Did Not Convey Fee Title.

Under well-established Arizona law when a railroad is granted a "right-of-way" it takes only an easement to use the property not fee title. See *Boyd*, 4 P.2d at 671, and *Lesueur*, 19 P. at 160, and discussion *supra*.

The private easements granted to the El Paso and Southwestern Railroad were specific conveyances of only a "right-of-way" easement "across the land." (*See* discussion above and Factual Background).

**B. An Railroad Easement Is Granted For The Limited Purpose of Operating A Railroad And When The Use Of The Property For This Purpose Is Abandoned, The Easement Is Extinguished.**

Under long-established Arizona law (as is the law in most other jurisdictions), an easement is a nonpossessory right to enter and use land possessed by another.[116] It is a right of use, but not an estate of the land.[117] Because an easement is not an estate in land, the conveyance of an easement does not convey title to land or dispossess the owner of the land subject to the easement. Instead, an easement only grants the right to use the property for some particular purpose.[118] The owner of an easement only possesses a right to use the property for that specific purpose and does not have any other interest in the land.[119]

1. A Railroad Easement is Limited to Using the Property to Operate a Railroad.

Conveyance of a strip of land to a railroad – even when in the form of a general warranty deed – conveys only an easement to use the property for the purpose of operating a railroad. It is a general principle of law in most jurisdictions that the conveyance of a strip of land to a railroad

---

116 *Clark v. New Magma Irrigation and Drainage Dist.*, 92 P.3d 876, 879 (Ariz. App. 2004).
117 *Id.*
118 *Clark*, 92 P.3d at 879.
119 *Id.*

company for a right of way does not vest an absolute title in the railroad company even if conveyance instrument is in the form of a general warranty deed.[120] The interest conveyed, particularly when conveyed to a railroad, is limited by the use for which the land is acquired.

The Federal Circuit in *Preseault II* applied these same principles to the easement at issue in that case:

> [R]ecognizing as we must that Vermont follows and applies common law property principles. The easements involved here are express easements, meaning that the scope of the easements are set out in express terms, either in the granting documents or as a matter of incorporation and legal construction of the terms of the relevant documents.

"The extent of an easement created by a conveyance is fixed by the conveyance."[121] In a leading treatise on the subject, the authors state the general rule to be "[w]hen precise language is employed to create an easement, such terminology governs the extent of usage."[122]

The private easements granted to the El Paso and Southwestern Railroad (as noted above in note 11 and in the Plaintiffs' Statement of Uncontroverted Fact) clearly and unambiguously convey a "right-of-way" over and across the property, not "fee" title to the property.

2. <u>The Easement Holder May Only Use The Property For The Specific Purpose For Which The Easement Is Granted</u>.

"The rights of any person having an easement in the land of another are measured and defined by the purpose and character of the easement; and the right to use the land remains in the owner of the fee so far as such right is consistent with the purpose and character of the easement.

---

[120] *Michigan Dept. of Natural Resources v. Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272, 279-84 (Mich. 2005); *Neider v. Shaw*, 65 P.3d 525, 529-30 (Idaho 2003); *Love v. U.S.*, 889 F. Supp. 1548, 1580-81 (E.D.N.C. 1994); *Drazich v. Lasson*, 964 P.2d 324, 327 (Utah App. 1998); *Huff v. Langman*, 646 N.E.2d 730 (Ind. App. 1995); *Harvest Queen Mill & Elevator Co. v. Sanders*, 370 P.2d 419 (Kan. 1962).

[121] 5 Restatement of Property § 482 ([A.L.I. ed.] 1944).

[122] Jon. W. Bruce and James W. Ely, Jr., The Law of Easements and Licenses in Land ¶ 8.02[1], at 8-3 (rev. ed. 1995)." *Preseault II*, 100 F.3d at 1542.

