# APPENDIX TO

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**APPENDIX 1:**

**A Description of the Plaintiffs' Property**

1. The Ladd Family

The Ladd Family originally acquired its property ("the Ladd Family Ranch") through land patents issued to Marie Ladd's family by the United States government in 1903. One of these land patents was that issued to Marie Ladd's great aunt, Ella M. Fike,[1] signed by President Theodore Roosevelt in 1903.[2] This property has remained in the Ladd Family since the original land patents. Marie Ladd's family (the Fike's) originally operated a dairy on the property and title was acquired from the United States by Marie Ladd's great aunts and uncles, Ella M. Fike, Lydia L. Fike, P.J. Fike, and E.M Fike.[3] Some of the Fike family employees, B.L. Robinson, and August Bhomfolk, also acquired property by land grant.[4] These employees subsequently sold their property to the Fike family.

Plaintiffs Jack and Marie Ladd are husband and wife. They hold fee title to their portion of the Ladd Family Ranch through their trust.[5] Jack and Marie Ladd are the beneficiaries of this trust and the trustees of this trust. The Ladds now operate a cattle ranch on this property. Jack

[1] Plaintiffs note that in their Complaint, they incorrectly referred to Ella M. Fike as Marie Ladd's "grandmother." After further research, Plaintiffs have clarified that she was actually Marie Ladd's "great aunt."
[2] *See* land patent from the United States to Ella M. Fike, signed by Theodore Roosevelt on December 4, 1903 (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 16 and Tab L).
[3] *See* Plaintiffs Proposed Findings of Uncontrovert Fact, paragraph no. 17 and Tabs B, D, G, and L.
[4] *See* Plaintiffs Proposed Findings of Uncontrovert Fact, paragraph no. 17 and Tabs A and E.
[5] The Ladds, individually, conveyed their interests in the Ladd Family Ranch to their trust, the John H. Ladd and Marie W. Ladd Trust, on which they serve as the trustees and beneficiaries. These conveyances into the Ladd Trust are as follows: the Special Warranty Deeds recorded on June 1, 1998 as Fee #980616283 and Fee #980616286 in the Cochise County Recorder of Deed's Office, and the Special Warranty Deed recorded on October 12, 2002 as Fee #021034971 in Cochise County Recorder of Deed's Office. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 18 and Tabs M, N, and O).

and Marie Ladd's son, John Ladd and his wife, Jobeth, also own fee title to a portion of the Ladd Family Ranch[6] The entire Ladd Family Ranch, as owned by Jack and Marie Ladd and by John and Jobeth Ladd, is shown on the Cochise County Assessor's map.[7] The portion of the abandoned SPROC right-of-way that burdens the Ladd's property is approximately six miles long and passes about 300 feet from the Ladd's home.[8] The Ladd Family Ranch includes fee title to property that abuts and underlies the abandoned SPROC right-of-way that was subject to the July 25, 2006 NITU.[9] The Ladd family was the fee owner of this property on the July 25, 2006 NITU.[10]

2. The Lindsey Family

In 1962, William Lindsey and his brother, Howard Lindsey, and Howard Lindsey's wife, Helen, acquired fee title to more than 60 acres of property in Cochise County, Arizona (the "Lindsey Property").[11] William Lindsey still holds title to his interest in the Lindsey Property individually.[12] Howard and Helen Lindsey transferred their interest in the Lindsey Property to the Harold A. Lindsey Revocable Trust (the "Lindsey Trust"). On October 30, 2002, the Lindsey Trust conveyed this property to Harold Lindsey's three children, Michael A. Lindsey, Gail A. Lanham, and James A. Lindsey.[13] The Lindsey Family's property includes fee title to property

---

[6] John and Jobeth Ladd acquired title to their property by Warranty Deed, recorded on February 2, 1984, as Docket No. 1726, Pages 241-43. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 19 and Tab P).
[7] *See* Cochise County Assessor's map depicting the Ladd's property. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 20 and Tab Q).
[8] *Id.*
[9] *See* the Ladd Family Deeds, attached as Tabs M, N, O, and P.
[10] *Id.*
[11] A copy of the Warranty Deed by which the Lindseys's acquired title to this property is attached as Tab R.
[12] *Id.*
[13] A copy of the Quitclaim Deed conveyed by the Harold A. Lindsey Revocable Trust to Harold Lindsey's three children is attached as Tab T.

