the City and Norfolk Southern entered into a trail use agreement, not when the ICC issued the NITU and not when the deed to the corridor changed hands. As discussed above, the terms of the trail use agreement are set forth in the purchase and sale agreement entered into between the Trust for Public Land and the railroad on August 17, 1995, as amended on April 18, 1996, and again on July 1, 1996, and assigned to the City on July 2, 1996. JA407, 425, 428, 404. On July 5, 1996, the City notified the ICC that the parties had entered into a trail use agreement. JA446. The Court need not determine when precisely the purchase and sale agreement became effective as a trail use agreement for purposes of claim accrual, because Caldwell's complaint was untimely using even the most recent of the above dates (July 5, 1996, the date the CFC adopted).

In determining when a taking occurred, the Court must first identify the property the government allegedly took. Alliance of Descendants, 37 F.3d at 1481. Caldwell's complaint alleged that the United States took his property because converting the rail corridor to interim trail use under the Trails Act preempted his reversionary rights under state law. JA39 ¶¶18, 20.[6] Caldwell thus alleged that it

[6] In Preseault, the Court explained that the proper terminology to describe Caldwell's property interest here is "a fee simple, burdened, during the life of the easement, by the easement-holder's rights." 100 F.3d 1534. We use "reversionary rights" as a shorthand to describe that interest, consistent with Caldwell's complaint and the Supreme Court's discussion 4 U.S. at 8.



EXHIBIT 1 (Part 2)

was the preemption of his rights under state property law by operation of the Trails Act that caused the taking. Caldwell's allegation is consistent with Preseault, where the Court concluded that a taking occurs "[w]hen state-defined property rights are destroyed by the Federal Government's preemptive power." 100 F.3d at 1552; see also Preseault, 494 U.S. at 21-22 (O'Connor, J., concurring). In this case, that preemption occurred, if at all, when the parties entered into their interim trail use agreement and the NITU took effect.

As described above, under federal law, the NITU authorizes railbanking and interim trail use, contingent upon the parties reaching a trail use agreement. Once the parties reach an agreement, that condition is satisfied, and interim trail use may be implemented without further federal action. 49 C.F.R. § 1152.29(d)(2); Preseault, 494 U.S. at 7 n.5; Jost, 194 F.3d at 82. In other words, the NITU provides time for the parties to negotiate, but until they reach an interim trail use agreement the NITU is effectively inchoate; the underlying landowner's reversionary rights might still vest after the negotiation period ends if there is no trail use agreement and the rail carrier abandons the line. Accordingly, the CFC held correctly that it is when the parties reach a trail use agreement that the

underlying landowner's reversionary rights are preempted, if ever.[7]

This analysis is consistent with the plurality opinion in Preseault, which observed that enactment of the Trails Act alone would not constitute a taking. Rather, the Act "requires an administrative decision to apply the law" before a potential taking claim arises. 100 F.3d at 1538. "Until the ICC makes the administrative decision to convert an unused right-of-way to a trail, rather than simply permit abandonment, and finds an appropriate public agency to operate the trail, a landowner's suit for a taking would run afoul of established requirements for exhaustion of administrative remedies." Id. In the particular circumstances presented in this case, the administrative agency's decision to allow conversion of the corridor to interim trail use became fully and finally effective when the parties

[7] Of course, the CFC did not determine whether the application of the Trails Act actually preempted Caldwell's reversionary rights under state law. If this case is remanded, Caldwell will have to show that the interest in the corridor would have reverted to him under state law were it not for the federal action. If under state law Caldwell's interest in the corridor would not revert during interim trail use and railbanking, then there is no preemption and no taking. See Preseault, 494 U.S. at 16 n.9 ("Some state courts have held that trail use does not constitute abandonment of a right-of-way for public travel so as to trigger reversionary rights."); id. at 20-21 (O'Connor, J., concurring); Preseault, 100 F.3d at 1555 ("if the right-of-way still exists, and if the current use of the original right-of-way is permissible under Vermont law, then the Preseaults would have no present right to claim ownership of the underlying land, free of the burden on their property created by the trail.") (Clevenger, J., dissenting). However, it is not necessary to answer the question of whether the Trails Act actually preempted Caldwell's reversionary rights to affirm the CFC's judgment.

entered into a trail use agreement. Therefore, that is the date from which the statute of limitations should run.

