IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JACK LADD and MARIE LADD, Husband and Wife, JOHN LADD and JOBETH LADD, Husband and Wife,<br><br>WILLIAM LINDSEY, JAMES A. LINDSEY, MICHAEL A. LINDSEY and GAIL A. LANHAM,<br><br>CHARLIE MILLER, RAYMOND and PAULINE MILLER, Husband and Wife,<br><br>VALENTIN CASTRO, III & DEBORAH ANN CASTRO REVOCABLE TRUST, VALENTIN and DEBORAH ANN CASTRO, Trustees,<br><br>SINGLETREE RANCH, LLC, AN ARIZONA LIMITED LIABILITY COMPANY,<br><br>JOSEPH LAWRENCE HEINZL,<br><br>MILLER FAMILY TRUST, COL. QUENTIN MILLER, TRUSTEE,<br><br>TAMMY WINDSOR-BROWN,<br><br>For Themselves and As Representatives of a Class of Similarly Situated Persons,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 07-CV-00271-RHH |

**BRIEF OF THE RAILS-TO-TRAILS CONSERVANCY AS AMICUS CURIAE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

## BACKGROUND


I. THE FEDERAL RAILBANKING LAW ..... 3

A. Background of the Federal Railbanking Law ..... 3

B. Operation of the Federal Railbanking Law ..... 4

II. STATEMENT OF THE CASE ..... 6


## DISCUSSION


I. EXISTING PRECEDENT HAS ONLY FOUND A TAKING WHEN A TRAIL USE AGREEMENT WAS REACHED AND A RAILS-TO-TRAILS CONVERSION OCCURRED ..... 7

II. PLAINTIFFS CANNOT SHOW THAT THE ISSUANCE OF A NITU AND UNSUCCESSFUL TRAIL NEGOTIATIONS IN ANY WAY ALTERED OR OTHERWISE AFFECTED THEIR ALLEGED STATE LAW PROPERTY INTERESTS. ..... 11

III. EVEN IF PLAINTIFFS COULD SHOW AN EFFECT ON THEIR ALLEGED PROPERTY INTERESTS, ANY TAKINGS CLAIM MUST BE ANALYZED UNDER THE PENN CENTRAL BALANCING TEST ..... 13

A. The Penn Central Balancing Test Must Be Applied To Takings Claims When, As Here, There Has Been No Physical Occupation or Complete Economic Deprivation ..... 13

B. Application of the Penn Central Test Is Required Because The Issuance of the NITU, Which Expired Without A Rails-to-Trails Conversion, Was A Regulatory Action That Did Not Result in A Physical Occupation of Plaintiffs' Property. ..... 14

C. Temporary Regulatory Actions, Like That Alleged Here, Are Always Analyzed Under the Penn Central Test Because the Per Se Rule of Lucas Is Inapplicable. ..... 16

1. Temporary Takings Claims Must Be Analyzed Under Penn Central ..... 17

2. The Issuance of the NITU and Subsequent Negotiating Period Were Only Temporary, and Plaintiffs At Best Have Only A Temporary Takings Claim. ..... 18

IV. APPLICATION OF THE PENN CENTRAL TEST DEMONSTRATES THAT NO COMPENSABLE TAKING HAS OCCURRED ..... 21

A. The Economic Impact of the Government's Action upon Plaintiffs' Property is Minimal and Utterly Insufficient to Constitute a Taking ..... 21

B. The Government's Issuance of the NITU Was Consistent With, And Did Not Interfere With, Plaintiffs' Reasonable Investment-Backed Expectations ..... 24

**TABLE OF CONTENTS**
**(continued)**

**Page**

C. Given the Importance of the Rails-to-Trails Act and the Limited Nature of the Regulation, the Character of the Government Action At Issue Does Not Demonstrate a Taking ........ 27

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*1902 Atl. Ltd. v. United States,*
26 Cl. Ct. 575 (Cl. Ct. 1992) ........ 22

*Agins v. Tiburon,*
447 U.S. 255 (1980) ........ 21

*Am. Pelagic Fishing Co. v. United States,*
379 F.3d 1363 (Fed. Cir. 2004) ........ 18

*Appolo Fuels, Inc. v. United States,*
381 F.3d 1338 (Fed. Cir. 2004) ........ 21, 22, 24

*Arctic King Fisheries, Inc. v. United States,*
59 Fed. Cl. 360 (Fed. Cl. 2004) ........ 22

*Barclay v. United States,*
443 F.3d 1368 (Fed. Cir. 2006) ........ passim

*Bass Enters. Prod. Co. v. United States,*
381 F.3d 1360 (Fed. Cir. 2004) ........ 18

*Beres v. United States,*
64 Fed. Cl. 403 (2005) ........ 8

*Blendu v. United States,*
75 Fed. Cl. 543 (2007) ........ 8

*Boise Cascade Corp. v. United States,*
296 F.3d 1339 (Fed. Cir. 2002) ........ 11, 12, 16, 17

*Bowles v. United States,*
31 Fed. Cl. 37 (Fed. Cl. 1994) ........ 22

*Brace v. United States*,
72 Fed. Cl. 337 (2006) .......... 23

*Caldwell v. United States*,
391 F.3d 1226 (Fed. Cir. 2004) .......... passim

*Cane Tennessee, Inc. v. United States*,
57 Fed. Cl. 115 (2003) .......... 22

*Carruth v. United States*,
627 F.2d 1068 (Ct. Cl. 1980) .......... 21

*Chevy Chase Land Co. v. United States*,
230 F.3d 1375 (Fed. Cir. 1999) .......... 1, 8, 12

*Cienega Gardens v. United States*,
33 Fed. Cl. 196 (1995), *aff'd*, 265 F.3d 1237 (Fed. Cir. 2001) .......... 15, 16

*Cienega Gardens v. United States*,
503 F.3d 1266 (Fed. Cir. 2007) .......... 24

*Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*,
508 U.S. 602 (1993) .......... 22

*Ellamae Phillips Co. v. United States*,
77 Fed. Cl. 387 (2007) .......... 8, 9

*Forest Properties, Inc. v. United States*,
177 F.3d 1360 (Fed. Cir. 1999) .......... 15

*Gibbons v. United States*,
660 F.2d 1227 (7th Cir. 1981) .......... 3

*Glosemeyer v. United States*,
45 Fed. Cl. 771 (2000) .......... 4, 8, 9, 14

*Hadacheck v. Sebastian*,
239 U.S. 394 (1915) .......... 22

*Hash v. United States*,
403 F.3d 1308 (Fed. Cir. 2005) .......... 8

*Illig v. United States*,
58 Fed. Cl. 619 (2003) .......... 8

*Iowa Power—Const. Exempt.—Council Bluffs, IA*,
8 I.C.C.2d 858 (1990) .......... 28

*Jentgen v. United States*,
657 F.2d 1210 (Ct. Cl. 1981) ........................................ 22

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ........................................ 13

*Louisville & A.R. Co., v. Bickham*,
602 F. Supp. 383 (D. La ), *aff'd*, 775 F.2d 300 (5th Cir. 1985) ........................................ 3

*Loveladies Harbor v. United States*,
21 Cl. Ct. 153 (Cl. Ct. 1990), *aff'd*, 28 F.3d 1171 (Fed. Cir. 1994) ........................................ 22

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........................................ 13, 16, 17

*Maritrans, Inc. v. United States*,
342 F.3d 1344 (Fed. Cir. 2003) ........................................ 27

*New Haven Inclusion Cases*,
399 U.S. 392, 490-93 (1970) ........................................ 3, 20

*Norfolk & W. Ry. Co.—Abandonment Between St. Mary's and Minster in Auglaize County, OH*,
9 I.C.C.2d 1015 (1993) ........................................ 28

*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005) ........................................ 17

*Penn Central Transportation Co. v. New York City*,
438 U.S. 104 (1978) ........................................ passim

*Preseault v. Interstate Commerce Comm'n*,
494 U.S. 1 (1990) ........................................ passim

*Preseault v. United States*,
100 F.3d 1525 (Fed. Cir. 1996) ........................................ passim

*PruneYard Shopping Center v. Robins*,
447 U.S. 74 (1980) ........................................ 21

*Reed v. Meserve*,
487 F.2d 646 (1st Cir. 1973) ........................................ 28

*Rogin v. Bensalem Township*,
616 F.2d 680 (3rd Cir. 1980) ........................................ 22

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ........................................ 21, 25

*Schmitt v. United States*,
203 F.R.D. 387 (2001) .......... 8

*Scogin v. United States*,
33 Fed. Cl. 285 (1995) .......... 17

*Swisher v. United States*,
176 F. Supp. 2d 1100 (D. Kan. 2001) .......... 8

*Tahoe-Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) .......... passim

*Toews v. United States*,
376 F.3d 1371 (Fed. Cir. 2004) .......... 1, 8, 9

*Tuthill Ranch, Inc. v. United States*,
381 F.3d 1132 (Fed. Cir. 2004) .......... 14, 16

*Village of Euclid v. Ambler Realty Co.*,
272 U.S. 365 (1926) .......... 22

*Walcek v. United States*,
303 F.3d 1349 (Fed. Cir. 2002) .......... 22

**STATUTES**

49 C.F.R.
§ 1152.27 .......... 5
§ 1152.29 .......... passim
§ 1152.50 .......... 4, 5

16 U.S.C.
§ 1241 *et seq.* .......... 1
§ 1247 .......... 1, 4, 28

49 U.S.C.
§ 10903 .......... 4, 25
§ 10904 .......... 5

*Amicus Curiae* Rails-to-Trails-Conservancy ("RTC")[1] submits this brief in opposition to Plaintiffs' motion for summary judgment and in support of the motion for summary judgment filed by Defendant United States of America.

