**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| JACK LADD and MARIE LADD, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 07-271 L |
| THE UNITED STATES OF AMERICA, | ) | Honorable Robert H. Hodges, Jr. |
| Defendant. | ) | |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Div.

RACHEL A. DOUGAN
JAMES D. GETTE
Trial Attorneys
Natural Resources Section
Environment and Natural Resources Div.
United States Department of Justice
Benjamin Franklin Station, P.O. Box 663
Washington, DC 20044-0663
Telephone: (202) 616-5082
Facsimile: (202) 305-0506
Rachel.Dougan@usdoj.gov

Of Counsel:
ELLEN D. HANSON, General Counsel
EVELYN KITAY, Attorney
Surface Transportation Board
Office of General Counsel
395 E Street, SW
Washington, DC 20024

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to Court of Federal Claims Rule ("RCFC") 56, Defendant moves for Summary Judgment in its favor and requests that the Court dismiss Plaintiffs' complaint in its entirety.

Plaintiffs have alleged a taking without just compensation of an interest they allegedly possess in property underlying a railroad corridor in Cochise County, Arizona, in violation of the Fifth Amendment. According to Plaintiffs, the taking resulted from the Surface Transportation Board's issuance of a Notice of Interim Trail Use ("NITU"), which allowed the railroad operator to negotiate with a third party for the conversion of the corridor to interim use as a trail. Because the negotiation period ended with no agreement for the establishment of an interim trail having been reached, any taking in this case is, at most, temporary. Plaintiffs admit as much with respect to a portion of the corridor, but wrongly argue that the alleged taking of the remaining section of the corridor is a permanent taking.

Moreover, Plaintiffs have mistakenly characterized any alleged taking in this case as a physical taking. Because neither the government, nor anyone acting pursuant to the NITU has invaded or occupied the property at issue in this case, any taking claim must be analyzed as a regulatory taking. In this regard, this case is markedly different from all the rails-to-trails takings cases that have preceded it.

Here, because the NITU negotiation period did not result in "extraordinary delay" in the regulatory process, Plaintiffs cannot demonstrate a regulatory taking and the United States is entitled to judgment on Plaintiffs' claims. Independently, the United States is entitled to judgment in its favor in this case because Plaintiffs have failed to show that they possess a compensable property interest in the land underlying the railroad corridor. Ownership of a

compensable property interest is a well-recognized condition precedent for asserting a takings claim.

In addition, Plaintiffs' Motion for Partial Summary Judgment should be denied because Plaintiffs have failed to establish that they have a reversionary interest in the property that comprises the relevant railroad corridor. Moreover, Plaintiffs have failed to show how the decisions from prior rails-to-trails cases they rely upon are relevant to the instant case. Unlike the prior rails-to-trails cases cited by Plaintiffs, there was no trail use agreement ever reached and no trail established in this case.

For the two independent yet equally sufficient bases stated above, the United States request for the entry of judgment in its favor pursuant to RCFC 56 should be granted and, additionally, Plaintiffs' Motion for Partial Summary Judgment should be denied. A detailed memorandum in support of this motion and in opposition to Plaintiffs' motion for partial summary judgment follows.

**TABLE OF CONTENTS**

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT . . . . 1

INTRODUCTION . . . . 1

BACKGROUND . . . . 3

I. The Regulatory Scheme Governing Railroad Lines . . . . 3

II. The History of the Subject Railroad Right-of-Way . . . . 7

III. The Named Plaintiffs' Property . . . . 10

STANDARD OF REVIEW . . . . 12

ARGUMENT . . . . 12

I. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DEFENDANT AS TO THE NAMED PLAINTIFFS' CLAIMS . . . . 12

A. Plaintiffs' Claims Are, at Most, Claims of Temporary Takings . . . . 13

1. The Ladd Family and Miller Family Plaintiffs acknowledge that they allege temporary takings; the NITU negotiation period for the portion of the corridor that abuts their property ended on January 22, 2007 . . . . 14

2. The six other named Plaintiffs can also only allege temporary takings; the NITU negotiation period for the portion of the corridor that abuts their property' ended on February 21, 2007 . . . . 14

B. Because the Government Action in This Case is Nothing More Than a Temporary Regulatory Moratorium and Does Not Involve Any Physical Occupation of Property, Any Alleged Taking Must Be Analyzed As a Regulatory Taking . . . . 15

1. Physical takings are limited to instances of physical occupation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Regulatory delay or moratoria do not constitute physical takings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

3. Prior rails-to-trails cases involved physical occupation resulting from the establishment of a recreation trail . . . . . . . . . 25

C. There Are No Takings Here; Plaintiffs Cannot Demonstrate Any Temporary Regulatory Takings Because Operation of the Trails Act Did Not Result In "Extraordinary Delay" In the Regulatory Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

II. BECAUSE PLAINTIFFS DO NOT POSSESS A COMPENSABLE PROPERTY INTEREST IN THE INSTANT CORRIDOR, PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED AND DEFENDANT'S CROSS-MOTION SHOULD BE GRANTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A. The Railroad Holds Fee Title to the Portion of the Railroad Corridor Abutting the Ladd Plaintiffs' Property . . . . . . . . . . . . . . . . . . . . 31

B. The Railroad Holds Fee Title to the Portion of the Railroad Corridor Abutting, the Lindsey, Castro, and Heinzl Plaintiffs' Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

C. The Railroad Holds Fee title to the Portion of the Railroad Corridor Abutting the Miller Family Plaintiffs' Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D. Resolution of the 1875 Act Claims Should Be Stayed . . . . . . . . . . . . . . 36

E. The Accrual Date of Plaintiffs' Claims is a Separate Issue From Whether those Claims Have Any Merit . . . . . . . . . . . . . . . . . . . . . 36

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## TABLE OF AUTHORITIES

### CASES

Agins v. City of Tiburon,
447 U.S. 255 (1980) . . . . . . . . . . 24, 28

Avenal v. United States,
100 F.3d 933 (Fed. Cir. 1996) . . . . . . . . . . 12

Atlantic & P.R. Co. v. Lesueur,
19 P. 157 (Ariz. Terr. 1888) . . . . . . . . . . 30

Barclay v. United States,
443 F.3d 1368 (Fed. Cir. 2006), cert. denied, 127 S.Ct. 1328 (2007) . . . . . . . . . . 25, 36

Bass Enterprises Prod. Co. v. United States,
54 Fed. Cl. 400 (Fed. Cl. 2002) . . . . . . . . . . 27

Bass Enterprises Prod. Co. v. United States,
133 F.3d 893 (Fed. Cir. 1998) . . . . . . . . . . 13

Birt v. STB,
90 F.3d 580 (D.C. Cir. 1996) . . . . . . . . . . 4, 6

Boise Cascade Corp. v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 27

Boyd v. Atchison, T. & S.F. Ry. Co.,
4 P.2d 670 (Ariz. 1931) . . . . . . . . . . 31

Caldwell v. United States,
57 Fed. Cl. 193 (2003), aff'd, 391 F.3d 1226 (Fed. Cir. 2004), cert. denied,
546 U.S. 826 (2005) . . . . . . . . . . 5, 6, 25, 36, 37

Casitas Municipal Water District v. United States,
76 Fed. Cl. 100 (2007) . . . . . . . . . . 20

Chevy Chase Land Co. v. United States,
37 Fed. Cl. 545 (1997) aff'd 230 F.3d 1375 (Fed. Cir. 1999),
cert. denied, 531 U.S. 957 (2000) . . . . . . . . . . 4

Citizens Against Rails-To-Trails ("CART") v. STB,
267 F.3d 1144 (D.C. Cir. 2001) . . . . . . . . . . 6

Colorado v. United States,
271 U.S. 153 (1926) . . . . . . . . . . 3

First English Evangelical Lutheran Church v. County of Los Angeles,
482 U.S. 304 (1987) . . . . . . . . . . 28

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir. 1999) . . . . . . . . . . 17, 19

Goos v. ICC,
911 F.2d 1283 (8th Cir. 1990) . . . . . . . . . . 6

Grantwood Village v. Missouri Pac. R.R. Co.,
95 F.3d 654 (8th Cir. 1996), cert. denied, 519 U.S. 1149 (1997) . . . . . . . . . . 4

Hayfield N. R.R. Co., Inc. v. Chicago & N.W. Transp. Co.,
467 U.S. 622 (1984) . . . . . . . . . . 4

Kalo Brick & Tile Co.,
450 U.S. 311 (1981) . . . . . . . . . . 3

Keystone Bituminous Coal Ass'n. v. DeBenedictis,
480 U.S. 470 (1987) . . . . . . . . . . 18

Lacer v. Navajo County,
687 P.2d 404 (Ariz. App. 1983) . . . . . . . . . . 32, 35, 36

Loretto v. Teleprompter Manhattan CATV Corp.,
458 U.S. 419 (1982) . . . . . . . . . . 17, 18

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . . . . . . 21

Nat'l Ass'n of Reversionary Property Owners ("NARPO") v. STB,
158 F.3d 135 (D.C. Cir. 1998) . . . . . . . . . . 3, 4, 6

Neb. Trails Council v. STB,
120 F.3d 901 (8th Cir. 1997) . . . . . . . . . . 4

Northern Transportation Co. v. Chicago,
99 U.S. 635 (1878) . . . . . . . . . . 19

Penn Central Transportation Co. v. New York City,
438 U.S. 104 (1978) . . . . . . . . . . 17, 18

