**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| JACK LADD and MARIE LADD, et al. | ) | |
| | ) | |
| For Themselves and As Representatives of a Class of Similarly Situated Persons, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 07-271L |
| | ) | |
| vs. | ) | Honorable Robert H. Hodges, Jr. |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**PLAINTIFFS' RESPONSE TO GOVERNMENT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

LATHROP & GAGE L.C.

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
(314) 613-2500
(314) 613-2550 (fax)
Thornet@ix.netcom.com

ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

I. POINTS RELIED UPON .......... 1

(1) The Federal Surface Transportation Board's Issuance of a Notice of Interim Trail Use operates as a physical - not a regulatory - taking of a landowner's property subject to the NITU. This is so, even when the railroad and the trail user have not reached a Trail Use Agreement. .......... 1

(2) An instrument granting a railroad the right to use land as a "right of way" grants the railroad only an easement to use the property and does not convey fee title to the land itself. .......... 2

II. SUMMARY OF PLAINTIFFS' RESPONSE .......... 4

III. PART ONE: THE PLAINTIFFS' LAND HAS BEEN PHYSICALLY TAKEN AND OCCUPIED. THIS IS A "PHYSICAL" - NOT A "REGULATORY" – TAKING OF THEIR LAND .......... 6

A. The NITU is a Physical Taking Because the Government Physically Occupied the Plaintiffs' Land and Excluded the Property Owners From Their Land. .......... 8

i. The Federal Government is Physically Occupying the Plaintiffs' Land. .......... 8

ii. The Federal Circuit Expressly Considered and Rejected the Government's Argument. .......... 9

iii. The NITU Operates to Exclude the Plaintiffs From Their Land. This is a Physical Taking and Not a Regulatory Taking. .......... 11

B. The Federal Circuit Considered and Rejected the Argument that a NITU is Only a Regulatory Taking Unless and Until a Trail Use Agreement is Subsequently Reached. .......... 16

C. The Department of Justice Itself agrees that "the argument that the NITU works a regulatory taking and that a single government action under the Trails Act might work two separate takings is clearly incorrect." .......... 18

i. The government has embraced before the Federal Circuit the Caldwell, Barclay, and Renewal holdings that a physical taking claim arises when the STB issues a NITU even when there is no Trail Use Agreement. .......... 19

ii. The government has embraced before the Court of Claims the Caldwell, Barclay, and Renewal holding that a physical taking claim

arises upon the STB's issuance of a NITU even when a Trail Use Agreement has not been reached. .....22

iii. In Testimony Before Congress, the Government has Embraced the Caldwell, Barclay, and Renewal holding that a physical taking claim arises upon the STB's issuance of a NITU. .....23

D. The Argument that the Government Makes in this Case, if Accepted, Would Mean that Every Post-*Caldwell* Trails Act Taking Case was Wrongly Decided, Including this Court's Own Recent Decision in *Carl Junction School District v. United States*. .....25

i. In Miller v. United States, the Court Ordered (and the Government agreed) to pay "just compensation" to landowners whose land was subject to a NITU at a time when there was no Trail Use Agreement. .....25

ii. In Carl Junction School District v. United States, the Court Ordered (and the Government agreed) to pay "just compensation" to landowners whose land was subject to a NITU at a time when there was no Trail Use Agreement. .....26

E. Conclusion: Part One – The NITU was a Physical Taking of the Plaintiffs' Land. .....27

IV. PART TWO: THE PLAINTIFFS OWN THE LAND. THE RAILROAD ONLY HELD AN EASEMENT TO OPERATE A RAILROAD ACROSS THIS LAND. .....28

A. The Precise Argument that the Government Makes Today was Expressly Considered and Rejected by the Arizona Supreme Court Twice. .....28

B. The United States Supreme Court and the Federal Courts of Appeal Have Recognized this Same Principle that a Grant to a Railroad Conveys Only an Easement to Use the Land and Not Fee Title to the Land Itself. .....29

C. Other State Courts Construing Similar Instruments Establishing a Railroad Right-of-Way Have Held that the Instruments Conveyed Only an Easement and Not Fee Title. .....31

D. The Express Terms Of The Conveyance Instruments Demonstrate The Grantor's Clear Intention To Grant Only An Easement And Not To Convey Fee Title. .....32

i. The Original Instruments Conveyed Only an Easement Over the Land Now Owned by the Ladd Family. .....34

ii. The Original Easements Conveying an Easement Over the Land Now Owned by the Lindsey, Castro, and Heinzl families. .....36

iii. The Original Easements Conveyed Only an Easement Over the Land Now Owned by the Miller family....38

CONCLUSION: ....39

APPENDIX:....Appendix 1

A. A List Of Other State Supreme Courts and Lower Courts Construing Similar Instruments Establishing A Railroad Right of Way as Conveying Only an Easement and Not A Conveyance of Fee Title To The Land....Appendix 2

B. Government's Opposition to Rehearing *en banc* by the Federal Circuit in *Barclay v. United States*, 443 F.3d 1368 (2006)....Appendix 7

C. Government's Opposition to Rehearing *en banc* by the Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004)....Appendix 40

D. Government's Brief in Response to Amicus Brief filed in in *Barclay v. United States*, 443 F.3d 1368 (2006)....Appendix 49

E. Government's Status Report and Motion to Stay filed in *Miller v. United States*, No. 03-2489L....Appendix 55

F. Judge Bruggink's November 2, 2005 Order in *Miller v. United States*, No. 03-2489L....Appendix 60

G. Letter from Assistant Attorney General William E. Moschella to the Honorable Devin Nunes, Chairman Subcommittee on National Parks, dated August 1, 2006....Appendix 63

# TABLE OF AUTHORITIES

**Cases**

*Atlantic v. P.R. Co. v. Lesueur*, 19 P. 157 (Ariz. Terr. 1888) .......... passim

*Barclay v. United States*, 443 F.3d 1368 (2006) .......... passim

*Biery v. United States* (No. 07-693) .......... 22, 23, 26

*Blendu v. United States*, 75 Fed.Cl. 543 (2007) .......... 7

*Boyd v. Atchison, T. & S.F. Ry. Co.*, 4 P.2d 670 (1931) .......... passim

*Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) .......... 15

*Brown v. Penn Central Corp.*, 510 N.E.2d 641 (Ind.1987) .......... 30, 33

*Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004) .......... passim

*Caldwell v. United States*, 57 Fed.Cl. 193 (Fed. Cl. Jun. 30, 2003) .......... 17

