In *Barclay*, the Justice Department purported to be "concerned" about the interest of land owners. The *Barclay* land owners argued that they did not have a claim for the taking of their property until a Trail Use Agreement was reached and the property was physically occupied as a trail. The Justice Department – seeking to escape liability with a statute of limitations argument – embraced the *Caldwell* decision and argued that the *Barclay* land owner's claim for a permanent taking arose when the NITU was issued, even though no Trail Use Agreement had yet been negotiated and even though there was no physical occupation of the land. In support of this argument the Justice Department claimed that to require land owners to wait for a Trail Use Agreement to be negotiated before filing suit for compensation would be a "disservice" to property owners and in some cases "future landowners would have to wait years in some cases in order for their takings claims to be ripe by waiting until abandonment is completed or the right-of-way is transferred."[64] The Justice Department feared that waiting until a Trail Use Agreement was reached before a land owner could bring a takings claim "would require landowners to delay their suits unnecessarily until a trail use agreement is reached, which could potentially take years during which the landowners' property rights have been interfered with."[65]

The Ladd's and the other seven Arizona families in this case are precisely these landowners about whom the Justice Department professed concern. Yet, when, in this case, they come to court with their takings claim, the Justice Department seeks to slam the court house door and deny their claim by arguing that no "physical" taking has yet occurred.

---

[64] *Id.*
[65] Appendix D, Appellee's Brief in Response to Amicus Curiae in *Barclay*.

***ii. The government has embraced before the Court of Claims the* Caldwell, Barclay*, and* Renewal *holding that a physical taking claim arises upon the STB's issuance of a NITU even when a Trail Use Agreement has not been reached.***

In *Illig v. United States*, 58 Fed. Cl. 619 (2003), the Department of Justice reiterated the Federal Circuit's holding that "[t]he NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued."[66]

There was a companion case to *Illig* involving the same right-of-way, *Miller v. United States*, 67 Fed.Cl. 542 (2005). Prior to the *Caldwell* decision, Judge Bruggink had ruled (and the Justice Department had agreed) that the date of taking was the date of the Trail Use Agreement. The date of the Trail Use Agreement was the date used for claim accrual including the date upon which any class member was required to show they held fee title to the land in order to participate in the class.

After *Caldwell*, the Justice Department *sui sponte* filed a motion to reopen the *Miller* class and amend the "date of taking" to be the almost two-year earlier date of the NITU, not the later date of the Trail Use Agreement.[67] Because *Caldwell* held that the date of taking occurred upon the issuance of the NITU and not the Trail Use Agreement, Judge Bruggink granted this motion and reopened the class, ordered a new notice to be sent, and those landowners that held title on the later date of the Trail Use Agreement but not on the date of the NITU were dismissed from the case. Other landowners that held title to the land on the date of the NITU but not the later date of the Trail Use Agreement were allowed to join the class and ultimately

---

[66] *See* Government's Renewed Motion to Dismiss in *Illig*, p. 10-11

[67] *See*, Appendix E, Defendant's Status Report and Motion to Stay, at 13; and Defendant's Motion to Dismiss and Memorandum in Support, at p. 2.

compensated.[68] When the property was valued and interest calculated, the date of the NITU was used.

Most recently, last week, the government made the following statements in its Cross-Motion for Summary Judgment in the consolidated Kansas Trails Act cases, *Biery v. United States* (No. 07-693) and *Pankratz v. United States* (No. 07-675):

> Applying the precedential rulings from *Caldwell* and *Barclay* to the undisputed facts of this case, the Court should rule that the permanent takings claims alleged by the Biery Plaintiffs acrrued on April 8, 2004 [the NITU date], and the permanent takings claims alleged by the Pankratz Plaintiffs accrued on June 2, 2005 [the NITU date].[69]
>
> In sum, any takings claim that accrued with the issuance of the first NITU was rendered temporary when that NITU expired according to its own terms on March 13, 2005 [without any trail use agreement ever being reached].[70]
>
> The subsequent issuance of a new NITU on June 2, 2005, which resulted in a railbanking and interim trail use agreement, thus gives rise to a permanent takings claim that relates back (and accrues on) June 2, 2005 [the date of the NITU even though no trail use agreement had then been reached].[71]

### *iii. In Testimony Before Congress, the Government has Embraced the* **Caldwell, Barclay,** *and* **Renewal** *holding that a physical taking claim arises upon the STB's issuance of a NITU.*

After *Caldwell* was decided, the United States House of Representatives and the United States Senate both considered legislation to restore the Trails Act cases to the pre-*Caldwell* rule of the claim accruing upon a Trail Use Agreement being reached and not upon the STB's issuance of a NITU. Senate Bill S. 3478 (109th Congress) and S. 2073 (110th Congress), and House Bills H.R. 4581 (109th Congress) and H.R. 3157 (110th Congress).

