B. District Court Litigation

The landowners filed a complaint on April 7, 2004, in the United States District Court for the District of Kansas, alleging a Fifth Amendment taking of ***16** their properties as a result of the railbanking and interim trail use of the above rights-of-way. JA35. The parties agreed that the complaint was subject to the six-year statute of limitations in 28 U.S.C. § 2401 (a). JA7. The government filed a motion to dismiss on June 7, 2004, arguing that the landowners' takings claims accrued before April 7, 1998, which was the date six years prior to the filing of the complaint. In response, the landowners argued that: 1) the district court should delay its action on the government's motion to dismiss until this Court had issued a decision in Caldwell. and 2) the landowners' claims were tolled during the pendency of a motion to certify a nationwide class action in Swisher v. United States. 189 F. R. D. 638 (D. Kan. 1999).[FN5]

FN5. The district court suspended the statute of limitations from the time that the Swisher complaint was filed until the date the district court in that case denied the motion to certify a class for lack of typicality. JA15.

This Court issued its opinion in Caldwell on December 14, 2004, and the district court issued its judgment and opinion two weeks later, on December 30, 2004. JA1. The district court applied the accrual rule announced by this Court, that "“it is the issuance of a NITU (Notice of Interim Trail Use or Abandonment) that gives rise to a cause of action.‘' JA10. Applying this rule, the district court found that a NITU had been issued for each right-of-way at issue more than six years before the complaint was filed, and thus the landowners' claims were all ***17** barred by the statute of limitations. JA19. The district court agreed with the landowners that the statute of limitations was tolled while a motion to certify a potential class action was pending, and concluded that the statute of limitations was suspended from October 2, 1998, to September 24, 1999. JA 15. Even with this additional period of time, however, the district court found that the landowners' claims were untimely and granted the government's motion to dismiss. JA19.

SUMMARY OF THE ARGUMENT

Binding Circuit precedent establishes the accrual date of a takings claim for trail

conversion under the Trails Act as the date when the STB issues a Notice of Interim Trail Use. The claims of the landowners in this case are subject to a six-year statute of limitations, and the STB issued a NITU for the landowners' rights-of-way more than six years before the landowners filed a complaint in the district court. Applying Caldwell to the facts of this case, the district court therefore correctly granted the government's motion to dismiss, as the landowners' takings claims were barred by the statute of limitations.

The landowners' argument to this Court that Caldwell was wrongly decided is futile at this juncture, since binding Circuit precedent can only be overturned *en bane*. The landowners' argument that Caldwell is distinguishable is similarly unavailing - the circumstances of this case were already contemplated in Caldwell. ***18** Accordingly, this Court should affirm the judgment of the district court.

ARGUMENT

Standard of Review

The district court's dismissal for lack of jurisdiction in this case is reviewed *de novo*. See Caldwell v. United States. 391 F. 3d 1226, 1233 (Fed. Cir. 2004); Frazer v. United States. 288 F. 3d 1347, 1351 (Fed. Cir. 2002)/

## I. THIS CASE IS CONTROLLED BY *CAW WEIL V. UNITED STATES*, AND THIS PANEL IS BOUND BY THAT DECISION.

This Court has already decided when a takings claim accrues for conversion of a railroad right-of-way to trail use under the Trails Act. In Caldwell, this Court concluded that the issuance of a Notice of Interim Trail Use was uthe only government action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way.‘’ 391 F. 3d at 1233-34. Therefore, upon issuance of a MTU, the claims of the landowners accrued.[FN6]

FN6. The district court did not determine whether the application of the Trails Act actually preempted the landowners' reversionary rights under state law. If this case is

remanded, the landowners will have to show that they possess an interest in the corridor and that this interest would have reverted to them under state law were it not for the federal action; otherwise, there is no preemption and no taking. See Preseault. 494 U.S. at 16 n. 9 ("'Some state courts have held that trail use does not constitute abandonment of a right-of-way for public travel so as to trigger reversionary rights.''); id at 20-21 (O'Connor, J., concurring). However, it is not necessary to answer the question of whether the Trails Act actually preempted the landowners' reversionary rights to affirm the district court's judgment.

***19** The district court held that all of the landowners' claims in the present case were untimely, because they accrued when the STB issued a NITU for the landowners' rights-of-way. JA19. The landowners do not dispute the applicability of the six-year statute of limitations for the takings claims in this case. 28 U.S.C. § 2401 (a). The landowners also concede the applicability of Caldwell: indeed, in the district court they requested that the district court delay issuing a decision until the Federal Circuit had published its opinion in Caldwell. JA10. Although the landowners now argue on appeal that their claims are timely and that the district court applied Caldwell incorrectly, Appellants' Br. at 56-61, the landowners are mistaken.

In the face of clearly controlling precedent, the landowners spend much of their brief contesting the merits of the Court's opinion in Caldwell. See Appellants' Br. at 23, n. 15 ("'Appellant-Landowners argue first for overruling CaldweU...''). These arguments have no place before this panel, as only an *en bane* sitting of the Federal Circuit can alter the rule of Caldwell. Fed. Cir. R. 35; Brubaker Amusement Co. v. United States. 304 F. 3d 1349, 1360 (Fed. Cir. 2002) (citing VasCath. Inc. v. Mahurkar. 935 F. 2d 1555, 1563 (Fed. Cir. 1991)).