The servient estate will not be burdened to a greater extent than was contemplated or intended at the time of the creation of the easement."[123]

3. The Easement Holder May Not Increase The Burden Upon The Property Subject To The Easement.

"The general rule with regard to the use of easements is that 'the owner of the easement cannot materially increase the burden of the servient estate or impose thereon a new and additional burden.'"[124]

An increase in burden on the fee holder includes any new or different uses not contemplated by the grantor when the easement was created. See *Hunt v. Richardson*, 163 P.2d at 1073; see also *Loveland v. CSX Transp., Inc.*, 622 So.2d 1120, 122 (Fla.App. 1993) (citing *Lawson v. State*, 107 Wash.2d 444, 730 P.2d 1308 (1986) (holding that the sale of railroad right-of-way to the county for use as hiking trail was not used for railroad purpose and it constituted abandonment); *Seventy-Ninth Street Improv. Corp. v. Ashley*, 509 S.W.2d 121, 123 (Mo. 1974) (holding that "[a]n offer to sell [right-of-way for use other than that for which is granted] is totally inconsistent with any position other than that the use of the strip for railroad purposes has been abandoned.").

4. The Easement Is Abandoned, Extinguished or Forfeited When The Property Is No Longer Used For The Purpose For Which The Easement Was Granted.

It is well-settled law that where only an easement is taken for a right of way, and the use for such purpose ceases, the right to possession reverts to the original landowner or his successors in interest. *See* General Right-of-Way Act of 1865, 43 U.S.C. § 944 (2000).

As the Arizona Supreme Court noted in *Boyd*, when a railroad easement is abandoned the reversionary owner enjoys his property free of the easement, "[f]or this reason we think [the

---

[123] *Hunt v. Richardson*, 163 P.3d 1064, 1073 (Ariz. App. 2007) (citing *Pinkerton v. Pritchard*, 223 P.2d 933, 938 (Ariz. 1950)).
[124] *City of Scottsdale v. Thomas*, 753 P.2d 1207 (Ariz. App. 1988).

Boyd's] were entitled to have their reversionary interest in the premises in controversy quieted, regardless of the fact that it is extremely doubtful as to when, if ever, such interest will fall in…."[125] In *Boyd*, the Court noted that it may be a while before the Boyds or their successors came to enjoy their reversionary interest, however, the property owner acquiring fee to property adjoining or underlying a railroad right-of-way acquires title with the expectation that when the railroad is done using the right-of-way for operation of a railroad, the property owners' fee to the property will be free and clear of any railroad easement. As the *Boyd* court noted, he has an ownership interest in the land and a right to have his title quited, no matter when that right may ripen.

The Federal Circuit in *Preseault II* noted that, "[t]he usual way in which such an easement ends is by abandonment, which causes the easement to be extinguished by operation of law."[126] The *Preseault II* court held that, upon an act of abandonment, the then owner of the fee estate is relieved of the burden of the easement.[127] In most jurisdictions, the reversion is automatic upon abandonment.[128]

## C. The SPROC Abandoned the 76 Mile Railroad Easement In 2005.[129]

Under Arizona law, railroad corporations may lay out railways in order to carry out their intended purpose of running cars "for the transportation of persons and property."[130] In *Boyd*, the Arizona Supreme Court recited the statutory authority which enabled the railroad corporations "to lay out their railroads" for the construction and maintenance of a railway:

---

125 *Boyd*, 4 P.2d at 671.

126 100 F.3d at 1543 (*citing* Restatement of Property § 504).

127 *Id.*

128 *Id.*

129 As a threshold issue, we note that the Defendant does not maintain that an abandonment of the right-of-way by the railroad is necessary for the Plaintiffs to be entitled to "just compensation" for a taking of their property. *See* Appendix 5, excerpts from the June 17, 2005 hearing before Judge Bruggink in *Illig v. United States*, 58 Fed. Cl. 619 (2003).

130 Ariz. Rev. Stat § 40-814 (2007).

> Such corporations [referring to railroad corporations] shall have power: ***
> (4.) To lay out their said railroads or either thereof, not exceeding two hundred feet wide, and to construct and maintain the same with single or double track, with such appendages as its directors may deem necessary for the convenient use thereof.***[131]

Once the railway is laid, it is the duty of railroad corporations to "[s]tart and run cars for the transportation of persons and property at regular and fixed times."[132] Once the railroad corporation ceases doing so, it has effectually abandons its purpose of operating a railroad.[133]

In our statement of facts, *supra* section II. C., we detail how the SPROC abandoned this seventy six mile long right-of-way. In March 2005, the SPROC "decided to abandon the line in March 2005 due to limited freight business and the lack of prospects for prospects for future traffic increases."[134]