that abuts and underlies the abandoned SPROC right-of-way that is now subject to the July 25, 2006 NITU and the STB's February 2007 Order extending the negotiating period for The Trust for Public Land and the SPROC to negotiate a Trail Use Agreement. The Lindsey Family was the fee owner of this property[14] on the July 25, 2006 NITU date.

3. The Charles Miller Family

Charles Raymond Miller and Pauline Miller are husband and wife. They acquired fee title, individually and through their revocable trusts ("the Charles Miller Family"), to a number of parcels of separately described property in Cochise County, Arizona.[15] The Charles Miller Family's property includes fee title to property that abuts and underlies the abandoned SPROC right-of-way that was subject to the July 25, 2006 NITU.[16] The Charles Miller Family was the fee owner of this property on the July 25, 2006 NITU.[17]

4. Valentin and Deborah Ann Castro

The Valentin Castro III and Deborah Ann Castro Revocable Trust, Valentin and Deborah Castro Trustees ("Castros"), acquired fee title to property in Cochise County, Arizona.[18] The

---

[14] *See* Tab R, Lindsay Warranty Deed, and Tab T, Lindsey Quitclaim Deed.

[15] The Charles Miller Family acquired fee title to their property in Cochise County, Arizona, by the following deeds: that Warranty Deed recorded in the Cochise County Recorder of Deed's Office on October 13, 1999 as Fee #991031019; that Quitclaim Deed recorded in the Cochise County Recorder of Deed's Office on April 20, 2000 as Fee #000411149; that Quitclaim Deed recorded in the Cochise County Recorder of Deed's Office on April 20, 2000 as Fee #000411150; and by that Quitclaim Deed recorded in the Cochise County Recorder of Deed's Office on August 1, 1986 as Fee #868816356. A copy of these deeds by which the Miller Family acquired their property are attached respectively as Tabs U, V, W, and X. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 29).

[16] *See* Plaintiffs' Proposed Findings of Uncontroverted Fact paragraph no. 29, and Tabs U, V, W, and X.

[17] *Id.*

[18] The Castros acquired fee title to property in Cochise County, Arizona, by that Quit Claim Deed recorded in the Cochise County Recorder of Deed's Office on January 3, 2006 as Fee #080100088. A copy of the Quit Claim Deed by which the Castros acquired their property is attached as Tab Y. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 31).

Castros property includes fee title to property that abuts and underlies the abandoned SPROC right-of-way that is subject to the July 25, 2006 NITU and February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.[19] The Castros were fee owners of this property July 25, 2006 (the NITU date).[20]

5. Singletree Ranch

John S. and Mary E. Gay ("Gays") are husband and wife who owned fee title to property in Cochise County, Arizona. The Gays subsequently transferred title to this property to Singletree Ranch, LLC, the beneficial ownership of which is held by John and Mary Gay and other members of the Gay family.[21] The Singletree Ranch includes fee title to property that abuts and underlies the abandoned SPROC right-of-way that is subject to the July 25, 2006 NITU and February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.[22]

6. Joseph Lawrence Heinzl

Joseph Lawrence Heinzl owns fee title to property in Cochise County, Arizona.[23] His property includes fee title to property that abuts and underlies the abandoned SPROC right-of-way that is subject to the July 25, 2006 NITU and February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.[24]

[19] *See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 31, and Tab Y.
[20] *See id.*
[21] A copy of the Gift Deed by which the Gays conveyed their property to Singletree Ranch, LLC, is attached as Tab Z. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 33).
[22] *See id.*
[23] Joseph Lawrence Heinzl acquired title by that Warranty Deed recorded with the Cochise County Recorder of Deed's Office on July 23, 1999 as Fee #990722817. A copy of the Warranty Deed by which Mr. Heinzl acquired his property is attached as Tab AA. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 35).
[24] *See id.*