Of course, each taking case challenging the Trails Act must be decided on its particular facts. See Florida Rock Industries, Inc. v. United States, 18 F.3d 1560, 1570 (Fed. Cir. 1994). The reaching of the trail use agreement might not trigger the statute of limitations in all cases. For example, in Preseault, the parties had already reached an agreement before the ICC issued a NITU. Preseault, 100 F.3d at 1549. On those facts, the CFC appropriately adopted February 5, 1986, the date the NITU "became effective," as the date of taking. Preseault, 52 Fed. Cl. 667, 684 (2002); Preseault, 27 Fed. Cl. 69, 82 (1992). Here, however, there was no agreement when the NITU was issued, and, therefore, the CFC held correctly that the taking claim accrued (if at all) when the parties reached a trail use agreement. It was then (if ever) that federal law preempted Caldwell's reversionary rights under state law. The fact that the Trust could have terminated the agreement before closing is of no consequence here. In the agreement, the Trust committed to purchasing the property, JA408, and in the April 18, 1996 amendment, it expressly committed to taking over the management, liability, and payment of taxes for the corridor and agreed to railbanking, JA425, which satisfied the statutory requirements for interim trail use.

Caldwell concedes that the NITU temporarily prevents abandonment and the possibility of reversion under state law, but contends that the alleged taking does not become permanent until the use of the corridor is actually changed. Br. at 30. Essentially, Caldwell suggests that there are two possible takings: a temporary taking that accrues when the parties reach an interim trail use agreement and the NITU becomes effective and a permanent taking that accrues when the corridor is actually converted to interim trail use. On the contrary, the government's action under the Trails Act is one action that might cause one taking. The taking might turn out to be temporary if, for example, the interim trail use agreement is terminated and the rail carrier subsequently abandons the line. But the temporary taking that might be caused when the NITU and interim trail use agreement prevent reversion under state law does not end when (or if) title to the corridor is later transferred or the use of the corridor later changes. Rather, that same potential taking continues and becomes permanent. See Cooley v. United States, 324 F.3d 1297, 1305 (Fed. Cir. 2003) (holding permit denial was final agency action that might give rise to taking claim, but remanding for determination of whether later granting of permit rendered taking temporary); Wyatt v. United States, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001) ("A temporary taking occurs when what would otherwise be a permanent taking is temporally cut short."). Therefore, in

conceding that the interim trail use agreement prevents the potential reversion of the corridor under state law, Caldwell concedes that he could have filed a taking claim challenging the government's action here after the parties reached an agreement and thus concedes that his claim accrued at that time.[8]

Despite that concession, Caldwell asserts that his claim did not accrue until title to the rail corridor changed hands in October, 1996. Br. at 13, 34. The CFC properly rejected that argument. JA8-11. By the time Norfolk Southern sold the property to the City, the operation of the Trails Act had already interfered with Caldwell's reversionary right (if it interfered at all). Once the parties entered into a trail use agreement, interim trail use was authorized without further federal action, and the City could only terminate trail use and abandon the corridor by petitioning the STB to vacate the NITU. 49 C.F.R. § 1152.29(d)(2). Thus, the administrative action authorizing conversion of the corridor to interim trail use had already become fully and finally effective before the property was actually sold.

In addition, as far as the Trails Act is concerned, it makes no difference whether title to the corridor transfers or not. The Trails Act specifically provides that railbanking can be accomplished through "donation, transfer, lease, sale or

---

[8] Caldwell explains for the first time on appeal that he is asserting a physical taking claim. Br. at 26-27. The Court need not determine whether Caldwell's complaint asserted a physical or regulatory taking to affirm the CFC's judgment.

otherwise." 16 U.S.C. § 1247(d). The Trails Act regulations similarly contemplate that a trail group need not acquire the corridor, but can "use" the rail corridor for interim trail use if it agrees to railbanking and assumes full responsibility for the corridor during the period of interim trail use. 49 C.F.R. § 1152.29(a). Since the Trails Act and STB regulations require no deed to effectuate interim trail use, a taking claim based on the operation of the Trails Act cannot be triggered by delivery of a deed.