**QUESTION**

Under the Federal Railbanking Law, is there a compensable taking when a NITU is issued but no trail use agreement is ever reached and no trail use occurs?

**INTRODUCTION**

Under the Federal Railbanking Law and Rails-to-Trails program, 16 U.S.C. § 1247(d), unused railroad rights-of-way can be converted for interim use as recreational trails, rather than abandoned, and thereby "rail banked" for conversion back to railroad use if necessary or desirable in the future. Several Federal Circuit decisions have held that a landowner holding a fee simple estate burdened by a railroad easement is entitled to just compensation for a taking of his or her property under the Fifth Amendment if this easement is converted to trail use and trail use exceeds the scope of the original easement under applicable state law. *Compare Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004) *with Chevy Chase Land Co. v. United States*, 230 F.3d 1375 (Fed. Cir. 1999).

Despite Plaintiffs' efforts to portray this case as a straight-forward application of *Toews*, a key factual difference is fatal to Plaintiffs' claims: here, no trail use agreement was ever reached and the railroad corridor has not been converted to trail use under the Federal Railbanking Law. Indeed, the Surface Transportation Board ("STB") has lost jurisdiction over a portion of the corridor, which now can never be converted to interim trail use under the Federal Railbanking Law. Instead, the STB merely issued a Notice of Interim Trail Use or Abandonment ("NITU") that resulted in, at most, a seven-month trail use negotiating period,

[1] RTC is a national, non-profit organization dedicated to advocating and facilitating the preservation of presently inactive railroad corridors through the Federal Railbanking Law, 16 U.S.C. § 1241 *et seq*. As a result, it has a significant interest in any issues affecting the Federal Railbanking program, as well as significant experience with takings issues arising in this context, and was granted leave to participate in this case as *amicus curiae*.

during which no actions were authorized that would extinguish Plaintiffs' alleged property interests under state law,[2] or that would affect these alleged property interests in any way inconsistent with the railroad use previously authorized by Plaintiffs' predecessors-in-interest. As recently as 2004, the Federal Circuit has noted that it is an open question whether a temporary taking occurs when a NITU is issued but no trail use agreement is reached and no trail use occurs. *See Caldwell v. United States*, 391 F.3d 1226, 1234 & n.7 (Fed. Cir. 2004). Thus, this Court is being asked to resolve a question of first impression.

While this issue has yet to be decided, it is clear that under Supreme Court, Federal Circuit, and Court of Federal Claims precedent no compensable taking occurred even under Plaintiffs' recitation of the facts. As an initial matter, Plaintiffs have not shown that the STB order, which in no way changed the nature or scope of the railroad's authorized use of a perpetual railroad easement, affected their property interest so as to give rise to a takings claim. Fundamentally, Plaintiffs have mounted a sweeping takings argument that, if accepted, would find a taking based on nothing more than the STB's continuing jurisdiction over railroad corridors, even though trail use may never occur, and indeed, where the railroad has not even made a final decision to abandon railroad use of the corridor.

Furthermore, any takings analysis that is required when no new physical occupancy of the corridor is authorized must be conducted under the balancing test of *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978). When analyzed under the *Penn Central* test, it is clear that no temporary taking occurred because, as a matter of law, Plaintiffs cannot establish a significant diminution in the value of their property, any investment-backed expectations that have been hindered, or government action sufficient to support a taking.

[2] RTC assumes solely for purposes of argument that Plaintiffs can demonstrate that they own the underlying fee property interest in the rail corridor at issue so as to have standing to assert this takings claim. However, RTC in no way concedes, and in fact disputes, this and other predicate state law questions that must be resolved favorably to Plaintiffs to confer standing to bring these takings claims. Specifically, Plaintiffs have failed to demonstrate that the railroad held only limited easement interests in the corridor under Arizona state law and that trail use is outside of the scope of such easements under Arizona law.

Finding a compensable taking under the facts presented here would significantly undermine the purpose and operation of the Federal Railbanking Law, and the STB's regulation of railroads generally.

## BACKGROUND

## I. THE FEDERAL RAILBANKING LAW

### A. Background of the Federal Railbanking Law

It is important to understand the regulatory context of the STB's actions that allegedly affected Plaintiffs' properties. "[B]eginning as early as 1920, [the federal government] has occupied the field of regulation of interstate railroad operations, preempting any pattern of conflicting state regulation." *See Preseault v. United States*, 100 F.3d 1525, 1537 (Fed. Cir. 1996) (en banc plurality opinion). Specifically, the STB, and its predecessor the Interstate Commerce Commission ("ICC"), have had "exclusive and plenary jurisdiction to regulate abandonments of railroad rights of way" so that "[a]bandonment cannot occur until authorized by federal law." *Barclay v. United States*, 443 F.3d 1368, 1374 (Fed. Cir. 2006) (internal quotation marks omitted). Thus, in the context of railroad rights-of-way, the state law that would normally determine whether a right-of-way has been abandoned by its holder is preempted and, instead, "[f]ederal law dictates when an abandonment occurs." *Id.* No court has ever held that the exclusive authority of the STB (or its predecessor, the ICC) to forestall authorization of railroad abandonments is a "taking" of any underlying property rights, even though the STB's continued jurisdiction over such lines prevents and delays any ability of the underlying property owner to use the land. *See, e.g. Louisville & A.R. Co., v. Bickham*, 602 F. Supp. 383 (D. La ), *aff'd*, 775 F.2d 300 (5th Cir. 1985) (upholding ICC's authority to regulate abandonments without suggesting a taking occurred). Indeed, the Supreme Court has expressly found that the ICC's refusal to authorize a railroad's abandonment did *not* affect a taking of the railroad's property. *See New Haven Inclusion Cases*, 399 U.S. 392, 490-93 (1970); *see also Gibbons v. United States*, 660 F.2d 1227, 1234-39 (7th Cir. 1981).

In the mid-1970s, Congress became concerned about the excessive number of railroad abandonments and the corresponding shrinkage of railroad trackage in the United States. *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 5 (1990). After its initial efforts to encourage preservation of railroad rights-of-way proved unsuccessful, Congress enacted Section 8(d) of the National Trails Systems Act, 16 U.S.C. § 1247(d), in 1983 to "establish[] a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for [recreational] trail purposes." *Id.* at 6 (internal quotation marks omitted). The Federal Railbanking Law serves two purposes. "First, Congress intended to encourage the development of additional trails and to assist recreational users by providing opportunities for trail use on an interim basis. Second, Congress intended to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." *Id.* at 17.

**B. Operation of the Federal Railbanking Law**

Under the STB's rules, a potential interim trail manager can request that the STB issue a railbanking/interim trail use notice after a railroad applies for permission from the STB to discontinue or terminate its common carrier obligation to provide freight rail service on a line.[3] 49 U.S.C. § 10903; 49 C.F.R. § 1152.29. Pursuant to the abandonment by exemption procedures applicable in this case,[4] a railroad must file a Notice of Exemption with the STB describing the line it intends to abandon, and the STB then publishes a notice in the Federal Register. 49 C.F.R. § 1152.50(d)(1) & (3). During the applicable period of notice, the railroad must make the

[3] A railroad can request authorization simply to discontinue rail service or to fully abandon its railroad line and dispose of any property interest it has in the railroad corridor. 49 U.S.C. § 10903. Since this case involves a railroad's application for abandonment authorization, the text focuses on that issue.

[4] Abandonment can occur as either a standard abandonment or as an abandonment by exemption. Abandonment by exemption "is a more streamlined abandonment process" and is available when "no local rail traffic [has] run over the line sought to be abandoned in the two years prior to the filing of the notice of exemption." *Glosemeyer v. United States*, 45 Fed. Cl. 771, 773 n.3 (2000). The different and more time-consuming standard abandonment procedures are not at issue in this case.

corridor available for continued rail service to any other carrier who provides an acceptable "offer of financial assistance" ("OFA") to subsidize or purchase the line. 49 U.S.C. § 10904. If an OFA is accepted, the STB is authorized to establish the terms and conditions of the subsidy or purchase. 49 C.F.R. § 1152.27.