Preseault v. ICC,
494 U.S. 1 (1990) . . . . . . . . . . 3, 4

Pumpelly v. Green Bay Co.,
80 U.S. 166 (1871) . . . . . . . . . . 19

RLTD Ry. v. STB,
166 F.3d 808 (6th Cir. 1999) . . . . . . . . . . 3, 4

Spurlock v. Santa Fe Pacific R. Co.,
143 Ariz. 469 (Ariz. App. 1984) . . . . . . . . . . 31, 32

Stearns Co., Ltd. v. United States,
396 F.3d 1354 (Fed. Cir. 2005) . . . . . . . . . . 17, 20, 26

Sweats Fashions, Inc. v. Pannill Knitting Co.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 12

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . 16, 22-24, 27-29

Tuthill Ranch, Inc. v. United States,
381 F.3d 1132 (Fed. Cir. 2004) . . . . . . . . . . 16, 17, 19

United States v. Causby,
328 U.S. 256 (1946) . . . . . . . . . . 18

United States v. Central Eureka Mining Co.,
357 U.S. 155 (1958) . . . . . . . . . . 18

United States v. General Motors Corp.,
323 U.S. 373 (1945) . . . . . . . . . . 18

United States v. Pewee Coal Co.,
341 U.S. 114 (1951) . . . . . . . . . . 18

United States v. Riverside Bayview Homes,
474 U.S. 121 (1985) . . . . . . . . . . 15, 28

Village of Euclid v. Ambler Realty Co.,
272 U.S. 365 (1926) . . . . . . . . . . 18

Walcek v. United States,
303 F.3d 1349 (Fed. Cir. 2002) . . . . . . . . . . 12

Wyatt v. United States,
271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Yee v. City of Escondido,
503 U.S. 519 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**STATUTES**

16 U.S.C. § 1247(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

49 U.S.C. § 10906 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**REGULATIONS**

49 C.F.R. § 1152.29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

49 C.F.R. § 1152.29(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

49 C.F.R. § 1152.29(c)-(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

49 C.F.R. § 1152.29(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 27

49 C.F.R. § 1152.29(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-10

49 C.F.R. § 1152.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**OTHER AUTHORITIES**

23 Am.Jur.2d Deeds § 268 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

65 Am.Jur.2d Railroads § 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

74 C.J.S. Rail § 185 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Restatement of Property §§ 7–9 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Melinda Harm Benson, The Tulare Case: Water Rights,
The Endangered Species Act, And The Fifth Amendment, 32 Envtl. L. 551 (2002) . . . 20

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

This case presents an issue of first impression: whether a takings claim should be analyzed as physical or regulatory where no trail use agreement is reached and no interim trail use is initiated. Pursuant to the National Trails System Act Amendments of 1983 ("Trails Act"), 16 U.S.C. § 1247(d), the Surface Transportation Board ("STB") issued a Notice of Interim Trail Use ("NITU"), which authorized a 180-day negotiation period to allow a rail carrier and a trail group time to negotiate a railbanking and interim trail use agreement. The negotiation period, which was extended by 30 days for part of the line, acted as a temporary moratorium on the railroad's ability to exercise its authority to abandon the line. The negotiations were not fruitful: no trail use agreement was reached for any portion of the line, the Trails Act negotiation period ended, and the standard regulatory process, by which the railroad has abandoned part of the corridor and continued its use of the remainder of the corridor, has continued. Thus, this case presents a set of facts that are unlike any rails-to-trails takings case that has preceded it.

Plaintiffs, however, would like to shoehorn the unusual facts of this case into the same legal analysis for garden-variety rails-to-trials takings cases. Despite the fact that there is no trail use agreement and no trail, Plaintiffs argue that this is a standard rails-to-trails case and that the Trails Act operated to take their property in violation of the Fifth Amendment. Plaintiffs' novel claims should be rejected. As Defendant will demonstrate below, a challenge to the

authorization of a NITU negotiation period that does not result in an trail use agreement must be analyzed as a regulatory taking claim and, as such, cannot survive summary judgment.

This Court should grant Defendant's cross-motion for summary judgment and hold that: (1) the named Plaintiffs' taking claims are, at most, temporary in nature; (2) their claims must be analyzed as potential regulatory takings, not physical takings; and (3) there was no temporary regulatory taking of the named Plaintiffs' properties. Plaintiffs cannot claim any permanent taking as the NITU negotiation period had no permanent effect. Plaintiffs have provided no support for their arbitrary distinction between the lands subject to the 180-day negotiation period, which they argue was temporarily taken, and the lands subject to the 210-day negotiation period, which they argue was permanently taken. The nature of the challenged government action – a temporary delay in the regulatory process for abandonment of the rail line that did nothing other than preserve the status quo – demonstrates that Plaintiffs' claims should be analyzed as claims for temporary regulatory takings. Finally, because the NITU negotiating period did not result in an "extraordinary delay" in the regulatory process, Plaintiffs cannot prove any compensable takings.

Even if this Court were to determine that the Plaintiffs' claims should be evaluated as physical takings claims, summary judgment should still be granted in favor of the United States because Plaintiffs have failed to prove that they have any reversionary interest in the railroad corridor. The conveyance documents show that the original landowners conveyed fee title interest in the corridor to the railroad.[1/] Therefore, Plaintiffs' motion for partial summary

---

[1/]To the extent that Plaintiffs' claims relate to portions of the corridor conveyed under the General Railroad Right-of-Way Act of 1875, ch. 152, 18 Stat. 482 (codified as 43 U.S.C. §§ 934-939 (1982)) (the "1875 Act"), Defendant is simultaneously and separately moving this Court to

judgment should be denied and summary judgment should be granted in favor of Defendant on all claims.

## BACKGROUND

### I. The Regulatory Scheme Governing Railroad Lines

Stemming from the Interstate Commerce Act of 1887, as amended and revised, and the Transportation Act of 1920 (41 Stat. 477-78) and subsequent statutes, the STB has exclusive and plenary authority over the construction, operation and abandonment of virtually all of the nation's rail lines. Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311 (1981); see also RLTD Ry. v. STB, 166 F.3d 808, 810 (6th Cir. 1999) (general discussion of the history of railroad regulation). Consequently, a railroad cannot be relieved of its legal obligation to offer service on a particular rail line without first obtaining the express consent of the STB. See Colorado v. United States, 271 U.S. 153, 165 (1926); Nat'l Ass'n of Reversionary Property Owners ("NARPO") v. STB, 158 F.3d 135, 137 (D.C. Cir. 1998).

The termination of active rail service by a railroad generally occurs under one of two mechanisms. First, a railroad can apply for permission to discontinue service. This authority allows the railroad to decide "to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." Preseault v. ICC, 494 U.S. 1, 6 n.3 (1990); see also NARPO, 158 F.3d at 137 n.1 ("A line that is no longer in use, but has not been officially abandoned, may be reactivated later and is termed 'discontinued.'"). Second, a

---

stay resolution of those claims, as this issue is currently pending before the Federal Circuit in Ellamae Phillips Co. v. United States, No. 2008-5042 (Fed. Cir.). Should this Court deny Defendant's Motion to Stay, Defendant respectfully requests an opportunity to respond to Plaintiffs' 1875 Act claims.

railroad may seek permission to terminate its service over a corridor through an abandonment proceeding. If authority to abandon is granted by the STB, and the railroad "consummates" the abandonment, the rail line is removed from the national transportation system and the STB's jurisdiction generally comes to an end. Hayfield N. R.R. Co., Inc. v. Chicago & N.W. Transp. Co., 467 U.S. 622, 633 (1984); Preseault, 494 U.S. at 6 n.3; Birt v. STB, 90 F.3d 580, 585 (D.C. Cir. 1996).

In 1976, Congress passed legislation to address concerns about the loss of railroad rights-of-way nationwide. See Preseault, 494 U.S. at 5-6. The provisions of the 1976 legislation authorized the STB to delay disposition of lines subject to abandonment for a period of time in order to allow the sale of the line for public purposes and recreational use. 49 U.S.C. § 10906 (1982 ed.). However, Congress subsequently found that these provisions "ha[d] not been successful in establishing a process through which railroad rights-of-way which are not immediately necessary for active service can be utilized for trail purposes." H.R. Rep. No. 98-28, p. 8 (1983) (quoted in Preseault, 494 U.S. at 6). Accordingly, in 1983, Congress acted once again, this time passing the Trails Act and providing railroads seeking to either abandon or discontinue their use of a rail line with a third option: railbanking.[2] See RLTD Ry., 166 F.3d at 811 ("Railbanking is an alternative to abandonment."); Grantwood Village v. Missouri Pac. R.R. Co., 95 F.3d 654, 659 (8th Cir. 1996) ("Congress determined that interim trail use was to be

---

[2] The term railbanking refers to "the preservation of [a] railroad corridor for future rail use." Neb. Trails Council v. STB, 120 F.3d 901, 903 n.1 (8th Cir. 1997). The federal regulatory process for railbanking a railroad right-of-way that might otherwise be abandoned has been described in some detail in numerous cases, including: Preseault, 494 U.S. at 4-9; Chevy Chase Land Co. v. United States, 37 Fed. Cl. 545, 553-54 (1997), aff'd, 230 F.3d 1375 (Fed. Cir. 1999), cert. denied, 531 U.S. 957 (2000); and NARPO, 158 F.3d at 137-39.

treated like discontinuance rather than as an abandonment."), cert. denied, 519 U.S. 1149 (1997); Caldwell v. United States, 57 Fed. Cl. 193, 194 (2003) (under the railbanking process, "[t]he right-of-way is 'banked' until such future time as railroad service is restored"), aff'd, 391 F.3d 1226 (Fed. Cir. 2004), cert. denied, 546 U.S. 826 (2005).