*Carl Junction R-1 School District v. United States*, 443 F.3d 1368 (2006) .......... 1, 5, 25, 26

*Chevy Chase Land v. United States*, 355 Md. 110, 733 A.2d 1055 (1999) .......... 31, 32

*Creppel v. United States*, 41 F 3d 627 (Fed. Cir. 1994) .......... 6, 16

*Danforth v. United States*, 424 U.S. 271 (1939) .......... 16

*Davis v. MCI*, 606 So. 2d 734 (1992) .......... 29

*Entick v. Carrington* 19 Howell's State Trials 1029, 95 Eng. Rep. 807 (C.P. 1765) .......... 15

*Fritsch v. I.C.C.*, 59 F.3d. 248 (D.C. Cir. 1995) .......... 13

*Grantwood Village v. Missouri Pacific R. Co.*, 95 F.3d 654 (8th Cir. 1996) .......... 13

*Great Northern Ry. Co. v. United States*, 315 U.S. 262 (1942) .......... 2

*Hartford Fire Insurance Co. v. Chicago, Milwaukee & St. Paul Ry. Co.*, 175 U.S. 91 (1899) .......... 13

*Henry v. Columbus Depot Co.*, 135 Ohio St. 311, 20 N.E.2d 921 (1939) .......... 30

*Highland Realty Co. v. City of San Rafael*, 46 Cal.2d 669, 298 P.2d 15, 20 (1956) .......... 30, 38

*Horton v. Mitchell*, 29 P.3d 870 (Ariz. App. Div. 1, 2001) .......... 38

*Illig v. U.S.* .......... 13

*Illig v. United States*, 67 Fed.Cl. 47 (Fed. Cl. Jul. 27, 2005) .......... 17, 21, 22

*In re Sanford Fork & Tool Co.*, 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895) .......... 7

*International News Service v. Associated Press*, 248 U.S. 215 (1918) .......... 15

*Japanese War Notes Claimants Ass'n v. U.S.*, 178 Ct.Cl. 630, 373 F.2d 356 (Ct. Cl.) cert denied, 389 U.S. 971 (1967) .......... 16

*Johnson v. Ocean Shore R.R.*, 16 Cal.App.3d 429, 94 Cal.Rptr. 68 (1971) .......... 30

*Kaiser Aetna et al. v. United States*, 444 U.S. 164 (1979) .......... 14

*Lacer v. Navajo County*, 687 P.2d 404 (Ariz.App. 1983) .......... 35

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) .......... 15

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) .......... 15

*Michigan DNR v. Carmody-Lahti Real Estate*, 699 N.W.2d 272 (Mich. 2005) .......... 33, 38

*Miller v. United States*, No. 03-2489L .......... passim

*Neider v. Shaw*, 138 Idaho 503, 65 P.3d 525 (Idaho, 2003) .......... 33

*Pankratz v. United States* (No. 07-675) .......... 22, 23, 26

*Penn. Cent. Corp. v. U.S.RR. Vest Corp.*, 955 F.2d 1158 (7th Cir. 1992) .......... 2, 30, 33

*Portsmouth Co. v. United States*, 260 U.S. 327 (1922) .......... 15

*Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (en banc) .......... passim

*Pumpelly v. Green Bay & Mississippi Canal Company*, 80 U.S. 166 (1871) .......... 15

*Renewal Body Works, Inc. v. United States*, 443 F.3d 1368 (2006) .......... passim

*Roane v. United States*, 231 F.3d 1348 (Fed.Cir.2000) .......... 7

*Rogers v. United States*, 07-273-L (05/23/2008) .......... 16

*Ross, Inc. v. Legler*, 245 Ind. 655, 199 N.E.2d 346 (1964) .......... 30

*Sherman v. Petroleum Exploration*, 280 Ky. 105, 132 S.W.2d 768 (1939) .......... 30, 33

*Silver Springs, O &G.R. Co. v. Van Ness*, 45 Fla. 559, 34 South. Rep., 884 .......... 39

*Towes v. United States*, 376 F. 3d 1371 (2004) .......... 12

*Transp. Co. v. Chicago*, 99 U.S. 635 (1878) ..... 15

*Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed. Cl. 313 (2001) ..... 15

*U.S. v. Arredondo*, 31 U.S. 691 (1832) ..... 33

*Underwood Livestock v. U.S.*, 79 Fed. Cl. 486 (2007) ..... 16

*United States v. Causby*, 328 U.S. 256 (1946) ..... 15

*United States v. Dow*, 357 U.S. 17 (1958) ..... 16

*Van Ness v. City of Washington*, 29 U.S. 232 (1830) ..... 33

*Van Ness v. Royal Phosphate Co.*, 60 Fla. 284, 53 So. 381 (Fla. 1910) ..... 39

*W. Seattle Gen. Hosp., Inc. v. United States*, 1 Cl.Ct. 745 (1983). ..... 7

*Western Union Telegraph Co. v. Penn RR. Co.*, 195 U.S. 540 (1904) ..... 13

**Other Authorities**

2 Elliott on Railroads § 1158, at 628 n. 77 (3d. ed. 1907) ..... 3, 34

Fitzgerald, F. Scott, "*The Crack-Up*", February, 1936 ..... 18

Restatement (Third) of Property § 2.2, "Intent to Create a Servitude" ..... 3, 30

STB's February 14, 2007 Decision, STB Docket No. AB-1081X ..... 13

*The Real Property Interest Created in a Railroad Upon Acquisition of its "Right of Way,"* 27 Rocky Mtn. L. Rev. at 74 ..... 30

U.S. Senate Energy Committee website, April 23, 2008 hearing at: http://energy.senate.gov/public/index.cfm?FuseAction=Hearings.ByMonth ..... 23

**Books**

Richard A. Epstein, TAKINGS: PRIVATE PROPERTY AND THE POWER OF EMINENT DOMAIN, Harvard Univ. P. (1985) ..... 15

## I. POINTS RELIED UPON

**(1) The Federal Surface Transportation Board's Issuance of a Notice of Interim Trail Use operates as a physical - not a regulatory - taking of a landowner's property subject to the NITU. This is so, even when the railroad and the trail user have not reached a Trail Use Agreement.**

***Preseault v. United States***[1]

"The trial court erred in accepting the Governments' effort to inject into the analysis of this physical taking case the question of the owner's 'reasonable expectations.'"