---

[68] *See*, Appendix F, Judge Bruggink's Order issued November 2, 2005, at 4.
[69] Government's cross-motion for summary judgment in the consolidated cases of *Biery v. United States*, (No. 07-693) and *Pankratz v. United States*, (No. 07-675), p. 11. In both cases, there was no Trail Use Agreement in force on the date of the NITU.
[70] *Id.* at 15.
[71] *Id.* at 16.

The Department of Justice has actively opposed this legislation and embraced the decision of the Federal Circuit in *Caldwell*, *Barclay*, and *Renewal*. Recently, on April 23, 2008, Daniel Wenk, Deputy Director of the National Park Service at the Department of Interior, testified before the United States Senate Committee on Energy and Natural Resources, Subcommittee on National Parks in opposition to S. 2073.[72] In his statement Deputy Director Wenk referenced the August 1, 2006 letter of Assistant Attorney General William E. Moschella to Congressman Nunes, Chairman of the House Subcommittee on National Parks, opposing this legislation.[73] Assistant Attorney General Moschella wrote Congressmen Nunes:

> The appeals court [in *Caldwell*] found the triggering event to be when the STB issued the NITU because that decision forestalled the abandonment proceedings and precluded any state law reversionary interests from taking effect. *** As a result of the *Caldwell* and *Barclay* decisions, no confusion remains in the law regarding accrual of rails-to-trails takings claims.[74]

The point is inescapable. From the moment *Caldwell* was decided the Department of Justice has uniformly embraced the view that the STB's issuance of a NITU - standing alone and without need of a subsequent Trail Use Agreement – is the single event that operated to work a physical taking of a property owner's land because when the NITU was issued, 'state law reversion interests [are] forestalled by operation of section 8(d) of the Trails Act.' The Justice Department itself (as did the Federal Circuit) expressly rejected the argument that a NITU would only create a "regulatory" taking until and unless a subsequent Trail Use Agreement was

---

[72] *See*, U.S. Senate Energy Committee website, April 23, 2008 hearing at: http://energy.senate.gov/public/index.cfm?FuseAction=Hearings.ByMonth.
[73] A copy of the letter is attached at Appendix G.
[74] *Id.* at p. 2.

reached. The Justice Department has embraced this position in cases in which, at the time the NITU was issued, no Trail Use Agreement had been reached.[75]

To the extent that the Department of Justice advances before this Court a legal argument that is flatly contradicted by the legal argument the Department of Justice is simultaneously advancing before this Court in other Trails Act cases, before the Federal Circuit, and even before the United States Congress, this Court should reject such argument.

### D. The Argument that the Government Makes in this Case, if Accepted, Would Mean that Every Post-*Caldwell* Trails Act Taking Case was Wrongly Decided, Including this Court's Own Recent Decision in *Carl Junction School District v. United States.*

Every Trails Act case that has been resolved since *Caldwell* involved compensation paid to land owners for the government's taking of their land when the NITU was issued, even though a Trail Use Agreement had not yet been reached. If the government's claim that land owners have only a non-compensable "regulatory" taking claim when the NITU is issued but a Trail Use Agreement has not yet been reached is valid, all these other cases were wrongly decided.

Two cases, *Miller v. United States*, 67 Fed.Cl. 542 (2005) and *Carl Junction R-1 School District v. United States*, 05-3L and 05-4L, illustrate this point.

#### *i. In* **Miller v. United States***, the Court Ordered (and the Government agreed) to pay "just compensation" to landowners whose land was subject to a NITU at a time when there was no Trail Use Agreement.*

When *Caldwell* was decided the Trails Act taking case, *Miller v. United States*, was pending. *Miller* had been certified as a class action and at the time of *Caldwell*, the government's liability had been determined and the case was in the property valuation stage.

---

[75] The Department of Justice suggests that it is "inappropriate" to bring to this Court's attention the Department of Justice's own statements made in other Trails Act cases which are inconsistent with the argument it makes today. While we understand that the Department of Justice may not want these statements brought to this Court's attention, these statements are directly on-point and flatly undermine the argument made by the Department of Justice today.

The date of taking was held to be the date of the Trail Use Agreement. In the class notice, only those who owned land on the date of the Trail Use Agreement were eligible to participate. Because of *Caldwell*, the Department of Justice, on its own motion, sought to amend the case to change the date of taking from the date of the Trail Use Agreement to the date of the NITU. Judge Bruggink granted this motion and a new class notice was sent. Those who owned the land on the date of the Trail Use Agreement but not on the date of the NITU were dismissed. Those who owned the land on the date of the NITU even if they did not own the land on the date of the Trail Use Agreement were added.