***20** The plaintiffs in Caldwell filed a petition for rehearing *en bane*, and the Court requested a response from the Government. After full consideration of the arguments from both sides, the Court denied the petition for rehearing *en bane*. JA79. This was less than six months ago. The landowners in the present case identify no change in circumstances in the last few months that would warrant *en bane* review of the Court's decision in Caldwell. This appeal presents only the question of whether the district court properly applied Caldwell to the facts of

this case. For the following reasons, the Court should affirm the district court's judgment.

## II. APPLYING *CALDWELL* TO THIS CASE, THE LANDOWNERS' CLAIMS ARE UNTIMELY.

In Caldwell. this Court addressed for the first time when a takings claim accrued ""when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use.'' 391 F. 3d at 1228 (citing Preseault v. United States. 100 F. 3d 1525, 1543 (Fed. Cir. 1996) (*en bane* (""Preseaultil'')). The Court held that a Trails Act taking ""occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting.'' Id This occurs ""when the railroad and trail operator communicate to the STB their intention to negotiate a ***21** trail use agreement and the agency issues a NITU that operates to preclude abandonment under section 8(d).'' Id.

The applicable statute of limitations provides in relevant part that ""every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues.'' 28 U.S.C. § 2401 (a). The statute of limitations serves the public interest in that it ""protects the government from having to defend suits long after the events sued upon have occurred'' and ""puts an end to the possibility of litigation after a reasonable time.'' Hart v. United States. 910 F.2d 815, 818 (Fed. Cir. 1990)[FN7] In holding a claim barred by section 2501, the Supreme Court observed: ""We are not unmindful that the enforcement of this rule might result in hardship in some cases * * *. Such considerations are not for us, as this Court can enforce relief against the sovereign only within the limits established by Congress.'' Soriano v. United States. 352 U.S. 270,277(1957).

FN7. While *Hart* applied the six-year statute of limitations established by 28 U.S.C. § 2501 rather than 28 U.S.C. § 2401, which applies in the present case, the same considerations apply to both sections. This Court has previously recognized that ""[sjection 2401 (a) parallels the provisions of section 2501,'' and that there is no substantive distinction between the two. Hopland Band of Porno Indians v. United States, 855 F.2d 1573, 1577 n.3 (Fed. Cir. 1988) (citing Walters v. Secretary of Defense. 725

F.2d 107, 114 (D.C. Cir. 1983)).

A claim accrues "“when all events have occurred that fix the alleged liability *22 of the Government and entitle the plaintiff to institute an action.‘’ Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994). "“A claimant under the Fifth Amendment must show that the United States, by some specific action, took a private property interest for a public use without just compensation. Therefore, a claim under the Fifth Amendment accrues when that taking action occurs.‘’ Alliance of Descendants of Texas Land Grants v. United States. 37 F.3d 1478, 1481 (Fed. Cir. 1994). Since the landowners filed their complaint on April 7, 2004, their claims are only timely if the United States' specific "“taking action‘’ occurred after April 6, 1998.

The district court suspended the statute of limitations for eleven months, three weeks, and one day, while the putative class action in Swisher was pending, which reverts the relevant date of accrual to April 16, 1997. The district court held correctly that for all three rights-of-way at issue in this case, the claims accrued prior to April *16*, 1997. JAI5-18. Although the Government believes that the district court erred in suspending the statute of limitations, see Section V of this brief, and therefore the correct date for the statute of limitations purposes is actually April 6, 1998, the district court was nevertheless correct that the landowners were untimely using either date.

## *23 III. THE LANDOWNERS' ARGUMENTS ARE BASED ON A MISUNDERSTANDING OF THE NATURE OF A TRAILS ACT TAKING.

### A. The Potential Taking Results from the Burden on the Landowners' Reversionary Interests

The landowners' entire argument against Caldwell is based on a misconception of the nature of a taking in the context of converting a railroad right-of-way to trail use under the Trails Act. The Circuit has held that this conversion is not a regulatory taking. See Preseault II. 100 F.3d at 1540 ("“The trial court erred in accepting the Government's effort to inject into the analysis of this *physical takings case* the question of the owner's “reasonable expectations.' "“) (emphasis added).[FN8] However, the landowners conclude incorrectly that their taking claim does

not accrue until the moment an entity other than the railroad acquires the right to occupy the right-of-way. Both the Supreme Court and this Court held that a landowner's claim accrues when his reversionary interests in the right-of-way on his property is burdened by government action. Preseault v. I.C.C. 494 U.S. 1, 22 (1990) (‘' "“Preseault I""") (""The Commission's actions may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the ***24** property interest rather than suspends or defers the vesting of those property rights.‘') (O'Connor, J., concurring); Caldwell. 391 F.3d at 1233 ("“The taking, if any, * * * occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting.‘').

FN8. Since this Court's precedent identifies this type of claim as a physical taking, the landowners' lengthy discussion of regulatory takings law is irrelevant, and we do not address it.

In describing the operation of the Trails Act, the Supreme Court stated that " “[b]y deeming interim trail use to be like discontinuance rather than abandonment, Congress prevented property interests from reverting under state law.‘' Preseault I, 494 U.S. at 8 (internal citation omitted). "“The primary issue in this case is whether Congress has violated the Fifth Amendment by precluding reversion of state property interests.‘' Id at 9. That preclusion occurs when "“state-defined property rights are destroyed by the Federal Government's preemptive power.‘' Preseault II. 100 F.3d at 1552. Thus, in Caldwell this Court focused on the moment when governmental action prevents the reversion of property interests. 391 F.3d at 1233. In Caldwell. this Court held that the issuance of the NITU is that moment because it is then that the government has interrupted the reversionary process; if state law would otherwise have permitted the property interest to revert to the property owner, the NITU "“burdens and defeats‘' that property interest. Preseault. 494 U.S. at 23 (O'Connor, J. concurring); Caldwell. 391 F.3d at 1233.