As the discussion of the facts above noted, not only was the rail line physically falling apart, but SPROC was losing a considerable amount of money operating the railway, and could not foresee any profit for the railway in the future. Accordingly, the SPROC formalized its intent to abandon the approximately 76.2 mile railroad line by filing a petition with the STB on October 17, 2005 seeking an exemption under 49 U.S.C. 10502.[135]

---

[131] *Boyd*, 4 P.2d at 671 (citing Paragraph 2151, subd. 4, Rev. St. Ariz. 1913 (Civil Code)).
[132] Ariz. Rev. Stat § 40-814.
[133] Similar results have been reached in other jurisdictions. *See Hennick v. Kansas City Southern Ry. Co.*, 269 S.W.3d 646, 654 (Mo. 1954) (holding that when the railroad ceases to use the land for legitimate purposes indicated in its charter, the lands revert to their owner); *Boyles v. Missouri Friends of the Wabash Trace Nature Trail, Inc.*, 981 S.W.2d 644, 649 (Mo.App.W.D. 1998) (holding that "The term "railroad purposes"…does not encompass other forms of transportation such as walking or bicycling, and the recreational purposes for which Wabash proposed to use the property do not fall within the commonly understood meaning of "railroad purposes."). *See also Lasson*, *Pollow*, *Glosemeyer*, *Toews*, cited above for the same proposition.
[134] *See* Tab EE, STB's February 3, 2006 decision.
[135] *See* Tab GG, STB's November 4, 2005 decision.

The SPROC's filings with the STB "are full of statements which unequivocally signify an intent to abandon."[136] As noted above, the SPROC was losing money on the railway and could not foresee any future of profitability. Likewise, the railway was so decrepit that the SPROC had to stop using the line on June 16, 2005. As of its October 17, 2005 filing with the STB, the SPROC had formalized intention to abandon this rail line.

## VI. WHEN THE TRAILS ACT PRECLUDES A PROPERTY OWNER FROM ENJOYING THEIR "REVERSIONARY" RIGHT TO PROPERTY, WHICH THE OWNER ENJOYS UNDER STATE LAW, IT IS A *PER SE* TAKING OF THAT PROPERTY OWNER'S LAND FOR WHICH THE FIFTH AMENDMENT REQUIRES THE FEDERAL GOVERNMENT TO PAY "JUST COMPENSATION"

### A. When the Trails Act precludes a property owner's "reversionary" right to property, it is a taking that requires payment of "just compensation" to the property owner.

The Federal Circuit noted that the Trails Act takes a property owner's interest in his property when it precludes the owner from enjoying the owner's reversionary right to his property that he held under state law. As the Federal Circuit in *Caldwell*, *Barclay* and *Renewal*

---

[136] *Id. See Glosemeyer*, 45 Fed.Cl. at 777, citing *Boyles*, supra. In *Glosemeyer*, Judge Bruggink looked to the railroad's filing with the STB a statement of its intent to abandon the line as an expression of its intent to abandon the rail line. Judge Bruggink stated:

> [t]he railroads' applications to the ICC for authority to abandon are clear evidence of intent to abandon their easements. [citation omitted] The applications are full of statements which unequivocally signify an intent to abandon. When a railroad's application for abandonment states that there is 'no feasible alternative' to abandonment, that it seeks to 'physically' abandon a rail line, or that it is 'not possible to operate [a] line profitably in the future,' a reader is left with no choice but to conclude that the railroad intends to abandon the rail line.
>
> ***
>
> The fact that no trains have been run over these easements for years is strong evidence of abandonment. '[A railroad right-of-way] easement is extinguished when the railroad ceases to run trains over the land.' [citations omitted]
>
> ***
>
> These facts compel the court to find that the railroads intended to abandon, and in fact did abandon, their easements. There is no contrary evidence offered of any intent to begin the rebuilding process that would be necessary to run trains once again. *Id.*

*Body Works* made clear, this "preclusion" or "forestalling" of a property owner's reversionary right occurs when the STB issues an NITU. (*See*, discussion *supra* section IV.) This is so whether or not the rail line has actually been abandoned by the railroad. This is so whether or not a Trail Use Agreement has been reached.

The Justice Department has come to embrace this post-*Caldwell* view of the Trails Act.[137] In short, the DOJ's post-*Caldwell* view simplifies the inquiry to two points: (1) did the Plaintiffs hold fee title to land subject to a railroad easement; and (2) did the STB issue a NITU. If so, the Plaintiffs are entitled to just compensation.