7. The Col. Quentin Miller Family Trust

The Col. Quentin Miller Family Trust, Col. Quentin Miller, Trustee, acquired fee title to property in Cochise County, Arizona.[25] The Col. Quentin Miller Family Trust's property includes fee title to property that abuts and underlies the abandoned SPROC right-of-way that is subject to the July 25, 2006 NITU and February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.[26]

8. Tammy Windsor-Brown

Tammy Windsor-Brown owns fee title to property in Cochise County, Arizona.[27] Her property includes fee title to property that abuts and underlies the abandoned SPROC right-of-way that is subject to the July 25, 2006 NITU and February 2007 order extending the negotiating period for the Trust for Public Land and the SPROC to negotiate Trail Use Agreement.[28]

---

[25] The Col. Quentin Miller Family Trust acquired fee title by that Warranty Deed recorded in the Cochise County Recorder of Deed's Office on October 22, 1993 as Fee #931028778. A copy of the deed is attached as Tab BB. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 37).

[26] *See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 37, and Tab BB.

[27] Tammy Windsor-Brown acquired fee title to that property by that Quitclaim Deed recorded in the Cochise County Recorder of Deed's Office on December 5, 2002 as Fee #021239035. A copy of the deed is attached as Tab CC. (*See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 39).

[28] *See* Plaintiffs' Proposed Findings of Uncontroverted Fact, paragraph no. 39.

## APPENDIX 2:

**Justice Brennan's summary of the legislative history underlying the 1983 Amendments to the Trails Act.**

In 1920, the Nation's railway system reached its peak of 272,000 miles; today only about 141,000 miles are in use, and experts predict that 3,000 miles will be abandoned every year through the end of this century. Concerned about the loss of trackage, Congress included in the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act), Pub. L. 94-210, 90 Stat. 144, as amended, 49 U.S.C. 10906 (1982 ed.), several provisions aimed at promoting the conversion of abandoned lines to trails. Section 809(a) of the 4-R Act required the Secretary of Transportation to prepare a report on alternative uses for abandoned railroad rights-of-way. Section 809(b) authorized the Secretary of the Interior to encourage conversion of abandoned rights-of-way to recreational and conservational uses through financial, educational, and technical assistance to local, state, and federal agencies. *See* note following 49 U.S.C. 10906 (1982 ed.). Section 809(c) authorized the Interstate Commerce Commission (ICC or Commission) to delay the disposition of rail property for up to 180 days after the effective date of an order permitting abandonment, unless the property had first been offered for sale on reasonable terms for public purposes including recreational use. *See* 49 U.S.C. 10906 (1982 ed.).

By 1983, Congress recognized that these measures "ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H. R. Rep. No. 98-28, p. 8 (1983) (H. R. Rep.); S. Rep. No. 98-1, p. 9 (1983) (S. Rep.) (same). Congress enacted the Amendments to the Trails Act, which authorize the ICC to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails. Section 8(d) provides that a railroad wishing to cease operations along a particular route may negotiate with a

State, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way. If the parties reach agreement, the land may be transferred to the trail operator for interim trail use, subject to ICC-imposed terms and conditions; if no agreement is reached, the railroad may abandon the line entirely and liquidate its interest.

Section 8(d) of the amended Trails Act provides that interim trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. 1247(d). at 6-8 *(footnotes omitted)*.

## APPENDIX 3

**The Department of Justice's Summary of the Facts in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), as recanted in the Department of Justice's appellate brief (a complete copy is attached as Exhibit 1).**