Moreover, the United States has no role in a transfer of the ownership interest in a rail corridor for railbanking and interim trail use. "The language of the Fifth Amendment itself requires that the United States * * * commit the taking action." Alliance of Descendants, 37 F.3d at 1482. The sale of property for Trails Act purposes, however, does not implicate the United States in any way, but is purely private action. Regardless of whether the title ultimately transfers or not, once the parties enter into an agreement, interim trail use is authorized. The NITU and interim trail use agreement constitute the government action that might allegedly constitute a taking by preventing the reversion of property rights under state law. See Preseault, 100 F.3d at 1554 ("the United States facilitated that conversion with its laws and regulatory approval") (Rader, J., concurring). Compare Alliance of Descendants, 37 F.3d at 1482 (holding ratification in 1941 of

treaty that extinguished legal claims was the "taking action," even though Mexico did not deny claims and leave plaintiffs without compensation until 1989).

On appeal, Caldwell contends that the potential taking occurs when "the railroad actually turns the easement over to trail use." E.g., Br. at 29, 31. Again, the question for federal takings purposes is not when the use of the corridor changes, but rather when the alleged reversion of the property under state law is preempted by federal action. JA39 ¶¶18, 20; Preseault, 100 F.3d at 1552; see also Preseault, 494 U.S. at 21-22 (O'Connor, J., concurring). Under Caldwell's view, land owners might be forced to wait for years after a Trails Act agreement is reached until a trail is fully developed before they can file takings claims alleging that their reversionary interests have been preempted. That approach might be in Caldwell's interest in this case, but it does not benefit land owners whose attorneys file timely complaints.

Finally, Caldwell alleges that the limitations period here should be tolled because he did not know that the rail corridor had been railbanked. Br. at 34. Caldwell did not raise this argument in the trial court and hence has not preserved it for appeal. Sage Products, Inc. v. Devon Industries, Inc., 126 F.3d 1420, 1426 (Fed. Cir. 1997). Nonetheless, if Caldwell had raised this argument below, he would have borne the burden of proving that he lacked knowledge of the claim and

that, exercising reasonable diligence, he could not have known about it within the limitations period. E.g., Geo. Knight & Co., Inc. v. Watson Wyatt & Co., 170 F.3d 210, 213 (1st Cir. 1999). Caldwell could not meet that burden here. Norfolk Southern's intent to abandon the corridor and the City's plans to acquire it and convert it to trail use were public, as were the proceedings in the ICC.[9] The fact that the corridor was not going to be abandoned and Caldwell's interest in the corridor was not going to revert to him was knowable long before the deed passed.

## II. The CFC held correctly that the statute of limitations was not tolled by another pending class action.

Caldwell contends that the statute of limitations was tolled during the pendency of a class action filed by Cheryl Swisher in October, 1998. Br. at 38. The Swisher complaint defined the class as all persons owning an interest in a rail corridor that has been railbanked under the Trails Act and who have suffered

[9] As explained in National Ass'n of Reversionary Property Owners, 158 F.3d at 138, a rail carrier proposing to abandon a corridor must provide newspaper notice, which indicates that trail use requests may be filed. Federal register notice also is provided in every abandonment proceeding. E.g., JA389-90; 49 C.F.R. §§ 1152.22(i), 1152.50(d)(3) ("The Board * * * shall publish a notice in the Federal Register within 20 days after the filing of the notice of exemption. The notice shall include a statement to alert the public that following any abandonment of rail service and salvage of the line, the line may be suitable for other public use, including interim trail use."), 1152.60(c). Accordingly, there is ample opportunity for interested parties like Caldwell to learn about potential plans for interim trail use early in the process.

damages of $10,000 or less or waive claims exceeding that amount. JA873 ¶7, amended JA881 ¶7. The federal district court in Kansas denied class certification on September 22, 1999, for lack of typicality because the representative plaintiff's claims did not sufficiently resemble the claims of the proposed class. Swisher v. United States, 189 F.R.D. 638, 640-42 (D. Kan. 1999). The court also held that the plaintiff had failed to satisfy Rule 23(b)(3). "In particular," the court found that a class action "would be extremely difficult to manage because of the complex and individualized nature of the takings' inquiry." Id. at 643.