If no OFA is received or accepted during the applicable time frame, a "state, political subdivision, or qualified private organization [that] is interested in acquiring or using a right-of-way of a rail line proposed to be abandoned for interim trail use and rail banking pursuant to" the Federal Railbanking Law can file a petition for interim trail use within ten days of publication of the notice in the Federal Register. 49 C.F.R. § 1152.29(a) & (b)(2). Since the Federal Railbanking Law is completely voluntary on the part of the railroad, the railroad then has ten days to "indicat[e] whether and with whom it intends to negotiate an agreement." 49 C.F.R. § 1152.29(b)(2). If no interim trail use notice is issued, the exemption is effective and abandonment approved thirty days after publication of the notice in the Federal Register. 49 C.F.R. § 1152.50(d)(1).

If the "railroad agrees to negotiate an interim trail use/rail banking agreement, then the [STB] will issue a Notice of Interim Trail Use or Abandonment (NITU) to the railroad and to the interim trail user for the portion of the right-of-way to be covered by the agreement." 49 C.F.R. § 1152.29(d)(1). By issuing the NITU, the STB simply creates a 180-day regulatory period in which the railroad and potential interim trail user can negotiate an agreement, while at the same time the railroad can discontinue service and pull up track. *See* 49 C.F.R. § 1152.29(d)(1). However, the NITU does not require or even approve the conversion of the right-of-way to interim trail use or impose any other new obligations or restrictions on the railroad. Again, during this period, the STB retains jurisdiction over the line, and abandonment is forestalled by operation of federal law. "If no trail use agreement is reached within 180 days, but the railroad wishes to continue negotiations with the trail operator rather than consummate abandonment, the regulations also allow the NITU to be extended." *Caldwell*, 391 F.3d at 1234. If the railroad and the trail operator reach an agreement during the negotiating period, "the NITU remains in effect

indefinitely and abandonment cannot be accomplished under the NITU until trail use terminates (without restoration of rail service)." *Id.* (internal quotation marks and alterations omitted). Thus, the right-of-way is railbanked and becomes subject to interim trail use, but the STB retains jurisdiction over the right-of-way and the "interim trail use is subject to future restoration of rail service." 49 C.F.R. § 1152.29(d)(2).

On the other hand, if no agreement is reached during the negotiating period, the NITU terminates and converts to a Notice of Abandonment, permitting the railroad to fully abandon the line. 49 C.F.R. § 1152.29(d)(1). When either no NITU is issued or the NITU is issued but expires without a trail use agreement, the STB retains jurisdiction over the line even after the abandonment approval becomes effective until the abandonment is fully consummated by the railroad. *See Barclay*, 443 F.3d at 1376 n.10. Under the STB's rules, an abandonment is consummated when the railroad notifies the STB that it has consummated the abandonment authority. 49 C.F.R. § 1152.29(e)(2). The railroad has up to one year to notify the STB of its consummation of abandonment authorization, which period may be extended by the railroad. *Id.* If the railroad fails to notify the STB that abandonment has been consummated within this period, the abandonment authorization lapses. *Id.*

Of course, a railroad need not utilize the Federal Railbanking Law to hold its corridor in an inactive status, *i.e.* "railbank" its own corridor for future use, and the STB has the authority to permit a railroad to hold a corridor indefinitely for future use. *See Preseault*, 494 U.S. at 5 n.3.

## II. STATEMENT OF THE CASE

Plaintiffs are landowners along a railroad right-of-way in Cochise County, Arizona that is owned by the San Pedro Railroad Operating Company, LLC ("SPROC"). (Plaintiffs' Proposed Findings of Uncontroverted Fact ("Pl.'s Proposed Findings") ¶ 3.) On October 17, 2005, SPROC filed a Notice of Exemption with the STB seeking to abandon 76.2 miles of railroad track along this right-of-way. *Id.* ¶¶ 56-57. On January 27, 2006, the Trust for Public Land ("Trust") filed a petition for issuance of a NITU, and on July 25, 2006, the STB issued a NITU for the 76.2 mile right-of-way. *Id.* ¶¶ 59-62. SPROC and the Trust were unable to reach a trail

use agreement within the original 180-day NITU period, but informed the STB on January 22, 2007, that they were completing trail use negotiations regarding a portion of the 76.2 mile SPROC right-of-way. *Id.* ¶ 65. As permitted by the regulations, the STB extended the NITU period for this portion of the SPROC right-of-way until February 21, 2007; for the remainder of the right-of-way, the NITU converted to a Notice of Abandonment at the end of the original 180-day period and SPROC consummated abandonment of this portion on January 29, 2007. *Id.* ¶ 68, 70. For the portion of the line subject to the regulatory extension, SPROC and the Trust were still unable to reach a trail use agreement within the extended NITU period, meaning that the NITU converted into a Notice of Abandonment for these portions on February 21, 2007. *Id.* ¶ 70. However, SPROC did not file a notice of consummation with respect to this portion of the corridor. *Id.* ¶ 71. Instead, SPROC requested an extension of time to decide whether to consummate abandonment authorization, or allow the authorization to lapse. *Id.*

In summary, for Plaintiffs whose property was *not* subject to the NITU extension, the NITU lasted only six months, no trail use agreement was reached, no trail use occurred, and the railroad has in fact consummated abandonment of the right-of-way. For Plaintiffs whose property *was* subject to the NITU extension, the NITU lasted only seven months, no trail use agreement was reached, no trail use occurred, and the STB has approved abandonment, leaving abandonment within the sole discretion of the railroad.

## ARGUMENT

### I. EXISTING PRECEDENT HAS ONLY FOUND A TAKING WHEN A TRAIL USE AGREEMENT WAS REACHED AND A RAILS-TO-TRAILS CONVERSION OCCURRED.

Plaintiffs mistakenly portray this case as involving the straight-forward application of existing precedent. (Pl.'s Memorandum at 16-21.) To the contrary, Plaintiffs cite no case, nor does one exist, where a court has found that mere issuance of a NITU and unsuccessful trail use negotiations, absent a trail use agreement and actual trail use, constitute a compensable taking.

Instead, Plaintiffs only cite cases in which interim trail use/railbanking agreements were executed and actual rails-to-trails conversions occurred,[5] and misleadingly argue, contrary to the clear statements of the Federal Circuit,[6] that these cases stand for the proposition that the mere issuance of a NITU authorizing railbanking negotiations constitutes a compensable taking. However, the cases cited by Plaintiffs merely found that the use of the easement for trail use, rather than railroad use, exceeded the scope of the original easement under the applicable state law, so that trail use in effect imposed a new easement on the plaintiff's property.[7] These cases thus explicitly rested their findings of a taking on the fact that the interim trail use agreement resulted in the physical occupation of the corridor though the imposition of a new easement for trail use.[8]

[5] *See Hash v. United States*, 403 F.3d 1308, 1310, 1318 (Fed. Cir. 2005); *Toews*, 376 F.3d at 1374; *Preseault*, 100 F.3d at 1550; *Ellamae Phillips Co. v. United States*, 77 Fed. Cl. 387, 390 (2007); *Blendu v. United States*, 75 Fed. Cl. 543, 545 (2007); *Glosemeyer v. United States*, 45 Fed. Cl. 771, 774 (2000); *Swisher v. United States*, 176 F. Supp. 2d 1100, 1100-01 (D. Kan. 2001); *see also Beres v. United States*, 64 Fed. Cl. 403, 410 (2005) (resolving tangential issues related to the takings claim); *Illig v. United States*, 58 Fed. Cl. 619, 623 (2003) (determining compensation); *Schmitt v. United States*, 203 F.R.D. 387, 391 (2001) (resolving tangential issues related to the takings claim).

[6] *See Preseault*, 100 F.3d at 1552 ("We do not hold that every exercise of authority by the Government under the Rails-to-Trails Act necessarily will result in a compensable taking. . . . Whether, at the time a railroad applies to abandon its use of an easement limited to railroad purposes, a taking occurs under an ICC order to 'railbank' the easement for possible future railroad use, and allowing in the interim for use of the easement for trail purposes, is a question not now before us. We offer no opinion at this time on that question."); *see also Preseault*, 494 U.S. at 16.