The railbanking provision of the Trails Act states that,

> . . . Consistent with the purposes of [the Railroad Revitalization and Regulatory Reform Act of 1976], and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for the purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.

16 U.S.C. § 1247(d); see also 49 C.F.R. § 1152.29 (implementing regulations). In order for a railroad corridor or right-of-way to be railbanked, the railroad must first engage in the STB's regulatory abandonment process. Caldwell, 57 Fed. Cl. at 195; see also 49 C.F.R. § 1152.29; 49 C.F.R. § 1152.50. Once an abandonment application or request for an exemption is filed, a party interested in acquiring or using the right-of-way for railbanking and interim trail use may then request the issuance of a certificate of interim trail use or "CITU" (in abandonment application proceedings) or a notice of interim trail use or "NITU" (in abandonment exemption proceedings). 49 C.F.R. § 1152.29(c)-(d). The STB's regulations require a qualified party interested in "acquiring or using" a right-of-way proposed to be abandoned for railbanking and interim trail use to file a request or petition that includes, *inter alia*, a statement of willingness to assume responsibility for the right-of-way, and an acknowledgment that interim trail use of the

right-of-way is subject to the "possible future reconstruction and reactivation of the right-of-way for rail service" (railbanking). 49 C.F.R. § 1152.29(a)(1)–(3). If the railroad indicates that it is willing to negotiate a Trails Act agreement, the issuance of the NITU is required.[3/] CART v. STB, 267 F.3d at 1150-53.

The NITU operates to preserve the STB's jurisdiction, thereby preempting the application of applicable law that would otherwise apply in the event that the railroad were fully authorized to abandon its rail line. Caldwell v. United States, 391 F.3d 1226, 1229-30 (Fed. Cir. 2004), cert. denied, 546 U.S. 826 (2005). If a railbanking and trail use agreement is reached, the NITU automatically authorizes the interim trail use and the trail sponsor may then assume management of the right-of-way, subject only to the right of a railroad to reassert control of the property for restoration of rail service. Goos v. ICC, 911 F.2d 1283, 1295 (8th Cir. 1990); Birt, 90 F.3d at 583; Caldwell, 57 Fed. Cl. at 195. If a railbanking and trail use agreement is not reached, the railroad may, in accordance with any requirements ordered in the STB's decision, exercise its authority to abandon the rail line by filing a notice of consummation. 49 C.F.R. §§ 1152.29(d)(1), (e)(2); NARPO, 158 F.3d at 139 & n.7. In general, railroads have one year from the date of a decision permitting abandonment to exercise the authority to abandon.[4/] 49 C.F.R. §

---

[3/]The STB has long described its role in issuing a NITU as "ministerial," in that the STB is required by statute to issue the NITU if the statutory requirements are met. Citizens Against Rails-To-Trails ("CART") v. STB, 267 F.3d 1144, 1151-53 (D.C. Cir. 2001).

[4/]If after one year, the railroad has not consummated abandonment "the authority to abandon will automatically expire. In that event, a new proceeding would have to be instituted if the railroad wants to abandon the line." 49 C.F.R. § 1152.29(e)(2). However, "[f]or good cause shown, a railroad may file a request for an extension of time to file a notice [of consummation of abandonment] so long as it does so sufficiently in advance of the expiration of the deadline for notifying the Board of consummation to allow for timely processing." Id.

1152.29(e)(2). While the abandonment authority is generally authorized in the same document that authorized the negotiation period under the Trails Act (the NITU), the abandonment authority does not stem from the Trails Act.[5]

## II. The History of the Subject Railroad Right-of-Way

In July 2006, when the NITU was issued, the San Pedro Railroad Operating Company, LLC ("SPROC"), a wholly-owned subsidiary of Arizona Rail Group, held an interest in approximately 76.2 miles of railroad line in Cochise, County, Arizona. See STB Decision and NITU at 1-2 (service date July 26, 2006) (attached as Ex. A). The subject right-of-way consists of (1) the Bisbee Branch between milepost 1085.0 at Bisbee Junction and milepost 1090.6 at Bisbee and (2) the Douglas Branch between milepost 1040.15 near Curtiss and milepost 1106.5 near Douglas. Id. The majority landowner adjacent to the railroad is the Bureau of Land Management; over 45 miles of the rail corridor passes through the San Pedro Riparian National Conservation Area. See Letter from BLM to STB dated March 22, 2006 (attached as Ex. B).

The subject right-of-way was originally acquired by railroad companies through the 1875 Act and various private conveyance documents executed in the early 1900s. See generally Declaration of Cindi A. R. Straup ("Straup Decl.") (attached hereto). The original conveyance documents show that the railroad corridor was acquired by the El Paso and Southwestern Railroad, the Arizona and Southeastern Railroad Company, and the Arizona and Colorado

---

[5] As will be explained more fully below, this is an important fact in cases in which no trail use agreement is reached because it means that the operation of the Trails Act does nothing more than preserve the status quo during a relatively short negotiating period. In those cases where the negotiating period has ended without a trail use agreement, the regulatory process is the same as it would have been if no NITU had been issued in the first place. See Background Section I, supra, and Argument Section I.B.2-3, infra.

Railroad Company. Id. For purposes of this filing, Defendant will assume (as Plaintiffs do) that SPROC holds the same interest in the corridor that was acquired by these predecessor railroads.[6] E.g. Docket No. 33 at 4 (referring to SPROC as the "successor to El Paso and Southwestern Railroad").

On July 13, 2006, SPROC filed a letter requesting that the STB authorize SPROC to abandon the approximately 76.2 miles of railroad line. See Ex. A at 1-2. Then, on July 20, 2006, SPROC filed a letter indicating its willingness to enter into trail use negotiations, previously requested by the Trust for Public Land ("the Trust"). Id. at 2. In a July 26, 2006 Decision and NITU,[7] the STB authorized a 180-day period for the parties to negotiate an interim trail use/rail banking agreement. Id. at 2. It is undisputed that no trail use agreement was reached during that time. See Excerpts of Pls.' Resps. to Defs' Discovery at Ans. to Interrog. 17 (attached as Ex. C).

By letter dated January 19, 2007, the Trust requested a 30-day extension of the NITU negotiation period for approximately 38.4 miles of the rail line. See Letter of the Trust to STB

---

[6] Similarly, for purposes of this filing, although Plaintiffs have not established a proper chain of title linking the named Plaintiffs to the original landowners that conveyed their interests to the predecessor railroads, Defendant does not challenge at this time Plaintiffs' assertion that the named Plaintiffs hold the same reversionary interest, if any, as the original landowners. E.g., Docket No. 32, Pls.' Mot. at 2 (¶ 2) ("The Plaintiffs are the successors in title to the original property owners that granted the rights-of-way to the El Paso and Southwestern Railroad."). However, Defendant respectfully reserves the right to challenge ownership should that become necessary.

[7] Although this document is generally referred to only as a "NITU," it both authorized the NITU negotiation period pursuant to the Trails Act and authorized the railroad to abandon the line if no trails use agreement was reached within the negotiation period. See Ex. A at 3. Defendant notes that although the NITU states that it was decided on July 25, 2006, which is the date Plaintiffs reference throughout their filings, the NITU only became "effective on its service date" of July 26, 2006. Id. at 1, 3.

dated Jan. 19, 2007 (attached as Ex. D). The Trust explained that SPROC and the Trust were "in the process of completing negotiations" of an option for the Trust to purchase that 38.4 mile portion of the subject right of way. Id. The STB issued a Decision extending the NITU negotiating period until February 21, 2007 for the portions of the Douglas Branch located between milepost 1040.15 near Curtiss and approximately milepost 1074.3 at the intersection of the rail line with State Highway 92. See STB Decision (service date February 14, 2007) (attached as Ex. E). The NITU negotiation period was not extended for the remainder of the line. See Ex. E. Therefore, the NITU negotiation period ended on January 22, 2007 for the Bisbee Branch between milepost 1085.0 at Bisbee Junction and milepost 1090.6 at Bisbee and for the portion of the Douglas Branch between milepost 1074.3 at the intersection of the rail line with State Highway 92 and milepost 1106.5 near Douglas. See id. at 2 (explaining that these portions of the right-of-way should be removed from continued trail use negotiations). No trail use agreement was reached during the NITU negotiation period for any portion of the line. See Ex. C at Ans. to Interrog. 17.

In addition to authorizing a negotiation period pursuant to the Trails Act, the STB's July 26, 2006 decision stated that if no agreement for interim trail use/rail banking was reached by January 22, 2007, "SPROC may fully abandon the line. . . ." by filing a notice of consummation in accordance with 49 C.F.R. § 1152.29(e)(2). Ex. A at 3.

On January 29, 2007, the railroad filed a letter with the STB stating that it had consummated abandonment of approximately 28.1 miles of the line, between: "(1) milepost 1084.0 and milepost 1097.3 at Paul Spur, (2) milepost 1097.3 at Paul Spur and milepost 1106.5 near Douglas, and (3) milepost 1085.0 at Bisbee Jct., and milepost 1090.6 at Bisbee." See Letter

of SPROC to STB dated Jan. 29, 2007 (attached as Ex. F).

On May 11, 2007, SPROC filed a request to postpone by one year, until July 26, 2008, the deadline to consummate abandonment of the remaining portion of the line. The railroad explained "that the extension is needed to arrange for the ultimate disposition of the underlying right-of-way." STB Decision (service date June 8, 2007) (attached as Ex. G). In a June 8, 2007 Decision, the STB determined that for good cause shown, the extension would be granted. Id. Accordingly, SPROC has until July 26, 2008 to exercise the authority to abandon and file a notice of consummation for the approximately 48.1 miles of rail line between milepost 1040.15 and milepost 1084.0. Id. Given that abandonment has not been consummated and that rail abandonment authority is permissive, SPROC, under authority that pre-dates the Trails Act, could still decide to reinitiate rail service over the portion of the corridor that has not been abandoned.