***Caldwell v. United States***[2]

"We hold that the Fifth Amendment taking, if any, under the Trails Act is accomplished when a NITU is issued and state law reversionary interest that would otherwise take effect pursuant to normal abandonment proceedings are forestalled."

***Barclay v. United States and Renewal Body Works v. United States***[3]

"We adhere to *Caldwell* and hold that the issuance of the original NITU triggers the accrual of the cause of action."

***Carl Junction R-1 School District v. United States***[4]

"The United States hereby stipulates to liability for the taking of an easement over Plaintiffs' property at issue in this consolidated action. The taking occurred on June 21, 2002, upon the issuance of the Notice of Interim Trail Use/Railbanking decision ("NITU") by the Surface Transportation Board ("STB")."

***Government's brief in opposition to rehearing en banc in Caldwell, at p. 7-8.***

"The argument that the NITU works a regulatory taking and that a single government action under the Trails Act might work two separate takings is clearly incorrect....This Court has long held that a single government action might cause a single taking, which might turn out to be temporary; if the taking later becomes permanent, it is merely the continuation of the initial taking, not a separate taking."

---

[1] 100 F.3d 1525 (Fed. Cir. 1996) (en banc).
[2] 391 F.3d 1226, 1236 (Fed. Cir. 2004).
[3] 443 F.3d 1368 (2006).
[4] Nos. 05-3L, 05-4L (Government's Stipulation as to Liability filed October 31, 2007).

**(2) An instrument granting a railroad the right to use land as a "right of way" grants the railroad only an easement to use the property and does not convey fee title to the land itself.**

***Atlantic v. P.R. Co. v. Lesueur***[5]

"It is said [by the railroad] that the term 'right of way' is used to describe the land granted, -that is, that these are words of description, rather than of tenure. We cannot concur with this view, and no authority can be found which so holds. We must conclude that the words are used in their common, well-known, and universally accepted legal meaning, and that it was grant of an easement as defined by the law. It was not a grant of the fee."

***Boyd v. Atchison, T. & S.F. Ry. Co.***[6]

"The precise point passed on in the *Lesueur* case, to wit, whether the title acquired by the railroad company to its right of way was in fee simple or merely an easement *** The ruling in the *Lesueur* Case, above set forth, was, and still is, the law of Arizona. For this reason we think the [property owners] were entitled to have their reversionary interest in the premises in controversy quieted."

***Great Northern Ry. Co. v. United States***[7]

"The Act of March 3, 1875, from which petitioner's rights stem, clearly grants only an easement, and not a fee. *** Congress itself in later legislation has interpreted the Act of 1875 as conveying but an easement. *** [O]n June 26, 1906, an act was passed confirming the rights of way which certain railroads had acquired under the 1875 Act in the Territories of Oklahoma and Arizona. The House committee report on this bill said: 'The right as originally conferred and as proposed to be protected by this bill simply grants an easement or use for railroad purposes. Under the present law whenever the railroad passes through a tract of public land the entire tract is patented to the settler or entryman, subject only to this easement.'"

***Penn. Cent. Corp. v. U.S.RR. Vest Corp.***[8]

"The presumption is that a deed to a railroad or other right of way company (pipeline company, telephone company, etc.) conveys a right of way, that is, an easement, terminable when the acquirer's use terminates, rather than a fee simple. Transaction costs are minimized by undivided ownership of a parcel of land, and such ownership is facilitated by the automatic reuniting of divided land once the reason for the division has ceased. If the railroad holds title in fee simple to a multitude of skinny strips of land now usable only by the owner of the surrounding or adjacent land, then before the strips can be put to their best use there must be expensive and time-consuming negotiation between the railroad and its neighbor – that or the gradual extinction of the railroad's interest through the operation of adverse possession. It is

---

[5] 19 P. 157, 160 (Ariz. Terr. 1888).
[6] 4 P.2d 670, 671 (1931).
[7] 315 U.S. 262, 271, 276 (1942).
[8] 955 F.2d 1158, 1160 (7th Cir. 1992).

cleaner if the railroad's interest simply terminates upon the abandonment of railroad service. A further consideration is that railroads and other right of way companies have eminent domain powers, and they should not be encouraged to use those powers to take more than they need of another person's property – more, that is, than a right of way."

***Preseault v. United States***[9]

"[T]he Preseaults argued that, although the Manwell deed purports to grant a fee simple, the deed was given following survey and location of the right-of-way and therefore it should be construed as conveying only an easement in accordance with Vermont railroad law."

"In short, the deed appears to be the standard form used to convey a fee simple title from a grantor to a grantee."

"[P]ractically without regard to the documentation and manner of acquisition, when a railroad for its purposes acquires an estate in land for laying track and operating railroad equipment thereon, the estate acquired is no more than that needed for the purpose, and that typically means an easement, not a fee simple estate."

**2 Elliott on Railroads § 1158, at 628 n. 77 (3d. ed. 1907)**

"'Right of way,' in its strict meaning, is 'the right of passage over another man's ground;' and in its legal and generally accepted meaning, in reference to a railway, it is a mere easement in the lands of others, obtained by lawful condemnation to public use or by purchase. It would be using the term in an unusual sense, by applying it to an absolute purchase of the fee-simple of lands to be used for a railway or any other kind of way."

**Restatement (Third) of Property § 2.2, "Intent to Create a Servitude"**

"The fact hat the grantee is a railroad may also tend to indicate that the instrument should be construed to convey an easement only. The narrowness of the pracel, the consideration paid, and the frequency with which railroad uses have been abandoned often lead to the conclusion that the grantor, as a reasonable person dealing with a railroad, intended to grant no more than an easement for the right of way, retaining ownership of the land."

---

[9] 100 F.3d at 1535-36.