Ultimately, the case was concluded with the Department of Justice agreeing to pay "just compensation" to those land owners that held title on the date of the NITU. The compensation was paid for the government's physical taking of these landowners' property. This compensation was paid to *even those land owners that held title to the property on the NITU date but no longer held title to the property on the date of the Trail Use Agreement*. Additionally, compensation was paid for the taking of the land owners' property during the almost two years between when the NITU was issued and the Trail Use Agreement was finally reached. If the issuance of a NITU is only a non-compensable regulatory taking and a compensable physical taking does not arise until a Trail Use Agreement is reached, why were the *Miller* property owners paid for the taking of their land at a time when there was no Trail Use Agreement?

***ii. In* Carl Junction School District v. United States*, the Court Ordered (and the Government agreed) to pay "just compensation" to landowners whose land was subject to a NITU at a time when there was no Trail Use Agreement.***

Similarly, this past November in *Carl Junction R-1 School District v. United States*, Nos. 05-3L and 05-4L, this Court approved the Justice Department's stipulation of liability and entry

of judgment for a Trails Act case with the NITU date as the date of taking even though at the time of the NITU there was no Trail Use Agreement.[76]

And, as we note above,[77] in the recent cases, *Pankratz* and *Biery*, the government acknowledges that a temporary taking claim has arisen upon the NITU being issued, even though no Trail Use Agreement was ever reached.

### E. Conclusion: Part One – The NITU was a Physical Taking of the Plaintiffs' Land.

The Government has physically taken the Plaintiffs' land. For those, such as the Ladd's and Millers, this physical taking of their land lasted slightly longer than six months. For those such as the Lindsey and Gay families, their land is still under the STB's control and jurisdiction and these families remain indefinitely excluded from their land. All these land owners are entitled to "just compensation" under the Fifth Amendment to the United States Constitution.

---

[76] *See Carl Junction R-1 School District v. United States*, Nos. 05-3L and 05-4L, Stipulation as to Liability filed by the United States on October 31, 2007 (Doc. No. 71); Offers of Judgment filed by the United States on November 8, 2007 (Doc. No. 73); and Orders issued by Judge Hodges on November 16, 2007 (Doc. No. 74), November 20, 2007 (Doc. Nos. 75-79, 81-83).

[77] *See* page 22-23.

## IV. PART TWO: THE PLAINTIFFS OWN THE LAND. THE RAILROAD ONLY HELD AN EASEMENT TO OPERATE A RAILROAD ACROSS THIS LAND.

The government claims that the El Paso and Southwestern Railroad was granted fee simple absolute title to portions of the strip of land upon which the railroad was constructed.[78] The government is wrong and their claim that the railroad gained fee title to the land not an easement is flatly contrary to: (a) the settled law of Arizona as declared by the Arizona Supreme Court, (b) the law of numerous other state supreme courts, the United States Supreme Court, and U.S. Courts of Appeal (including the Federal Circuit *en banc*) construing similar grants establishing railroad rights-of-way, and (c) the express terms of the relevant instruments.

### A. The Precise Argument that the Government Makes Today was Expressly Considered and Rejected by the Arizona Supreme Court Twice.

Curiously, the Department of Justice now makes precisely the same losing argument that was made in 1888 by the railroad in *Atlantic & P.R. Co. v. Lesueur*, 19 P. 157 (Ariz. Terr. 1888) and expressly rejected by the Arizona Supreme Court.

The government argues, "The fact that the deeds note that the grants of land were for a particular purpose – a right of way of the El Paso and Southwestern Railroad – did not reserve in the grantor a reversionary interest, nor negate that the conveyance was a conveyance of the land and not a right."[79]

When confronted with this exact same argument, the Arizona Supreme Court in *Lesueur* ruled,

> It is said [by the railroad] that the term 'right of way' is used to describe the land granted,-that is, that these are words of description, rather than of tenure. We cannot concur with this view, and no authority can be found which so holds. We

[78] Government's Memo in Opposition, p. 30-36.
[79] Government's Memo in Opposition, p. 32.

> must conclude that the words are used in their common, well-known, and universally accepted legal meaning, and that it was a grant of an easement as defined by the law. It was not a grant of the fee.[80]

As we noted in our principle memorandum of law, the *Lesueur* decision was expressly reaffirmed by the Arizona Supreme Court in *Boyd v. Atchison, T. & S.F. Ry. Co.*, 4 P.2d 670 (1931). In *Boyd*, the Court quoted the above language from the *Lesueur* decision and wrote further,

> The precise point passed on in the *Lesueur* Case, to wit, whether the title acquired by the railroad company to its right of way was in fee simple or merely an easement *** The ruling in the *Lesueur* Case, above set forth [that a conveyance of a "right of way" conveys only an easement], was, and still is, the law of Arizona. For this reason we think the [property owners] were entitled to have their reversionary interest in the premises in controversy quieted.[81]

The Arizona Supreme Court then went on to direct that the property owners held fee title to the land underlying the disputed railroad right-of-way and the railroad held only an easement.