As described in more detail above, a railroad may not abandon a right-of-***25** way without the express consent of the STB. 49 U.S.C. § 10903(a)(1). The railroads that previously controlled the rights-of-way at issue in this case began the abandonment process by filing a notice of exemption with the STB pursuant to 49 U.S.C. § 10502 and 49 C.F.R. § 1152.29. JA37,

39,41. The filing of this notice only begins the abandonment process. Railroad rights-of-way are not fully abandoned until the Board has issued authority to abandon and that authority is exercised (i.e., railroads have ceased all operations, removed all equipment, and filed a notice of consummation of abandonment with the STB). 49 C.F.R. § 1152.29(e)(2). This process is the way in which the holders of a reversionary interest in the rights-of-way would recover that interest, but for the existence of the Trails Act.

The Trails Act permits the STB to issue a N1TU, delaying the abandonment process so that potential trail operators can negotiate for conversion of the right-of-way into a recreational trail. 49 C.F.R. § 1152.29(d). During this period of time after the N1TU is issued, the right-of-way may not have been abandoned according to the applicable state law, which the landowners argue is the case here. Appellants' Br. at 25-30. If interim trail use begins, the property is considered not to be abandoned for purposes of state law for the duration of interim trail use. 16 U.S.C. § 1247(d). However, the Court in Caldwell reasoned that the abandonment ***26** could have taken place *but for* the governmental action of issuing the N1TU and delaying the process for an indefinite period of time (since extensions to a NITU may be granted, and frequently are).

In Caldwell, this Court recognized that the issuance of the NITU is a voluntary process, issued only when trail operator and the rail carrier are willing to negotiate a rail use agreement. Caldwell. 391 F.3d at 1233. "“In implementing the Trails Act, the STB chose to place the primary responsibility for creating railbanking arrangements on the railroad and trail operator.‘’ Id. "“[T]he NITU is issued only after the trail operator has been identified, and moreover, has indicated its willingness to assume full financial responsibility and liability for the line and to agree to the railbanking condition for potential future reactivation of rail service.‘’ Id. (internal quotations and citation omitted).

Thus "“[t]he issuance of the NITU is the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way.‘’ Id (emphasis in original). Therefore, in this Circuit the NITU marks the beginning point of a potential taking of the right-of-way which, were it not for the NITU, could have been abandoned by the railroad and reverted to the holder of the

property in fee simple.

*27 B. Kansas Law Does Not Dictate A Different Result

The landowners argue that a railroad right-of-way is not abandoned for purposes of Kansas law at the point where a NITU is issued, and therefore this cannot be the moment a takings claim accrues because this is not the moment when the interest in the right-of-way would have reverted to the property owner. See Appellants' Br. at 25-30. Again, the landowners misunderstand the nature of the potential takings that result from the railbanking of a right-of-way under the Trails Act. This Court held in Caldwell that the NTTU initiates a potential taking not because it is issued at the moment when the right-of-way would have been abandoned, but because it *prevents* the reversion of that right-of-way to the landowner. 391 F.3d at 1233-34. Whether the right-of-way was fully abandoned at the moment that the STB issued a NTTU is not the correct question to ask to determine the moment of accrual under the reasoning of Caldwell.

Nevertheless, the landowners argue at some length that, under Kansas law, their rights-of-way were not fully abandoned. See, e.g. Appellants' Br. at 26-30. The landowners argue that ""if the right-of-way remains in the railroad's possession, the easement is still considered to be employed for railroad uses and the Kansas landowner's interests have not been disturbed.'' Br. at 29. As this case was dismissed on statute of limitations grounds, the district court had no need or ***28** opportunity to determine whether or not the rights-of-way in this case were abandoned under Kansas law. While the government reserves the right to address this argument should this Court remand the case, this question is not necessary to determine when the landowners' takings claims accrued for statute of limitations purposes. Under Caldwell, the claims accrued not on the precise date of any abandonment under state law, but rather on the date that the abandonment under state law was prevented by the Government. That date was the issuance of the NITU.

C. *Caldweli* Anticipates That a NITU Can Lead to Several Outcomes

The issuance of a NITU does not necessarily mean a railbanking agreement will be reached. As occurred in this case, negotiations with-the initial trail operator may fail and a new trail operator may take their place. Although in the present case all three rights-of-way were

eventually successfully converted to recreational trails under the Trails Act, in some situations no agreement is reached and the right-of-way could be abandoned after the NITU expires. "“Thus, the NITU operates as a.single trigger to several possible outcomes.‘’ Cajdweil, 391 F.3d at 1234. *29 NITU. Id Even if negotiations fail, then the right-of-way may be abandoned, and "“a temporary taking may have occurred.‘’ Id. As the Court noted in Caldwell. as in the case of an issuance of a NITU, "“[i]t is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.‘’ Id (citing Seiber v. United States. 364 F.3d 1356, 1365 (Fed. Cir. 2004); Cooley v. United States. 324 F.3d 1297, 1299-300 (Fed. Cir. 2003); Boise Cascade Corp. v. United States. 296 F.3d 1339, 1347 (Fed. Cir. 2002)).