The fact that for some of the Plaintiffs (those whose property adjoined and underlay the portion of the right-of-way from state Highway 92 to Bisbee and Douglas) the period for negotiating a Trail Use Agreement expiring without such agreement being reached does not change the fact that the federal government took their property and precluded their state law reversionary rights during that period in which their land was subject to the NITU and the STB's continuing jurisdiction.[138]

**B. When The Trails Act Imposes New Burdens And Servitudes Upon A Land Owners Property Such As An Easement For The Possible Creation Of A Public-Access**

---

[137] We include a detailed recitation of the Justice Department's post-*Caldwell* view that the taking occurs immediately upon the STB's issuance of the NITU irrespective of whether the railroad had been abandoned, and irrespective of whether any Trail Use Agreement had been or ever would be reached. (*See,* Appendix 5).

[138] The Plaintiff's brought a third count seeking declaratory judgment that the STB's jurisdiction over a portion of the right-of-way expired when the NITU negotiating period expired on January 29, 2007 and was not extended. The Justice Department sought to have this declaratory judgment count dismissed and this Court granted that dismissal. However, whether in the context of a declaratory judgment count or in the context of a decision on the amount of "just compensation" the property owners are entitled to receive for the loss of their property during that period of time during which the government precluded their reversionary rights, it is necessary to determine whether the Plaintiff's property is still subject to the NITU and to the STB continuing jurisdiction and, if not, at what time the NITU no longer precluded the Plaintiff's from regaining their reversionary rights.

**Recreational Trail, As Well As A Future Easement For Railroad Use, It Is A Substantial *Per Se* Physical Taking Of That Property Owner's Property.**

The Plaintiffs add their voice to the chorus lauding the noble goals of Congress in passing the 1983 Trail Act Amendments preserving abandoned railroad right-of-ways for public hiking and biking trails for the benefit of greater society. This, however, as Justice Bruggink noted infra, "is immaterial." When property owners' land is taken for the benefit of society as a whole, they are entitled to "just compensation." As Justice Bruggink explained,

> The likelihood that the Rails-to-Trails Act was motivated by a commendable interest in public recreation or was an exercise in great foresight is immaterial. Rights in private property are more durable than the current majority's notion of what constitutes a worthy cause. As Justice Holmes said in *Pennsylvania Coal Co. v. Mahon*, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." 260 U.S. 393, 416 (1922). *See also Armstrong v. United States*, 364 U.S. 40, 49 (1960) (the "Fifth Amendment's guarantee ... [is] designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.").[139]

The Supreme Court noted that even though Congress possesses eminent domain authority by which to accomplish this taking of Plaintiffs' property, the taking is not free of the government's constitutional obligation to pay "just compensation" to the Plaintiffs.

As the U.S. Supreme Court held in *Preseault I*, "if the rails-to-trails statute gives rise to a taking, compensation is available to petitioners under the Tucker Act…and the requirements of the Fifth Amendment are satisfied."[140] Justice Plager, of the Federal Circuit, later commented on the Supreme Court's holding,

> [i]t is elementary law that if the Government uses (or authorizes the use of-a point to be considered later) an existing railroad easement for purposes and in a manner not allowed by the terms of the grant of the easement, the Government has taken the landowner's property for the new use. The consent of the railroad to the new

[139] *Glosemeyer*, 45 Fed.Cl. at 782.
[140] 494 U.S. at 4 (citation omitted).

use does not change the equation – the railroad cannot give what it does not have.[141]

As Justice Plager wrote for the Federal Circuit in *Towes v. United States*, "[t]he Government has the legal power and is thus free to impose such new uses upon the fee interests held by the adjacent landowners. But the private property interests taken are not free; the Government must pay the just compensation mandated by the Constitution."[142]

The protection of an individuals' right to their property is a foundational concept upon which our Republic is formed. It finds expression in the Fifth Amendment which succinctly provides, "private property [shall not] be taken for public use, without just compensation." The Fifth Amendment did not spring out of the ether. The protection of an individuals' right to own and use their property – land especially – is a fundamental hallmark of political liberty.[143]

One of the most fundamental aspects of property ownership is the right to exclude others. In *Kaiser Aetna et al. v. United States*, 444 U.S. 164 (1979) the Supreme Court wrote, "[W]e hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation. This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina. And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation.[144]