On July 5, 1994, The Norfolk Southern filed with the ICC a notice of its request to abandon railroad service over a rail line in Columbus, Georgia, which rail line included the Caldwell property. The City of Columbus requested that the ICC issue a NITU under the Trails Act. The ICC issued a NITU effective August 31, 1994. On February 23, 1995, before the 180-day negotiating period expired, the City and Norfolk Southern jointly requested that the negotiating period be extended another 180 days and that the NITU be expanded to cover an additional 3.2 mile segment of the Warm Springs Rail Line. Norfolk Southern had obtained permission to abandon the 3.2 mile segment years earlier, but had never consummated the abandonment. Effective June 2, 1995, the ICC extended the negotiating period 180-days from its original expiration date to August 26, 1995 and consolidated the 3.2 mile segment into the proceeding. On August 17, 1995, Norfolk Southern entered into a Purchase and Sale Agreement with the Trust for Public Land, the organization the City selected to negotiate the acquisition of the corridor. The Purchase and Sale Agreement provided for closing within one year and permitted the Trust to terminate the agreement. ***

On April 30, 1996, the Columbus City Council authorized the purchase of the corridor. The Trust and Norfolk Southern amended the agreement again on July 1, 1996 to include Norfolk Southern's consent to the assignment of the Trust's rights and duties under the Agreement to the City. The Trust assigned its interests under the Purchase and Sale Agreement to the City the following day. In the July 1, 1996 amendment, the Trust and Norfolk Southern also agreed to (a) join in the City's motion with the STB (successor the ICC) to again extend the

NITU and (b) extend the closing date to the earlier of 75 days after the granting of that motion or December 20, 1996. In its motion filed on July 5, 1996, the City informed the ICC that a "railbanking agreement has been reached by the parties," but sought to extend the negotiation period under the NITU to November 1, 1996 "to ensure that the railbanking period extends through the actual transfer of the corridor to the interim trail manager * * * and to cover any gaps that may have inadvertently occurred in the railbanking negotiating period."

By quitclaim deed dated October 9, 1996 and recorded October 14, 1996, Norfolk Southern transferred its interest in the corridor to the City, subject to the terms of the NITU and the Trails Act. On November 5, 1996, the City notified the STB that the corridor had been transferred to the City on October 13, 1996. On April 30, 1996, the Columbus City Council authorized the purchase of the corridor.

# APPENDIX 4

**Law in numerous jurisdictions holding that a grant of a "right-of-way" to a railroad conveys only an easement.**

(1) In *United States v. Magnolia Petroleum Co.*, 110 F.2d 212, 217 (C.A. 10 1939), the court stated:

> It is the general rule that the servient estate in a strip of land set apart for a railroad or highway right-of-way, or for a street, or a small area set apart for school, church, or other public purpose, passes with a conveyance of the fee to the abutting legal subdivision or tract out of which the strip or small area was carved even though no express provision to that effect is contained in the instrument of conveyance, and that on the abandonment of the strip or small area of the purpose for which it was set apart and dedicated the dominant estate becomes extinguished and the entire title and estate vests in the owner of such abutting legal subdivision or tract.

(2) In *Rogers v. Pitchford*, 184 S.E. 623 (Ga. 1936), the successor in title to a railroad company sought to enjoin defendant, the successor in interest to the original owner of the property, which had been conveyed to the company for railroad purposes, from trespassing thereon. The parties stipulated at trial that if the deed to the company conveyed only an easement, then the petitioner had not acquired title to the property, which had been abandoned for railroad purposes prior to the deed from the railroad to plaintiff, but that if the deed to the company conveyed to it a fee simple title, petitioner received title under the deed to him and was entitled to recover. The Georgia Supreme Court construed the deed in question as conveying an easement and accordingly affirmed the trial court in refusing an injunction.

(3) In *Jackson v. Crutchfield*, 191 S.E. 468, 471 (1937), where it appeared that a landowner conveyed a right of way across his land to a railroad company, that his executor subsequently deeded the land to the plaintiffs' ancestor, and that the defendant was the grantee of the receiver of the railroad company, which had abandoned the land for railroad purposes, it was held that under the evidence the jury was entitled to find that the deed to the railroad company passed only

an easement in the property for railroad purposes and that "upon the abandonment of the railroad all and any rights of the railroad company, its successors and assigns, to said lands and the appurtenances thereof were forfeited and the property conveyed reverted to the plaintiffs as the sole heirs of [their ancestor], to whom the lands through which the railroad right of way ran were subsequently conveyed by the executor of the grantor to the railroad company."