Caldwell raised this issue for the first time in his motion for reconsideration under Rule 59(a). The CFC denied the motion, finding Caldwell's contention that this information was previously "unknowable" to be a "failing argument" and holding that no case law supported Caldwell's position on the merits. JA19-20. The court also denied the motion "based on the reasons set forth in" the government's responsive brief. JA20. On appeal, Caldwell reargues the merits of his tolling argument, but does not show how his motion met the standards of Rule 59(a). His failure to address that question in his opening brief constitutes a waiver of the issue, and the Court need not address this question. Rumsfeld v. Freedom, NY, Inc., 346 F.3d 1359, 1361 (Fed. Cir. 2003). In any event, the CFC did not abuse its discretion in denying Caldwell's motion for the following reasons.

As this Court's predecessor observed, "[t]he reargument of cases cannot be permitted upon the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged, with no more satisfactory results, as there would still be a losing party in the end." Roche v. District of Columbia, 18 Ct. Cl. 289, 290 (1883). Accordingly, a party moving for reconsideration must show "(1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." Fru-Con Constr. Corp. v. United States, 44 Fed. Cl. 298, 301 (1999), aff'd 250 F.3d 762 (Fed. Cir. 2000) (unpublished); see also 11 Federal Practice & Procedure § 2804 & n.7 ("A motion for a new trial in a nonjury case or a petition for rehearing should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons.") (listing cases). This case does not meet that test.

First, the tolling argument Caldwell raised for the first time on reconsideration was available at the time he responded to the government's motion to dismiss in March, 2003. The argument is based upon American Pipe & Construction Co. v. Utah, 414 U.S. 538 (1974), and Crown, Cork & Seal Co., Inc.

v. Parker, 462 U.S. 345 (1983). See Br. at 40. Thus, no change in the controlling law justified reconsideration.

Second, Caldwell presented no evidence in support of his motion that was previously unavailable. "[A] strong public policy precludes a reconsideration motion based on evidence that was readily available at the time the original motion was heard." Fru-Con Constr., 44 Fed. Cl. at 301 (citing General Electric Co. v. 189 Ct. Cl. 116, 117-18 (1969)). For example, in Vulcan Engineering Co., Inc. v. Fata Aluminum, Inc., 278 F.3d 1366 (Fed. Cir. 2002), this Court affirmed the denial of a motion for a new trial based on newly discovered evidence because the assertedly new evidence was "readily available public information." Id. at 1380; see also, e.g., United States v. Dailide, 316 F.3d 611, 621 (6th Cir. 2003) (holding under Fed. R. Civ. P. 59 that new evidence must not have been discoverable earlier through due diligence); Stephens v. Rheem Mfg. Co., 220 F.3d 882, 886 (8th Cir. 2000) (same).

The only new "evidence" Caldwell presented in support of his motion was the Swisher decision. However, that decision was published in 1999 and hence was readily available at the time Caldwell opposed the government's motion to dismiss. Swisher, 189 F.R.D. at 640-42. A search on an electronic database such as Westlaw would have unearthed this material. Thus, the Swisher decision was

not previously unavailable, and Caldwell did not exercise reasonable diligence in discovering it.

Third, Caldwell's motion was not necessary to prevent manifest injustice. Caldwell could easily have raised this argument in response to the government's motion to dismiss. The CFC certainly did not abuse its discretion in denying the motion on that ground. In addition, Caldwell's motion lacked any merit. In American Pipe, the Supreme Court held "that the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." 414 U.S. at 554. This Court has never addressed the question of whether that rule applies under RCFC 23, and it need not do so here. Since Caldwell and the other potential class members were not members of the putative class in Swisher, American Pipe cannot apply here. The class proposed in Swisher was explicitly limited to claims of $10,000 or less, JA873 ¶7, because the action was filed in federal district court under the Little Tucker Act, 28 U.S.C. § 1346(a)(2). Caldwell has never waived claims exceeding $10,000. Although he could have filed this action in district court seeking $10,000 or less and thereby fallen within the bounds of the putative Swisher class, he elected to file in the Court of Federal Claims, which has exclusive jurisdiction over all takings claims exceeding

$10,000. 28 U.S.C. § 1491(a)(1). Accordingly, the claim Caldwell presented in this case does not fall within the proposed Swisher class, and American Pipe cannot apply here.