[7] *See, e.g., Toews*, 376 F.3d at 1381 ("As a result of the imposition of the recreational trail and linear park, the easement for railroad purposes was converted into a new and different easement."); *Preseault*, 100 F.3d at 1550 ("The taking of possession of the lands owned by the Presaults for use as a public trail was in effect a taking of a new easement for that new use."); *Glosemeyer*, 45 Fed. Cl. at 781 ("Solely because of the operation of the Rails-to-Trails Act, plaintiffs' lands are now burdened by new easements—for recreational trails."); *Swisher*, 176 F. Supp. 2d at 1102 ("[P]laintiffs' property was subject to an easement for railroad purposes. Now, pursuant to the Trails Act, plaintiffs' property is subject to an easement for interim trail use."). *But see Chevy Chase Land Co.*, 230 F.3d 1375 (finding no "taking" because trail use was within the scope of a railroad easement under Maryland law).

[8] *See, e.g., Hash*, 403 F.3d at 1318 ("[U]pon conversion of this land to a public trail, these owners' property interests were taken for public use."); *Toews*, 376 F.3d at 1379 (holding that the government must pay "just compensation" where the government imposed "new uses" on "a public transportation easement defined as one for railroad purposes" when it converted it to "an

(Footnote continues on next page.)

However, the present case poses a very different situation. No trail use agreement was ever reached and no trail use has occurred. Instead, the issuance of the NITU and subsequent trail use negotiations were no different from any other discussions or proceedings that might take place to transfer the corridor to another carrier through an Offer of Financial Assistance or indeed the railroad's own right to reinstitute rail service on the existing railroad easement at any point prior to consummation of abandonment authorization. During this brief negotiating period, the easement remained within the exclusive possession of the railroad and was not used for any purpose other than railroad purposes. *See Toews*, 376 F.3d at 1377 (suggesting that "a continuation of an existing" easement would not constitute a taking).

In fact, Plaintiffs have not even attempted to explain, nor could they, how mere issuance of the NITU and subsequent trail use negotiations in any way altered the existing railroad easement or imposed a new easement. Thus, Plaintiffs conclusory assertion that the NITU "impose[d] two new servitudes or easements upon the owners' property" is completely unsupported and patently false, and therefore must be rejected as a matter of law. (Pl.'s Memorandum at 43.)

Facing a dearth of authority to support their claim, Plaintiffs again resort to a conclusory assertion, namely that "the Federal Circuit has determined that the NITU gives rise to a taking notwithstanding whether or not the railroad and the trail user reach an agreement." (Pl.'s Memorandum at 28.) This statement is simply not true, and, of course, Plaintiffs do not identify, nor could they identify, any Federal Circuit case that so held. Instead, Plaintiffs appear to rely on

---

(Footnote continued from previous page.)

easement for a recreational trail"); *Preseault*, 100 F.3d at 1550 (holding that "use as a public trail" was "a new easement for the new use, constituting a physical taking"); *Ellamae Phillips*, 77 Fed. Cl. at 396 (finding "takings liability" based on the "conversions of 1875 Act [railroad] easements to trail use"); *Glosemeyer*, 45 Fed. Cl. at 781 (finding a "physical taking of the plaintiffs' property" where "plaintiffs' lands are now burdened by new easements—for recreational trails"). RTC disagrees that a rails-to-trails conversion imposes a new easement and instead believes that interim trail use and railbanking are railroad purposes that are fully consistent with the STB's regulatory authority. However, RTC acknowledges that cases from the Federal Circuit and Court of Federal Claims have held otherwise.

two inapposite cases, *Caldwell* and *Barclay*, but in both of those cases, unlike the instant case, an interim trail use agreement was reached before the expiration of the NITU and an actual rails-to-trails conversion occurred.

Moreover, both *Barclay* and *Caldwell* addressed the question of when a takings claim for a rails-to-trails conversion *accrued*, rather than whether or not a compensable taking had occurred, and the court merely concluded that a takings claim for a rails-to-trails conversion accrues with issuance of the NITU. *Barclay*, 443 F.3d at 1368; *Caldwell*, 391 F.3d at 1226. To say that a takings claim for an actual rails-to-trails conversion accrues with issuance of a NITU is very different from saying that issuance of a NITU, absent the rails-to-trails conversion, in and of itself constitutes a taking. Put another way, the fact that Plaintiffs' claim that the NITU has taken their property may be ripe for judicial review does not establish that a taking occurred.

In fact, the Federal Circuit in *Caldwell* clearly recognized that mere issuance of a NITU does *not* necessarily result in a taking, holding that the NITU may "trigger a process that results in a permanent taking *in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked*," which did not happen here. *Caldwell*, 391 F.3d at 1235 (emphasis added). *Caldwell* expressly declined to decide whether a taking occurs when the NITU triggers a process in which no trail use agreement is ultimately reached. *See* 391 F.3d at 1235 n.7 ("This case does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached."). Likewise, *Preseault* declined to determine whether a taking occurs at the time the STB issues an "order to 'railbank' the easement for possible future railroad use," *i.e.*, at the time a NITU issues. *Preseault*, 100 F.3d at 1552.

Thus, the exact issue before this Court—whether issuance of a NITU and subsequent trail use negotiations can constitute a taking absent a trail use agreement and actual trail use—is an open question that the Federal Circuit has expressly declined to decide. However, the existing precedent under the Federal Railbanking Law, which has consistently relied on imposition of actual trail use in finding a taking, suggests that Plaintiffs' claim to a taking in the absence of

such trail use is not viable. The general takings jurisprudence of the Supreme Court, Federal Circuit, and Court of Federal Claims confirms that no compensable taking has occurred.

## II. PLAINTIFFS CANNOT SHOW THAT THE ISSUANCE OF A NITU AND UNSUCCESSFUL TRAIL NEGOTIATIONS IN ANY WAY ALTERED OR OTHERWISE AFFECTED THEIR ALLEGED STATE LAW PROPERTY INTERESTS.

The Federal Circuit applies a two-step approach to takings claims: first, the court determines whether the plaintiff has a valid property interest affected by the government action and, second, the court determines whether the government action constitutes a taking of this interest. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1343 (Fed. Cir. 2002). Even assuming solely for purposes of argument that each of the named Plaintiffs have a "reversionary" property interest in the railroad's right-of-way,[9] Plaintiffs' takings claims fail at the outset because the mere issuance of a NITU and subsequent trail negotiations simply maintained the status quo and did not alter or otherwise affect these alleged property interests.

In the prior Federal Railbanking cases relied on by Plaintiffs, the courts found that trail use imposed a new easement on the landowner's property because either the railroad easement had previously been extinguished or trail use exceeded the scope of the railroad easement under applicable state law. *See, e.g. Preseault*, 100 F.3d at 1550. These cases found trail use to be an additional encumbrance that affected the landowner's property interest so as to support a takings claim. As discussed above, no new easement was even arguably imposed here so as to affect Plaintiffs' alleged property interest, since the NITU lapsed without any trail use agreement and no rails-to-trails conversion has or can ever take place pursuant to this NITU.

Nor can Plaintiffs assert that the mere issuance of a NITU affected their alleged property interest by delaying the vesting of their rights to the corridor. As noted above, STB's preemptive jurisdiction over a railroad corridor continues even after the abandonment becomes effective until the railroad notifies the STB that the abandonment has been consummated. *See Barclay*,

[9] As previously noted, RTC disputes Plaintiffs' assertion that the railroad held only limited easement interests in the corridor under Arizona state law.

443 F.3d at 1376 n.10. The railroad can take up to a year to notify the STB of consummation, and, if it fails to do so, the abandonment authorization lapses, and the railroad retains its common carrier obligation to provide rail service on the corridor. Plaintiffs cannot demonstrate that the railroad would have notified the STB of its consummation of abandonment authorization any earlier if the NITU had not been issued, and Plaintiffs had no rights to the property until abandonment has been fully consummated by the railroad.

Plaintiffs have identified no other effect on their alleged property interest that would have triggered any possessory rights under applicable state law or otherwise supported a takings claim. The railroad continues to hold the corridor in the same manner as it has done for more than a century. The NITU simply allowed for the maintenance of an existing easement for the same (railroad) use that was already authorized to be continued by the railroad in perpetuity. Plaintiffs are not "in a position to complain about the use of the [existing] easement for a permitted purpose." *Preseault*, 100 F.3d at 1552. Since Plaintiffs have not shown any possible effect on their alleged state law property interests from the mere issuance of the NITU and unsuccessful trail use negotiations,[10] no further takings analysis is required under the Federal Circuit's "two-step approach to takings claims." *See Boise Cascade*, 296 F.3d at 1343.

## III. EVEN IF PLAINTIFFS COULD SHOW AN EFFECT ON THEIR ALLEGED PROPERTY INTERESTS, ANY TAKINGS CLAIM MUST BE ANALYZED UNDER THE *PENN CENTRAL* BALANCING TEST.

### A. The *Penn Central* Balancing Test Must Be Applied To Takings Claims When, As Here, There Has Been No Physical Occupation or Complete Economic Deprivation.