**III. The Named Plaintiffs' Property**

Defendant does not dispute that on July 25, 2006, the alleged date of taking, (but see supra at n.7), the named Plaintiffs owned property abutting the railroad corridor.[8] As demonstrated in Part II of the Argument Section below, however, the named Plaintiffs held no reversionary property interest in the railroad corridor itself.

The Lindsey Family, Castro, Heinzl, Singletree Ranch, Miller Ranch Trust, and

[8] Plaintiffs can be divided into eight "groups" that allege common interests: (1) the Ladd Family, which includes Jack Ladd, JoBeth Ladd, John Ladd, and Marie Ladd; (2) the Lindsey Family, which includes Gail Lanham, James A. Lindsey, Michael A. Lindsey, and William Lindsey; (3) the Charles Miller Family; (4) Valentin Castro; (5) the Singletree Ranch, LLC; (6) Joseph Lawrence Heinzl; (7) the Miller Family Trust; and (8) Tammy Windsor-Brown. Plaintiffs have filed a motion for class certification, Docket No. 19, which remains pending. This cross-motion and Plaintiffs' motion for partial summary judgment apply only to the named Plaintiffs.

Windsor-Brown Plaintiffs' properties abut portions of the railroad corridor located between milepost 1040.15 near Curtiss and milepost 1074.3 at the intersection of the rail line with State Highway 92 (referred to herein as the "Northern Stretch"). See Straup Decl. at ¶ 8. This part of the corridor was subject to both the original 180-day NITU negotiation period as well as the 30-day extension of the NITU negotiation period. See Exs. A, B. The railroad has authority until July 26, 2008 to consummate abandonment of this portion of the line. See Ex. G. With respect to the Northern Stretch, no interim trail use agreement was ever reached and no interim trail was ever established.

The Ladd Family property and most of the Miller Family property abut portions of the railroad corridor located between milepost 1074.3 at the intersection of the rail line with State Highway 92 and milepost 1084.0 (referred to herein as the "Middle Stretch"). See Straup Decl. at ¶ 9. This part of the corridor was subject to the original 180-day NITU negotiation period but not the 30-day extension of the NITU negotiation period. See Exs. A, B. The railroad has authority until July 26, 2008 to consummate abandonment of this portion of the line. See Ex. G. Like the Northern Stretch, no interim trail use agreement was ever reached and no interim trail was ever established over the Middle Stretch.

A small piece the Miller Family property abuts a portion of the railroad corridor located between milepost 1084.0 and milepost 1097.3 at Paul Spur (referred to herein as the "Southern Stretch"). See Straup Decl. at ¶ 9. This part of the corridor was subject to the original 180-day NITU negotiation period but not the 30-day extension of the NITU negotiation period. See Exs. A, B. Like the other stretches of the Corridor, no interim trail use agreement was ever reached and no interim trail was ever established over the Southern Stretch. Moreover, the railroad has

fully consummated abandonment of this part of the line. See Ex. F.

## STANDARD OF REVIEW

Summary judgment is a "salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotation marks omitted). A party is entitled to summary judgment under RCFC 56 "when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." Avenal v. United States, 100 F.3d 933, 936 (Fed. Cir. 1996). Both parties' summary judgment motions – which ask the Court to determine whether particular regulatory actions constitute a taking – present "a question of law based on factual underpinnings." Walcek v. United States, 303 F.3d 1349, 1354 (Fed. Cir. 2002) (citing Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 535 U.S. 1077 (2002)).

## ARGUMENT

### I. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DEFENDANT AS TO THE NAMED PLAINTIFFS' CLAIMS.

Plaintiffs claim an interest in lands that have, for approximately 100 years, been home to a railroad corridor. Because the Trails Act operated to provide a regulatory negotiating period that allowed for consideration of the use of the corridor as an interim recreational trail – that lasted for either 180 days or 210 days, depending on location – Plaintiffs argue they have suffered a permanent physical taking. They have not.

At most, Plaintiffs can allege claims of temporary takings. The negotiation period authorized by the July 26, 2006 NITU has ended for the entire rail line, there is no trail use

agreement, and there is no trail.[9] In this regard, this case differs from all rails-to-trails takings cases that have preceded it.

In addition, because Plaintiffs challenge a regulatory action of the STB that acted only as a temporary moratorium on the abandonment process and did not involve any physical occupation of property, their claims must be analyzed as regulatory takings claims. As explained below, this analysis shows that the NITU negotiation period did not give rise to any Fifth Amendment taking. For these reasons, this Court should deny Plaintiffs' motion and grant Defendant's cross-motion for summary judgment on all of Plaintiffs' claims.

**A. Plaintiffs' Claims Are, at Most, Claims of Temporary Takings.**

No Plaintiff can claim a permanent taking because the July 26, 2006 NITU negotiation period has ended and had no permanent effect on the rail corridor. "Whether a taking is permanent is a question of law." Bass Enterprises Production Co. v. United States, 133 F.3d 893, 895 (Fed. Cir. 1998) (citation omitted). While "cessation of regulation may be sufficient for finding a temporary taking," it is not necessary. Id. at 896 (holding that denial of applications for permits to drill oil and gas wells was not a permanent taking because there was an ongoing "regulatory process [that] will result in a decision whether or not to condemn the leases"). As explained above, the NITU negotiation period is part of a regulatory process that merely preserves the status quo for a temporary period of time to allow the future use of the corridor to be negotiated. If no trail use agreement is reached by the relatively brief deadline included in the NITU, the railroad may abandon the line in accordance with the STB's decision or it may, in

---

[9]Even if Plaintiffs did have a reversionary interest in the corridor, which as explained in Argument Section II, they do not, the facts simply cannot support a permanent taking claim for any part of the corridor.

fact, resume rail service over the corridor. As such, any claim that the NITU negotiation period alone resulted in a taking must be a claim of a temporary taking.

**1. The Ladd Family and Miller Family Plaintiffs acknowledge that they allege temporary takings; the NITU negotiation period for the portion of the corridor that abuts their property ended on January 22, 2007.**

Two of the named Plaintiffs, the Ladd Family and the Charles Miller Family, acknowledge that they bring temporary taking claims. See, e.g., Docket No. 6, Pls.' First Am. Compl. at Count 2; Ex. C at Ans. to Interrog. 10. On the date of the alleged taking, these two Plaintiffs owned land that abuts a portion of the rail line that was subject to the 180-day NITU negotiation period (from July 26, 2006 until January 22, 2007), but was not subject to the 30-day extension of the NITU negotiation period. See Docket No. 35, Pls.' Proposed Findings of Fact at ¶¶ 22, 30. The railroad corridor that abuts these Plaintiffs' properties continues to be under STB jurisdiction because the railroad has not consummated abandonment of that portion of the line.[10/] See Straup Decl. at ¶¶ 8-9 (describing location of Plaintiffs' properties in relation to railroad corridor); Ex. F (describing portion of rail line that has been abandoned).

**2. The six other named Plaintiffs can also only allege temporary takings; the NITU negotiation period for the portion of the corridor that abuts their property ended on February 21, 2007.**

Although Plaintiffs admit that the Ladd Family and Miller Family Plaintiffs bring claims of temporary takings, they inexplicably argue that the other six named Plaintiffs have claims of permanent takings. Because the undisputed facts do not support such a claim, this Court should hold that all Plaintiffs have, at most, temporary takings claims.

---

[10/] The only exception is a small piece of the Miller Plaintiffs' property that abuts the railroad corridor between milepost 1084.0 and 1085.0. See Straup Decl. at ¶ 9. The railroad has consummated abandonment of this portion of the rail line. See Ex. F.

On the date of the alleged taking, the Lindsey Family, Castro, Singletree Ranch, Heinzl, Miller Family Trust, and Windsor-Brown Plaintiffs owned lands that abut a portion of the railroad corridor that was subject to both the 180-day NITU negotiation period and the 30-day extension of the NITU negotiation period. See Docket No. 35, Pls.' Proposed Findings of Fact at ¶¶ 28, 32, 34, 36, 38, 40. The only distinction between their "permanent" taking claims and the Ladd Family and Miller Family Plaintiffs' temporary taking claims appears to be the 30-day extension of the NITU negotiation period. Even with this extension, however, the NITU negotiation period ended on February 21, 2007. Ex. E. Because no trail use agreement was reached and no trail was established, the NITU extension had no permanent effect and it cannot be the logical basis for a permanent taking claim. Indeed, Plaintiffs provide no support or rational basis for distinguishing between the effect of a 180-day NITU negotiation period and a 210-day negotiation period, when neither resulted in a trail use agreement or trail.[11/] Accordingly, no Plaintiff can assert a permanent taking as a result of the Trails Act.

### B. Because the Government Action in This Case is Nothing More Than a Temporary Regulatory Moratorium and Does Not Involve Any Physical Occupation of Property, Any Alleged Taking Must Be Analyzed As a Regulatory Taking.