## II. SUMMARY OF PLAINTIFFS' RESPONSE

The Notice of Interim Trail Use ("NITU") issued by the federal Surface Transportation Board ("STB") on July 25, 2006 operated to both preclude eight Arizona families from regaining their reversionary rights and to physically exclude them from their land. During such time as the NITU was in force, these families had no legal right to physically occupy or make any use of their land. Instead, the federal government, by operation of the federal Trails Act, excluded these property owners from occupation and use of their land and prevented them from excluding others from using their land. Even more, federal Border Patrol agents have made daily use of the Plaintiffs' land as an access road. The NITU has prevented the landowners from excluding the federal agents or the drug smugglers and illegal immigrants that routinely use their land as an access corridor. The government's physical occupation of the Arizona families' land constitutes a *per se* physical taking, for which the Fifth Amendment requires "just compensation."

The government, however, does not want to pay the "just compensation" to these eight Arizona families for taking their land. The government attempts to escape its constitutional obligation to pay these land owners by arguing two points: (1) the STB's order that excluded these land owners from their property was not a "physical" taking of their land but was a "regulatory" taking for which the government is not required to pay "just compensation;" and, (2) the land owners do not really own their land because the instruments by which the railroad acquired the right to operate a railroad "over and across" the land actually conveyed fee simple absolute title to this "strip of land" to the railroad.

The government is flat wrong on both counts. We show below that not only is the government wrong on these two points, the government's arguments on both points are completely contrary to well-settled and established law. This is not even a close question.

The government's first argument is that the government does not need to pay the land owners because the STB's NITU is only a "regulatory" taking for which the government does not need to pay compensation. This argument is contrary to: (a) clear and settled precedent of the Federal Circuit that is directly on point, (b) the Justice Department's own statements of the settled law; (c) settled Fifth Amendment law holding that to physically exclude someone from their land is a physical taking; and (d) if accepted, would mean that every Trails Act taking case decided after the Federal Circuit issued *Caldwell v. United States*,[10] has been wrongly decided, including this Court's own recent decision in *Carl Junction R-1 School District*[11].

The government's second argument is that the land owners do not really own their land because the railroad acquired fee simple absolute title to the land upon which the now abandoned right of way was built. This argument is: (a) contrary to the clear and express terms of the written instruments by which the El Paso and Southwestern Railroad Company acquired an easement, (b) contrary to the settled law of Arizona, including two directly on-point Arizona Supreme Court decisions (*Atlantic v. P.R. Co. v. Lesueur*[12] and *Boyd v. Atchison, T. & S.F. Ry. Co.*[13]), (c) contrary to more than 100 years of law governing how railroad conveyances are read as evidenced by numerous state supreme court decisions construing similar instruments establishing railroad rights-of-way and decisions of the United States Supreme Court and United States Courts of Appeal (including the Federal Circuit *en banc* in *Preseault II*) construing similar instruments establishing railroad rights-of-way.

---

[10] 391 F.3d 1226 (Fed. Cir. 2004).
[11] Nos. 05-3L and 05-4L (2008).
[12] 19 P. 157 (Ariz. Terr. 1888).
[13] 4 P.2d 670 (1931).

## III. PART ONE: THE PLAINTIFFS' LAND HAS BEEN PHYSICALLY TAKEN AND OCCUPIED. THIS IS A "PHYSICAL" - NOT A "REGULATORY" – TAKING OF THEIR LAND

The government seeks to avoid paying "just compensation" to eight Arizona families by claiming that the STB's order excluding these Plaintiffs from their land was only a "regulatory" taking for which "just compensation" is not due.

The Federal Circuit ruled in not one, but three recent Trails Act taking cases that, "a Trails Act taking begins and a takings claim accrues, if at all, on issuance of the NITU *** The issuance of the NITU is the only event that must occur to 'entitle the plaintiff to institute an action'"[14] The Federal Circuit has rejected the government's earlier argument that Trails Act cases involve a "regulatory" taking claim.

The government finds this ruling inconvenient in the present case and seeks to sidestep this holding by attempting to redefine this holding to apply only to cases where "critical milestones" including a "trail use agreement, acquisition of a property right by the trail operator, and actual establishment of an interim recreational trail" have occurred.[15]

The government claims that, "[t]his case presents an issue of first impression: whether a takings claim should be analyzed as physical or regulatory where no trail use agreement is reached and no interim trail use is initiated."[16] The government further contends, "[the] authorization of a NITU negotiation period that does not result in an (sic) trail use agreement

---

[14] *Barclay v. United States*, 443 F.3d 1368, 1373 (2006), citing *Caldwell* and *Creppel v. United States*, 41 F 3d 627, 631 (Fed. Cir. 1994).
[15] Government's Memo in Opposition, p. 25-26.
[16] *Id.* at 1.

must be analyzed as a regulatory taking claim."[17] The government then concludes that, "because the NITU negotiating period did not result in an 'extraordinary delay' in the regulatory process, Plaintiffs cannot prove any compensable takings."[18]

The government contends that the period after the STB issues a NITU, but before a Trail Use Agreement has been reached, is a time during which a land owner may only assert a temporary "regulatory" taking for which no compensation is due. In short, the government is now claiming that the Trails Act involves two separate and distinct takings. One, a temporary "regulatory" taking at the time the NITU is issued but when no Trail Use Agreement has yet been reached. And, a second permanent physical taking claim which occurs only when (or if) the Trail Use Agreement is subsequently consummated.

To succeed on this argument the government must escape the clear and directly on-point decisions of the Federal Circuit in *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), *Barclay v. United States*, 443 F.3d 1368 (2006), and *Renewal Body Works, Inc. v. United States*, 443 F.3d 1368 (2006). The government fails in this attempt to avoid the very law they have previously embraced.[19]

---

[17] *Id.* at 2.
[18] *Id.*
[19] The Plaintiffs counsel harbor some sympathy for the Department of Justice's arguments. Plaintiffs' counsel made much the same the arguments in an amicus brief filed in *Barclay* and *Renewal*. The Federal Circuit, however, considered and rejected these arguments. However, whether or not one agrees with *Caldwell*, *Barclay*, and *Renewal*, it is settled law binding upon this Court. *See Blendu v. United States*, 75 Fed.Cl. 543, 549 (2007), citing, "*In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895). Although this particular case has not reached the Federal Circuit, and the Federal Circuit did not remand *Hash II* to this court, the Federal Circuit's decision in *Hash II* is binding on this court. *Roane v. United States*, 231 F.3d 1348 (Fed.Cir.2000) (holding that published decisions of the Federal Circuit constitute binding precedent on the Court of Federal Claims); *see also W. Seattle Gen. Hosp., Inc. v. United States*, 1 Cl.Ct. 745, 746 (1983)."