### B. The United States Supreme Court and the Federal Courts of Appeal Have Recognized this Same Principle that a Grant to a Railroad Conveys Only an Easement to Use the Land and Not Fee Title to the Land Itself.

As Justice Brennan observed in *Preseault I*, "many railroads do not own their rights-of-way outright but rather hold them under easements or similar property interests. *** [and] frequently the easements provide that the property reverts to the abutting landowner upon abandonment of rail operations."[82] This presumption is commonly held by states construing instruments establishing railroad rights-of-ways.[83]

---

[80] *Id.* at 160.
[81] *Id.* at 671.
[82] *Preseault*, 494 U.S. at 9.
[83] *Id.* at 738. *See*, for example, *Davis v. MCI*, 606 So. 2d 734 (1992), "Except to site a station house or similar land use here and there, the railroads had no need or desire for any interest except 'right-of-way.'"

Judge Posner noted the fundamental presumption that a railroad's interest in land used for a right-of-way is only an easement. Judge Posner also noted the public policy underlying this presumption in *Penn. Cent. Corp. v. U.S.R.R. Vest Corp.*, 955 F. 2d 1158, 1160 (7th Cir. 1992):

> The presumption is that a deed to a railroad or other right of way company (pipeline company, telephone company, etc.) conveys a right of way, that is, an easement, terminable when the acquirer's use terminates, rather than a fee simple. Transaction costs are minimized by undivided ownership of a parcel of land, and such ownership is facilitated by the automatic reuniting of divided land once the reason for the division has ceased. If the railroad holds title in fee simple to a multitude of skinny strips of land now usable only by the owner of the surrounding or adjacent land, then before the strips can be put to their best use there must be expensive and time-consuming negotiation between the railroad and its neighbor-that or the gradual extinction of the railroad's interest through the operation of adverse possession. It is cleaner if the railroad's interest simply terminates upon the abandonment of railroad service. A further consideration is that railroads and other right of way companies have eminent domain powers, and they should not be encouraged to use those powers to take more than they need of another person's property-more, that is, than a right of way.[84]

The Federal Circuit echoed this language in *Preseault II* by applying Vermont law and citing a similar Oregon state case. In *Preseault II*, the Federal Circuit was asked to construe a

---

[84] Citing, *Brown v. Penn Central Corp.*, 510 N.E.2d 641, 644 (Ind.1987); *Ross, Inc. v. Legler*, 245 Ind. 655, 199 N.E.2d 346 (1964); *Highland Realty Co. v. City of San Rafael*, 46 Cal.2d 669, 678, 298 P.2d 15, 20 (1956); *Sherman v. Petroleum Exploration*, 280 Ky. 105, 132 S.W.2d 768 (1939); *Johnson v. Ocean Shore R.R.*, 16 Cal.App.3d 429, 94 Cal.Rptr. 68 (1971), *Henry v. Columbus Depot Co.*, 135 Ohio St. 311, 20 N.E.2d 921 (1939). *See also*, Restatement (Third) of Property § 2.2, "Intent to Create a Servitude" cmt. g (Tentative Draft No. 1, 1989), "The fact that the grantee is a railroad may also tend to indicate that the instrument should be construed to convey an easement only. The narrowness of the parcel, the consideration paid, and the frequency with which railroad uses have been abandoned often lead to the conclusion that the grantor, as a reasonable person dealing with a railroad, intended to grant no more than an easement for the right of way, retaining ownership of the land;" *The Real Property Interest Created in a Railroad Upon Acquisition of its "Right of Way,"* 27 Rocky Mtn. L. Rev. at 74, observing that construing a right of way as an easement "seems socially more desirable, since it helps clear titles and prevents long narrow strips of agricultural land from being rated from the adjoining farms, with attendant waste and inconvenience."

general warranty deed that purported to convey "fee simple" title to a railroad.[85] Yet the court concluded that only an easement was granted to the railroad.

### C. Other State Courts Construing Similar Instruments Establishing a Railroad Right-of-Way Have Held that the Instruments Conveyed Only an Easement and Not Fee Title.