This Court relied on United States v. Dow. 357 U.S. 17 (1958), for the proposition that a single governmental action may cause either a temporary or permanent taking. Caldwell. 391 F.3d at 1234-35. Dow was a condemnation action in which the Government entered into physical possession of the land three years before it acquired title to the land by filing a declaration of taking. Dow. 357 U.S. at 23. The Supreme Court held that the Government's physical possession of the land had been a taking and "“rejected, as bizarre, the argument that there were two different takings of the same property, with some incidents of the taking determined as of one date and some as of the other.‘’ Caldwell. 391 F.3d at 1235 (quoting Dow. 357 U.S. at 24) (internal quotations omitted). Instead, ua taking occurs when the owner is deprived of use of the property,‘’ which in the Trails Act context occurs "“by blocking the easement reversion.‘’ Id. Contrary to the ***30** landowners' arguments in this case, this is true even if the taking is eventually abandoned, id. although in that situation the taking would only be for a term of years. E.g, Hendler v. United States, 952 F.2d 1364, 1383 (Fed. Cir. 1991).

The landowners criticize this Court's understanding of Dow, arguing that, to determine when a takings claim accrues, the Court should consider at what point the third-party trail operators physically occupy the right-of-way. Appellants' Br. at 43. However "“[t]he language of the Fifth Amendment itself requires that the United States * * * commit the taking action.‘’ ?? 7 F.3d at 1482. The United States has no role in a transfer of the ownership interest in a rail corridor for railbanking and interim trail use. The sale of property by a railroad to a trail operator is purely private action that does not involve the United States. Whether or not the parties

eventually reach an agreement, interim trail use has been authorized when a N1TU is issued.[FN9]

FN9. Furthermore, the railbanking of a right-of-way does not require that title ever be transferred. The rail carrier may retain title, and the trail use agreement may only permit the trail operator to occupy and use the right-of-way during interim trail use without possessing title to the right-of-way. Rail Abandonments - Use of Rights-of-wayasTrails,2I.C.C. 2d 591, 599, 1986 WL 68617 (April 16, 1986)

""The issuance of the NITU is the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way.'' ***31**Caldwell. 391 F.3d at 1233-34 (emphasis in original). See also Preseault II, 100 F.3d at 1554 (""the United States facilitated that conversion with its laws and regulatory approval'') (Rader, J., concurring); of Alliance of Descendants, 37 F.3d at 1482 (holding ratification in 1941 of treaty that extinguished legal claims was the ""taking action,'' even though Mexico did not deny claims and leave plaintiffs without compensation until 1989). Therefore, under Caldwell, the NITU ""marks the "finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued.'' 391 F.3d at 1235.[FN10]

FN10. Additionally, the landowners' argument that their claims accrued later than the date the NITUs were issued, see, e.g., Br. at 30, would benefit them in this particular case but would do most landowners a disservice. If this Court were to adopt the argument of the landowners in this case, future landowners would have to wait years in some cases in order for their takings claims to be ripe by waiting until abandonment is completed or the right-of-way is transferred. Permitting such claims to ripen when the NITU is issued is a more favorable rule for property owners who will have a legal recourse much earlier as a result.

## IV. CALDWELL CANNOT BE DISTINGUISHED BECAUSE THERE ARE NO UNIQUE CIRCUMSTANCES IN THIS CASE

Caldwell clearly states that a potential takings claim accrues with ""[t]he issuance of the

NITU.'' 391 F.3d at 1233. In the present case, the railbanking process involved additional regulatory procedures, which the landowners claim are unique circumstances justifying the lateness of their complaint. However, the *32 landowners misinterpret the Caldwell decision - the delays in claim accrual they propose in their brief are not supported by the law of this Circuit. The facts of Caldwell involved circumstances similar to those of the present landowners; the original NITU was extended to encompass an additional, adjacent right-of-way. 391 F.3d at 1231 -32. As discussed above, Caldwell does not assume that the issuance of the NITU is the final step in the railbanking process. The additional steps in the process that occurred in the present case do not distinguish it factually from Caldwell - the NITU remains the moment at which the landowners' takings claims accrued.

I. THE CLAIMS ON THE MEADOWLARK TRAIL WERE NOT TIMELY FILED.

The STB issued a NITU pertaining to the Meadowlark Trail on September 28, 1995. JA56. Therefore, any takings claim pertaining to the Meadowlark Trail accrued on September 28, 1995. The landowners filed their complaint.eight years, six months, and ten days after their claim accrued. Regardless of whether or not the landowners' statute of limitations was tolled, the Meadowlark Trail claims were untimely.

The landowners do not contest that they filed their complaint more than six years after the NITU for the Meadowlark Trail was filed. Instead, they point to the *33 fact that concurrent with the NITU, the STB authorized a 180-day public use condition, which might have allowed for use of the right-of-way for something other than a recreational trail. Appellants' Br. at 56. The landowners claim that their reversionary interests could not have been blocked at that point, because ""under no measure would non-trail use have given rise to rails-to-trails takings.'' Br. at 57.

As described above, the public use condition imposed by the STB under 49 U.S.C. § 10905 prevents abandonment of a railroad right-of-way for up to 180 days unless the right-of-way has first been offered for sale for public use, including recreational purposes. However, unlike a NITU, a public use condition does not act to prevent abandonment, and delays the reversionary interest for no more than 180 days. Section 8(b) of the Trails Act specifically states

that conversion to trail use prevents abandonment - ""such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes.'' 16 U.S.C. § 1247(d). The statutory provision for public use has no similar language, and therefore the public use condition does not prevent the rail carrier from abandoning the right-of-way. Thus, under Caldwell. the landowners' takings claims still accrued when the NITU was issued.