---

[141] *Toews*, 376 F.3d at 1376.
[142] *Toews*, 376 F.3d at 1279.
[143] A fuller commentary on the importance of the property owners' constitutionally protected right to their land is included in the Appendix. (*See* Appendix 6.)
[144] See *United States v. Causby*, 328 U.S. 256, 265 (1946); *Portsmouth Co. v. United States*, 260 U.S. 327 (1922). (Several other citations omitted) (Citing for additional authority at footnote 11, "As stated by Mr. Justice Brandeis, '[a]n essential element of individual property is the legal

In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), Justice Marshall, writing for the Court, said: "We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation...." Loretto, 458 U.S. at 441. (Cited by Federal Circuit in *Preseault II* at 1540.) The Supreme Court has recognized the right to exclude as a fundamental feature of property ownership.[145]

The right to exclude others is important in the context of Trails Act takings because the Trails Act not only "forestalls" or "precludes" a property owner from enjoying their state law "reversionary" right to their property, it actually precludes the property owner themself from regaining possession of his or her property.

The Trails Act also imposes two new servitudes or easements upon the owners' property. The first new easement is one for the creation of a public-access recreational trail and the second is a new easement for potential future railroad use. Both of these are a *per se* physical taking of the owners' property. The owner's property (for the property owners in this case, a portion of their residence ranch that has been in their family for years) is now subject to a creating a public trail for the general public to use the Plaintiffs' property as well as an easement for a railroad being built on the property in the future. This is a very substantial *per se* physical intrusion into an owner's property and for this taking of the Plaintiffs' property, they have been paid nothing.

---

right to exclude others from enjoying it.' *International News Service v. Associated Press*, 248 U.S. 215, 250 (1918)).

[145] See *Boyd v. U.S.,* 116 U.S. 616, 630 (1886) *quoting*, *Entick v. Carrington 19 Howell's State Trials 1029*, 95 Eng. Rep. 807 (C.P. 1765), and adopted by U.S. Supreme Court in *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) and *United States v. Lefkowitz*, 285 U.S. 452, 466 (1932). See also *Silverman v. United States*, 365 U.S. 505, 511 – 512 (1961).

## V. CONCLUSION

We began this memorandum by noting that summary judgment can be entered against the federal government on the basis of two uncontested facts and well-settled law. This motion presents this court with precisely the same question that a similar motion presented Judge Bruggink in the Missouri cases of *Glosemeyer*, *Grantwood Village*, *Moore*, and *Illig*. It presents this court with the same question presented to the Federal Circuit in *Towes, Hash* and *Preseault II*. We are not asking this Court to plow new ground. The law and facts are settled.

Plaintiffs' point one: on July 25, 2006, the Plaintiffs were fee owners of land in Cochise County, Arizona that was (or had been) burdened by the El Paso and Southwestern Railroad easement; point two: on July 25, 2006, the STB issued a NITU precluding Plaintiffs' reversionary rights to this property; and point three: the Fifth Amendment requires the federal government to pay the Plaintiffs "just compensation" for this taking of their property.

The Defendant, by operation of the Trails Act, and the STB's issuance of the July 25, 2006 NITU, has taken the Plaintiffs' property. The Fifth Amendment now requires that the federal government pay the Plaintiffs "just compensation" for this taking of their property. This entry of partial summary judgment rests upon uncontroverted facts and settled law.

The Plaintiffs request that this Court enter judgment against the Defendant on the issue of the Defendant's obligation to pay "just compensation" to the Plaintiffs for the taking of the Plaintiff's property. The Plaintiffs further request that this court order this case to proceed to determining the value of the property that has been taken from the Plaintiffs.

Respectfully submitted,

| | |
|---|---|
| Date: 12/4/07 | LATHROP & GAGE L.C.<br><br>By /s/ Mark F. (Thor) Hearne, II<br>MARK F. (THOR) HEARNE, II<br>LINDSAY S.C. BRINTON<br>10 South Broadway, Suite 1300<br>St. Louis, MO 63102-1708<br>(314) 613-2500<br>(314) 613-2550 (fax)<br>Thornet@ix.netcom.com<br><br>ATTORNEYS FOR PLAINTIFFS |