(4) In *Barton v. Jarvis*, 291 S.W. 38 (Ky 1927), the plaintiff, who had purchased one of the lots abutting the railroad company's strip, sought to enjoin the defendant, to whom the railroad had attempted to convey the entire length of the strip of land between the edge of the highway farthest from its track and the western boundary of the strip of land between the edge of the highway farthest from its track and the western boundary of the strip as originally conveyed to it, from obstructing plaintiff's access to the highway. The Supreme Court of Kentucky held that since the railroad company received only an easement under the original deed to it and since its action in attempting to convey to defendant a portion of the land covered by such easement amounted to an abandonment of that portion for railroad purposes, title thereto reverted to the purchasers of lots abutting on the strip originally conveyed to the railroad, and plaintiff was consequently entitled to maintain his suit.

(5) The Missouri Supreme Court in *Jones v. Van Bochove*, 61 N.W. 342 (Mich 1894), where it appeared that a landowner conveyed a right of way for railroad purposes through land owned by him, that he died leaving his real property to his children, through whom defendant claimed title to the tract on which the right of way strip abutted, the land having been abandoned for railway purposes, and that plaintiff derived his claim to the strip by mesne conveyances from the grantee named in the right of way deed, held that since the deed for railway purposes conveyed an easement rather than a fee and since the evidence clearly established an abandonment of the

right of way, the title to the strip in question had become vested in defendant and plaintiff was not entitled to maintain his present action for trespass.

(6) The Missouri Supreme Court in *Roanoke Invest. Co. v. Kansas City & S.E. R. Co.*, 17 S.W. 1000 (Mo. 1891), held that the trial court had correctly concluded that the original deed for railroad purposes passed a mere easement to the strip covered by the right of way and that, an abandonment of such easement having been clearly established, plaintiff acquired title to the tract in question discharged of the easement and was consequently entitled to the relief sought.

(7) In *Brown v. Weare,* 152 S.W.2d 649 (Mo. 1941), the Missouri Supreme Court held that the interest in land held by a railroad for right-of-way were to be narrowly construed, not broadly recognized. *Brown* concerned whether a recorded instrument of title which was fashioned as a general warranty deed conveyed fee title to the railroad or only a limited easement to use the property for the sole purpose of operating a railroad. The Missouri Supreme Court held that the recorded instrument conveyed only the lesser interest in the property, an easement to use the property for a railroad. In *Brown*, the court wrote:

> The law is settled in this state that when a railroad acquires a right of way whether by condemnation, by voluntary grant or by a conveyance in fee upon a valuable consideration the railroad takes but a mere easement over the land and not the fee...we have pointed out that it is the public policy of this State that a railroad acquires an easement only in a right of way...." at 658-656.

(8) In *Allen v. Beasley*, 249 S.W. 387 (Mo. 1923), the Missouri Supreme Court held that since the land was conveyed for railroad purposes the company received only an easement and not the fee therein, although the deed contained no reservation as to the use to which the property was to be put, that upon the abandonment of the property for railroad purposes the title reverted back to plaintiff, and that the latter was accordingly entitled to maintain his present action in ejectment to recover possession of the land.

(9) Further, in *Missouri P. R. Co. v. Bradbury*, 79 S.W. 966 (Mo. 1904), an action by plaintiff railroad to enjoin defendants from removing the rails lying in a part of plaintiff's right of way, which had been abandoned by plaintiff, it appeared that defendants had purchased the rails from the landowners who had originally conveyed to plaintiff the right of way in question, and it was held that by plaintiff's abandonment of the property the easement thereover for railroad purposes was extinguished, the land became discharged of the burden, and the right of way strip reverted to the owners of the servient estate, and that, the rails having become realty by their attachment to the soil, title thereto vested in the landowners upon the abandonment of the land for railroad purposes and passed to defendants under their purchase.