Moreover, the policy behind American Pipe is not applicable in this case. The Court in American Pipe sought to balance the need for statutes of limitations against the efficiency goals of class action rules. American Pipe, 414 U.S. at 553. The rule of American Pipe was intended to avoid forcing potential class members to intervene before the expiration of the statute of limitations "to protect themselves against the possibility that certification would be denied. The principal purposes of the class action procedure – promotion of efficiency and economy of litigation – would thereby be frustrated." Crown, Cork & Seal, 462 U.S. at 349. That concern is not present in this case because the motion for class certification in Swisher was denied long before the limitations period on Caldwell's claim expired. Thus, unlike American Pipe, the plaintiffs in this case were never forced to intervene or file an individual suit "to ensure that their rights would not be lost in the event class certification was denied." Crown, Cork & Seal, 462 U.S. at 350.

In addition, American Pipe does not toll the limitations period for subsequent class actions, but allows individual members of the denied class to make a timely motion to intervene or to pursue an individual claim by filing a new complaint.

The courts of appeals have rejected efforts like Caldwell's to piggyback successive class actions to keep the claims of individual class members alive despite their inaction. See Basch v. Ground Round, Inc., 139 F.3d 6 (1st Cir.), cert. denied, 525 U.S. 870 (1998); Griffin v. Singletary, 17 F.3d 356, 359 (11th Cir. 1994), cert. denied sub nom. Florida v. Platt, 513 U.S. 1077 (1995); Andrews v. Orr, 851 F.2d 146, 149 (6th Cir. 1988) (citing Korwek v. Hunt, 827 F.2d 874, 879 (2d Cir. 1987)); Robbin v. Fluor Corp., 835 F.2d 213, 214 (9th Cir. 1987).

Caldwell contends that this well-established limitation on the American Pipe rule should not apply here because his proposed class is a subclass of the putative Swisher class, but he admits that no case law supports his argument directly. Br. at 43. His reliance on McKowan Lowe & Co., Ltd. v. Jasmine, Ltd., 295 F.3d 380 (3d Cir.), cert. denied, 123 S.Ct. 691 (2002), is to no avail. There the Third Circuit held that "the class claims of intervening class members are tolled if a district court declines to certify a class for reasons unrelated to the appropriateness of the substantive claims for certification." 295 F.3d at 389 (emphasis added). Caldwell and the proposed class members here did not intervene in Swisher, so the reasoning of McKowan is not applicable here.

Finally, Caldwell claims that even if the class claims here are not tolled under American Pipe, the individual claims should be. Br. at 48. If that is so, only

the individual claims filed by Caldwell and Billings would be timely. In addition, claims against the United States in excess of $10,000 were not encompassed by the proposed Swisher class and thus are not entitled to the protection of the American Pipe rule. Therefore, even if the Court were to allow Caldwell and Billings to pursue their individual claims (though it should not for the reasons discussed above), those claims should be limited to $10,000 per claim.

For these reasons, the CFC acted within its discretion in denying Caldwell's motion for reconsideration and declining Caldwell's invitation to extend American Pipe to the circumstances of this case.

**III. The CFC did not err in its procedural handling of this case.**

For the first time on appeal, Caldwell alleges that the CFC erred in its handling of this case. He contends that the court should have treated the United States' motion to dismiss under Rule 12(b)(1) as a motion under Rule 12(b)(6), converted it to a summary judgment motion, and shifted the burden of proof to the United States. Not only is Caldwell's analysis incorrect, but he failed to preserve this issue for appeal and failed to show that handling the case as he suggests would have yielded a different outcome.