Assuming solely for the sake of argument that Plaintiffs are able to demonstrate that the issuance of the NITU in some way affected their alleged property interests under state law, any

[10] *Preseault* recognized that not every government action under the Federal Railbanking Law affects a property interest so as to give rise to a takings claim. For example, *Preseault* noted that if the railroad owns the right-of-way in fee simple, "there is no owner of a separate underlying property interest" to be effected, and if the railroad easement were broad enough to permit trail use, "the use of the easement for a permitted purpose" would not affect the interests of "the servient estate holder." *Id.* at 1552; *see also, e.g.*, *Chevy Chase Land Co.*, 230 F.3d 1375.

analysis of whether that impact rises to the level of a taking in this case would have to proceed under the three-part balancing test enunciated by the Supreme Court in *Penn Central*. Under *Penn Central*, in determining whether a "taking" occurs, a court must balance "the economic impact of the regulation, the extent to which it interferes with investment-backed expectations, and the character of the governmental action." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434 (1982).

As the Supreme Court has made clear, the *Penn Central* balancing test is the default analysis applied to takings claims. *See id.* ("[R]esolving whether public action works a taking is ordinarily an ad hoc inquiry in which several factors are particularly significant."). The Supreme Court has identified only two "unique" circumstances that justify departing from the default *Penn Central* balancing test and instead applying a *per se* rule. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992). Only a "permanent physical occupation," *Loretto*, 458 U.S. at 434-35, or a "regulation [that] denies all economically beneficial or productive use of land," *Lucas*, 505 U.S. at 1015, constitutes a taking *per se*.

There is simply no support for the Plaintiffs' view that the mere issuance of a NITU authorizing unsuccessful interim trail use negotiations for a brief period, which lapsed without any rails-to-trails conversion, constitutes a *per se* "taking." The *per se* rule of *Loretto* is inapplicable because the issuance of the NITU was a regulatory action, not a physical occupation, while the *per se* rule of *Lucas* is inapplicable because the alleged regulatory taking was temporary, not a complete economic deprivation. Thus, even assuming that each Plaintiff can show a property interest in the railroad corridor and that this alleged interest was somehow affected by issuance of the NITU, the *Penn Central* balancing test must be applied to determine whether this impact rises to the level of a taking.

**B. Application of the *Penn Central* Test Is Required Because The Issuance of the NITU, Which Expired Without A Rails-to-Trails Conversion, Was A Regulatory Action That Did Not Result in A Physical Occupation of Plaintiffs' Property.**

The NITU, which expired without any rails-to-trails conversion occurring, does not constitute a *per se* taking under *Loretto* because there is no physical occupation of the right-of-way by a new easement for trail use. Instead, Plaintiffs' claim that the issuance of the NITU resulted in a "taking" of their alleged property interests in the underlying rail corridor must be analyzed under the *Penn Central* test governing regulatory actions.

Plaintiffs' reliance on previous Rails-to-Trails cases applying *Loretto*'s *per se* rule for physical occupations, (Pl.'s Memorandum at 43), is misplaced because, as discussed above, those cases all involved actual trail use, which led courts to conclude that "[w]hereas previously the plaintiffs could exclude all but the railroads from use of the right-of-ways, now the public at large has access. This is a physical taking of the plaintiffs' property." *Glosemeyer*, 45 Fed. Cl. at 781. By contrast, issuance of the NITU and the subsequent negotiation period did not change the use of the existing easement, which remains exclusively under the possession and control of the railroad, and did not provide "access" to the right-of-way to "the public at large" for use as a trail or for any other use outside the scope of a railroad easement.

The Federal Circuit has made clear that when, as here, there is "no change of use and no expansion" of a pre-existing easement affected by government action, no physical invasion has occurred, and the landowner has, at most, a regulatory takings claim. *Tuthill Ranch, Inc. v. United States*, 381 F.3d 1132, 1139 (Fed. Cir. 2004) (concluding that government leasing of excess space on a fiber optic cable running over an existing easement did not constitute a *per se* taking under *Loretto*). This follows from the fact that, when the government action does not alter the scope of the easement, that "which occupies physical space," *i.e.*, the easement, "is not the source of [the plaintiff's] complaint." *Id.* at 1138. Instead, the full extent of the use of the property was already permitted prior to the government action, and the landowner's complaint is merely with regulatory action affecting this pre-existing use, which gives rise, at most, to a regulatory takings claim. *Id.* at 1138-39 (noting that plaintiffs had already "received full

compensation for the physical space" occupied by the easement); *see also Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed. Cir. 1999) (rejecting a physical takings claim where the physical invasion was "attributable not to the government's action, but to the prior contractual arrangement" between the landowner and a third-party).

Here, as noted above, the railroad was already permitted, under the terms of even the most limited existing easement, to physically occupy the right of way and use or hold it for railroad purposes, and the government action—the issuance of the NITU and subsequent unsuccessful trail negotiations—did not alter the scope of this occupation or grant the railroad or any third party any additional rights to use the right-of-way. Accordingly, the mere issuance of the NITU, without any trail use, does not constitute a physical occupation that would give rise to a *per se* takings claim.

Nor does the possibility that, "after issuance of the NITU, the [existing] easement continued in existence beyond the time when it otherwise would have been abandoned," *Barclay*, 443 F.3d at 1374 (internal quotation marks omitted), give rise to a physical takings claim. First, as noted above, it is entirely speculative to suggest that the issuance of the NITU delayed abandonment of the corridor. It is the railroad's actions, not the STB's, that determine when abandonment is consummated, and therefore when any alleged possessory rights of Plaintiffs might become vested. It is possible that SPROC would have deferred consummating abandonment authorization even absent the issuance of the NITU. Since any easement interests held by the railroad were indefinite in nature, their mere continuance for six or seven months (or longer) did not cause any greater physical invasion than was already authorized.

Moreover, the Federal Circuit and this Court have made clear that no physical takings claim lies when the government action results only in the "continued presence" of a pre-existing physical invasion that otherwise would have been terminated. *See Cienega Gardens v. United States*, 33 Fed. Cl. 196, 214 (1995), *aff'd*, 265 F.3d 1237 (Fed. Cir. 2001) (concluding that a government regulation barring landlords from evicting tenants when they otherwise would have done so did not constitute a physical taking). In such situations, the government action does not

result in any greater physical invasion than had already been authorized, and thus "the effect of the [government action] is merely to enhance an existing . . . possessory interest." *Cienega Gardens*, 265 F.3d at 1248. Since the government action here does not "authorize[]" a "physical occupation of the Owners' property," but merely, at most, continues an existing, authorized invasion, Plaintiffs' "takings" claim must be analyzed as a regulatory taking under *Penn Central*. *Id.*

In sum, the mere issuance of the NITU involves no physical appropriation of any property in which Plaintiffs claim an ownership interest. At most, Plaintiffs can allege "government action outside the owner's property," *i.e.*, issuance of the NITU and subsequent unsuccessful trail negotiations, "that [allegedly] causes consequential damages within," which is indisputably a regulatory takings claim. *Tuthill Ranch*, 381 F.3d at 1136. Regulatory takings claims, of course, are not subject to *Loretto*'s *per se* rule for physical occupations and, instead, are generally subject to the *Penn Central* balancing test. *See, e.g.*, *Tuthill Ranch*, 381 F.3d at 1137 ("[R]egulations that merely restrict the use of property may qualify as regulatory takings, but not as physical takings."); *Boise Cascade*, 296 F.3d at 1354 ("[A] regulatory takings claim [is] governed by *Penn Central*.").

### C. Temporary Regulatory Actions, Like That Alleged Here, Are Always Analyzed Under the *Penn Central* Test Because the *Per Se* Rule of *Lucas* Is Inapplicable.

The Supreme Court has recognized only a narrow exception when regulatory takings claims are not analyzed under *Penn Central*: when the "regulation denies all economically beneficial or productive use of land," it is a taking *per se* under *Lucas*. *Lucas*, 505 U.S. at 1015. The issuance of a NITU alone cannot be a *per se* taking under *Lucas* because it does not deprive Plaintiffs of all beneficial use of any property interest that they might have in the railroad right-of-way. Rather, as noted above, a NITU that does not result in a trail use agreement is merely a regulatory action that has little or no impact on Plaintiffs' investment-backed expectations

concerning their alleged property interests.[11] Even assuming, solely for purposes of argument, that the STB's action deprived Plaintiffs of all beneficial use of the portion of the right-of-way in which they claim an interest, this action is still not a *per se* taking because any economic deprivation was only temporary—no more than seven months in the case of one segment and six months in the case of another. The law is clear that an allegation of a "temporary taking" is not a *per se* "taking," but must be analyzed under the *Penn Central* balancing test.