Because of the unique nature of this case, the Court should not simply accept Plaintiffs' contention that their case should be treated like previous rails-to-trails cases. Those cases all

---

[11/] To the extent that Plaintiffs attempt to base their claims of permanent takings on the possible future issuance of another NITU for the portion of the railroad corridor that has not been abandoned by the railroad, Plaintiffs' claim should be rejected. The fact that the STB retains jurisdiction over much of the subject corridor and thus has the ability to authorize another NITU negotiation period is not a basis for a takings claim. As the Supreme Court has emphasized, "we have made it quite clear that the mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking." United States v. Riverside Bayview Homes, 474 U.S. 121, 126 (1985).

involved issuance of a trail use agreement. This case does not.

Generally, the Supreme Court has recognized two distinct types of takings – physical takings and regulatory takings. See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 321 (2002) ("The text of the Fifth Amendment itself provides a basis for drawing a distinction between physical takings and regulatory takings."). See also Tuthill Ranch, Inc. v. United States, 381 F.3d 1132, 1135 (Fed. Cir. 2004) ("The Supreme Court has recognized that the government may 'take' private property by either physical occupation or regulation, and that these two categories of takings are subject to different analyses.").

In Tahoe-Sierra, the Supreme Court expanded upon the distinction between physical and regulatory takings, explaining that physical takings involve physical appropriation, while regulatory takings do not:

> [The] plain language [of the Fifth Amendment] requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is the result of a condemnation proceeding or a physical appropriation. But the Constitution contains no comparable reference to regulations that prohibit a property owner from making certain uses of her private property.

535 U.S. at 321-22. The Court amplified this distinction, stating that physical takings are typically self-evident because they involve physical appropriation:

> When the government condemns or physically appropriates the property, the fact of a taking is typically obvious and undisputed. When, however, the owner contends a taking has occurred because a law or regulation imposes restrictions so severe that they are tantamount to a condemnation or appropriation, the predicate of a taking is not self-evident, and the analysis is more complex.

Id. at 322, n.17.

The distinction between regulatory takings and physical takings is based on the nature of

the government action: physical invasion versus regulatory restrictions on use. In the instant action, because the nature of the government action has done nothing more than place a regulatory moratorium on the railroad's authority to abandon its property interest and has not involved a physical occupation, any alleged taking must be analyzed as a potential regulatory taking under the ad hoc inquiry set forth in Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124 (1978).

**1. Physical takings are limited to instances of physical occupation.**

Physical takings occur only when the government has physically occupied or taken the property and put it to its own use or allowed some third party to use the property. Yee v. City of Escondido, 503 U.S. 519, 527 (1992) ("The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land.") (underline added, italics in original); accord Stearns Co., Ltd. v. United States, 396 F.3d 1354, 1357 (Fed. Cir. 2005); Forest Properties, Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 440 (1982) ("So long as . . . regulations do not require the [plaintiff] to suffer the physical occupation of a portion of his [property] by a third party, they will be analyzed under the multifactor [Penn Central] inquiry generally applicable to nonpossessory governmental activity.") (emphasis added); Tuthill Ranch, 381 F.3d at 1136 ("the sole question governing physical takings is whether or not the government has physically occupied the plaintiff's property") (emphasis added).

Recent cases from the Supreme Court and the Federal Circuit have confirmed that it is the nature of the government action which distinguishes physical from regulatory takings and that the *sine qua non* of a physical taking is the actual physical occupation of property. In

Tahoe-Sierra, the Court listed the following examples of government actions characterized as physical occupations or invasions of private property that would be considered *per se* takings:

- the government occupies a warehouse for its own purposes (United States v. General Motors Corp., 323 U.S. 373 (1945));
- the government appropriates part of a rooftop to provide cable TV access for apartment tenants (Loretto, 458 U.S. 419);
- planes owned by the government physically invade private airspace (United States v. Causby, 328 U.S. 256 (1946)); and
- the government takes actual possession and control of a coal mine (United States v. Pewee Coal Co., 341 U.S. 114 (1951)).

Id. at 322-25.

In contrast, the Court listed the following examples, not involving physical occupation, which should be viewed as possible regulatory takings to which *per se* rules would not apply:

- a government regulation bans certain private uses of a portion of an owner's property (Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926); Keystone Bituminous Coal Ass'n. v. DeBenedictis, 480 U.S. 470 (1987));
- a government regulation prohibits the private use of certain airspace (Penn Central, 438 U.S. 104); and
- the government issues a wartime order requiring nonessential gold mines to cease operations (United States v. Central Eureka Mining Co., 357 U.S. 155 (1958)).

Id.

The Federal Circuit has also consistently made this distinction. In Forest Properties, involving the denial of a dredge and fill permit for wetlands, the Court concluded that the plaintiffs' claim should be considered under a regulatory takings analysis rather than as a physical taking:

> A physical taking of land occurs when the government itself occupies the property or 'requires the landowner to submit to physical occupation of its land,' . . . whether by the government or a third party . . . . In a regulatory taking the government prevents the landowner from making a particular use of the property that otherwise would be permissible.

177 F.3d at 1364 (citations omitted).

More recently, the Federal Circuit stated that the Supreme Court had confirmed the distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property. Tuthill Ranch, 381 F.3d at 1137.[12/] The Federal Circuit held that both of the latter categories were not physical takings: "Physical invasions short of an occupation and regulations that merely restrict the use of property may qualify as regulatory takings, but not as physical takings." Id. The Federal Circuit reiterated this distinction in holding that the application of surface mining regulations to a mineral estate must be viewed in the regulatory taking context, stating that a physical taking occurs only when the government itself occupies property or requires the landowner to submit to physical occupation.

[12/]In explaining that the impact on the plaintiff is not determinant of whether a taking has occurred and what kind of taking it is, the Federal Circuit in Tuthill Ranch cited to two Supreme Court cases in which the plaintiffs were prevented, by different acts of the federal government, from entering their property. Id. at 1135 (citing Pumpelly v. Green Bay Co., 80 U.S. 166 (1871) and Northern Transportation Co. v. Chicago, 99 U.S. 635 (1878)). In Pumpelly, the government constructed a dam that permanently flooded the plaintiff's property. In Northern Transportation, a temporary dam built by the government, which was installed to aid in the construction of a tunnel, prevented the plaintiffs from all access to their property. In both cases the impact on the plaintiffs was identical – they lost the ability to access and use their property as a result of the government action. But, only in Pumpelly did the Supreme Court find a taking. In Northern Transportation, "[t]he absence of even a minor physical occupation led the Court to rule that no taking had occurred." Tuthill Ranch, 381 F.3d at 1136.

Stearns, 396 F.3d at 1357.[13]

Judge Wiese's decision in Casitas Municipal Water District v. United States, 76 Fed. Cl. 100, 106 (2007), appeal docketed, No. 2007-5153 (Fed. Cir. Aug. 7, 2007), reiterated that Tahoe-Sierra precludes the finding of a physical taking when there has been no invasion of the plaintiff's property:

> [Tahoe-Sierra] compels us to respect the distinction between a government takeover of property (either by physical invasion or by directing the property's use to its own needs) and government restraints on an owner's use of that property. Although from the property owner's standpoint there may be no practical difference between the two, Tahoe-Sierra admonishes that only the government's active hand in the redirection of a property's use may be treated as a per se taking.

Id.

This case law, from the Supreme Court on down, establishes that the proper distinction between physical and regulatory takings is based on the nature of the government action. As this Court is well aware, this distinction between the two types of government action is critical because it dictates whether a *per se* rule is applied (physical takings) or the multi-factor Penn Central inquiry is applied (regulatory takings). If there has been a permanent physical occupation, a *per se* taking has occurred and the owner must be provided compensation. See id. at 322-23. On the other hand, when the government has not physically occupied property or required a landowner to submit to occupation by a third-party, but instead has restricted the use of property through regulation, the takings analysis requires an ad hoc factual inquiry to

[13] See also Melinda Harm Benson, The Tulare Case: Water Rights, The Endangered Species Act, And The Fifth Amendment, 32 Envtl. L. 551, 584 (2002) ("[T]he nature of the government action makes all the difference in the Fifth Amendment context because the action forms the very basis of the reasoned distinction between regulatory and physical takings.").

determine whether the restrictions have gone "too far" and placed such an imposition on the owner's property rights that they effectuate a taking. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992).

In this case there has been no physical invasion or occupation of the railroad right-of-way. Plaintiffs assert that the issuance of the NITU is the governmental action which has operated to take their property. The NITU, however, has not resulted in the invasion or occupation of the property by any agent of the government or any third party. In those rails-to-trails cases where a trail use agreement is reached and interim trail use is initiated, a third party trail operator and the general public gain the right to physically enter the property. Here, because no trail use agreement was reached and no trail was established, there was no physical entry onto the property as a result of the NITU. In short, under the Trails Act, unless and until a trail use agreement is reached, there can be no physical occupation of the property by third parties and, thus, no physical taking.

Rather, the NITU here did nothing more than place a temporary regulatory hold or moratorium on the railroad's authority to abandon the line while the rail corridor's future use was determined. Indeed, the same document that contains the NITU also authorizes the railroad to fully abandon the corridor, provided previously-imposed conditions are met, but simply stays that authorization for 180 days to allow the railroad and an authorized trail sponsor an opportunity to negotiate a railbanking and trail use agreement. See Ex. A at 3. If no such agreement is reached, the stay or moratorium that is established by the NITU is lifted and the railroad may proceed, just as if no Trails Act negotiation period had been requested, to consummate abandonment or resume rail operations. This type of regulatory action is really no

different than the moratorium at issue in Tahoe-Sierra or the type of regulatory delays that are rather routine in the land use planning context.

As set forth more fully below, the Supreme Court has directly ruled that such regulatory moratoria, without some physical invasion, cannot form the basis for a physical taking claim. Rather, any taking claim in such instances must be pursued as a regulatory taking under Penn Central.