**A. The NITU is a Physical Taking Because the Government Physically Occupied the Plaintiffs' Land and Excluded the Property Owners From Their Land.**

The government contends that the NITU is not a physical taking of these Arizona property owners' land. The government states, "Physical takings occur only when the government has physically occupied or taken the property and put it to its own use or allowed some third party to use the property."[20] The government argues, "In the instant action, because the nature of the government action has done nothing more than place a regulatory moratorium on the railroad's authority to abandon its property interest and has not involved a physical occupation, any alleged taking must be analyzed as a potential regulatory taking."[21]

The government is wrong for three reasons: (1) the Plaintiffs' are making a claim for a *per se* physical taking as a matter of fact. The government has physically occupied the Plaintiffs' land; (2) totally apart from the government's physical occupation of the Plaintiffs' land, the Federal Circuit considered and rejected this precise argument that the NITU standing alone is not a physical taking; and (3) excluding a property owner from their land is a physical taking of the property owner's land. The STB's issuance of a NITU is most definitely not "nothing more than plac{ing} a regulatory moratorium on the railroads authority to abandon its property."

***i. The Federal Government is Physically Occupying the Plaintiffs' Land.***

The STB issued a NITU on July 25, 2006 that precluded the Plaintiffs from regaining their right to occupy and possess their Arizona ranch land.[22] Then, after the rails and ties were

---

[20] Govt. Memo in Opposition, p. 17.
[21] *Id.*
[22] *See* affidavits of Plaintiffs John Ladd, John Gay, and Charlie Miller (a copy of each is attached to Plaintiffs' Statement of Uncontroverted Facts in Response to Government's Cross-Motion for Summary Judgment respectively as exhibits 1, 2, and 3).

removed, the federal Border Patrol made use of this abandoned right-of-way as an access road. In the Ladd's case, when the Ladd's put locks on their fence to restrict access to the abandoned right of way the Border Patrol agents cut those locks and replaced them with the Border Patrol's own locks.[23] The Plaintiffs were denied the ability to grade or cultivate this land and had no ability to erect barriers or fences to exclude others from this strip that bisected their ranches.[24] The Plaintiffs were forced to endure a condition in which their land was taken and used as an access road by the federal government, illegal immigrants, and drug smugglers, all of which the Plaintiffs had no ability to prevent.[25]

***ii. The Federal Circuit Expressly Considered and Rejected the Government's Argument.***

The government's claim that a NITU is not a physical taking is an argument that has been considered and rejected by the Federal Circuit. Both the *Barclay* and *Renewal* land owners made precisely the same argument to the Federal Circuit that the Justice Department makes to this Court today.

"*Renewal* concludes that its claim did not accrue until it was physically ousted from the property when trail use began."[26] The Federal Circuit rejected this argument and wrote, "The barrier to reversion [of the Renewal land owner's property] is the NITU, not physical ouster from possession."[27]

Similarly, "[the *Barclay* land owners] insist that the NITU would not itself block a reversion if the railroad continued to use the right-of-way for railroad purposes after the NITU

---

[23] *See* affidavit of John Ladd, exhibit 1 to Plaintiffs' Statement of Uncontroverted Facts in Response to Government's Cross-Motion for Summary Judgment.
[24] *Id.*
[25] *Id.*
[26] *Renewal*, 443 F.3d at 1374.
[27] *Id.*

was issued. They argue that *** the taking can occur only after federal law authorized abandonment – that is, when the railroad ceases operations and the trail operator assumes physical possession. They thus argue that the trail operator's physical occupation, and not the Meadowlark trail NITU, blocked reversion."[28] The Federal Circuit rejected this argument that the land owners' right to compensation only arose upon being physically ousted by the trail operator. The Federal Circuit wrote, "state law reversion was still delayed by the issuance of the NITU, and the claim still accrued with the issuance of the NITU."[29]

The government makes a feeble attempt to distinguish this spot-on holding of the Federal Circuit by arguing that *Caldwell*, *Barclay*, and *Renewal* possess the "critical milestones for the establishment of a physical taking present in these previous rails-to-trails cases – a trail use agreement, acquisition of a property right by the trail operator, and actual establishment of an interim recreational trail."[30]

This is, in essence, an effort by the government to rewrite the Federal Circuit's decision in *Caldwell*, *Barclay*, and *Renewal*. In *Caldwell*, *Barclay*, and *Renewal*, the Federal Circuit held that a Trails Act taking "occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting. [T]he appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued."[31]

The Federal Circuit most definitely did NOT hold that a taking occurs only when the so-called "critical milestones" suggested by the government are present. The Federal Circuit did NOT hold that a taking occurred only upon a Trail Use Agreement, acquisition of a property

[28] *Barclay*, 443 F.3d at 1375.
[29] *Id.*
[30] Govt. Memo in Opposition, p. 26.
[31] *Caldwell*, 391 F.3d at 1235.

right by the trail operator, or actual establishment of an interim recreational trail. Indeed, as is amply discussed in our principle memorandum, the Federal Circuit had before it precisely the invitation to find that a Trails Act taking would only occur when one or more of these "critical milestones" had occurred. The Federal Circuit flatly – and expressly – rejected that invitation and held that the Trails Act works only a single taking and this single taking occurs when the original NITU is issued.

As such, the government's attempt to distinguish *Caldwell*, *Barclay*, and *Renewal* amounts to the equivalent of arguing a distinction without a difference.

The Federal Circuit has held that the issuance of a NITU is a physical taking of a landowner's property "when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." Period. Full Stop. No "Critical Milestones" necessary.

***iii. The NITU Operates to Exclude the Plaintiffs From Their Land. This is a Physical Taking and Not a Regulatory Taking.***

The government contends that "physical takings occur only when the government has physically occupied or taken property and put it to its own use or allowed some third party to use the property."[32] The government then claims that the NITU which prevented the Ladd's and the other seven Arizona families from regaining their land falls into the category of "regulatory" takings. This is a fundamental misunderstanding of both Fifth Amendment jurisprudence and the Trails Act.