The nature of the real estate interest conveyed by these instruments is to be determined by reference to Arizona law.[86] As we show above, the issue is conclusively settled in the Plaintiffs' favor by reference to settled Arizona law. However, as Arizona courts have done, we look to other state and federal courts that have faced a similar issue.

The tenet that a conveyance to a railroad of a "right-of-way" conveys only an easement (i.e., the right to use the land and not a grant of fee title in the land itself) is widely and commonly held in other states as well as Arizona. Instruments virtually identical in relevant respect to those before this Court have been construed as conveying only an easement to the railroad by the supreme courts and lower courts of Florida, Kansas, Georgia, Missouri, California, Michigan, Idaho, Kentucky, Indiana, Tennessee, Oregon, Texas, Maryland, Wisconsin, Colorado, Washington, Vermont, and a number of other states.[87] These other cases

---

[85] "The deed contains the usual habendum clause found in a warranty deed, and purports to convey the described strip of land to the grantee railroad "[t]o have and to hold the above granted and bargained premises ... unto it the said grantee, its successors and assigns forever, to its and their own proper use, benefit and behoof forever." The deed further warrants that the grantors have "a good, indefeasible estate, in fee simple, and have good right to bargain and sell the same in manner and form as above written...." *Preseault II*, 100 F.3d at 1535-36.

[86] *See* Justice O'Connor's concurrence in *Preseault I*, supra, note 3.

[87] We have noted several of these leading state supreme court decisions in Appendix A and in Appendix 4 in our principle memorandum of law. Especially noteworthy is the Maryland Supreme Court's decision in *Chevy Chase Land v. United States*, 355 Md. 110, 733 A.2d 1055 (1999). In *Chevy Chase Land*, the Maryland Supreme Court considered a 1911 deed conveying a "right of way" to a railroad. The case arose in the contest of a Trails Act taking and the question of what interest (easement or fee) was conveyed to the railroad under Maryland law was referred to the Maryland Supreme Court by the Federal Circuit. The government argued that the instrument granted fee title to the land. The Court of Claims accepted this interpretation and

hold that language in the instrument referring to the grant of a "right of way" or describing the location of the interest granted as "over or across" property conveys only an easement. These same terms, "over and across," are used in the instruments before this Court.

**D. The Express Terms Of The Conveyance Instruments Demonstrate The Grantor's Clear Intention To Grant Only An Easement And Not To Convey Fee Title.**

We turn now to the specific instruments by which the El Paso and Southwestern Railroad right-of-way was originally established. The initial task is to determine if the fee owners intended to grant the railroad a right to use the land or to grant them ownership of the land itself.[88] If the grant to the railroad was a grant of the right to use the land for a specific purpose (construction and operation of a railroad) than the railroad obtained an easement. Alternatively, if the fee owner intended to convey the land itself to the railroad, then the railroad obtained a fee simple determinable interest in the land – terminable upon the cessation of railroad operations.

We begin with basic hornbook law. When construing an instrument that conveys an interest in land, courts seek to give effect to the intent of the parties to the transaction. The intent

---

ruled that no taking had occurred because the railroad acquired fee title. The Maryland Supreme Court held that this was in error. Only an easement was conveyed. The Maryland Supreme Court surveyed the law in Maryland as well as other states and real estate treatises. The Court held "[the] deed granting a 'right of way' to the railroad conveyed an easement. The use of the 'right of way' language provides a strong indicating that the parties intended to convey an easement as opposed to an estate in fee simple absolute." *Id.* at 1060. "In conclusion, the use of the term 'right of way' in the deed provides a strong indication that the railroad and the land company intended the 1911 deed to convey an easement. Our cases and the cases from other states consistently have construed deeds to railroads of 'rights of way' as conveying easements and not estates in fee simple absolute." *Id.* at 1071. (emphasis supplied) (The Court went on to find that the language of the 1911 deed did not limit the scope of the easement to railroad purposes and the deed did not ever refer to the word "railroad." On this basis, the Court concluded that the right of way was not limited to just a railroad. *Id.* at 1073.

[88] "Most cases dealing with conveyances to railroad companies fall into two general categories: (1) Those that grant "land" and those that grant a "right." In the former group are those in which contain language by which the grantor grants and conveys a strip, piece, parcel or belt of land. In the latter group are those in which the language purports to convey a right of way, or other right or privilege with respect to using the property." 6 A.L.R. 3d 973, §3[a].

of the parties is determined by construing the conveyance instrument as a whole. The intent of the parties is determined in light of the circumstances at the time the conveyance was granted. Interpretation of an unambiguous conveyance instrument is a question of law to be settled by its plain language.