The landowners' second argument for delaying the accrual of the *34 Meadowlark Trail claims, Br. at 57, is that after the NITU was issued, the potential trail operator changed a number of times, and the landowners filed an objection which was resolved by a final STB decision issued January 31, 1997. JA58. The landowners argue that due to the ""uncertainty and changing circumstances at hand,'' Br. at 57, their property interests were not blocked until the STB's decision made the trail use agreement final.

The issuance of a NITU is inherently an uncertain prospect, as the Court recognized in Caldwell. See 391 F.3d at 1234-35. There, the Court contemplated even greater uncertainty than occurred with the Meadowlark Trail, and found that the possibility that trail use negotiations might fall through altogether did not prevent the issuance of a NITU from effectuating a taking. Id That the identity of the prospective trail operator changed did not delay the accrual of the landowners' claims.

The landowners' third argument to support delaying the date of accrual on the Meadowlark Trail is that the railroad was continuing to use the right-of-way after the NITU was issued. Br. at 57-58. Nevertheless, the process of reverting the landowners' property interests back to them was cut off by the NITU. The NITU permitted the trail sponsor to begin interim trail use, and authorized transfer of the right-of-way to the trail sponsor subject to railbanking without abandoning the line. *35 Even if the rail carrier continued to use the right-of-way after the issuance of the NITU, under Caldwell the landowners' interests in the property, if any, were burdened and defeated when the NITU issued.

2. THE CLAIMS ON THE SUNFLOWER TRAIL WERE NOT TIMELY FILED

The STB first issued a NITU relating to the Sunflower Trail on April 12, 1996. JA66. Using this NITU as the date of accrual means that the landowners filed their complaint seven years, eleven months, and 26 days after their claim accrued, and therefore the claim is barred by the six-year statute of limitations. The landowners argue that the correct date of accrual should be the second NITU issued for the Sunflower Trail, Br. at 58-60, which was issued on June 12, 1997. JA68. Even using this date, the landowners' claims are still untimely, as the complaint was filed six years, nine months, and twenty-six days after this date. Using this second date as the date of accrual, and also tolling the statute of limitations as the district court did, would make this claim timely, but as demonstrated below neither of these is correct.

The original trail owner, named in the first NITU, was replaced by a new trail manager and a new NITU was issued to reflect the change. Id Although the original NITU had expired ten days prior to issuance of the second, the line was not ***36** abandoned when the NITU expired, because the railroad did not take action to exercise its abandonment authority at that point. See Becker v. STB, 132 F.3d 60, 62 (D.C. Cir. 1997) (abandonment requires objective indicia of intent to abandon on the part of rail carriers even after NITU expires). Therefore, the STB retained jurisdiction over the right-of-way, and while CKR had the opportunity to consummate abandonment, they instead negotiated with a new trail operator who then filed a request for a NITU. JA68.

This second NITU did not begin some new regulatory process, but simply " "reopened'' the original NITU to substitute one trail sponsor for another as specifically allowed by the STB's regulations. Id.; 49 C.F.R. § 1152.29(f). The second NITU states explicitly that it is simply extending the deadline of the original 1996 NITU issued to Jennings (the previous potential trail operator). JA68. The NITU states that ""[u]pon reconsideration, the notice of exemption served and published in the Federal Register on March 13, 1996, exempting the abandonment of the line described above is modified to the extent necessary to implement interim trail use/rail banking as set forth below until December 13, 1997.'' Id. No new potential taking was worked by this second STB document; rather it functioned as a modification of the original NITU to permit trail use negotiations authorized by the first NITU to continue with a different trail sponsor.

*37 The procedures followed here are expressly permitted by the STB regulations implementing the railbanking process. 49 C.F.R. § 1152.59(e)(1). If a trail-use statement is filed late, or after an original NITU expires, the STB can contact the rail carrier by telephone and if abandonment has not yet been consummated, and the rail carrier is willing to negotiate, then the abandonment proceeding will be reopened and a new NITU issued. Id. Moreover, § 1152.29(f) sets out procedures for the substitution of new trail sponsors. In sum, negotiating with a substitute trail operator or issuing a new NITU for the same property is not a new regulatory action that could cause a new taking; rather, it is a continuation of the same regulatory process that Caldwell held begins with issuance of the first NITU. Therefore, following Caldwell, the district court held correctly that the landowners' claims accrued upon issuance of the first NITU.

The landowners also argue, as they do for the Meadowlark Trail, that their claim could not accrue when the first NITU issued, because they challenged the transfer of title from CKR to the trail operator after interim trail use began. Br. at 59. Some Sunflower Trail landowners petitioned the STB to reopen the proceedings and vacate the NITU, alleging that CKR had improperly transferred certain parts of the right-of-way prior to conversion to interim trail use and had therefore fully abandoned the line. The United States Court of Appeals for the *38 District of Columbia Circuit remanded the case to the STB in 1999 after the STB denied the landowners' request, and the STB's final decision denying relief was issued on May 8, 2001. Jost v. STB, 194 F.3d 79 (D.C. Cir. 1999); STB Decision, 2001 WL 489991 (May 8, 2001). The landowners claim that May 8, 2001, is the date of accrual, although they offer no argument to support this claim. Br. at 60. Just as the objections filed by the landowners on the Meadowlark Trail did not create uncertainty which was unanticipated by this Court's decision in Caldwell. the objections filed by the Sunflower Trail landowners did not change the original date of accrual.

Although the proceedings to resolve their petition to reopen lasted for some time, they were not initiated until the trail conversion had already been completed. STB Decision, 2001 WL 489991 at * 1. Permitting landowners to toll their statute of limitations by filing objections after the Trails Act process is completed would provide a perverse incentive to generate unnecessary administrative hearings and judicial proceedings. Following Caldwell, the landowners' reversionary interests were interrupted by the issuance of the first N1TU, and the subsequent

administrative actions never changed that fact

*39 3. THE CLAIMS ON THE FLINT HILLS TRAIL WERE NOT TIMELY FILED.