(10) *Rombauer v. St. Louis-San Francisco Ry. Co.*, 34 S.W.2d 155 (Mo.App. 1931) arose in the context of a written easement which contacted, "a broad and general grant" allowing the railroad to make use of the property, "for a railroad right-of-way, and for all purposes incident to or connected with the maintenance and operation of a railroad." The Court was called upon to interpret this language in the specific written and recorded easement which they placed into the context of a dispute about the "particular uses to which railroad property may ordinarily be put as against objections of the owner of the fee." The Court construed this written provision in the context of the general principle of law that, "[o]f course, the authorities are all of one accord that, where a right-of-way is granted by a deed specifically defining and limiting the easement granted, the railroad company can acquire no greater right or interest in the land, or subject it to a more extensive easement or a heavier burden, then is passed or authorized by the deed." *Id.* at 155-57.

## APPENDIX 5

**Defendant's post-*Caldwell* concession that the NITU alone (without abandonment of right-of-way by railroad and without Trail Use Agreement being reached) is a taking of the land owner's property:**

In the Federal Government's Renewed Motion to Dismiss in *Illig v. United States*, 58 Fed. Cl. 619 (2003), pages 10-11:

> The Federal Circuit found that "[t]he NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." ***
>
> The Caldwell decision unequivocally holds that a Fifth Amendment takings claim under the Trails Act accrues when a NITU is issued because this is the date on which any existing state law reversionary interests that would otherwise take effect pursuant to normal abandonment proceedings are forestalled. ***
>
> The NITU is the triggering event which forestalled the operation of state law and Plaintiffs' realization of any reversionary interests they held in the subject right-of-way.

In the Federal Government's Response to Plaintiffs' Sur-Reply to Defendant's Renewed Motion to Dismiss in *Illig v. United States*, pages, 9-10:

> The claim accrual rule set forth in Caldwell is not based on the point in time when the plaintiff regains unencumbered fee title because of the termination or abandonment of a railroad easement. Instead, the question is when the alleged "reversion" of property under state law (either the termination of an easement or the vesting of a reversionary interest by operation of state law) is preempted or forestalled by operation of the Trails Act. In other words, the decision recognizes that when a railroad seeks regulatory authorization to abandon its line from the ICC or STB, it has taken a step toward actual abandonment of its interest in the right-of-way lands as a matter of state law. However, the issuance of the NITU interferes with that state law process because once a NITU is issued, the railbanking and interim trail use "shall not be treated, for the purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). The Federal Circuit's decision thus properly hinges claim accrual on that point in time when federal action caused the state law abandonment process to be blocked, forestalled or interrupted, and correctly finds that this occurs when a NITU is issued.***
>
> Simply stated, the Trails Act operates by preempting the state law abandonment process. There is no support in the Act itself, or in the Caldwell decision, for plaintiffs' assertion that the state law abandonment must have occurred and the plaintiffs' must have regained full uncumbered fee title in order to bring a takings

> claim against the United States. Plaintiffs' ownership of a fee interest subject to a railroad easement is a present interest. If the Trails Act – through the issuance of a NITU – prevents the extinguishment or abandonment of that easement under state law, an interference with plaintiffs' property rights (the right to regain encumbered fee simple title) has occurred and plaintiffs' takings claim accrues. This is the holding of Caldwell, and that decision is binding precedent in this Court.

In the Federal Government's Response to Plaintiffs' Post-Argument Letter, in *Illig v. United States*, pages 1-2:

> Plaintiffs did possess a present interest in the subject property in March 1992. Specifically, they were (or allegedly were) the fee owners of land burdened by a railroad easement in March 1992. This present interest encompasses the right to regain full unencumbered fee title to the subject property (a strip of land burdened by a railroad easement) if and when that easement was extinguished under state law, by abandonment or any other means provided by state law. The fact that the railroad easement in question was an exclusive use easement does not mean – as plaintiffs appear to now contend – that the plaintiffs did not possess a present interest in that property.***
>
> The Trails Act operates to preclude the operation of state law and preclude the easement in question from being extinguished or otherwise terminated under state law.