Since Caldwell did not present any of the procedural arguments he now asserts on appeal in the CFC, those arguments are waived. Sage Products, 126 F.3d

at 1426. None of the exceptions to that general rule apply here. See L.E.A. Dynatech, Inc. v. Allina, 49 F.3d 1527, 1531 (Fed. Cir. 1995).[10]

Caldwell also failed to show that if the CFC had handled the case as he now suggests, it would have come to a different conclusion. Essentially, Caldwell contends that the trial court should have interpreted the facts in his favor and shifted the burden of proof to the government. Br. at 25. However, Caldwell points to no facts relevant to the issue decided that were in dispute and identifies no additional facts that he would now include in the record. And since the court is the final arbiter of legal issues like those presented here, Caldwell has not demonstrated how shifting the burden of proof would have made any difference. Cf. United States v. Middleton, 246 F.3d 825, 838 (6th Cir. 2001) (trial court, as final arbiter of legal questions, must limit witness testimony on such issues). In any event, the plaintiff bears "the burden of establishing jurisdiction, including jurisdictional timeliness." Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998). The Supreme Court has oft stated that the federal courts should assume that any given action lies outside their limited jurisdiction and that "the burden of establishing the contrary rests upon the party asserting jurisdiction."

---

[10] By the same token, any argument Caldwell failed to raise in his opening brief is now waived. Rumsfeld v. Freedom, NY, 346 F.3d at 1361.

Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994).

Nonetheless, the trial court did not err in disposing of this case under Rule 12(b)(1). Caldwell's analysis begins with the proposition that the statute of limitations does not implicate the courts' subject matter jurisdiction and, hence, should have been raised in a 12(b)(6) motion for failure to state a claim rather than a 12(b)(1) motion for lack of jurisdiction. Although the Court need not reach this question because Caldwell did not raise it below and because it has no bearing on the outcome of this appeal, Caldwell is wrong. This Court has affirmed judgments dismissing cases for lack of subject matter jurisdiction based on the statute of limitations on numerous occasions. E.g., Martinez v. United States, 333 F.3d 1295, 1300, 1320 (Fed. Cir. 2003); Frazer, 288 F.3d 1347, 1355; Caguas Central Federal Savings Bank v. United States, 215 F.3d 1304, 1310 (Fed. Cir. 2000); Alder Terrace, 39 Fed. Cl. 114 (1997), aff'd 161 F.3d at 1379; see also RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1463 (Fed. Cir. 1998) (remanding with instructions to dismiss for lack of jurisdiction); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1582 (Fed. Cir. 1988) (same).

This Court has reiterated repeatedly that "statutes of limitations for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional in nature." Martinez, 333 F.3d at 1316; see also Block

v. North Dakota, 461 U.S. 273, 292 (1983); Hopland Band, 855 F.2d at 1576-77. Although sovereign immunity and subject matter jurisdiction are distinct concepts, when no statute waives the government's sovereign immunity from suit, the court lacks subject matter jurisdiction. United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); Ledford v. United States, 297 F.3d 1378, 1381-82 (Fed. Cir. 2002); LeBlanc v. United States, 50 F.3d 1025, 1030 (Fed. Cir. 1995). Accordingly, lack of an applicable waiver of sovereign immunity, including failure to satisfy a statutory time limitation, is properly raised in a motion to dismiss under Rule 12(b)(1). E.g., Cannon v. United States, 338 F.3d 1183, 1188 (10th Cir. 2003) (dismissal for lack of jurisdiction under 28 U.S.C. § 2401); McCall ex rel. Estate of Bess v. United States, 310 F.3d 984, 986 (7th Cir. 2002) (same); Gonzalez v. United States, 284 F.3d 281, 286-87 (1st Cir. 2002) (same); see also 5A Federal Practice & Procedure § 1350 & n.5 (2003) (citing cases).