### 1. Temporary Takings Claims Must Be Analyzed Under *Penn Central*

The Supreme Court and Federal Circuit have made clear that regulatory action that temporarily deprives a property owner of all economically beneficial use of his or her property is not a *per se* taking under *Lucas* and, instead, is subject to the *Penn Central* balancing test.[12] *See Tahoe-Sierra*, 535 U.S. at 334-38. In *Tahoe-Sierra*, the plaintiffs' lands were subject to a 32-month "moratorium on development" that prohibited "virtually all development on a substantial portion of the property." *Id.* at 306. The plaintiffs alleged that this temporary moratorium constituted a *per se* taking under *Lucas* because they were denied "all viable economic use of [their] property" for the period that the moratorium was in effect. *Id.* at 321. The Supreme Court rejected "the extreme categorical rule that any deprivation of all economic use, no matter

---

[11] Moreover, only the small portion of Plaintiffs' land burdened by the railroad corridor could even arguably have been affected by the NITU. However, "takings jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Tahoe-Sierra Pres. Council Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 327 (2002) (quoting *Penn Central*, 438 U.S. at 130-31. Where, as here, "the government action does not deprive the owner of all beneficial use of the entire relevant parcel, then no categorical taking [under *Lucas*] can be shown," *Norman v. United States*, 429 F.3d 1081, 1091 (Fed. Cir. 2005), and the *Penn Central* test must be applied, *see Tahoe-Sierra*, 535 U.S. at 327.

[12] Even claims involving temporary physical invasions are analyzed under the *Penn Central* test not *Loretto*'s *per se* rule for permanent physical occupations. *See Boise Cascade*, 296 F.3d at 1353 ("The [Supreme] Court [has] carefully distinguished physical occupations (to which the *Loretto* rule applies) from temporary physical invasions of property by the government (to which the *Loretto* rule does not apply)."); *Scogin v. United States*, 33 Fed. Cl. 285, 290 (1995) ("[W]hen a physical invasion that can be characterized as temporary takes place, courts are to apply the balancing test under Penn Central.").

how brief, constitutes a compensable taking" and instead concluded that "the better approach to claims that a regulation has effected a temporary taking requires careful examination and weighing of all the relevant circumstances." *Id.* at 334, 336 (internal quotation marks omitted).

As the Federal Circuit has explained: "In *Tahoe-Sierra*, the Supreme Court clarified that the rule applied in *Lucas* would only be applicable to *permanent*, rather than *temporary*, regulatory takings, stating that '*Lucas* carved out a narrow exception to the rules governing regulatory takings for the "extraordinary circumstance" of a *permanent* deprivation of all beneficial use.'" *Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1365 (Fed. Cir. 2004) (emphases added). Instead, *Tahoe-Sierra* "reaffirmed that the *Penn Central* analysis is the proper way to address whether a temporary regulatory taking has occurred." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1370 n.10 (Fed. Cir. 2004).

### 2. The Issuance of the NITU and Subsequent Negotiating Period Were Only Temporary, and Plaintiffs At Best Have Only A Temporary Takings Claim.

Since the government action at issue here—the NITU and subsequent trail use negotiations—lasted no more than seven months, Plaintiffs are limited to, at best, a temporary takings claim subject to the *Penn Central* balancing test. As Plaintiffs' own recitation of the facts shows, the STB issued the NITU on July 25, 2006. (Pl.'s Proposed Findings ¶¶ 61-62.) No trail use agreement was reached by the end of the 180-day NITU period. (*Id.* ¶ 65.) For a portion of the railroad line, the NITU was not extended and therefore the NITU converted to a Notice of Abandonment at the end of the 180-day period. (*Id.* ¶¶ 66-67); 49 C.F.R. § 1152.29(d)(1). This permitted SPROC "to fully abandon the line," and SPROC in fact consummated abandonment for this portion of the right-of-way on January 29, 2007. (Pl.'s Proposed Findings ¶ 68); 49 C.F.R. § 1152.29(d)(1). Thus, for this portion of the right-of-way, the government action at issue lasted only six months, and the STB's preemptive jurisdiction over this portion of the corridor has now come to an end. No federal law or federal action stands

in the way of any rights that Plaintiffs may have to re-possess this portion of the corridor under state law.[13]

For the remainder of the right-of-way, the STB granted a 30-day extension and the NITU negotiating period therefore extended until February 21, 2007. (Pl.'s Proposed Findings ¶¶ 67-70.) However, SPROC and the Trust failed to reach a trail use agreement for this portion as well, and therefore under 49 C.F.R. § 1152.29(d)(1) SPROC was permitted "to fully abandon" this portion of the line when the NITU converted to a Notice of Abandonment on February 21, 2007. Thus, for this second portion of the right-of-way, the government action at issue lasted only seven months. While the railroad has not yet consummated abandonment authorization of this portion of the property, it is impossible for the NITU that Plaintiffs challenge in this action to authorize trail use of this portion of the corridor, since this NITU has now lapsed, no further extension has been timely sought, and the abandonment proceeding has now closed.

Inexplicably, Plaintiffs allege that the landowners who allegedly own property burdened by the portion of the easement that was subject to the NITU extension have a permanent takings claim for the seven month period of government action, while at the same time admitting that the landowners who claim to own property burdened by the portion of the easement that was not subject to the NITU extension have only a temporary takings claim for the six month period of government action. (Pl.'s Memorandum at 28.) There is nothing in law or logic that would support Plaintiffs' distinction between a six and seven month period. Moreover, both periods are significantly shorter than the 32-month period the Supreme Court found to be temporary in *Tahoe-Sierra*, 535 U.S. at 330-31. In fact, as noted above, the Federal Circuit has indicated that the issuance of a NITU and subsequent trail negotiations is at most only temporary government action when no trail use agreement is reached. *Caldwell*, 391 F.3d at 1234. While the Court reserved the question of whether this action constituted a taking at all, it distinguished this

[13] Indeed, the fact that Plaintiffs have taken no action to assert any property rights to this portion of the corridor strongly suggests that they have none.

situation from the permanent government action resulting from a trail use agreement and actual trail use, and made clear that when no trail use agreement is reached, at most, "a *temporary* taking may have occurred." *See id.* (emphasis added).

Plaintiffs' permanent takings argument is apparently based on the STB's order granting SPROC's request to extend the deadline to consummate abandonment until July 26, 2008, which was issued after the NITU terminated without any trail use agreement. (Pl.'s Memorandum at 28; Pl.'s Proposed Findings ¶ 71.) Plaintiffs cite no authority to support their assertion that a permanent taking occurred even after the NITU lapsed, and, in fact, *Caldwell* indicates that any taking that results from the issuance of a NITU that does not lead to trail use ends with "termination of the NITU." *See Caldwell*, 391 F.3d at 1234-35. At that point, the Federal Railbanking Law has ceased to operate, thereby "permit[ting] the railroad to fully abandon the line" and leaving consummation of abandonment fully within the discretion of the railroad. 49 C.F.R. § 1152.29(d)(1). Even if SPROC subsequently consents to the issuance of another NITU, and that negotiation results in the execution of an interim trail use agreement and a rails-to-trails conversion, the Plaintiffs will be able to file a "takings" claim arising from the issuance of that NITU. It defies reason, and the holding of *Preseault* and its progeny, to suggest that a compensable taking occurs merely from the railroad's unilateral decision to delay consummation of abandonment. In fact, such an argument would suggest that any decision of the STB or the railroad that delays abandonment results in a compensable taking—including STB decisions to deny a railroad's request for abandonment authorization, an action that the Supreme Court has already found *not* to result in a taking. *See New Haven Inclusion Cases*, 399 U.S. at 490-93.

Thus, the six to seven month period of unsuccessful interim trail use negotiations that took place in this case pursuant to the NITU is clearly not "permanent" within the meaning of the takings law and, at most, gives rise only to a temporary takings claim subject to the *Penn Central* balancing test.

## IV. APPLICATION OF THE *PENN CENTRAL* TEST DEMONSTRATES THAT NO COMPENSABLE TAKING HAS OCCURRED.

As discussed above, application of the *Penn Central* balancing test is mandated by the fact that the government action was merely a temporary regulation that did not result in a permanent physical occupation of land that Plaintiffs claim to own. Application of the three *Penn Central* factors—(1) the economic impact of the regulation; (2) the degree of interference with reasonable investment-backed expectations; and (3) the nature and character of the governmental action—to the physical and temporal whole of Plaintiffs' property makes clear that no taking occurred here. *Penn Central*, 438 U.S. at 124; *see also PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83 (1980); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984).[14]

### A. The Economic Impact of the Government's Action upon Plaintiffs' Property is Minimal and Utterly Insufficient to Constitute a Taking.