**2. Regulatory delay or moratoria do not constitute physical takings.**

The Supreme Court's decision in Tahoe-Sierra, 535 U.S. 302, provides a detailed roadmap for the Court's analysis of Plaintiffs' takings claims in the instant case. In Tahoe-Sierra, property owners in the Lake Tahoe area brought suit against a regional governmental planning authority. Id. at 306. The planning authority had issued a moratorium within the Lake Tahoe region to "maintain the status quo" while "designing a strategy" for the future use and development of property within the region. Id. The moratorium lasted 32 months and effectively prevented any development of the plaintiffs' property. Id.

In Tahoe-Sierra, the plaintiffs argued that "a temporary deprivation – no matter how brief – of all economically viable use [ ] trigger[s] a *per se* rule that a taking has occurred." Id. at 320. As set forth above, in rejecting the plaintiffs' claims of a *per se* physical taking, Justice Stevens exhaustively explained that the distinction between *per se* physical takings and regulatory takings is focused upon whether the "government occupies the property for its own purposes." Id. at 322; see also Argument Section I.B.1, supra. Because the governmental action merely resulted in a moratorium that "preserve[d] the status quo while formulating a more permanent development strategy," id. at 337, the Court ruled that no physical taking had occurred and that

any claimed taking must be analyzed as a potential regulatory taking under Penn Central. Id. at 321.

Like in Tahoe-Sierra, the governmental action at issue in this case – the issuance of the NITU by the STB – was, at most, a regulatory action that placed a relatively short moratorium on the railroad's authority to abandon. As explained above, there are three distinct portions of the right-of-way: the Northern Stretch, the Middle Stretch, and the Southern Stretch. While each of the three portions of the right-of-way present slightly different facts, those differences are immaterial. For all three sections of the right-of-way, the negotiating period has now expired and, at most, the NITU extended for 210 days. Thus, the moratorium – created so that the railroad and the prospective trail operator could conduct negotiations – has been lifted.[14/] Also, with respect to all three portions of the right-of-way, no trail use agreement was reached, no trail was established, no trail operator acquired any right to use or property interest in the right-of-way, and no trail use has taken place. In short, there has been no physical occupation of any portion of the right-of-way by the government or any third party acting with the approval of the government, the moratorium created while negotiations proceeded has been lifted, and there is no current impact on the right-of-way resulting from the Trails Act. As Tahoe-Sierra instructs, this temporary moratorium – which extended, at most, 210 days and was not accompanied by any physical invasion of the right-of-way by the government or a third party – must be analyzed as a regulatory taking.

---

[14/]Indeed, with respect to the Southern Stretch of the right-of-way, the NITU has now expired, the moratorium has been lifted, the railroad has abandoned the right-of-way, and the adjoining property owners, to the extent they possess a reversionary interest, have regained full access to and the right to use the property as if the NITU had never been issued.

In addition, while the Northern and Middle Stretches of the right-of-way are still subject to reactivation for rail use, the time period for negotiating a trail use agreement has run and no trail has been authorized or established. Thus, again, any restriction resulting from the Trails Act was nothing more than a relatively short-term moratorium on the property while the future use of the property was determined. And, as the Supreme Court has admonished, finding a taking as a result of the type of limited moratorium that took place here would effectively establish "[a] rule that required compensation for every delay in the use of property[, which] would render routine government processes prohibitively expensive or encourage hasty decisionmaking." Id. at 335. To avoid such excessive costs in cases where there has been no physical invasion and where any restriction on use represents, at most, a temporary moratorium, Tahoe-Sierra dictates that any alleged taking must be analyzed as a regulatory taking under the ad hoc Penn Central test.[15/]

---

[15/] In Tahoe-Sierra, in addition to rejecting the plaintiffs' claim of a physical taking, the Supreme Court similarly rejected the use of a *per se* rule under Lucas. Id. at 325-332. The Court concluded that a Lucas categorical taking, which requires deprivation of all economic benefit, could not apply because, "[l]ogically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted." Id. at 332 citing Agins v. City of Tiburon, 447 U.S. 255, 263 (1980). Citing approvingly from Agins, the Court also held that:

> Mere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.' (quoting Danforth v. United States, 308 U.S. 271, 285 (1939).

Tahoe-Sierra, 535 U.S. at 332.

### 3. Prior rails-to-trails cases involved physical occupation resulting from the establishment of a recreational trail

Based upon statements by Plaintiffs' counsel in recent status conferences, Defendant anticipates that Plaintiffs will point out that prior rails-to-trails cases have been analyzed by the courts as physical takings. As such, Plaintiffs are likely to argue that any claim in the instant rails-to-trails case should also be analyzed as a physical taking as the courts did in Barclay v. United States, 443 F.3d 1368 (Fed. Cir. 2006), cert. denied, 127 S.Ct. 1328 (2007), Caldwell v. United States, 391 F.3d 1226 (Fed. Cir. 2004), and Renewal Body Works, Inc. v. United States, 443 F.3d 1368 (Fed. Cir. 2006).[16/] These cases, however, are all significantly different from the case presently before the Court. In each of these prior rails-to-trails cases, trail negotiations resulted in a trail use agreement, the trail operators implemented interim trail use and took a real property interest in the right-of-way, and recreational trails were ultimately established. See Caldwell, 391 F.3d at 1231-32 (In July 1996 a "railbanking agreement" was reached and in October 1996 the right-of-way was "'transferred to the City of Columbus as interim trail manager pursuant to an interim trail use/railbanking agreement.'"); Barclay, 443 F.3d at 1372 (indicating that the right-of-way at issue was actually "converted into three different recreational trails"); Renewal Body Works, 443 F.3d at 1372 (indicating that the "right-of-way was converted into a trail" following the issuance of the NITU). None of the critical milestones for the establishment of a physical taking present in these previous rails-to-trails cases – a trail use

[16/]Indeed, Plaintiffs' counsel's repetition of the mantra "Caldwell, Barclay, and Renewal" throughout the recent status conferences, appears to be an attempt to convince the Court to lump the instant case into the prior rails-to-trails cases without any consideration given to the significant factual distinctions between the instant case and these prior rails-to-trails cases, described above.

agreement, acquisition of a property right by the trail operator, and actual establishment of an interim recreational trail – have occurred in this case.

In short, the Court should not apply a physical takings analysis to the facts of this case because, in marked contrast to cases like Caldwell, Barclay, and Renewal Body Works, there has not been a permanent physical occupation by the government (or even by a third party acting under the government's authority), and at most, the government imposed temporary regulatory restrictions on the use of the property. It is undisputed that the government has never physically occupied or appropriated the property at issue in this case. Instead, the Trails Act merely resulted in a regulatory delay while the future property use was considered, identical to the moratorium in Tahoe-Sierra. Any resulting delay in the reversion of property interest to Plaintiffs through this regulatory process clearly presents a regulatory takings issue and not a physical takings issue. See e.g., Stearns, 396 F.3d at 1357 (a physical taking must involve a physical occupation). In the instant case, because the government action is nothing more than a regulatory moratorium, and does not involve any physical occupation of property, Plaintiffs' claims must be analyzed as alleged regulatory takings.

**C. There Are No Takings Here; Plaintiffs Cannot Demonstrate Any Temporary Regulatory Takings Because Operation of the Trails Act Did Not Result In "Extraordinary Delay" In The Regulatory Process.**

Because Plaintiffs cannot prove that there was any "extraordinary delay" in the ordinary regulatory process, their takings claims must fail.[17/]

---

[17/]In the event that this Court determines that Plaintiffs state a regulatory takings claim notwithstanding the absence of extraordinary delay, this case would proceed to an analysis of the Penn Central factors, for which a period of additional discovery would be required. To date, Plaintiffs have objected to and failed to respond to discovery requests related to the economic impact of the alleged taking, a necessary inquiry under Penn Central. See Ex. C at Interrog. &

To establish that there has been a temporary regulatory taking of their property as a result of the NITU, Plaintiffs must prove that there was "extraordinary delay" by the government in the regulatory process. See Wyatt v. United States, 271 F.3d 1090 (Fed. Cir. 2001) (holding that only an "extraordinary delay" in the challenged regulatory process can give rise to a compensable taking); see also Boise Cascade Corp. v. United States, 296 F.3d 1339, 1349-52 (Fed. Cir. 2002) (discussing case law related to the "long-standing rule that, absent denial of a permit, only extraordinary delays in the permitting process ripen into compensable taking"); Tahoe, 535 U.S. at 337 n.31, 338 n.34, 341-42 (discussing duration of the regulatory restriction as one of the factors to be considered in analyzing regulatory takings claims). Plaintiffs have failed to allege – much less prove – that there was any extraordinary delay during the regulatory process in question. As a result of this complete failure of proof on Plaintiffs' part, their motion for partial summary judgment on their takings claims must be denied and Defendant's motion for summary judgment should be granted.