The Trails Act operates to achieve two objectives. First, it preserves railroad corridors that would otherwise be abandoned by precluding a land owner's state law right to possess the

[32] Govt. Memo in Opposition, p. 17. We note above that the NITU did involve the government and third parties physically occupying the Plaintiffs' land. This point is made in addition to the factual matter that the government physically occupied the Plaintiffs' land.

land used as a railroad corridor. Second, it imposes a new easement for public-access recreational trail use upon the land until such time as the corridor is reactivated for operation of a railroad.[33]

The government now claims that the physical taking only occurs when this second event – the public trail – is established. It is certainly true that the federal government inviting the public to use the Plaintiffs' land for a hiking trail is a physical taking of the Plaintiffs' land. The creation of this public trail is an additional burden imposed upon the Plaintiffs' land by the Trails Act. However as the Federal Circuit has held, the Plaintiffs' property is physically taken even before this additional burden is imposed upon the land.

Imagine if the government issued an order excluding the Ladd's from their home. It is no defense for the government to argue that no physical taking has occurred because the public is not yet invited to lodge in the Ladd's home.

When the STB issued the NITU, it had the effect of perpetuating an exclusive railroad easement and precluding the fee owners "reversionary"[34] right to their property. The fee owners had no more right to access or possess the land after the issuance of the NITU than they did before the NITU when the right of way was being actively used for a railroad. As the Justice Department itself noted,

---

[33] *Preseault v. United States*, 494 U.S. 1, 6-7 (1990) ("*Preseault I*").

[34] Plaintiffs use the term "reversionary" or "reversion" in this memorandum in the generic sense to describe the Plaintiff's property interest. We employ the term in this generic sense because it is commonly used in this manner by courts considering Trails Act taking cases. This is not a technically correct use of the term. As the Federal Circuit has noted, "as a matter of traditional property law terminology, a termination of the easements would not cause anything to "revert" to the landowner. Rather, the burden of the easement would simply be extinguished, and the landowner's property would be held free and clear of any such burden." *Towes v. United States*, 376 F. 3d 1371, 1376 (2004).

> Unlike the usual physical occupation case, the landowners in a Trails Act takings case is already deprived of possession. Thus, the question is not when the owner loses the right to possess the property (since he is already not in possession), but rather when he would otherwise have recovered ownership of the easement were it not for the operation of the Trails Act.[35]

Plaintiffs readily acknowledge that a public-access recreational trail has not yet been created across the Plaintiffs' land. Plaintiffs also acknowledge that for the "southern portion" no trail will ever be created because the NITU and the STB's jurisdiction expired without a Trail Use Agreement being reached. For the "northern portion" of the right-of-way, the land owners are still excluded from their property and a public trail is still a possibility. The government has acknowledged that so long as the STB retains jurisdiction over this land, a trail use agreement may be reached, even though the negotiating period has expired.[36] Further, so long as the STB retains jurisdiction over the land, it can indefinitely extend the NITU allowing for the creation of a possible trail and continuing to exclude the land owners from their property.[37]

An easement for a railroad right of way is unlike other easements. A railroad easement is *sui generis* and the serviant owner is excluded from all use of the land while such easement is in force.[38]

---

[35] Government's Opposition to Petition for Rehearing En Banc filed in *Caldwell v. United States*, 2005 WL 4146730, *5 (March 10, 2005).

[36] *See* statements of counsel for the Defendant at the April 1, 2008 status conference before this Court, p. 16. *See also* STB's February 14, 2007 Decision, STB Docket No. AB-1081X, "[w]here, as here, the carrier has not consummated the abandonment at the end of the previously imposed negotiating period and has indicated its willingness to continue negotiations by requesting an extension, the Board retains jurisdiction and the NITU negotiating period may be extended."

[37] *See Id. See also Grantwood Village v. Missouri Pacific R. Co.*, 95 F.3d 654 (8th Cir. 1996), and *Fritsch v. I.C.C.*, 59 F.3d. 248 (D.C. Cir. 1995).

[38] *See, Hartford Fire Insurance Co. v. Chicago, Milwaukee & St. Paul Ry. Co.*, 175 U.S. 91 (1899) at 98, *Western Union Telegraph Co. v. Penn RR. Co.*, 195 U.S. 540, 570 (1904). Also, *Illig v. U.S.*, Order issued by Judge Bruggink on Dec. 3, 2002.

As the government acknowledges, the STB's issuance of a NITU pursuant to the Trails Act operates to perpetuate a railroad easement that would be otherwise abandoned under state law and extend the STB's jurisdiction over the property where that jurisdiction would otherwise have been lost.[39] Thus, the effect of the NITU is to completely exclude the land owners from their property and deny them the right to regain physical occupation and possession of the land – a right that they enjoyed under Arizona law.

The NITU, for such time as it is in force, has operated to exclude these Arizona property owners from their land.[40] The NITU has prevented the land owners from physically occupying their land or preventing them from excluding others from their property.[41] While the NITU is in force, the land owners do not have the legal ability to make any use of this land – including grazing cattle on the land and grading or cultivating the land.[42]

In addition to excluding these property owners from their land, the government has physically occupied the land after the rails and ties were removed. After the rails and ties were removed, the U.S. Border Patrol used the Ladd's property for an access road.[43]

The right to exclude is an essential component of property ownership. The Trails Act takes from the fee owner their right to exclude others from the land and actually excludes the fee

---

[39] Defendant's Memo in Opposition, p. 21.
[40] See, Affidavits of John Ladd, John Gay, and Charlie Miller, exhibits 1, 2, and 3 to Plaintiffs' Statement of Uncontroverted Facts in Response to Government's Cross-Motion for Summary Judgment.
[41] *Id.*
[42] *Id.*
[43] *See* affidavit of John Ladd, 1. See also, letter sent from John Ladd to the U.S. Border Patrol regarding its unauthorized use of the Ladd family's property, a copy of which is attached as exhibit 4 to Plaintiffs' Statement of Uncontroverted Facts in Response to Government's Cross-Motion for Summary Judgment.

owners from their land. This is a *per se* physical taking of the land which occurs when the STB issues a NITU.