These fundamental rules of construction are not only well-settled Arizona law, they are well-settled principals of law acknowledged by the U.S. Supreme Court and various state supreme courts.[89]

The language of the instruments by which the El Paso and Southwestern Railroad acquired its right to construct a railroad across the land are clearly the grant of an easement only and not a conveyance of fee. The relevant language of each is as follows:

---

[89] See, for example, *Van Ness v. City of Washington*, 29 U.S. 232 (1830) (A case construing the grant of land for Washington D.C. involving the land underlying Pennsylvania Avenue and other streets. Justice Story announced the Court's decision holding that, "Here we have a solemn instrument embodying the final intentions and agreements of the parties, without any allegation of mistake; and we are to construe that instrument according to the legal import of its terms." at 282.), *U.S. v. Arredondo*, 31 U.S. 691 (1832). (In a case concerning title to almost 300,000 acres of Florida land near St. Augustine involving a Spanish Land Grant, the Supreme Court noted that, "The words of a grant are always construed according to the intention of the parties, as manifested in the grant by its terms or by the reasonable and necessary implication, to be deduced from the situation of the parties and of the thing granted, its nature and use." at 740.) See also, *Neider v. Shaw*, 138 Idaho 503, 65 P.3d 525 (Idaho, 2003), *Brown v. Penn Central Corp.*, 510 N.E. 2d 641 at 643 (Ind., 1987). *Sherman v. Petroleum Exploration*, 280 Ky. 105, 132 S.W.2d 768 (1930) ("In the problem of construction of any deed, the test is that of intention, which is to be gathered from the context of the instrument, read in those lights which are properly employed in construing writings. We think it may be well said that an indefinite or ambiguous conveyance of land specifically for a railroad right of way is in its interpretation subject to the influence of a general knowledge that much railroad right of way is expressly or by operation of law limited to an easement, which has been usually found sufficient for the purpose desired." At 770.) *Michigan DNR v. Carmody-Lahti Real Estate*, 699 N.W.2d 272 (Mich. 2005).

### *i. The Original Instruments Conveyed Only an Easement Over the Land Now Owned by the Ladd Family.*

As the government confirmed in their Cross-Motion for Summary Judgment, the Ladd's acquired title to their land by a series of six deeds with almost identical language, as well as by an Act of Congress.[90] These instruments contain the following nearly identical language:

> *This Indenture *** between [the grantor] *** and the El Paso & Southwestern Railroad Company*** by these present, doth bargain; sell grant alien release, remise and confirm *** the following described tracts, pieces or parcels of land, situate in the County of Cochise, Territory of Arizona, as and for a* ***right-of-way*** *of the El Paso and Southwestern Railroad,* ***through, along and over the same****, to wit: A strip of land one hundred (100) feet in width and being 50 ft.* ***on each side of the center line of the main tracks of the Railroad*** **** Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining. To Have and to Hold the said tract, pieces and parcels of land and premises,* ***as and for a right-of-way for said railroad*** *****[91] (emphasis supplied)*

The government claims that this instrument conveyed fee title to the railroad for three reasons: (1) a "piece or parcel of land" is described; (2) the instrument does not contain any "reversionary" language; and (3) the consideration paid by the railroad is not nominal.[92] The Government is flat wrong. This instrument clearly and unambiguously conveyed only an easement to use the land for operation of a railroad and did not convey fee title to the land itself.

---

[90] The Plaintiffs' response regarding all right-of-way conveyances pursuant to the 1875 Act of Congress and the 1906 Act of Congress are detailed in its Motion in Opposition to Defendant's Motion to Stay.

[91] For the exact language of the six deeds conveying a right-of-way to the El Paso Southwestern Railroad Company, see Plaintiffs' Proposed Findings of Uncontroverted Fact, tabs A-F. These tabs represent the following deeds: Tab A,

[92] Defendant's Memo in Opposition, p. 31-33.

The two Arizona Supreme Court decisions – *Boyd* and *Lesueur* – are directly on point to this issue of railroad instrument interpretation. When an instrument refers to the interest conveyed as a "right of way", only an easement is granted.[93]

The government, however, has conveniently chosen to ignore this on-point precedent of the Arizona Supreme Court and instead cites as its only authority an appellate court decision interpreting a deed for real property conveyed in fee for the construction of a courthouse – *Lacer v. Navajo County*, 687 P.2d 404 (Ariz.App. 1983). In *Lacer*, the plaintiff argued that she had a reversionary interest in the courthouse property because the original, admittedly fee conveyance, created either a fee simple determinable or a fee simple subject to a condition subsequent. *Id.* at 209. Lacer has nothing to do with the issue before this Court. *Lacer* did not concern the question of whether the grantor intended to convey "fee" versus an "easement."