With respect to the final right-of-way, the Flint Hills Nature Trail, there were also multiple NITUs issued, the first of which issued on October 31, 1994. This NITU, issued nearly ten years before the complaint was filed, covered the 37.83 miles of rail line identified in Paragraph 22 of the complaint (the " "Lyon County section''). JA18. For the second stretch of rail line, the 26.57 miles of rail line identified in Paragraph 23 of the complaint (the ""Morris County section''), the STB issued a NITU on March 31, 1995. This was nine years and seven days prior to the filing of the complaint, and therefore also well outside of the statute of limitations.

The STB issued a third and final NITU for the Flint Hills Nature Trail, consolidating the Lyon County and Morris County rights-of-way into a single NITU. JA77. Unlike the second NITU issued for the Sunflower Trail, this last NITU issued for the Flint Hills Trail vacated the previous NITUs when it replaced the prior potential trail managers with the trail manager who eventually assumed operations of the trail. JA77-78. On the basis of that, the landowners make a different argument than they do for the claims made on the Sunflower Trail, and instead argue that each of the three NITUs issued for this trail worked a new, independent taking. Br. at 61.

***40** The district court correctly rejected this argument and used the date of the first NITU for each section of the interim trail. JA19. The landowners concede on appeal that their claims accrued on these dates, Br. at 61, which are well outside the statute of limitations. However, the landowners believe that the subsequent consolidation of the NITUs and the naming of a new trail operator began a new taking, and that their complaint should be based on the last possible taking date of July 25, 1997. Tellingly, the landowners cannot support their argument with Federal Circuit precedent. The only takings case cited for this proposition is New Port Largo v. Monroe County. 985 F.2d 1488 (1 lth Cir. 1993), which does not. itself apply the ""continuing wrong'' doctrine that the landowners propose. In that case, although the district court had created such a doctrine, id at 1492 n.7, the Eleventh Circuit's decision followed its precedent holding that a regulatory taking claim is ripe only once the state courts have issued a final decision as to

whether the zoning regulation was valid. Id. at 1

Lakes, 904 F.2d 585 (1 lth Cir. 1990)). This situation is not analogous to the Flint Hill landowners' claims, because there is no question here as to the validity of the Trails Act or the STB's regulations.

Indeed, the landowners' argument directly conflicts with Caldwell and Supreme Court precedent. The idea that, once a property owner has been deprived ***41** of reversionary rights by a government action, subsequent government actions depriving the property owner of the same rights create a new taking is "“bizarre.‘' Dow, 357 U.S. at 24 (quoted in Caldwell. 391 F.3d at 1235). Instead, the taking occurs when the landowners' reversionary interests are blocked in the first instance, and if the taking subsequently ceases, this serves only to limit the scope of potential takings claims. Caldwell. 391 F.3d at 1235. The district court acknowledged this and correctly used the initial NITUs as the date of accrual for the Flint Hills Trail. JA19.

## V. THE DISTRICT COURT ERRED IN TOLLING THE STATUTE OF LIMITATIONS

For two of the three trails at issue in this case, the landowners' claims are untimely whether or not the statute of limitations was tolled. However, for the Sunflower Trail and Flint Hills Nature Trail, if the Court adopts the landowners' argument that subsequent NITUs, rather than the first, mark the date of accrual, the Court will then need to consider whether the district court erred in tolling the statute of limitations.[FN11]

FN11. Using the date of the second Sunflower Trail NITU, June 12, 1997, and then tolling the statute of limitations for eleven months, three weeks, and one day as the district court d JA 15, the landowners' claims for the Sunflower Trail would not be barred by the statute of limitations. Similarly, the landowners suggest that the Court should use the final consolidated NITU for the Flint Hills Nature Trail, issued on July 25, 1997, JA77, as the date of accrual for that trail. This too would make this claim timely were the statute of limitations tolled for the period of time that the district court chose.

*42 As discussed above, the district court tolled the statute of limitations for the length of time that the District of Kansas considered a motion to certify a potential class of rails-to-trails takings plaintiffs. Swisher v. United States. No. 98-1352 (D. Kan.).[FN12] The motion to certify a putative nationwide class of landowners alleging takings by the United States under the Trails Act was filed on October 2, 1998, and denied on September 24, 1999. Swisher v. United States. 189 F.R.D. 638 (D. Kan. 1999). Although the district court held correctly that the landowners were potential members of the Swisher class, the court erred in holding that the pendency of that action tolled the landowners' statute of limitations.

FN12. Some of the counsel for the landowners also represented the putative class in Swisher.

A. The case law relied on by the landowners assumes facts not applicable here.

The United States respectfully submits that the rule of American Pipe & Constr. Co. v. Utah. 414 U.S. 538 (1974), does not apply to plaintiffs such as the landowners in the present case who still had ample time to bring their claims after denial of a motion for certification of a class which would have included those plaintiffs. In American Pipe, the class-action suit was filed eleven days before the ***43** statute of limitations would have barred claims by the individual class members. 414 U.S. at 541. In that case, the district court ruled on the motion to certify the class several months later, well after the statute of limitations for individual class members had expired. Eight days after this, the class members moved to intervene as individual plaintiffs, and the Supreme Court eventually held that their motion was timely, tolling the statute of limitations for the length of time that the certification motion was pending.