Oral Argument, before Judge Bruggink, June 17, 2005, *Illig v. United States*, 58 Fed. Cl. 619 (2003):

**Ms. Tardiff [counsel for the Federal Government]**: As the Federal Circuit has ruled on the statute of limitations, the claim-accrual date in *Caldwell*, as of April 1st in this case, these Plaintiffs had a valid takings claim against the government because what the NITU[29] does, in these circumstances, by operation of the Trails Act, it preempts the operation of state law in terms of abandonment. (P. 4)

***

**The Court**: What precisely would we be measuring by way of damages at this point?

**Ms. Tardiff**: If all of that happens before a trial-use agreement is entered into? (P. 4)

***

**Ms.Tardiff**: I think, by way of damages, because you don't have anything that has happened at that point that narrows the effect of the NITU, or termiates the NITU, the NITU, at that point,

[29] Plaintiffs note that the original transcript mistakenly refers to the NITU as a "need-to." For clarification, Plaintiffs have changed all references to read "NITU."



STLDOCS 210747v1

places a burden on the Plaintiffs' property interest, and I think you would be measuring it as a permanent taking if liability is established.

If, by some subsequent act, the NITU is revoked, and the state-law abandonment process is allowed to proceed, then your permanent taking may be converted into a temporary taking. But I think the Federal Circuit addressed that in *Caldwell*, and said: that it doesn't change your claim-accrual date. The claim still accrues when the NITU is issued, regardless of whether it is permanent, or becomes temporary by virtue of a subsequent action. (P. 5)

***

**The Court**: I know, but even for liability there has to be an interest in property taken. What was the interest that was taken?

**Ms. Tardiff**: The interest that is taken, as I understand the *Caldwell* decision, and having lived with *Caldwell* for a long time because I was with the trial attorney in that case, the interest taken is really the plaintiff's right to essentially recover full unencumbered fee title when the plaintiff is the fee owner of property with a railroad right of easement encumbering that fee title.

What would happen, but for the Trails Act, is: the railroad would abandon. Under state law, that abandonment would essentially terminate the easement and the plaintiffs would recover full, unencumbered fee. So what the Trails Act does is: It comes in and it interrupts that process, that state-law abandonment process. And says: By operation of this Trails Act, rail banking and interim-trail use shall not be treated as abandonment as a matter of state law.

So what is taken is that right to gain back full, unencumbered fee title (P. 9).

***

**Ms. Tardiff**: In terms of those cases where, under state law, it might be determined that there was abandonment before the NITU, I think *Caldwell* really operates the same way and says that the NITU still becomes your triggering event because, even if you assumed that that abandonment process has, in fact, taken place, then what federal law does in those circumstances is: come in and impose a new burden on the unencumbered fee.

So I really don't think,regardless of when state-law abandonment occurs, whether it is before the NITU or something that would have occurred but-for the NITU at a latter date, the NITU still becomes the trigger point in terms of claim accrual. (P. 10).

***

**Ms. Tardiff**: At the time a NITU is issued, landowners, such as the Illigs, do have an interest, a property right under state law.

They are the fee owners of land that is encumbered by a railroad easement. But for operation of the Trails Act, the Surface Transportation Board would issue abandonment authorization, that

regulatory authorization that gives the railroad the right to proceed to abandon its rail line; and those actions, under state law, would then eventually result in an actual abandonment of the corridor, which would terminate the easement and the plaintiffs would recover full, unencumbered fee title. At which point, they have, once again, control, possession and the right to use that fee land, unencumbered by a railroad easement, unencumbered by a trail easement. (P. 20).

***

**Ms. Tardiff**: [the property owners] owned fee title subject to the railroad easement. What the Trails Act does is it preempts, or interrupts, that state-law abandonment process.

That action, I think the Federal Circuit correctly held is what interferes with the plaintiffs' ownership. It prevents them from regaining unencumbered fee title; and it is at that point that any claim against the United States accrues. (P. 21)

## APPENDIX 6:

**Fundamental Nature of a Citizen's Constitutionally Protected Rights to Their Land.**

"The right of eminent domain, or inherent sovereign power, it is admitted by all publicists, gives to the legislature the control of private property for public uses, and for public uses only. Roads may be cut through the cultivated lands of individuals without their consent, provided it be done by town officers of their own appointment, upon the previous application of twelve freeholders; and the value of the lands, and amount of the damages, must be assessed by a jury, and paid to the owner.