The cases upon which Caldwell relies, Br. at 17-19, are not on point and do not contravene the settled authorities we cite here. Moreover, Caldwell's assertion, Br. at 19, that the availability of equitable tolling under section 2501 indicates that it does not implicate subject matter jurisdiction is incorrect. In Irwin v. Department

of Veterans Affairs, 498 U.S. 89 (1990), the Supreme Court explained that allowing equitable tolling does not broaden a waiver of sovereign immunity. Id. at 95. Thus, equitable tolling does not expand the courts' subject matter jurisdiction. In any event, the Court need not determine whether equitable tolling is available under section 2501 in this case. Caldwell's assertion, Br. at 23, that the statute of limitations is "merely" an affirmative defense is also incorrect. This Court has held that, in suits against the United States, section 2501 is not "simply" an affirmative defense, but "serves as a jurisdictional limitation." Hopland Band, 855 F.2d at 1577.

Caldwell concludes that in treating the government's motion as a Rule 12(b)(1) motion, the court did not have to assume the truth of the factual allegations in the complaint, whereas if it had handled the motion under Rule 12(b)(6), it would have been required to assume the truth of all well-pleaded factual allegations. Br. at 24. Again, since the relevant facts are not in dispute here, it makes no difference whether the CFC assumed the facts in the complaint were true or not. Caldwell does not identify any facts in the complaint that the trial court found to be erroneous; the court ruled purely on legal grounds.

Caldwell further contends that the court should have converted the government's motion to one for summary judgment. Br. at 24. Even if Caldwell

were correct that this should have been handled as a Rule 12(b)(6) motion, since the documents upon which the court's decision was based were all referenced in the complaint and their authenticity was not questioned, the court did not have to convert the motion to dismiss to a summary judgment motion. R.C.F.C. 12(c); Pryor v. National Collegiate Athletic Ass'n, 288 F.3d 548, 559-60 (3d Cir. 2002); see JA33-36. Even if they had not been referenced in the complaint, all the relevant documents here are matters of public record that the court could consider without converting the motion to one for summary judgment. See Boateng v. InterAmerican University, Inc., 210 F.3d 56, 60 (1st Cir. 2000).

If it had converted the motion, of course it would no longer have to assume that the facts alleged in the complaint were true, but would make a decision based on the undisputed facts in the record. See Kunkes v. United States, 78 F.3d 1549, 1550 n.2 (Fed. Cir. 1996). Thus, Caldwell's argument cuts against his prior contention that the court should have assumed the truth of the facts in the complaint. In any event, Caldwell fails to demonstrate how handling this proceeding on summary judgment would have made any difference. He does not, for example, point to any additional evidence that he would have presented. Indeed, as the record here shows, Caldwell took the opportunity to present evidence in response to the government's motion and never contended that the

court should not decide the legal questions at issue without further development of the facts. Moreover, if there were any factual dispute, the CFC could resolve that issue within the rubric of Rule 12(b)(1). See Cedars-Sinai Medical Center v. Watkins, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993). Hence, any erroneous failure to convert the motion here was harmless error. See Loeb Industries, Inc. v. Sumitomo Corp., 306 F.3d 469, 479-80 (7th Cir. 2002); Boateng, 210 F.3d at 60-61.

## CONCLUSION

For the foregoing reasons, the judgment of the CFC should be affirmed.

Respectfully submitted,

THOMAS L. SANSONETTI
Assistant Attorney General

JOHN SMELTZER
KRISTINE TARDIFF
KATHRYN E. KOVACS

U.S. Department of Justice
Environment & Natural Resources
Division, Appellate Section
P.O. Box 23795 l'Enfant Plaza Sta.
Washington, D.C. 20026
(202) 514-4010

OF COUNSEL:

EVELYN KITAY
Surface Transportation Board
Office of the General Counsel
Washington, D.C. 20423

February, 2004
90-1-23-10794

STATUTORY ADDENDUM

16 U.S.C. § 1247(d) Interim use of railroad rights-of-way

The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 [45 U.S.C.A. § 801 et seq.], shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