Plaintiffs' claim undoubtedly fails the first factor of the *Penn Central* test, which determines the diminution in economic value of Plaintiffs' property as a result of the governmental regulation. Even if Plaintiffs had submitted any proof that the issuance of the NITU diminished the value of their property (and they did not), "[i]t is well settled that lawful regulatory action does not constitute a compensable taking merely because the result is to diminish the value of private property, reduce profits, or prevent the most beneficial use of such property." *Carruth v. United States*, 627 F.2d 1068, 1081 (Ct. Cl. 1980). Instead, the regulation must extinguish "a fundamental attribute of ownership" rendering the property substantially useless. *Agins v. Tiburon*, 447 U.S. 255 (1980). "The cynosure of this factor is the change in the fair market value of the subject property caused by the regulatory imposition—in other words,

[14] In applying the *Penn Central* test to the case at hand, the Court must look to each Plaintiff's entire parcel, rather than just the portion of the land burdened by the railroad easement, because it is improper to "divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated." *Penn Central*, 438 U.S. at 130-31; *see also Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004). In fact, this Court must look to both the geographic and temporal whole of Plaintiffs' properties in applying the three *Penn Central* factors because "[b]oth dimensions of a real property interest—the metes and bounds describing its geographic dimensions and the term of years describing its temporal aspect—must be considered when viewing the interest in its entirety." *Tahoe-Sierra*, 535 U.S. at 305.

the court must 'compare the value that has been taken from the property with the value that remains in the property.'" *Arctic King Fisheries, Inc. v. United States*, 59 Fed. Cl. 360, 374 (Fed. Cl. 2004) (*quoting Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)).

A regulatory taking occurs only "in cases in which the value of the property was reduced drastically." *Rogin v. Bensalem Township*, 616 F.2d 680, 691-692 (3rd Cir. 1980). Courts generally require diminutions in value in excess of 85 percent before finding a regulatory taking.[15]

In the present case, Plaintiffs cannot demonstrate that the STB order authorizing interim trail use negotiations had any economic impact on the value of their property whatsoever, much less rendered each Plaintiff's entire parcel of land substantially useless, as required under this "economic impact" factor. Plaintiffs have failed to provide any proof that the NITU diminished the value of the underlying right-of-way. In fact, it is inconceivable that the value of the land currently occupied by the railroad easement, which is being occupied in the same manner as it has been occupied for more than a century, changed in any manner as a result of the issuance of the NITU. Plaintiffs hold exactly the same interest (if any) in the underlying right-of-way that they have always held. Nor did the issuance of the NITU change the use of the right-of-way in

[15] *Compare Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (no taking despite 75% diminution); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (no taking despite 87.5% diminution); *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 645 (1993) (no taking despite 46% diminution); *Walcek v. United States*, 303 F.3d 1349, 1355-1356 (Fed. Cir. 2002) (no taking despite 60% diminution); *Jentgen v. United States*, 657 F.2d 1210, 1213 (Ct. Cl. 1981) (no taking despite 50% diminution); *Arctic King*, 59 Fed. Cl. at 384-385 (no taking despite 50% diminution); *Cane Tennessee, Inc. v. United States*, 57 Fed. Cl. 115 (2003) (no taking despite 49.6% diminution); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1348 (Fed. Cir. 2004) (no taking despite 78% diminution in part of property and 92% diminution in another part of property); *with Loveladies Harbor v. United States*, 21 Cl. Ct. 153, 160 (Cl. Ct. 1990) (taking at 99% diminution), *aff'd*, 28 F.3d 1171 (Fed. Cir. 1994); *Bowles v. United States*, 31 Fed. Cl. 37, 48-49 (Fed. Cl. 1994) (taking at 92-100% diminution); *1902 Atl. Ltd. v. United States*, 26 Cl. Ct. 575, 579 (Cl. Ct. 1992) (88% diminution satisfies "economic impact" factor, but no taking found).

any way that affected Plaintiffs' alleged property interests. If anything, the value of Plaintiffs' alleged property interests may have increased since abandonment is now authorized.

The Plaintiffs' claim of economic impact is particularly baseless when one considers that the railroad easement is only 100-200 feet wide and covers, for example, a maximum of only 1.26% of the Ladd property.[16] As Plaintiffs admit, "[f]or most of the Plaintiffs, their property is their home or ranch where they earn their living." (Pl.'s Memorandum at 4.) Certainly land used as a home or to earn a living is not rendered substantially useless, particularly by the short term continuance of an existing easement, as required to satisfy the "economic impact" factor.

Moreover, the time during which the land is affected by the government regulation is also a factor in determining "economic impact." The Supreme Court in *Tahoe-Sierra* held that "a temporary restriction causing a diminution in value is not [a taking], for the property will recover value when the prohibition is lifted." 535 U.S. at 305. Here, the NITU lasted for only six or seven months. Even if the NITU somehow temporarily affected the market value of Plaintiffs' lands (and Plaintiffs have submitted no evidence that it did), under *Tahoe-Sierra*, this economic impact is necessarily insufficient to constitute a taking because the property will recover its full value at the end of the period.

Thus, it is clear, as a matter of law, that there has been no diminution in value of Plaintiffs' property. This fact is fatal to Plaintiffs' takings claim because "[o]nly when [the effect of the regulation] is to prevent 'economically viable' use of the [property] in question 'can it be said that a taking has occurred.'" *Brace v. United States*, 72 Fed. Cl. 337, 357 (2006) (*quoting United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985)).

[16] "The right-of-way easement varies in width from 100 feet to 200 feet." (Pl.'s First Amended Complaint ("Complaint"), Docket No. 6, at ¶ 5.) The Ladd property is about 18 square miles, which is 501,811,200 square feet. (*See* Complaint, at Ex. E; Pl.'s Proposed Findings ¶ 21.) The railroad easement on the Ladd property is approximately 6 miles long. (Pl.'s Proposed Findings ¶ 21.) An easement that is 200 feet wide and 8 miles long is 6,336,000 square feet. Thus, the railroad easement on the Ladd property covers a maximum of 1.26% of the property. This is the only property for which Plaintiffs have provided sufficient information to make a calculation.

### B. The Government's Issuance of the NITU Was Consistent With, And Did Not Interfere With, Plaintiffs' Reasonable Investment-Backed Expectations.

Under the second *Penn Central* factor, the Court must look at whether the government action excessively interfered with Plaintiffs' reasonable investment-backed expectations in their properties. This analysis requires that this Court first "determine the benefits that the owners reasonably could have expected at the time they entered into the investment." *Cienega Gardens v. United States*, 503 F.3d 1266, 1289 (Fed. Cir. 2007). Second, "the claimant must establish that it made the investment because of its reasonable expectation of receiving the benefits denied or restricted by the government action, rather than the remaining benefits." *Id.* In other words, this Court must determine that Plaintiffs' "rights thus denied" by the government action "were the primary or 'but for' cause of the investment" in the property. *Id.* at 1289-90.

First, in terms of the benefits Plaintiffs reasonably could have expected at the time of purchase, all Plaintiffs purchased their properties already burdened by the railroad easement at issue here.[17] (Pl.'s Proposed Findings ¶¶ 1-40.) Because these easements were perpetual, Plaintiffs could not have bought their property with any reasonable expectation of being able to use the portion of their land subject to the easement. Thus, as a matter of law, Plaintiffs could have no reasonable investment-backed expectations that were interfered with by issuance of the NITU and continuation of the existing railroad easement.

In addition, Plaintiffs cannot establish reasonable investment-backed expectations if they "could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment' at the time of purchase." *Appolo Fuels*, 381 F.3d at 1349. All but the Ladd and Lindsay Plaintiffs purchased their property after the enactment of the 1983 Federal Railbanking Law. (Pl.'s Proposed Findings ¶¶ 1-40.) Only the Ladd Plaintiffs allegedly purchased their property prior to the related Transportation Act of 1920. (Pl.'s Proposed Findings ¶ 16.)

[17] The Ladd Plaintiffs purchased their property subject to part of the easement at issue here and later gave additional land to the railroad for the easement.

The Transportation Act of 1920 completely preempted any state-law based expectations that Plaintiffs might have had, and the 1983 Federal Railbanking Law did not enlarge the broad and preemptive statutory powers that the Transportation Act of 1920 conferred on the ICC to regulate abandonments. 49 U.S.C. § 10903(d). After 1983, just as before, it has remained entirely in the railroad's discretion whether merely to discontinue rail operations "for an indefinite period while preserving the rail corridor for possible reactivation of service in the future," or fully to abandon the right of way and thereby permit state law rights of reversion to take effect. *Preseault*, 494 U.S. at 6 n.3.

Thus, Plaintiffs' reasonable expectations should have contemplated the railroad's right to hold the corridor, unused, indefinitely, even without the issuance of a NITU. The STB's current rules, requiring that a railroad file a notice of consummation within one year of the effective date of the abandonment authorization have been in effect only eleven years; prior to 1997, consummation of abandonment authorization depended solely on the intent of the railroad, as evidenced through its subsequent actions, which actions might not take place until many years after the ICC's abandonment authorization. *See, e.g. Black v.* ICC, 762 F.2d 106, 112-113 (D.C. Cir. 1985). Thus, Plaintiffs' reasonable expectations surely would encompass the possibility that the railroad could hold the corridor for a mere six or seven months during the unsuccessful interim trail use negotiations. Indeed, the STB had the authority to permit a railroad to hold a corridor indefinitely for future use without the issuance of a NITU. *See Preseault*, 494 U.S. at 5 n.3.