As described above, the NITU negotiation period is a regulatory tool intended to preserve the status quo to allow the rail carrier and the trail operator time to negotiate a railbanking and interim trail use agreement. 49 C.F.R. § 1152.29(d)(1). The delay in the regulatory process that resulted from the NITU negotiation period – which was extended for no more than 210 days – is not extraordinary and therefore is not a taking. The Federal Circuit has clearly stated that while a "taking may occur by reason of 'extraordinary delay in governmental decisionmaking,'" courts "have recognized that extraordinary delay must be 'substantial' and that the Supreme Court has

---

Resp. Nos. 15 & 16. Once any such discovery is completed, Defendant should be provided a separate opportunity to seek summary judgment based upon the application of the Penn Central factors to this case.

condoned delays of up to 'approximately eight years.'" Wyatt, 271 F.3d at 1098 (citations omitted); see also Bass Enterprises Prod. Co. v. United States, 54 Fed. Cl. 400, 402-03 (Fed. Cl. 2002) (holding that the four-year delay attributable to the regulatory process did not result in a temporary taking of the plaintiffs' property after analyzing and balancing the Penn Central factors in accordance with Tahoe). The Circuit has instructed that,

> [t]he length of delay is not necessarily the primary factor to be considered when determining whether there is extraordinary government delay. Because delay is inherent in complex regulatory permitting schemes, we must examine the nature of the permitting process as well as the reasons for any delay. Moreover, it is the rare circumstance that we will find a taking based on extraordinary delay without a showing of bad faith.

Wyatt, 271 F.3d at 1098. Here, Plaintiffs have not – and cannot – allege any bad faith. Importantly, the assertion of regulatory jurisdiction cannot, by itself, constitute a regulatory taking. Riverside Bayview Homes, 474 U.S. at 126. In addition, as the Supreme Court has explained, "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered a 'taking' in the constitutional sense.'" Agins v. City of Tiburon, 447 U.S. 255, 263 n.9 (1980) (quoting Danforth v. United States, 308 U.S. 271, 285 (1939)); see also Wyatt, 271 F.3d at 1098; First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 320 (1987) (same).

In Tahoe, the Supreme Court determined that a moratorium on development that operated to "maintain the status quo while studying the impact of development" for 32 months did not result in a compensable taking. 535 U.S. at 306. Here, the subject lands have been home to a railroad corridor for approximately 100 years. A delay of no more than 210 days (7 months) as a

result of a regulatory scheme that maintains the status quo while allowing negotiations to occur is a "normal delay" in the regulatory process. In Tahoe, the landowners sought to establish a taking of their property by conceptually severing the 32-month temporal segment from the remainder of their fee simple estate and then arguing that this temporal segment had been taken in its entirety by the regulatory development moratorium in question. The Supreme Court rejected this argument, stating that

> Of course, defining the property interest taken in terms of the very regulation being challenged is circular. With property so divided, every delay would become a total ban; the moratorium and the normal permit process alike would constitute categorical takings. Petitioners' "conceptual severance" argument is unavailing because it ignores Penn Central's admonition that in regulatory takings cases we must focus on "the parcel as a whole."

Tahoe, 535 U.S. at 331 (quoting Penn Central, 438 U.S. at 130-31). The Court further instructed that the starting point for a court's analysis in a regulatory takings case is "to ask whether there was a total taking of the entire parcel; if not, then Penn Central [is] the proper framework." Id. Regarding the task of defining the "entire parcel," the Court noted that "[a]n interest in real property is defined by the metes and bounds that describe its geographic dimensions and the term of years that describes the temporal aspect of the owner's interest" and that "[b]oth dimensions must be considered if the interest is to be viewed in its entirety." Id. at 331-332 (citing RESTATEMENT OF PROPERTY §§ 7–9 (1936)). Therefore, even assuming Plaintiffs have a reversionary interest in the instant corridor, they cannot temporally sever the effect of the 180-day or 210-day negotiation period on the corridor from their interest in the parcel as a whole. As the Supreme Court stated: "Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the

prohibition is lifted." Id. at 332. Here, any fluctuations in the value of the parcel as a whole that may have occurred during the NITU negotiation period are "incidents of ownership," not a taking. Id. For these reasons, the NITU negotiation period was a "normal delay" in the regulatory process for abandonment that did not rise to the level of a taking as the NITU negotiation period did not result in a trail use agreement or interim trail use. Indeed, the Supreme Court has recognized that similar moratoria that preserve the status quo – while a more permanent plan is established for use of the subject lands – are widely used and an "essential tool" of regulatory agencies. Id. at 337-38. Accordingly, because there is nothing in this process that supports a finding of extraordinary delay by the government, Plaintiffs' temporary regulatory takings claims are without merit and summary judgment should be granted in favor of Defendant on all of the named Plaintiffs' claims.

## II. BECAUSE PLAINTIFFS DO NOT POSSESS A COMPENSABLE PROPERTY INTEREST IN THE INSTANT CORRIDOR, PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED AND DEFENDANT'S CROSS-MOTION SHOULD BE GRANTED.

Plaintiffs have moved for partial summary judgment "on the issue of liability for taking the [eight named] Plaintiffs' property by operation of the Trails Act." Docket No. 32, Pls.' Mot. at 1. Plaintiffs' arguments incorrectly assume that but for the operation of the Trails Act, the named Plaintiffs hold fee title to the subject right-of-way that abuts their property. See, e.g., Docket No. 6, Pls.' First Am. Compl. ¶ 10; Docket No. 33, Pls.' Mem. at 7, 11. However, Plaintiffs have failed to prove they have an interest in the railroad corridor. As explained below, because the original private conveyance documents conveyed fee title to the railroad, Plaintiffs have no reversionary interest in the subject right-of-way as a result of those deeds. Therefore,

Plaintiffs' Motion for Partial Summary Judgment should be denied and Defendant's cross-motion should be granted.

To support their contention that the railroad only acquired an easement as a result of these private conveyances, Plaintiffs primarily rely on two cases: Atlantic & P.R. Co. v. Lesueur, 19 P. 157 (Ariz. Terr. 1888), and Boyd v. Atchison, T. & S.F. Ry. Co., 4 P.2d 670 (Ariz. 1931).[18/] See Docket No. 33-2, Pls.' Mem. at 30-31. Because these cases are inapposite to the question presented to this Court, Plaintiffs have failed to meet their burden of demonstrating a reversionary interest in the railroad corridor and their motion for partial summary judgment must fail. The issue considered in the cases cited by Plaintiffs – whether the Act of Congress of July 27, 1866 at Sec. 2 (14 Stat. 292), which incorporated the Atlantic and Pacific Railroad Company, conveyed a fee or an easement to the railroad by granting it a "right of way" – is not present here. Plaintiffs have not asserted, nor can they, that the 1866 Act is relevant to the named Plaintiffs' claims. Moreover, the language of the 1866 Act's granting clause, which grants a "right," is distinct from the language contained in the private conveyance documents relevant to Plaintiffs' claims, which grant "land" (described below). Because Plaintiffs cannot meet their burden of proof, at a minimum, Plaintiffs' summary judgment motion should be denied.

## A. The Railroad Holds Fee Title to the Portion of the Railroad Corridor Abutting the Ladd Plaintiffs' Property.

There are six private conveyance documents, which contain almost identical language, that originally granted the lands underlying the portion of the railroad corridor that abuts the

---

[18/] Plaintiffs are correct to rely on Arizona state law because state law determines the nature of the property interest conveyed by the private conveyance documents. For this reason, rails-to-trails cases applying the law of other states are not controlling.

Ladd Plaintiffs' property.[19] See Straup Decl. at ¶ 5 (chart). "[I]n construing deeds, the court's role is to give effect to the intent of the contracting parties. If the instrument is unambiguous, the intent of the parties must be discerned from the four corners of the document. " Spurlock v. Santa Fe Pacific R. Co., 143 Ariz. 469, 474 (Ariz. App. 1984) (internal citations omitted). Here, the language in the deeds at issue unambiguously reflect the intent of the grantors to convey land, rather than merely a right to use land, to the grantee.

The granting clause in each deed states that the grantor "doth bargain, sell, grant, alien, release, remise and confirm, unto said party of the second part, the following described piece or parcel of land situate in the County of Cochise, Territory of Arizona, as and for a right-of-way of the El Paso and Southwestern Railroad, through, along and over the same . . . ." Straup Decl. Ex. 1 (emphasis added); see also id. Exs. 2-6 (containing almost identical language). By their plain language, the deeds convey a designated tract, piece, or parcel of land; they do not grant a right, such as the right to traverse the land pursuant to an easement. The fact that the deeds note that the grants of land were for a particular purpose – a right of way of the El Paso and Southwestern Railroad – did not reserve in the grantor a reversionary interest, nor negate that the conveyance was a conveyance of the land and not a right.[20] Cf. Lacer v. Navajo County, 687 P.2d 404 (Ariz.

---

[19] The Ladd Family Plaintiffs also owned property that abuts a portion of the corridor that was conveyed to the railroad under the 1875 Act. See Straup Decl. at ¶ 5 (chart).

[20] The question of whether the use of the term "right of way" in a railroad deed converts an otherwise unambiguous fee conveyance into an easement has been addressed in a number of treatises and by a number of courts. For example, 74 C.J.S. Rail § 185, page 475, states,

> If the conveyance is in the form of a general warranty deed, or otherwise shows an intention to convey a fee simple title, it will be so construed, although the instrument is entitled "deed of right of way," or employs the term "right of way" in describing the

App. 1983) (heir of grantor did not retain any interest where deed conveyed land for a specific purpose).

Moreover, the deeds do not contain any statements retaining any reversionary interests in the original landowners. A conveyance of land, as opposed to a right, where no reversionary interest is specifically retained by the grantor, can be nothing short of a conveyance of the fee interest in the land.

Finally, in each deed, the consideration paid by the railroad is far more than nominal, which indicates fee title, rather than an easement, was transferred. See Straup Decl. Exs. 1-6 (consideration, paid in 1903, ranging from $100 to $817 for the subject parcels). In short, because the terms of the granting clause, the absence of any language regarding reversionary interest, and the consideration paid demonstrate the original landowners conveyed fee title to the railroad under Arizona law, the Ladd Family Plaintiffs do not hold any reversionary interests in the railroad corridor abutting their property.