One of the most fundamental aspects of property ownership is the right to exclude others. In *Kaiser Aetna et al. v. United States*, 444 U.S. 164 (1979), the Supreme Court wrote,

> [W]e hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation. This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina. And even if the Government physically invades only an easement in property, it must nonetheless pay just compensation.[44]

In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), Justice Marshall, writing for the Court, said: "We affirm the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation...."[45]

The Supreme Court has made it clear that a "physical taking occurs when the government's action amounts to a physical occupation or invasion of the property, including the functional equivalent of a 'practical ouster of [the owner's] possession.' *Transp. Co. v. Chicago*, 99 U.S. 635, 642 (1878); *Loretto*, 458 U.S. 419. When an owner has suffered a physical

---

[44] *See United States v. Causby*, 328 U.S. 256, 265 (1946); *Portsmouth Co. v. United States*, 260 U.S. 327 (1922)." (Several other citations omitted). Citing for additional authority at footnote 11, "As stated by Mr. Justice Brandeis, '[a]n essential element of individual property is the legal right to exclude others from enjoying it.' *International News Service v. Associated Press*, 248 U.S. 215, 250 (1918). *See generally* Richard A. Epstein, Takings: Private Property and the Power of Eminent Domain, Harvard Univ. P. (1985).

[45] *Loretto*, 458 U.S. at 441 (cited by the Federal Circuit in *Preseault II*, 100 F.3d at 1540; *see also Pumpelly v. Green Bay & Mississippi Canal Company*, 80 U.S. 166 (1871). The Supreme Court has recognized the right to exclude is a fundamental feature of property ownership. *See Boyd v. U.S.*, 116 U.S. 616, 630 (1886) *quoting*, *Entick v. Carrington* 19 Howell's State Trials 1029, 95 Eng. Rep. 807 (C.P. 1765), and adopted by U.S. Supreme Court in *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989).

invasion of his property, courts have noted that 'no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation.' *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)."[46]

**B. The Federal Circuit Considered and Rejected the Argument that a NITU is Only a Regulatory Taking Unless and Until a Trail Use Agreement is Subsequently Reached.**

The "date of taking" is important because it is the date when the claim accrues.[47] The date of claim accrual determines several important issues in any Trails Act taking case. The date of claim accrual is: (a) the date when the statute of limitations begins to run[48]; (b) the date when a party must be the owner of the land that has been taken (i.e., a property owner that sold the land prior to the date of taking or acquired title to the land after the date of taking is not eligible to make a claim for compensation)[49]; (c) the date when the government's obligation to pay interest begins to accrue[50]; and, (d) the date when property value is determined for the purpose of establishing "just compensation."[51]

The Federal Circuit held *en banc* that Trails Act taking claims were physical, not regulatory taking claims. *See Preseault II* at 1540 ("The trial court erred in accepting the Governments' effort to inject into the analysis of this physical taking case the question of the

---

[46] *Tulare Lake Basin Water Storage Dist. v. United States*, 49 Fed. Cl. 313, 318 (2001).

[47] Calling it an "uncontroversial proposition," the government in Barclay agreed that "A taking accrues at the time all events have occurred to fix the government's liability." *See*, Brief of United States in Opposition to Rehearing *En Banc*, *Barclay v. U.S.*, 431 F.3d 1368 (2006), p. 4. *See also*, *Creppel v. U.S.*, 41 F.3d 627 (Fed. Cir. 1994); *Japanese War Notes Claimants Ass'n v. U.S.*, 178 Ct.Cl. 630, 373 F.2d 356 (Ct. Cl.) cert denied, 389 U.S. 971 (1967).

[48] *See Caldwell, Barclay,* and *Renewal.*

[49] "Compensation is due at the time of taking, [and] the owner at that time, not the owner at an earlier or later date, [should] receive[] the payment of just compensation." Department of Justice, Defendants' Initial Objections To Individual Class Claims, *Rogers v. United States*, 07-273-L (05/23/2008) (citing, *Underwood Livestock v. U.S.*, 79 Fed. Cl. 486 (2007) at 497, *United States v. Dow*, 357 U.S. 17 (1958), *Danforth v. United States*, 424 U.S. 271 (1939).)

[50] *Miller v. United States*, No. 03-2489L, Order issued by Judge Bruggink on August 22, 2006.

[51] *Id.*

owner's 'reasonable expectations'.") As the government itself notes, no court has ever considered a Trails Act taking claim to be a "regulatory" taking claim.[52]

Prior to the Federal Circuit's decision in *Caldwell*, Trails Act taking cases were resolved with the date of taking being the date of the Trail Use Agreement.[53] Prior to *Caldwell*, the Department of Justice and counsel for land owners accepted the date of the Trail Use Agreement as the date of taking.[54] This all changed in *Caldwell* when the Federal Circuit announced a "new rule" for Trails Act taking claims in which the date of taking for both permanent and temporary Trails Act takings claims was held to be the date the STB issued the original NITU. The NITU was held to be the date of taking even when, on the date the NITU was issued, the railroad and trail user had not yet negotiated a Trail Use Agreement. This holding was emphatically reaffirmed by the Federal Circuit in the consolidated cases of *Barclay* and *Renewal Body Works*.

After *Barclay* and *Renewal*, it is beyond cavil that the focus in a Trails Act taking case turns upon "when the state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." The Federal Circuit wrote, "We conclude that this occurs when the railroad and trail operator communicate to the STB their intention to

---

[52] *Barclay*, Government's Memorandum in Opposition to Rehearing *en banc*, p. 11, "The landowners' arguments about the potential for a temporary regulatory takings claim is inapposite in the context of a rails-to-trails conversion, which this Court's precedent seems to have characterized as a physical takings claim."

[53] The government had argued prior to *Caldwell* that the date of taking was the date of the NITU and not the Trail Use Agreement but they had lost those arguments. *See Caldwell v. United States*, 57 Fed.Cl. 193 (Fed. Cl. Jun. 30, 2003) and *Illig v. United States*, 67 Fed.Cl. 47 (Fed. Cl. Jul. 27, 2005); and see our more detailed discussion of *Caldwell* in our principle memorandum at p. 22.