The government cites *Lacer* for its proposition that "[t]he fact that the deeds note that the grants of land were for a particular purpose *** did not reserve in the grantor a reversionary interest, nor negate that the conveyance was a conveyance of the land and not a right."[94] This citation to *Lacer* is taken from the discussion of whether a fee simple determinable estate was created by words of limitation (e.g., "until," "so long as," or "during"). The Court stated "a grant for a special purpose, without other words, does not make an estate conditional and in this case, the language used in the conveyance was a description of the reason the property was deeded to the county." Id. at 408.

---

[93] "'Right of way,' in its strict meaning, is 'the right of passage over another man's ground;' and in its legal and generally accepted meaning, in reference to a railway, it is a mere easement in the lands of others, obtained by lawful condemnation to public use or by purchase. It would be using the term in an unusual sense, by applying it to an absolute purchase of the fee-simple of lands to be used for a railway or any other kind of way." 2 Eliott on Railroads § 1158, at 628 n. 77 (3d. ed. 1907).

[94] *Lacer*, 687 P.2d at 408.

The language used by the Court – as interesting as it may be – has nothing to do with the issue of whether an instrument conveys fee or an easement. In *Lacer*, the question was whether the grant of fee contained reversionary language either by a fee simple determinable or condition subsequent. In this case, however, the Plaintiffs are not alleging a conveyance of any fee interest and therefore the distinction between a fee simple determinable and condition subsequent is completely irrelevant. Plaintiffs are puzzled why the government would cite to this case when there are two Arizona Supreme Court cases directly on point interpreting instruments conveying a railroad right-of-way. The *Lacer* case is inapplicable to the question before the Court here.

As discussed above, Arizona law unequivocally holds that an instrument conveying a "right of way" to a railroad for "railroad purposes" is clearly intended to convey an easement to the railroad for operation of a railroad. To Plaintiff counsel's knowledge (and based on the government's lack of citations), there is no Arizona case that has ever found an instrument granting a "right of way" to convey fee title to the land. Stated more simply, the government has absolutely no authority upon which to premise its contention that these instruments conveyed anything other than an easement to the railroad, and when the law of Arizona is consulted, two Supreme Court cases hold a contrary result.

***ii. The Original Easements Conveying an Easement Over the Land Now Owned by the Lindsey, Castro, and Heinzl families.***

The government contends that there are three sources by which the right of way was created over the land now owned by the Lindsey, Castro, and Heinzl families. Specifically, the government claims that there are two deeds (one conveyed by C.L. Cummings and another

conveyed by John E. Logan, *et ux*) and an 1875 Act of Congress that conveyed an interest to the Railroad for its operation of a right-of-way.[95]

As for the two deeds at issue, those conveyed by C.L. Cummings and John E. Logan, *et ux*, the government is correct in noting that the deeds state that the land is conveyed "in fee simple," however, this is not outcome determinative.

The Federal Circuit in *Preseault II* was confronted with a virtually identical conveyance. The court recited the exact language in the deed:

> The deed contains the usual habendum clause found in a warranty deed, and purports to convey the described strip of land to the grantee railroad "[t]o have and to hold the above granted and bargained premises ... unto it the said grantee, its successors and assigns forever, to its and their own proper use, benefit and behoof forever." The deed further warrants that the grantors have "a good, indefeasible estate, in fee simple, and have good right to bargain and sell the same in manner and form as above written...." In short, the deed appears to be the standard form used to convey a fee simple title from a grantor to a grantee.
>
> ****
>
> [T]he Preseaults argued that, although the Manwell deed purports to grant a fee simple, the deed was given following survey and location of the right-of-way and therefore it should be construed as conveying only an easement in accordance with Vermont railroad law.[96]

The Federal Circuit ultimately held that "despite the apparent terms of the deed indicating a transfer in fee, the legal effect was to convey only an easement."[97] A similar conclusion applies in this case.

---

[95] See Declaration of Cindi A. R. Straup. As previously stated, the limited interest conveyed by the 1875 Act as well as by the 1906 Act as applied to Arizona is discussed in greater detail in Plaintiffs' principle Memorandum.
[96] *Preseault II*, 100 F.3d at 1535-36.
[97] *Id.* at 1536.