The concern expressed by the Supreme Court in American Pipe arose again in Crown. Cork & Seal Co. v. Parker. 462 U.S. 345 (1983), in which the putative class members filed separate actions after their class certification was denied. The plaintiff alleged racial discrimination, and had only ninety days to bring suit after being issued a Notice of Right to Sue by the Equal Employment Opportunity Commission. Id. at 348. The plaintiff did not bring his individual complaint until after the denial of a potential class certification of which he would have been a member, which the district court took a year and a half to issue. Id In both cases, the

Court was concerned that unless the statute of limitations was tolled in those circumstances, potential class members would be forced to file actions before the expiration of the statute of limitations ""to protect themselves against the possibility that certification would be denied. The principal purposes of the class action ***44** procedure - promotion of efficiency and economy of litigation - would thereby be frustrated.'' Crown. Cork & Seal. 462 U.S. at 349. That policy concern, critical to the Court's decisions in those cases, is not implicated by the facts in the present case.

After the denial of the class in Swisher, the landowners in the present case all ""had at least thirteen months to file a complaint before the statute of limitations would have barred their claims.[FN13] With such a substantial amount of time remaining after the denial of the class certification, the landowners in the present case can not be said to have been required to file an individual suit in order ""to ensure that their rights would not be lost in the event class certification was denied.'' Crown. Cork & Seal 462 U.S. at 350. Properly viewed, the United States respectfully submits that tolling was not appropriate here.[FN14] Should the Court alter ***45** its rule in Caldweil and adopt the dates of later NITUs as the accrual date for the landowners' takings claims, the Court should find, as an alternative grounds for affirmance, that the district court erred in tolling the statute of limitations and that the landowners were required to file their claims no more than six years after the issuance of a NITU for the relevant right-of-way.

FN13. The Swisher class was denied on September 24, 1999. For the Meadowlark Trail, the claim accrued on September 28, 1995, and the landowners were left with two years and four days until the six-year statute of limitations had run following the district court's decision to deny class certification in Swisher. The Sunflower Trail landowners, whose NITU was issued on April 12, 1996, were left with two years, six months, and 19 days. The Flint Hills landowners whose NITU was issued on March 31, 1995, had one year, six months and seven days after the denial of the class. Those Flint Hills landowners whose NITU was issued on October 31, 1994, were left with one year, one month and seven days.

FN14. The courts of appeals have rejected efforts to take advantage of the filing

of a class action by tolling the statute of limitations for the filing of successive class actions. See, e.g. Basch v. Ground Round. Inc., 139F.3d 6 (1st Cir. 1998); Griffin v. Singletary, 17 F.3d 356, 359 (1 lth Cir. 1994); Robbin v. Fluor Corp., 835 F.2d 213, 214 (9th Cir. 1987); Korwek v. Hunt. 827 F.2d 874 (2d Cir. 1987).

CONCLUSION

For the foregoing reasons, the judgment of the district court granting the government's motion to dismiss should be AFFIRMED.

Appendix not available.

John BARCLAY, Constance Barclay, Royer Barclay, Althea Barclay, John Amos, Marcia J. Bacon, Ronald J. Bartel, Melvin Bergen, John E. Boyle, Jonathan Ehrlich, Florence Ehrlich, Donald Graumann, Ruben Kliewer, Alvin Kroupa, Barbara Kroupa, Burdett Ledell, Lee Dale Miller, Vernon Minns, Frank A. Mitchell, Mid Kansas Cooperative Association, John F. Opat, Robert Presnell, Janet Regier, Sonja Regier, Don Reinhardt, Janice Reinhardt, Mary J. Rodgers, Darrell Thompson,

2005 WL 2156907 (C.A.Fed.)

END OF DOCUMENT

**Appendix C:**

United States Court of Appeals,Federal Circuit.

William B. CALDWELL, III and Ben Frank Billings, III, (for themselves and as representative of a class of similarly situated persons)

v.

UNITED STATES, Defendant - Appellee.

No. 03-5152.

March 10, 2005.

Appeal from the United States Court of Federal Claims in 02-CV-1347 Judge Christine O.C. Miller

United States' Opposition to Petition for Rehearing En Banc

Thomas L. Sansonetti, Assistant Attorney General, John Smeltzer, Kristine Tardiff, Kathryn E. Kovacs, U.S. Department of Justice, Environment & Natural Resources, Division, Appellate Section, P.O. Box 23795 l'Enfant Plaza Sta., Washington, D.C. 20026, (202) 514-4010, of Counsel: Evelyn Kitay, Surface Transportation Board, Office of the General Counsel, Washington, D.C. 20423.

*i*TABLE OF CONTENTS*

INTRODUCTION ... 1

ARGUMENT ... 3

I. The majority's opinion does not conflict with Supreme Court or circuit precedent, and the question here does not otherwise warrant rehearing en banc ... 3

II. Caldwell's regulatory takings argument is beyond the scope of this case and is incorrect ... 7

III. The majority opinion does not conflict with binding precedent ... 9

IV. Caldwell's position is not representative of landowners generally ... 11

CONCLUSION ... 12

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

*ii*TABLE OF AUTHORITIES*

*Cases:*

*Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478 (Fed. Cir. 1994) ... 6

*Cooley v. United States,* 324 F.3d 1297 (Fed. Cir. 2003) ... 9, 10

*Creppel v. United States,* 41 F.3d 627 (Fed. Cir. 1994) ... 9

*Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573 (Fed. Cir. 1988) ... 9

*National Ass'n of Reversionary Property Owners v. STB,* 158 135 (D.C. Cir. 1998) ... 4