In these, and other instances which might be enumerated, the interest of the public is deemed paramount to that of any private individual; and yet, even here, the constitutions of the United States, and of this state, and of most of the other states of the Union, have imposed a great and valuable check upon the exercise of legislative power, by declaring, that private property should not be taken for public use without just compensation. A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property without his consent; and this principle in American constitutional jurisprudence, is founded in natural equity, and is laid down by jurists as an acknowledged principle of universal law." James Kent, "*Commentaries on American Law*", Lecture XXXIV.

"The concluding clause is, that private property shall not be taken for public use without just compensation. This is an affirmance of a great doctrine established by the common law for the protection of private property. It is founded in natural equity, and is laid down by jurists as a principle of universal law. Indeed, in a free government, almost all other rights would become utterly worthless, if the government possessed an uncontrollable power over the private fortune

of every citizen. One of the fundamental objects of every good government must be the due administration of justice; and how vain it would be to speak of such an administration, when all property is subject to the will or caprice of the legislature, and the rulers." Joseph Story, "*Commentary on the Constitution of the United States*" 1833, Vol. III, §§ 1784.

"The third absolute right, inherent in every Englishman, is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land. The original of private property is probably founded in nature.

So great, moreover, is the regard of the law for private property, that it will not authorize the least violation of it; no, not even for the general good of the whole community. If a new road, for instance, were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without consent of the owner of the land. In vain may it be urged, that the good of the individual ought to yield to that of the community; for it would be dangerous to allow any private man, or even public tribunal, to be the judge of this common good, and to decide whether it be expedient or no. Besides, the public good is in nothing more essentially interested than in the protection of every individual's private rights, as modeled by the municipal law. In this and similar cases the legislature alone can, and indeed frequently does, interpose, and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner; but by giving him a full indemnification and equivalent for the injury thereby sustained. The public is now considered as an individual, treating with an individual for an exchange. All that the legislature does is to oblige the owner to alienate his possessions for a reasonable price; and even this is an exertion of power, which the legislature

indulges with caution, and which nothing but the legislature can perform." William Blackstone, *Commentaries on the Laws of England,* 1753, Book I, §§ 191-192.

Indeed, one can go back even further to biblical authority recognizing the importance of private property and rights of individual property owners against the limitations upon sovereign taking of the property. See the account of King Ahab and his scheme to take Naboth's vineyard and a perversion of the judicial process to do so. The prophet Elijah condemned this injustice – I Kings, 21.

*See also*, David A. Thomas, "Why The Public Plundering of Private Property Rights Is Still A Very Bad Idea." 41 Real Property, Probate And Trust Journal, 25. (Spring 2006). Professor Thomas is author of the oft-quoted 15 volume treatise, Thompson on Real Property. Professor Thomas noted that:

> The spread of private ownership rights throughout the American population was an essential element in creating the prosperity, health, education, and ambition that have made this country the greatest nation in the history of the planet. *** Today, however, the challenge seems not to be how to deal with private bullies, but how to contain the public bully. If that challenge is not successfully met, the result could be permanent, unfortunate, and unnecessary changes in our way of life. *** The profoundly wise Constitution contains three guiding beacons for resolving these difficult issues. If more attention were given to following these beacons conscientiously rather than seeking to evade them, a workable and healthy balance of private and public property rights could be achieved. *** The third beacon is that any deprivation of private property, whether of the land itself or of the rights in the land, should be compensable. *** Predictions of doom for governmental entities required to carry greater compensation burdens do not ameliorate the unconstitutionality, illegality, and moral perfidy of wrongful depravations of private property by irresistible public power. To suggest that property rights should be vulnerable to subjective notions of changing societal values is to negate the rule of law. Changing values can indeed be invoked, but only for a democratically acceptable notion of public use, and only accompanied by just compensation. at 71.