49 C.F.R. § 1152.29 Prospective use of rights-of-way for interim trail use and rail banking

(a) If any state, political subdivision, or qualified private organization is interested in acquiring or using a right-of-way of a rail line proposed to be abandoned for interim trail use and rail banking pursuant to 16 U.S.C. 1247(d), it must file a comment or otherwise include a request in its filing (in a regulated abandonment proceeding) or a petition (in an exemption proceeding) indicating that it would like to do so. The comment/request or petition must include:
(1) A map depicting, and an accurate description of, the right-of-way, or portion thereof (including mileposts), proposed to be acquired or used;
(2) A statement indicating the user's willingness to assume full responsibility: for

managing the right-of-way; for any legal liability arising out of the use of the right-of-way (unless the user is immune from liability, in which case it need only indemnify the railroad against any potential liability); and for the payment of all taxes assessed against the right-of-way; and
(3) An acknowledgment that interim trail use is subject to the user's continuing to meet its responsibilities described in paragraph (a)(2) of this section, and subject to possible future reconstruction and reactivation of the right-of-way for rail service. The statement must be in the following form

* * *

(d) Exempt abandonment proceedings.
(1) If continued rail service does not occur under 49 U.S.C. 10904 and § 1152.27 and a railroad agrees to negotiate an interim trail use/rail banking agreement, then the Board will issue a Notice of Interim Trail Use or Abandonment (NITU) to the railroad and to the interim trail user for the portion of the right-of-way to be covered by the agreement. The NITU will: permit the railroad to discontinue service, cancel any applicable tariffs, and salvage track and materials, consistent with interim trail use and rail banking, as long as it is consistent with any other Board order, 30 days after the date it is issued; and permit the railroad to fully abandon the line if no agreement is reached 180 days after it is issued, subject to appropriate conditions, including labor protection and environmental matters.
(2) The NITU will indicate that interim trail use is subject to future restoration of rail service, and subject to the user continuing to meet the financial obligations for the right-of-way. The NITU will also provide that, if the user intends to terminate trail use, it must send the Board a copy of the NITU and request that it be vacated on a specific date. The Board will reopen the exemption proceeding, vacate the NITU, and issue a decision reinstating the exemption for that portion of the right-of-way. Copies of the decision will be sent to:
(i) The abandonment exemption applicant;
(ii) The owner of the right-of-way; and
(iii) The current trail user.

* * *

(e)(2) A railroad that receives authority from the Board to abandon a line (in a regulated abandonment proceeding under 49 U.S.C. 10903, or by individual or

class exemption issued under 49 U.S.C. 10502) shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line (e.g., discontinued operations, salvaged the track, canceled tariffs, and intends that the property be removed from the interstate rail network). The notice shall provide the name of the STB proceeding and its docket number, a brief description of the line, and a statement that the railroad has consummated, or fully exercised, the abandonment authority on a certain date. The notice shall be filed within 1 year of the service date of the decision permitting the abandonment (assuming that the railroad intends to consummate the abandonment). Notices will be deemed conclusive on the point of consummation if there are no legal or regulatory barriers to consummation (such as outstanding conditions, including Trails Act conditions). If, after 1 year from the date of service of a decision permitting abandonment, consummation has not been effected by the railroad's filing of a notice of consummation, and there are no legal or regulatory barriers to consummation, the authority to abandon will automatically expire. In that event, a new proceeding would have to be instituted if the railroad wants to abandon the line. Copies of the railroad's notice of consummation shall be filed with the Secretary of the Board. In addition, the notice of consummation shall be sent to the State Public Service Commission (or equivalent agency) of every state through which the line passes. If, however, any legal or regulatory barrier to consummation exists at the end of the one- year time period, the notice of consummation must be filed not later than 60 days after satisfaction, expiration or removal of the legal or regulatory barrier. For good cause shown, a railroad may file a request for an extension of time to file a notice so long as it does so sufficiently in advance of the expiration of the deadline for notifying the Board of consummation to allow for timely processing.

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[x] this brief contains 9325 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[x] this brief has been prepared in a proportionally spaced typeface using WordPerfect 9 in 14-point Times New Roman, *or*

[ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Kathryn E. Kovacs, Attorney

CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2004, two copies of the foregoing were served by first class mail upon the following:

Jeffrey O. Bramlett
Bondurant, Mixson & Elmore
3900 One Atlantic Center
1201 West Peachtree Street, NW
Atlanta, GA 30309

James P. Kelly
Kelly Law Firm
200 Galleria Parkway
Suite 1510
Atlanta, GA 30339

Kathryn E. Kovacs, Attorney