A "'reasonable investment backed expectation' must be more than a 'unilateral expectation or an abstract need,'" but must in fact be reasonable. This pre-existing regulatory regime foreclosed any reasonable expectation that Plaintiffs' alleged "reversionary" interests would not be delayed by the STB's abandonment approval process. *Ruckelshaus*, 467 U.S. at 1005-1006 (internal citation omitted).

In any event, none of the Plaintiffs can establish that the NITU delayed their ability to re-possess the corridor. As noted above, the STB's abandonment authorization is permissive only,

and the railroad unilaterally and in its sole discretion determines whether and when to consummate abandonment authorization. Thus, Plaintiffs could have no reasonable expectation that the issuance of the NITU delayed their re-possession of the corridor. In *Tahoe-Sierra*, in determining plaintiffs' reasonable investment-backed expectations, the Supreme Court looked to the temporary nature of the regulations at issue, as well as testimony that the "average holding time of a lot in the Tahoe area between lot purchase and home construction is twenty-five years." 535 U.S. at 315. Because the plaintiffs had failed to offer specific evidence of harm, the Supreme Court evaluated the "average" purchasers' intent, and held that such purchasers "did not have reasonable, investment-backed expectations that they would be able to build single-family homes on their land within the six-year period involved in this lawsuit." *Id.*

As Plaintiffs admit, they bought the land at issue to use as a home or as a way to make a living. (Pl.'s Memorandum at 4.) None of the Plaintiffs could have reasonably bought their land for the primary purpose of using the land occupied by the railroad easement in the six or seven months that the NITU existed. In light of the fact that the railroad easement could exist indefinitely, and had in fact had been continuously in existence for over 100 years prior to the NITU, any such expectation that did exist would have been unreasonable. Like *Tahoe-Sierra*, the average purchaser of land in Cochise County, Arizona did not have reasonable, investment-backed expectations that they would be able to use land subject to a railroad easement during the period that the NITU was in effect. Therefore, Plaintiffs cannot satisfy this second factor of the *Penn Central* test as a matter of law.

### C. Given the Importance of the Federal Railbanking Law and the Limited Nature of the Regulation, the Character of the Government Action At Issue Does Not Demonstrate a Taking.

The last *Penn Central* factor requires this Court to consider the character of the government's action. Any delay in Plaintiffs' (unreasonable) expectations for when they would re-possess the right-of-way was for a period of six or seven months. Such a short delay is not of the character typically held to be a taking. *See Tahoe-Sierra*, 535 U.S. 302 (holding that length of delay is relevant to the character of the action, and that even a six year temporary delay was of

insufficient character to constitute a taking). Similarly, this brief delay affected a very small area (for example, at most 1.26% of the Ladd's land), as the easement spanned 200 feet across at its widest point. The Supreme Court has held that "restrictions on the use of only limited portions of the parcel, such as set-back ordinances . . . [are] not considered regulatory takings [because] where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." *Id.* at 327 (internal citation omitted). Thus, any restriction of such a limited temporal and physical scope is of insufficient character to constitute a taking.

In fact, finding a taking from this government action could have far-reaching effects. As previously noted, the issuance of the NITU and subsequent unsuccessful trail use negotiations are indistinguishable from a wide variety of STB activities that regulate railroad abandonment; thus, to find a taking here would suggest that all STB actions that prevent or delay abandonment constitute a taking. Moreover, the NITU merely permitted negotiations between private parties that could possibly result in actions that qualify as a taking under existing precedent. If a plaintiff could bring a temporary takings claim in this circumstance, any government action that merely raised the possibility that property would eventually be taken—such as the mere consideration of use of eminent domain at a legislative hearing or government surveys of possible property to be condemned—would be vulnerable to a temporary takings claim. The sheer absurdity of such a result confirms that the government action here was of insufficient character to constitute a taking.

By contrast, the importance of the government action in this case—*i.e.*, the importance of the Federal Railbanking Law—is beyond dispute. *See Maritrans, Inc. v. United States*, 342 F.3d 1344, 1356 (Fed. Cir. 2003) (noting that the final *Penn Central* factor considers "the purpose and importance of the public interest underlying [the] regulatory imposition"). As the Supreme Court explained in *Preseault*:

> [The Railbanking Law i]s the culmination of congressional efforts to preserve shrinking rail trackage by converting unused rights-of-way to recreational trails. In 1920, the Nation's railway system reached its peak of 272,000 miles; today only about 141,000 miles are in use, and experts predict that 3,000 miles will be abandoned every year through the end of this century. Concerned about the loss

> of trackage, Congress included in the Railroad Revitalization and Regulatory Reform Act of 1976 several provisions aimed at promoting the conversion of abandoned lines to trails. . . . By 1983, Congress recognized that these measures "had not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes."

494 U.S. at 5-6 (footnotes and internal citations omitted). As a result, Congress enacted the Federal Railbanking Law in 1983 to reflect "the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use." 16 U.S.C. § 1247(d); *Preseault*, 494 U.S. at 7.

Thus, the Federal Railbanking Law reflects a vital concern for the significant public investment made in railroad corridors that were "painstakingly created over several generations" and seeks to avoid the potentially prohibitive costs of reassembling railroad rights-of-way if the existing corridors become fragmented. *See Reed v. Meserve*, 487 F.2d 646, 649-50 (1st Cir. 1973). The Federal Railbanking Law has been a stunning success, preserving 4,913 miles of rail corridors in 35 states that otherwise would have been abandoned.[18] Rail service has even been reactivated on a number of these corridors in the years since the inception of the Federal Railbanking Law.[19] In fact, fueled by growing global trade and rising fuel costs for 18-wheelers, the freight railway industry is enjoying its biggest building boom in nearly a century.[20] As the cost of gasoline continues to rise, it is likely that even more railbanked corridors will be returned to active rail service in the near future. Accordingly, the significant importance of the Federal

---

[18] Statistics maintained by the Rails-to-Trails Conservancy, as of May 13, 2008.

[19] *See, e.g.*, *Norfolk & W. Ry. Co.—Abandonment Between St. Mary's and Minster in Auglaize County, OH*, 9 I.C.C.2d 1015 (1993); *see also Iowa Power—Const. Exempt.—Council Bluffs, IA*, 8 I.C.C.2d 858 (1990); *Georgia Great Southern Division, South Carolina Central Railroad Co. Inc. -- Abandonment and Discontinuance Exemption -- Between Albany and Dawson, in Terrell, Lee and Dougherty Counties*, GA, Dkt. No. AB-389 (Sub-No. 1X), served May 16, 2003.

[20] *See Washington Post*, "A Switch on the Tracks: Railroads Roar Ahead—Global Trade, Fuel Costs Add Up to Expansion for Once-Dying Industry," (April 20, 2008), available at www.washingtonpost.com/wp-dyn/content/article/2008/04/20/AR2008042002407.html.

Railbanking Law clearly outweighs any limited impact on Plaintiffs' property, and therefore, the final *Penn Central* factor weighs against finding a taking.

None of the three *Penn Central* factors indicates that the government action in this case—issuance of a NITU without any subsequent trail use—is sufficient to constitute a taking, even assuming it affected Plaintiffs' property. Thus, the balance of all three factors together proves that no compensable taking occurred.

**CONCLUSION**

For the reasons described above, Plaintiffs have failed to establish a compensable takings claim as a matter of law. Since there is no genuine issue of material fact that a taking has not occurred, Plaintiffs' motion for summary judgment should be denied and the United States' cross-motion for summary judgment should be granted.

Respectfully submitted,

Dated: May 15, 2008

RAILS-TO-TRAILS CONSERVANCY

By: /s/ Andrea C. Ferster

Andrea C. Ferster
General Counsel
Rails-To-Trails Conservancy
2121 Ward Ct., NW, 5th Floor
Washington, DC 20037
Telephone: 202.974.5142
Facsimile: 202.223.9257
ATTORNEY-OF-RECORD

OF COUNSEL:
Mark C. Zebrowski
Greg Reilly
GReilly@mofo.com
Ramin Tohidi
Sarah E. Simmons
Morrison & Foerster LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

Attorneys for *Amicus Curiae* RAILS-TO-TRAILS CONSERVANCY

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 15, 2008, a true and correct copy of the foregoing was filed with this Court's electronic filing system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing unable as indicated on the Notice of Electronic Filing

/s/ Andrea C. Ferster
Andrea C. Ferster