---

> property conveyed, or states that the conveyance is for railroad purposes only.

Similarly, in 65 Am.Jur.2d Railroads § 78, it is noted that,

> In instances . . . involving the construction of deeds granting "land" rather than a "right," the result has been reached that the fact that the deed contained additional language embodying some reference to a "right of way" did not operate to limit the estate conveyed or to cut it down from a title in fee to an easement.

See also 23 Am.Jur.2d Deeds § 268. Although these treatises recognize that some courts have interpreted some deeds containing the term "right-of-way" as conveying only an easement, these decisions appear to be largely based on the determination by the courts that the deed conveyed a "right" to use the land for railroad purposes as opposed to conveying the "land" itself, with the references to "right of way" being merely descriptive of the use to which the land would be put.

**B. The Railroad Holds Fee Title to the Portion of the Railroad Corridor Abutting the Lindsey, Castro, and Heinzl Plaintiffs' Property.**

Two of the deeds conveying title to the railroad expressly state that they granted "fee" title to the railroad.[21/] As such, the named Plaintiffs who have properties abutting this portion of the rail line cannot have any reversionary interests in the corridor.

On the date of the alleged taking, the Lindsey Family owned property abutting a portion of the corridor that was conveyed to the railroad through an October 30, 1911 deed. See Straup Decl. at ¶ 5 (chart). This deed states that the grantor "by these presents does bargain, sell, grant, convey, alien, remise, release and confirm unto the party of the second part, its successors and assigns, in fee simple, all that certain lot, piece or parcel of land situated in the County of Cochise, Territory of Arizona, and described as follows. . . ." See Straup Decl. Ex. 7 (emphasis added). The Castro Plaintiffs and Plaintiff Joseph Lawrence Heinzl owned property that abuts a portion of the corridor that was conveyed to the railroad through a November 6, 1911 deed.[22/] See Straup Decl. at ¶ 5 (chart). This deed similarly states that the grantor "by these presents do bargain, sell, grant, convey, alien, remise, release and confirm unto the party of the second part, its successors and assigns in fee somple [sic], all that certain lot, piece or parcel of land situs in the County of Cochise, Territory of Arizona, and described as follows . . . ." See Straup Decl.

---

[21/] Despite the fact that three of the named Plaintiffs' properties abut the portion of the line that was conveyed by these two deeds, Plaintiffs failed to disclose these documents to the Court or to the Defendant. In fact, the only conveyance documents that Plaintiffs produced that are relevant to the named Plaintiffs' properties are the six documents identified in Argument Section II.A, supra, which relate to the Ladd Family Plaintiffs' claim.

[22/] The Castro Plaintiffs and Joseph Lawrence Heinzl also owned property that abuts a portion of the corridor that was conveyed to the railroad under the 1875 Act. See Straup Decl. at ¶ 5 (chart).

Ex.8 (emphasis added). By their plain language, these deeds conveyed land in fee to the railroad. The deeds do not even make reference to a "right of way." In addition, like the Ladd Family deeds, the consideration is more than nominal ($250 and $150, respectively), further indicating that fee title was transferred. Because these deeds expressly state that they conveyed fee title to the railroad, Plaintiffs can have no reversionary interest in these portions of the railroad corridor.

### C. The Railroad Holds Fee Title to the Portion of the Railroad Corridor Abutting the Miller Family Plaintiffs' Property.

There are two deeds which conveyed to the railroad that portion of the corridor that abuts the Miller Family property.[23] See Straup Decl. at ¶ 5 (chart). A January 14, 1910 deed states that the grantor has "remised, released and forever quitclaimed and by these presents do remise, release and forever quit-claim unto the said party of the second part, its successors and assigns, the following strip of land . . . ." See Straup Decl. Ex. 9 (emphasis added). A March 20, 1903 deed states that the grantor "hereby grants and conveys . . . the [indecipherable word] described lands situated in Cochise County, Arizona. . . ." See Straup Decl. Ex. 10 (emphasis added). As with the Ladd Plaintiffs, these two deeds conveyed land (a "strip of land" and certain "described lands"); they do not grant a right, such as the right to traverse the land pursuant to an easement. Moreover, as stated above, even though the 1910 deed notes that the grant of land was for a particular purpose – a right of way of the El Paso and Southwestern Railroad – this does not reserve in the grantor a reversionary interest, nor negate the fact that the conveyance was of the land and not of a right. Cf. Lacer, 687 P.2d 404 (heir of grantor did not retain any interest where

[23] The Miller Family Plaintiffs also owned property that abuts a portion of the corridor that was conveyed to the railroad under the 1875 Act. See Straup Decl. at ¶ 5 (chart).

deed conveyed land for a specific purpose). Indeed, in the 1903 deed, there is in fact no description regarding to what use the land was intended to be put.

Again, like the deeds related to the portion of the corridor adjacent to the Ladd Plaintiffs' property, the deeds do not contain any statements retaining any reversionary interests in the original landowners. A conveyance of land, as opposed to a right, where no reversionary interest is specifically retained by the grantor can be nothing short of a conveyance of the fee interest in the land.

**D. Resolution of the 1875 Act Claims Should Be Stayed.**

All of the property owned by three of the named Plaintiffs – the Singletree Ranch, the Miller Ranch Trust, and Tammy Windsor-Brown – abuts portions of the corridor that were conveyed to the railroad under the 1875 Act. See Straup Decl. at ¶ 5 (chart). Four other named Plaintiffs – the Ladd Family, the Miller Family, the Castros, and Joseph Lawrence Heinzl – have property that abuts, in part, portions of the railroad corridor that were conveyed under the 1875 Act, but (as described above) also have property that was conveyed through private conveyance documents. Id. For the reasons set forth in Defendant's Motion to Stay, filed today (Docket No. 54), the Court should stay resolution of claims related to 1875 Act lands. See supra n.1.

**E. The Accrual Date of Plaintiffs' Claims is a Separate Issue From Whether those Claims Have Any Merit.**

Throughout this litigation, Plaintiffs have emphasized Federal Circuit case law stating that a Fifth Amendment takings claim under the Trails Act may accrue for purposes of the statute of limitations on the date of the NITU. E.g., Caldwell, 391 F.3d 1226; Barclay, 443 F.3d 1368. Because Defendant has not raised any statute of limitations defense in this case, Plaintiffs' citation to these cases, e.g. Pls.' Mem. at 22-28, and other statements related to the claim accrual

rule,[24] are irrelevant and should be disregarded by this Court. Neither of the cases involved the issue presented to this Court: whether a NITU negotiation period that does not result in any interim trail use (or even a trail use agreement) can result in a Fifth Amendment taking. See, e.g., Caldwell, 391 F.3d at 1234 n.7 ("This case does not involve, and we do not herein address, whether the issuance of the NITU in fact involves a compensable temporary taking when no agreement is reached."). These cases, as well as the other cases cited in Plaintiffs' summary judgment memorandum are inapposite because they involved facts that are distinct from the instant case.[25] See Argument Section I.B.3, supra.

[24] For example, in their motion to supplement their summary judgment filing, Plaintiffs argue that a recent statement by the Deputy Director of the National Park Service supports their position that "the law is settled and a property owner's claim for a *per se* physical taking of their land arises upon the STB issuing a NITU." See Docket No. 52, Pls.' Mot. Suppl. Summ. J. Memo. at 3. Plaintiffs are incorrect. The referenced statements only relate to when the statue of limitation begins to run on a rails-to-trails taking claim. Id. at Ex. A. The statement does not discuss in any way whether a temporary takings claim, such as those brought by Plaintiffs in this lawsuit, should be evaluated as a regulatory or physical taking. Similarly, Plaintiffs' repeated references to statements by Department of Justice attorneys outside this litigation regarding the claim accrual rule, e.g., id. at Ex. B, Docket No. 33-4, Pls.' App. 5, – even if appropriate for citation by Plaintiffs, which they are not – are irrelevant because Defendant is not currently asserting a statute of limitations defense in this case. Moreover, the referenced statements were made in the context of litigation that presented very different facts than those presented here.

[25]In prior rails-to-trails cases, the courts have analyzed whether use of a railroad right-of-way for railbanking and interim use as a recreational trail may create a different burden on the landowner than the burden to which they consented when they (or their predecessors) granted an easement to the railroad for operation of a railroad. This case is distinct from prior case law because, even assuming that the landowners granted an easement as opposed to fee title to the railroad, there has been no use of the right-of-way for railbanking or interim use as a recreational trail. In contrast to prior cases, the temporary moratorium in the abandonment process during the NITU negotiation period resulted in no physical occupation.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion for summary judgment based on the determination that: (1) all of the named Plaintiffs have presented, at most, temporary takings claims; (2) these claims must be analyzed as potential regulatory takings; and (3) there was no temporary regulatory taking of the named Plaintiffs' properties. In addition, Defendant respectfully requests that the Court hold that none of the named Plaintiffs have demonstrated a property interest in the instant railroad as a result of the private conveyance documents and deny Plaintiffs' motion for partial summary judgment.

May 15, 2008 Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources Division

/s/ Rachel A. Dougan
RACHEL A. DOUGAN
JAMES D. GETTE
Trial Attorneys
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
Benjamin Franklin Station, P.O. Box 663
Washington, DC 20044-0663
Telephone: (202) 616-5082
Facsimile: (202) 305-0506
Rachel.Dougan@usdoj.gov

Of Counsel:
ELLEN D. HANSON, General Counsel
EVELYN KITAY, Attorney
Surface Transportation Board
Office of General Counsel
395 E Street, SW
Washington, DC 20024