[54] In *Caldwell*, the Department of Justice argued before the Federal Circuit that the date of taking was the date of the Trail Use Agreement. *See* Brief of the United States, *Caldwell v. U.S.*, 391 F.3d 1226 (Fed.Cir. 2004). In our principle memorandum of law we provide a detailed discussion of the Federal Circuit's legal analysis in *Caldwell*, *Barclay*, and *Renewal Body Works* at p. 22-28.

negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d) [of the Trails Act]."[55] At bottom, the taking – whether temporary or permanent – occurs when the STB issues the NITU that precludes the owner from regaining their reversionary interest to use and occupy the land. It is this loss of ownership, not the subsequent additional burden of a public trail easement that the Federal Circuit held to be the taking giving rise to the claim.

The Federal Circuit ruled that the fact that "subsequent events might render the NITU only temporary" does not change the fact that the land owner's "reversionary" right to their land were taken upon the issuance of the NITU.[56]

The government's dispute on this point is not with us but with the Federal Circuit – and, as we show next, with itself.

### C. The Department of Justice Itself agrees that "the argument that the NITU works a regulatory taking and that a single government action under the Trails Act might work two separate takings is clearly incorrect."[57]

F. Scott Fitzgerald wrote, "The test of a first-rate intelligence is the ability to hold two opposed ideas in mind at the same time, and still retain the ability to function."[58] Fitzgerald's observation is put to the test by reading the brief filed by the government in opposition to the

---

[55] *Caldwell*, 391 F.3d at 1233.

[56] The Federal Circuit made clear that a Trails Act taking may be either permanent or temporary depending upon whether a Trails Use Agreement is subsequently reached between the railroad and the trail user. However, this issue, "temporary" versus "permanent" taking, is a question to be reached in the damages phase of a Trails Act taking case, not the liability phase. As the Federal Circuit made clear in *Preseault II* (and we discuss in more detail below) all Trails Act takings – whether temporary or permanent – are physical not "regulatory" takings.

[57] The phrase in quotations is taken from the Department of Justice brief. Brief of United States in Opposition to Rehearing *En Banc*, *Caldwell v. U.S.*, 391 F.3d 1226 (2005), at p. 7-8. "This Court has long held that a single government action might cause a single taking, which might turn out to be temporary; if the taking later becomes permanent, it is merely the continuation of the initial taking, not a separate taking." *Id.*, at p. 8.

[58] Fitzgerald, F. Scott, "*The Crack-Up*", February, 1936.

Federal Circuit rehearing *Barclay en banc* (attached as Appendix B) and the memorandum in opposition which the government has filed in this matter.

Contrary to the government's present suggestion that this case may involve "only" a regulatory taking claim, the government itself has repeatedly declared that Trails Act takings – including taking claims for that period when a NITU has been issued but no Trail Use Agreement has been reached – are not a regulatory but are a physical taking claim.[59]

The Department of Justice comes today before this Court and argues that (in this case) the STB's issuance of a NITU was only a "regulatory" taking for which no compensation is due because a Trail Use Agreement has not been negotiated. Yet, simultaneously, the Department of Justice is arguing (before this Court, the Federal Circuit and the United States Congress) that the law is settled and a claim for a compensable physical taking occurs as soon as the STB issues a NITU even when a Trail Use Agreement has not yet been reached.

***i. The government has embraced before the Federal Circuit the* Caldwell, Barclay*, and* Renewal *holdings that a physical taking claim arises when the STB issues a NITU even when there is no Trail Use Agreement.***

The Department of Justice in its brief to the Federal Circuit opposing rehearing *en banc* in *Caldwell* wrote,

> *Caldwell's* regulatory takings argument is beyond the scope of this case and is incorrect. *** [T]he argument that the NITU works a regulatory taking and that a single government action under the Trails Act might work two separate takings is clearly incorrect. First, issuance of the NITU did not constitute a regulatory taking, because it merely delayed abandonment of the corridor, and only an extraordinary regulatory delay can constitute a taking. *** No court has held that issuance of a NITU might work a regulatory taking.[60]

---

[59] *Barclay*, Government's Memorandum in Opposition to Rehearing *en banc*, p. 11

[60] The Government continued, "Second, Caldwell provides no support for the contention that a single government action might cause a single taking, which might turn out to be temporary; if the taking later becomes permanent, it is merely the continuation of the initial taking, not a separate taking. Under the Trails Act, the STB takes only one action – it issues the NITU – that

The Department of Justice continued, "[T]he majority did not hold that issuance of the NITU triggered a regulatory taking; as noted above, Caldwell expressly disavowed any regulatory taking claim and the Court addressed no such claim."[61]

The Department of Justice in its brief to the Federal Circuit opposing rehearing *en banc* in *Barclay* wrote,

> [T]he panel's adherence to *Caldwell* is consistent with applicable precedent of the Supreme Court and this Court. *** The landowners' arguments about the potential for a temporary regulatory takings claim is inapposite in the context of a rails-to-trail conversion, which this Court's precedent seems to have characterized as a physical takings claim. [*Presault II*]. Although *Caldwell* recognized that the issuance of a NITU may not result in a permanent taking (if the trail use agreement is not reached, for instance) this may mean that the result is a taking for a limited period of time.[62]

"The [Federal] Circuit has held that this [rails-to-trails] conversion is not a regulatory taking."[63]

The Department of Justice's position in *Barclay* is an especially rich irony given its position in this case.

---

might cause one taking. The taking might turn out to be temporary if, for example, the interim trail use agreement is terminated and the rail carrier subsequently abandons the line. *But the temporary taking that might be caused when the NITU and interim trial use agreement prevent reversion under state law does not end when (or if) interim trial use later ensues.* Rather, that same potential taking continues and becomes permanent. [Citations omitted]." United States' Opposition to Petition for Rehearing En Banc in *Caldwell v. United States*, 391 F.3d 1226 (2005), p. 7-8. (emphasis supplied) (A copy of which is attached as Appendix C.)

[61] *Id.*

[62] United States' Opposition to Petition for Rehearing En Banc in *Barclay v. United States*, 443 F.3d 1368 (2006), p. 11. (A copy of which is attached as Appendix B.).

[63] *See Preseault II*, 100 F.3d at 1540 ("The trial court erred in accepting the Government's effort to inject into the analysis of this physical takings case the question of the owner's "reasonable expectations."") (emphasis added). FN8. (FN8 Since this Court's precedent identifies this type of claim as a physical taking, the landowners' lengthy discussion of regulatory takings law is irrelevant, and we do not address it.) Brief of Appellee The United States, *Barclay v. U.S.*, 431 F.3d 1368 (2006), p. 23.