***iii. The Original Easements Conveyed Only an Easement Over the Land Now Owned by the Miller family.***

As the Defendant stated in its brief, the portion of the railroad right of way over land now owned by the Miller family was originally conveyed by two instruments: (1) a right of way granted by J.V. Vickers *et ux.* on January 14, 1910 (D.R. 50-416); and (2) right of way granted by Aztec Land and Cattle Company on March 20, 1903 (D.R. 27-495).[98]

The first instrument, granted by J.V. Vickers, reads in pertinent part as follows:

> ***DEED FOR RIGHT OF WAY***. *This indenture made and entered into the 14th day of January, A.D. 1910, by and between J.V. Vickers and Anne C. Vickers, his wife*** and El Paso & Southwestern Railroad Company *** [the Vickers] have remised, released and forever quitclaimed unto the said party of the second part, its successors and assigns *** a strip of land **** ***over, through, across and upon*** *[land] patented to said J.V. Vickers **** ***as and for a right of way, for the construction, maintenance, and operation of a line or lines of railroad*** **** TO HAVE AND TO HOLD the above describe [sic] premises* ***as and for such right of way and purpose*** **** (emphasis supplied).*

The second instrument, granted by Aztec Land and Cattle Company, reads in pertinent part as follows:

> The Aztec Land and Cattle Company *** hereby grants and conveys unto the Arizona and El Paso Railroad Company *** in consideration of one (1) dollar the *** described lands situated in Cochise County, Arizona***

Defendant erroneously alleges that these two instruments conveyed fee title to the railroad because "these two deeds conveyed land" and "no reversionary interest is specifically retained by the grantor."[99] This argument is completely baseless, especially given the fact that once again, the government has no statutory or case law authority for their argument and it is contrary to long-settled real estate law.

---

[98] The Millers also acquired their property by an Act of Congress which is discussed Plaintiffs' Memorandum in Opposition to Defendant's Motion to Stay.

[99] Govt. Memo in Opposition, p. 35-36. The argument apparently proceeds from the mistaken notion that a conveyance of an easement must contain a reversionary provision.

The language in each of these instruments unambiguously conveyed only an easement. The conveyance directs the granting of a "right" to use the land, not title to the land itself. The J.V. Vickers conveyance described the interest conveyed as "*a right of way for rail road purposes over, through, across and upon the following described land.*" The land in all three conveyances is described as "*fifty feet on each side of the El Paso & Southwestern Railroad as located across land owned by the*" grantor.

When confronted with similar instruments that describe the interest conveyed as being "over" or "across" land, courts hold such to be an easement only not a fee conveyance. "[T]he grant of land as a right of way recognizes nothing but an easement. *** the grant [by the land owner] to the railroad of a right of way 'upon, over, and along a strip of land' conveyed only an easement, and not the underlying land."[100]

These instruments clearly, repeatedly, and unambiguously limit the right conveyed to use of the land for "railroad purposes". Importantly, they also describe the location of the easement conveyed as being "across lands owned by the grantor." This demonstrates the understanding that the grantor of each instrument intended to retain ownership of the land itself. Further, under the *Lesueur* and *Boyd* cases, the use of the term "right of way" conveys only an easement. There is no basis upon which these instruments could be considered a fee conveyance.

**CONCLUSION:**

The government has failed on both points they argue in their effort to deny "just compensation" to these eight Arizona families. Indeed, the facts presented by the government

[100] *Highland Realty Co. v. City of San Rafael*, 46 Cal.2d 669, 298 P2d 15 (1956). *See also Horton v. Mitchell*, 29 P.3d 870 (Ariz. App. Div. 1, 2001); *Michigan Dept. of Natural Resources v. Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272 (Mich. 2005); *Van Ness v. Royal Phosphate Co.*, 60 Fla. 284, 53 So. 381 (Fla. 1910) and *Silver Springs, O &G.R. Co. v. Van Ness*, 45 Fla. 559, 34 South. Rep., 884.

themself[101] establish that these land owners hold fee title to the land adjoining and underlying the abandoned El Paso and Southwestern Railroad right of way. The government's argument that the STB's issuance of a NITU operates as only a "regulatory" taking is flatly contradicted by the facts of this case and, decisions of the Federal Circuit that have considered and rejected precisely the argument that the government makes today. And, the government's argument is contrary to its own repeated representations of the law.

Accordingly, the Plaintiffs' request that this court enter summary judgment for the Plaintiffs and against the government on the issue of the government's liability for a taking of the plaintiff's land when the STB issued a NITU pursuant to the Trails Act.

Dated: June 9, 2008

LATHROP & GAGE L.C.

By /s/ Mark F. (Thor) Hearne, II

MARK F. (THOR) HEARNE, II
LINDSAY S.C. BRINTON
MEGHAN S. LARGENT
10 South Broadway, Suite 1300
St. Louis, MO 63102-1708
(314) 613-2500
(314) 613-2550 (fax)
Thornet@ix.netcom.com

ATTORNEYS FOR PLAINTIFFS

[101] For purposes of this response to the government's cross motion for partial summary judgment, we accept the facts as purported by the government in their statement of uncontroverted facts. On the basis of these facts set forth by the government, judgment on liability should be entered for the Plaintiffs.