*Preseault v. ICC,* 100 F.3d 1525, 1552 (Fed. Cir. 1996) (en banc) ... 3, 6

*Preseault v. ICC,* 494 U.S. 1 (1990) ... 3

*Wyatt v. United States,* 271 F.3d 1090 (Fed. Cir. 2001) ... 7, 9, 10

*Statutes, Rules and Regulations:*

16 U.S.C. 1247(d) ... 1

28 U.S.C. 2501 ... 1

49 C.F.R. 1152.29 ... 4

*INTRODUCTION*

This case concerns the accrual date of a claim alleging that conversion of a railroad right-of-way to interim trail use under the National Trails System Act Amendments of 1983, 16 U.S.C. § 1247(d), constitutes a taking. The majority's opinion does not conflict with any Supreme Court or circuit precedent, and this case does not present any question of exceptional importance. Thus, rehearing en banc is not warranted under Rule 35.

The Appellants, William B. Caldwell, III and Ben Frank Billings, III ("Caldwell"), alleged that they own property underlying a railroad corridor in Georgia and that the railbanking of that corridor under the Trails Act worked a taking of their property under the Fifth Amendment. On June 30, 2003, the Court of Federal Claims dismissed the complaint for lack of

jurisdiction under 28 U.S.C. § 2501, holding that Caldwell did not file within the six-year statute of limitations. JA1. The United States argued that the claim accrued when the Interstate Commerce Commission ("ICC," now the "STB") issued the Notice of Interim Trail Use or Abandonment ("NITU"); in the alternative, the United States argued that the claim accrued when the railroad and the City reached a trail use agreement. Caldwell filed his complaint more than six years after both of those dates. Caldwell contended that the claim did not accrue until the railroad delivered the deed to the City. The court held that the statute of limitations began to run on July 5, 1996, when the City notified the ICC that it had reached a trail use agreement with the railroad. JA17. The court reasoned that the NITU takes effect only if the right-of-way meets the criteria for abandonment and negotiation of trail use occurs." JA15. It is when the parties reach a trail use agreement that the "taking becomes fixed * * *. Before that date the outcome of the Government action is not certain, so the taking has not been effected." JA17.

On appeal, the United States argued that the trial court held correctly that Caldwell's claim accrued when the railroad and the City reached a trail use agreement. A divided panel of this Court affirmed the judgment, but the majority held, contrary to the government's and the trial court's position, that Caldwell's claim accrued when the ICC issued the NITU, because it was then that his alleged reversionary interest in the corridor was blocked. Slip op. at 11.[FN1] The majority recognized that if the NITU works a taking -- a question the Court expressly declined to answer, *id.* at 14 n.7 -- that taking might turn out to be temporary if trail use does not ensue and the railroad abandons the line. *Id.* at 14. The dissent opined that it was not until title passed to the City that Caldwell's claim accrued, because it was then that the City gained the right to possess and occupy the corridor. Slip dissent at 6.

FN1. The Court's slip opinion is attached to the Appellants' Petition for Rehearing En Banc and is published at *Caldwell v. United States,* 391 F.3d 1226 (Fed. Cir. 2004).

## ARGUMENT

### I. *The majority's opinion does not conflict with Supreme Court or circuit precedent, and the question here does not otherwise warrant rehearing en banc.*

Caldwell's complaint alleged that the United States took his property because converting the rail corridor to interim trail use under the Trails Act preempted his reversionary rights under state law. JA39 ¶¶18, 20. Caldwell's allegation is consistent with *Preseault v. United States,* where a plurality of this Court sitting en banc concluded that a taking occurs under the Trails Act "[w]hen state-defined property rights are destroyed by the Federal Government's preemptive power." 100 F.3d 1525, 1552 (Fed. Cir. 1996) (en banc); *see also* *Preseault,* 494 U.S. at 21-22 (O'Connor, J., concurring). The majority followed that precedent and answered the allegation in Caldwell's complaint when it held that "a Fifth Amendment taking occurs when, pursuant to the Trails Act, state law reversionary interests are effectively eliminated in connection with a conversion of a railroad right-of-way to trail use." Slip op. at 2, 11.

The majority also followed the statutory scheme when it recognized that "the NITU is the only *government* action in the railbanking process that operates ***4** to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way." Slip op. at 13 (emphasis in original). The NITU delays the abandonment of the line for 180 days to allow the rail carrier and the trail group time to negotiate a railbanking and interim trail use agreement. 49 C.F.R. § 1152.29(d)(1). In the circumstances of this case, once the NITU issued, interim trail use was authorized without further federal action. After that point, abandonment required further STB involvement: if the railroad and the City had not reached a trail use agreement, the railroad could have abandoned by filing a notice of consummation with the STB "to signify that it has exercised the authority granted and fully abandoned the line," 49 C.F.R. §§ 1152.29(d)(1), (e)(2); *National Ass'n of Reversionary Property Owners v. STB,* 158 F.3d 135, 139 & n.7 (D.C. Cir. 1998); and here, where the parties reached a trail use agreement, the City could only terminate trail use and abandon the corridor by petitioning the STB to vacate the NITU, 49 C.F.R. § 1152.29(d)(2). Absent the NITU the railroad would have been able to abandon the corridor, causing title to revert to Caldwell. Thus, although the majority's conclusion differed from the reading that the United States presented in its brief on appeal, the Court's opinion reflects a permissible construction of the statutory scheme, is consistent with applicable precedent, and does not qualify for rehearing en banc under Rule 35.

***5** Caldwell argues the dissent's position that the taking did not occur until title changed