hands and the City acquired the right to possess and occupy the corridor. Slip dissent at 6. That position is inconsistent with the plurality's reasoning in *Preseault,* quoted above, and misunderstands a fundamental point about Trails Act takings claims. Unlike the usual physical occupation case, the landowner in a Trails Act takings case is already deprived of possession. Thus, the question is not when the owner loses the right to possess the property (since he is already not in possession), but rather when he would otherwise have recovered ownership of the easement were it not for the operation of the Trails Act. The dissent's focus on when the City acquired the right to possess and occupy the property is misplaced in this unique context, because Caldwell was not in possession of the corridor in the first place and his alleged reversionary rights were interrupted (if at all) long before title transferred to the City.[FN2]

FN2. Neither the trial court nor this Court determined whether the application of the Trails Act actually preempted Caldwell's reversionary rights under state law. If this case is remanded, Caldwell will have to show that he has an interest in the corridor and that this interest would have reverted to him under state law were it not for the federal action. At that time, the parties can brief the questions raised by the amici regarding which law applies, if necessary. State law is not relevant, however, to the question currently before the Court.

Moreover, the United States has no role in a transfer of the ownership ***6** interest in a rail corridor for railbanking and interim trail use.[FN3] "The language of the Fifth Amendment itself requires that the United States * * * commit the taking action." *Alliance of Descendants of Texas Land Grants v. United States,* 37 F.3d 1478, 1482 (Fed. Cir. 1994). The sale of property for Trails Act purposes does not implicate the United States, but is purely private action. Regardless of whether the title ultimately transfers or not, once the parties enter into an agreement, interim trail use is authorized. The NITU is the government action that might allegedly constitute a taking by preventing the reversion of property rights under state law. *See Preseault,* 100 F.3d at 1554 ("the United States facilitated that conversion with its laws and regulatory approval") (Rader, J., concurring). *Compare Alliance of Descendants,* 37 F.3d at 1482 (holding ratification in 1941 of treaty that extinguished legal claims was the "taking action," even though Mexico did not deny claims and leave plaintiffs without compensation until 1989). In this case, that

preemption of Caldwell's alleged reversionary rights occurred, if at all, long before title passed to the City, and Caldwell did not have to wait the two years between the issuance of the NITU and the transfer of title before filing suit to *7 collect just compensation.

FN3. As far as the Trails Act is concerned, it makes no difference whether title to the corridor transfers or not. The Trails Act specifically provides that railbanking can be accomplished through "donation, transfer, lease, sale or otherwise." 16 U.S.C. § 1247(d); *see also*49 C.F.R. § 1152.29(a).

II. *Caldwell's regulatory takings argument is beyond the scope of this case and is incorrect.*

In his petition for rehearing en banc, Caldwell extends his argument well beyond the dissenting opinion and asserts for the first time that the issuance of the NITU constitutes a regulatory taking and transfer of title to the trail operator constitutes a separate physical taking. The Court should not address this argument, since Caldwell did not preserve it at earlier stages of the litigation. *See* Rumsfeld v. Freedom, NY, Inc., 346 F.3d 1359, 1361 (Fed. Cir. 2003). Moreover, although the complaint did not specify the type of taking alleged, Caldwell's brief as appellant in this Court expressly disavowed any assertion of a regulatory taking claim, Caldwell Br. at 26-27, and the Court did not address such a claim. Thus, this new regulatory takings argument is beyond the scope of this case.

In any event, the argument that the NITU works a regulatory taking and that a single government action under the Trails Act might work two separate takings is clearly incorrect. First, issuance of the NITU did not constitute a regulatory taking, because it merely delayed abandonment of the corridor, and only an extraordinary regulatory delay can constitute a taking. *Wyatt v. United States,* 271 F.3d 1090, 1097-1100 (Fed. Cir. 2001). Essentially, the Trails Act is analogous to ***8** other statutes that require a permit for activities under federal jurisdiction in that it requires a railroad to obtain STB authorization to abandon a rail corridor. The NITU is an optional step in that process, triggered by a potential trail operator, which merely adds a layer of analysis and extends a process that is already required before the STB can relinquish its jurisdiction over the line. No court has held that issuance of a NITU might work a regulatory

taking.[FN4]

FN4. The United States reserves the right to make additional arguments in defending against a regulatory taking claim if this case is remanded and Caldwell is permitted to amend his complaint to assert such a claim.

Second, Caldwell provides no support for the contention that a single government action might trigger two separate takings. To the contrary, this Court has long held that a single government action might cause a single taking, which might turn out to be temporary; if the taking later becomes permanent, it is merely the continuation of the initial taking, not a separate taking. Under the Trails Act, the STB takes only one action -- it issues the NITU -- that might cause one taking. The taking might turn out to be temporary if, for example, the interim trail use agreement is terminated and the rail carrier subsequently abandons the line. But the temporary taking that might be caused when the NITU and interim trail use agreement prevent reversion under state law does not end when (or if) interim trail use later ensues. Rather, that same potential taking continues and becomes ***9** permanent. *See* Cooley v. United States, 324 F.3d 1297, 1305 (Fed. Cir. 2003) (holding permit denial was final agency action that might give rise to taking claim, but remanding for determination of whether later granting of permit rendered taking temporary); Wyatt, 271 F.3d at 1097 n.6 ("A temporary taking occurs when what would otherwise be a permanent taking is temporally cut short.").

III. *The majority opinion does not conflict with binding precedent.*

Caldwell's contention that the majority opinion conflicts with Supreme Court and circuit precedent is incorrect, since no other court has addressed the question presented here of when a Trails Act taking claim accrues. In particular, neither *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573 (Fed. Cir. 1988), nor *Creppel v. United States,* 41 F.3d 627 (Fed. Cir. 1994), concerned the Trails Act. *See* Pet. at 6-7. Caldwell incorrectly relies on *Hopland Band* for his assertion that the NITU is "irrelevant." *Id.* at 7. On the contrary, the NITU is the only government action that might possibly trigger a taking. Caldwell draws from *Creppel* the argument that even if the NITU triggers a taking, such a claim only becomes ripe when the NITU expires. *Id.* However, the NITU marks the end of the regulatory process for converting a rail

corridor to interim trail use; if the parties reach an agreement, the STB has no further involvement in the conversion to interim trail use.

***10** Caldwell also takes issue with the majority's reliance on United States v. Dow, 357 U.S. 17 (1958). Pet. at 8 ff. While *Dow* is obviously distinguishable from this case, as the dissent correctly pointed out, slip dissent at 5-6, Caldwell's criticism of the majority's reliance on it reveals a misreading of the majority opinion. Caldwell reads the majority's citation of Dow as "support[ing] its conclusion that a temporary *regulatory* taking might occur in the situation where the NITU expires without the rail line being converted to a trail." Pet. at 9 (emphasis in original). However, the majority did not hold that issuance of the NITU triggered a regulatory taking; as noted above, Caldwell expressly disavowed any regulatory taking claim, and the Court addressed no such claim. Rather, the majority cited *Dow* for the unsurprising principles that a single governmental action might give rise to a single taking, not multiple takings arising at different points, slip op. at 15, and that "the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues." *Id.* at 14. Those holdings in *Dow* are consistent with recent holdings of this Court, *e.g.*, Cooley, 324 F.3d at 1305; *Wyatt*, 271 F.3d at 1097 n.6, and the majority's reliance on that Supreme Court precedent certainly does not merit en banc review.

***11** IV. *Caldwell's position is not representative of landowners generally.*

Although Caldwell's position benefits him in this particular case (as well as the amici in their cases), it disserves landowners generally. Waiting for trail use to actually ensue may take years or, indeed, may never occur. In this case two years elapsed between issuance of the NITU and transfer of title. During that time, the landowner cannot make use of land that would have reverted were it not for the operation of the Trails Act. The landowner need not wait for this potentially lengthy process to result in an actual transfer of title before having a ripe claim.

Caldwell's recitation of the impacts of the majority opinion, Pet. at 12, extend well beyond the narrow holding in this case. The majority held only that in the circumstances of this case, Caldwell's taking claim ripened when the ICC issued the NITU. Certainly, that holding will have implications in other Trails Act takings cases, but there is no ground for drawing grandiose

conclusions outside the circumstances of the Trails Act. The majority's opinion was consistent with controlling precedent, and the issue presented in this case does not warrant en banc review under Rule 35.

*12*CONCLUSION*

For the foregoing reasons, the petition for rehearing en banc should be denied.

Appendix not available.

William B. CALDWELL, III and Ben Frank Billings, III, (for themselves and as representative of a class of similarly situated persons) v. UNITED STATES, Defendant - Appellee.

2005 WL 4146730 (C.A.Fed.)

END OF DOCUMENT

**Appendix D:**

United States Court of Appeals, Federal Circuit.

John BARCLAY, Constance Barclay, Royer Barclay, Althea Barclay, John Amos, Marcia J. Bacon, Ronald J. Bartel, Melvin Bergen, John E. Boyle, Jonathan Ehrlich, Florence Ehrlich, Donald Graumann, Ruben Kliewer, Alvin Kroupa, Barbara Kroupa, Burdett Ledell, Lee Dale Miller, Vernon Minns, Frank A. Mitchell, Mid Kansas Cooperative Association, John F. Opat, Robert Presnell, Janet Regier, Sonja Regier, Don Reinhardt, Janice Reinhardt, Mary J. Rodgers, Darrell Thompson, Robert Turner, Geneva Turnquist, Donald Turnquist, Clark E. Wiebe, and Marlene J. Weber, Plaintiffs - Appellants,

v.

UNITED STATES, Defendant - Appellee.

Nos. 05-1255, 05-5109.

November 23, 2005.

On Appeal from the United States District Court for the District of Kansas

Supplemental Brief of the United States in Response to the Brief of Amici Curiae

Sue Ellen Wooldridge, Assistant Attorney General, John E. Arbab, Lane M. McFadden, U.S. Department of Justice, P.O. Box 23795 (L'Enfant Plaza Station), Washington, D.C. 20026, (202) 353-9022.

***i** TABLE OF CONTENTS

ARGUMENT ... 1

1. *Amici's new claim is not properly presented in this appeal* ... 1

2. *Even if amici's new arguments are considered, the trial courts in Barclay and Renewal Body Works correctly interpreted this Court's decision in Caldwell* ... 2

3. *Adoption of amici's reading of Caldwell would be fatal to the takings claim in Renewal Body Works* ... 4

4. *The trial courts' reading of Caldwell in Barclay and Renewal Body Works will not lead to adverse "practical consequences* ... 5

CONCLUSION ... 5

CERTIFICATE OF SERVICE ... 8

*ii TABLE OF AUTHORITIES

Cases:

*Caldwell v. United States,* 391 F.3d 1226 (Fed. Cir. 2004), cert. denied, 126 S. Ct. 366 (2005) ... 1, 2, 5

*Christian v. United States,* 337 F.3d 1338 (Fed. Cir. 2003) ... 2

*Hash v. United States,* 403 F.3d 1308 (Fed. Cir. 2005) ... 4

*In re Alappat,* 33 F.3d 1526 (Fed. Cir. 1994) ... 1

*Preseault v. ICC,* 494 U.S. 1 (1990) ... 3, 4

*Preseault v. United States,* 100 F.3d 1525 (Fed. Cir. 1996) ... 3, 4

*Renewal Body Works, Inc. v. United States,* No. 05-5109, at 37 ... 1

*Toews v. United States,* 376 F.3d 1371 (Fed. Cir. 2004) ... 3, 4

*United Parcel Service v. Mitchell,* 451 U.S. 56 (1981) ... 1

STATUTES, RULES and REGULATIONS:

Trails Act

Section 8(d), 16 U.S.C. § 1247(d) ... 2, 4

*1 Pursuant to this Court's order of November 10,2005, the United States hereby submits its supplemental brief in response to the brief of *amici curiae* Sarah and Gale Illig *et al.*

ARGUMENT

1. *Amici's new claim is not properly presented in this appeal.* In both *Barclay v. United States* and the companion case of *Renewal Body Works, Inc. v. United States,* the respective appellants contend that *Caldwell v. United States,* 391 F.3d 1226 (Fed. Cir. 2004), *cert. denied,* 126 S. Ct. 366 (2005), was wrongly decided.[FN1] *Amici,* however, rely on an entirely new argument: they state that their "brief alone presents the Court with an understanding of *Caldwell v. United States* * * * that assumes its validity and is consistent with binding precedent."

Unopposed Motion of Sarah Illig and Gale Illig for Leave to Respond to the Expedited Motion of United States to Strike Brief of *Amici Curiae* at 1-2 (Nov. 9, 2005).

FN1. *See, e.g.,* Appellants' Opening Brief in *Barclay v. United States,* No. 05-1255, at 23 n. 5 ("Appellant-Landowners argue first for overruling *Caldwell* * * * because * * * *Caldwell* was wrongly decided."); Appellant's Opening Brief in *Renewal Body Works, Inc. v. United States,* No. 05-5109, at 37 ("*Caldwell* is incorrect and should be reversed.").

The law is clear that "[an] amicus may not rely on new arguments not presented below." In re Alappat, 33 F.3d 1526, 1536 (Fed. Cir. 1994) (citing United Parcel Service v. Mitchell, 451 U.S. 56, 60 n. 2 (1981)). Where, as here, none of the parties ***2** has made or adopted the arguments of *amici,* this Court will not consider those arguments. Christian v. United States, 337 F.3d 1338, 1345 (Fed. Cir. 2003).

2. *Even if amici's new arguments are considered, the trial courts in Barclay and Renewal Body Works correctly interpreted this Court's decision in Caldwell. Amici* assert (Br. 16) that "the Court of Federal Claims' reading of *Caldwell* is certainly wrong" insofar as the trial court concluded that a takings claim arising under section 8(d) of the Trails Act, 16 U.S.C. § 1247(d), accrues when the Surface Transportation Board (STB) issues a Notice of Interim Trail Use or Abandonment (NITU). *Amici* are incorrect.

The trial courts in *Barclay* and *Renewal Body Works* correctly interpreted the *Caldwell* decision. The *Caldwell* court explained that the question before it was "in the context of an exemption proceeding, when are state law reversion interests forestalled by operation of section 8(d) of the Trails Act?" 391 F.3d at 1233. This Court answered that question as follows: "We conclude that this occurs when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)." *Id.* In so concluding, this Court emphasized that "[t]he issuance of the NITU is the only *government* action in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law ***3** reversionary interests in the right-of-way." *Id.* at 1233-34 (emphasis in original). The Court

could not have been clearer about the scope of its accrual holding: "We therefore hold that the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued. The NITU marks the 'finite start' to either temporary or permanent takings claims by halting abandonment and the vesting of state law reversionary interests when issued." *Id.* at 1235. *See also id.* at 1228 ("[A]ppellants' claim accrued when the exemption proceedings were halted by issuance of a [NITU].").

Contrary to *amici's* suggestion (Br. 13), the trial courts' reading of *Caldwell* in *Barclay* and *Renewal Body Works* does not contravene the precedent of the United States Supreme Court or this Court "regarding the operation of the Trails Act on property rights defined by state [law]." For that contention, *amici* primarily rely on the majority and concurring opinions in *Preseault v. ICC*, 494 U.S. 1 (1990), the plurality opinion in *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) *(en banc)*, and *Toews v. United States*, 376 F.3d 1371 (Fed. Cir. 2004). However, none of these opinions addresses *when* a cause of action accrues for a Trails Act takings claim. The Supreme Court's opinion in *Preseault* recognizes that whether a taking has in fact occurred - that is, the question of liability, as distinguished from the separate and antecedent question of accrual - generally involves an issue of state law. ***4** *See Preseault*, 494 U.S. at 16 (noting that under state law "[s]ome rights-of-way are held in fee simple" and "[o]thers are held as easements that do not revert upon interim use as nature trails"); *id.* at 21 (opinion of O'Connor, J.) (explaining that "[d]etermining what interest petitioners would have enjoyed under Vermont law * * * will establish whether petitioners possess the predicate property interest that must underlie any takings claim"). This Court's decisions in *Preseault* and *Toews* recognize the same principle.[FN2] But none of these decisions holds that state property law determines when a takings cause of action accrues under 16 U.S.C. § 1247(d).[FN3]

FN2. *See Preseault*, 100 F.3d at 1541-44 (concluding that under Vermont law the easement granted to the railroad was not sufficiently broad in scope to embrace use as a public recreational trail); *Toews*, 376 F.3d at 1376-79 (reaching a similar conclusion under California law).

FN3. Nor did *Hash v. United States*, 403 F.3d 1308 (Fed. Cir. 2005), *cited by* Br.

at 9, address the question of when a takings claim accrued; that case was limited to threshold questions of title.

3. *Adoption of amici's reading of Caldwell would be fatal to the takings claim in Renewal Body Works. Amici* contend (Br. 5) that, properly understood, *Caldwell* holds that "[i]f the railroad easement would have terminated under state law prior to issuance of the NITU, then a Trails Act taking occurs at the moment the NITU issues, for it prevents the railroad easement from in fact terminating." *Caldwell* did not so hold, and the accrual principle advanced by *amici* would be fatal to the takings claim in *Renewal Body Works.* In its opening brief, Renewal contends (Br. 21) that "[t]he ***5** state law easement was abandoned in the summer of 1995, several months before the NITU issued. Therefore Renewal's cause of action did not accrue when the NITU issued." This result, however, is precisely the opposite of that which would obtain under *amici's* proposed reading of *Caldwell:* under that reading, Renewal's takings claim accrued when the NITU was issued (and thus is time-barred) because, according to Renewal, the railroad abandoned its easement under state law prior to the issuance of the NITU.

4. *The trial courts' reading of Caldwell in Barclay and Renewal Body Works will not lead to adverse "practical consequences."* Although *amici* contend (Br. 22) that it would make "no sense" to require property owners to file suit when a NITU issues, *Caldwell* states that this is the point at which state law reversion interests are forestalled, and thus the injury-in-fact requirement is met. *See* 391 F.3d at 1233-34. Furthermore, the rule proposed by *amici* would require landowners to delay their suits unnecessarily until a trail use agreement is reached, which could potentially take years during which the landowners' property rights have been interfered with.

## CONCLUSION

The judgments of the district court in No. 05-1255 and of the Court of Federal Claims in No. 05-5109 should be affirmed.

John BARCLAY, Constance Barclay, Royer Barclay, Althea Barclay, John Amos, Marcia J. Bacon, Ronald J. Bartel, Melvin Bergen, John E. Boyle, Jonathan Ehrlich, Florence Ehrlich, Donald Graumann, Ruben Kliewer, Alvin Kroupa, Barbara Kroupa, Burdett Ledell, Lee

Dale Miller, Vernon Minns, Frank A. Mitchell, Mid Kansas Cooperative Association, John F. Opat, Robert Presnell, Janet Regier, Sonja Regier, Don Reinhardt, Janice Reinhardt, Mary J. Rodgers, Darrell Thompson,

2005 WL 5630861 (C.A.Fed.)

END OF DOCUMENT

Appendix E:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DIANNE J. MILLER, et al., Plaintiffs, v. THE UNITED STATES, Defendant. | ) | No. 03-2489L<br>Senior Judge Eric Bruggink |

**DEFENDANT'S STATUS REPORT AND MOTION TO STAY**

Pursuant to the Court's instructions during the March 11, 2005 status conference in the above-titled matter, Defendant submits the following status report.

1. On April 30, 1999, Union Pacific Railroad Company ("UP") filed a petition for exemption pursuant to 49 U.S.C. § 10502, seeking an exemption from the statutory provisions of 49 U.S.C. § 10903 to permit UP's abandonment and discontinuance of operation over a 2.18-mile segment of UP's Kirkwood Industrial Lead extending from milepost 13.62 to 15.8 in St. Louis County, Missouri ("Corridor"). See Ex. 6 to Pls.' Memo. in Supp. of Mot. to Certify Class Action.

2. On May 13, 1999, Paul Evans, attorney for Trailnet, Inc., requested that the Corridor be "subject to a Certificate of Notice of Interim Trail Use, rather than an outright abandonment." See Attachment A.

3. On May 21, 1999, UP submitted a letter indicating that UP was "agreeable to entering into negotiations with Trailnet, Inc. for trail use" on the Corridor. See Attachment B.

4. The Surface Transportation Board issued a Decision and Notice of Interim Trail Use or Abandonment ("NITU") on August 18, 1999. See Ex. 6 to Pls.' Memo. in Supp. of Mot. to Certify Class Action.

5. On July 26, 2001, UP and Trailnet, Inc. entered into a Donation and Purchase and Sale Agreement ("Agreement"), whereby UP conveyed its interest in the subject railroad corridor "in accordance with and subject to the National Trails System Act, 16 U.S.C. § 1247(d)" ("Trails Act"). See Ex. 3 to Pls.' Memo. in Supp. of Mot. to Certify Class Action.

6. On April 20, 2004, the Court granted plaintiffs' unopposed motion to certify this as a class action pursuant to Rule 23 of the Rules of the United States Court of Federal Claims.

7. Pursuant to the Court's April 20, 2004 Order, the opt-out class was limited to

> land owners in St. Louis County, Missouri, whose land is currently burdened by the Kirkwood Industrial Lead and/or Carondelet Branch Trial as specified in the Notice of Interim Trail Use or Abandonment dated August 18, 1999, and who fall within the scope of the Agreement, namely, those owning fee interest in land along the subject corridor between mileposts 13.766 and 15.80.

Id.

8. On May 11, 2004, the parties submitted a Joint Status Report, proposing an Entry of Appearance, a document titled "Important Legal Notice - Notice of Pendancy of Class Action," and a Proposed Scheduling Order. See Joint Status Report, dated May 11, 2004.

9. The "Important Legal Notice - Notice of Pendancy of Class Action" states that the class action "was brought on behalf of a class consisting of all persons who, on July 26, 2001,

were owners of real property over which the Union Pacific Railroad formerly held an interest or right-of-way."

10. Similarly, the Entry of Appearance required prospective class members to "state to the best of our knowledge and belief" that they owned affected property on July 26, 2001.

11. On December 14, 2004, the United States Court of Appeals for the Federal Circuit issued an opinion in Caldwell v. United States, 391 F.3d 1226, 1233 (Fed. Cir. 2004), holding that in the context of a Fifth Amendment claim resulting from application of the Trails Act, a taking had occurred, if at all, "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues an NITU that operates to preclude abandonment under section 8(d)." See also Renewal Body Works, Inc. v. United States, _ Fed. Cl. _, 2005 WL 741706, *3 (Fed. Cl. Apr. 1, 2005) ("Caldwell constitutes precedent binding upon this Court and must be followed.").

12. The United States Court of Appeals for the Federal Circuit denied the Caldwell Appellants' petition for rehearing en banc on March 23, 2005. See Attachment C.

13. Based on Caldwell, defendant believes the date of taking in the instant matter should be August 18, 1999, the date of the issuance of the NITU, not July 26, 2001, the date of the Agreement. Accord Renewal Body Works, Inc., 2005 WL 741706 (applying Caldwell in California case); Barclay v. United States, 351 F.Supp.2d 1169 (D. Kan. 2004) (applying Caldwell in Kansas case). Defendant understands that class counsel disagrees with the government's position.

14. Because the previously-disseminated notice used the date of the Agreement rather than the date of the issuance of the NITU, the government believes that the previously-disseminated notice may be insufficient and should be corrected by dissemination of a corrected notice.

15. Class counsel in the instant matter is the same counsel for the class in Illig v. United States, Civil No. 98-934L (Fed. Cl.).

16. The parties in the Illig case have initiated briefing of the applicability of the Caldwell decision.

17. In order to conserve judicial resources, Defendant hereby proposes that the Court issue a stay in the instant matter pending resolution of the statute of limitations issue in Illig.

18. Defendant further proposes that the parties file a joint status report suggesting further proceedings within 10 days of a decision on the statute of limitations issue in Illig.

19. The undersigned counsel provided a copy of this Status Report to class counsel, and understands that class counsel has certain objections to its filing. The undersigned counsel also understands that counsel for the class will be filing a separate memorandum to represent the views of the class.

Dated: April 6, 2004

Respectfully submitted,
THOMAS L. SANSONETTI

Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

WILLIAM J. SHAPIRO
Trial Attorney
General Litigation Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Tele: (202) 305-0479
Fax: (202) 305-0506

Attorney for Defendant

**Appendix F:**

# In the United States Court of Federal Claims

No. 03-2489L
(Filed: November 2, 2005)

* * * * * * * * * * * * * * * * * * * * * * *
DIANNE J. MILLER, ROBERT N. MILLER, and LISA M. SHANIKA, For Themselves and as Representatives of a Class of Similarly Situated Persons,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant.*
* * * * * * * * * * * * * * * * * * * * * * *

ORDER

Oral argument was heard Tuesday, October 25, 2005, on defendant's motion to dismiss, plaintiff's motion for reconsideration of the August 31, 2005, order granting defendant's motion for partial summary judgment, plaintiff's motion to amend the court's August 11, 2005, order and joint case management plan, and plaintiff's motion to amend the class. As a result of the oral argument, the following is ordered:

(1) Defendant's motion to dismiss is granted. It is undisputed that the current claimants did not own the relevant parcels as of the date of the Notice of Interim Trail Use. *See Illig v. United States*, 67 Fed. Cl. 47 (2005). Accordingly, the following Claims are dismissed: 3, 4, 7, 8, 10, 11, 16, 24, 32, 33, 43, 49, 51, 72.

(2) Plaintiffs' motion for reconsideration of the court's order of August 31, 2005, is denied.

(3) Plaintiff's motion to amend the court's August 11, 2005, order and joint case management plan is

granted as follows:

(a) On or before Friday, November 18, 2005, defendant shall file any substantive objections to the new claim book.

(b) On or before Wednesday, November 30, 2005, the joint appraiser shall furnish his report for the selected parcels to both parties.

(c) On or before Wednesday, December 14, 2005, the parties shall notify each other in writing of any objection to the appraiser's report.

(d) On or before Friday, January 6, 2006, the parties shall file a joint status report. Thereafter the court will arrange a status conference.

(4) Plaintiff's motion to amend the class is granted. With respect to that motion, the following is ordered:

(a) The class shall be amended to include, in addition to the claims remaining from the original claim book, those class members identified as Claims 78-116 in the Supplemental Claim Book as being the fee owners of the property as of the date of the Notice of Interim Trail Use.

(b) For Claims number 20, 30, and 33, the original claimant shall be substituted by the successor in interest.

(c) The portion of claim 80, identified by Locator Number 24M 32 0494, shall be dismissed based upon the Triplett/Walker deed. It is undiputed that Claim 80 involves the same parcel of property which was involved in Claim 3, which

we dismissed based upon the Tripplet/Walker deed in *Miller v. United States*, 67 Fed. Cl. 542 (2005).

(d) Mary Neunheim is permitted to enter the class, as she has an undivided one-half interest with Christopher Neunheim in claim number 73.

ERIC G. BRUGGINK
Judge

Appendix G:

U.S. Department of Justice

Office of Legislative Affairs

Office of the Assistant Attorney General

Washington, D.C. 20530

August 1, 2006

The Honorable Devin Nunes
Chairman
Subcommittee on National Parks
Committee on Resources
U.S. House of Representatives
Washington, D.C. 20515

Dear Mr. Chairman:

The Department of Justice appreciates the opportunity to share its views with regard to H.R. 4581, the "Easement Owners Fair Compensation Act of 2005," as a follow-up to the Subcommittee hearing held on July 13, 2006. We commend the drafters of the bill for their commitment to ensuring that individuals whose property may have been taken by government action have an opportunity to present their claims in the Federal courts. We share this commitment. H.R. 4581, however, would unnecessarily displace settled, well-reasoned case law, as well as raise other concerns, including constitutional ones. We thus note our opposition to the bill.

Section 2(c) of the underlying bill raises a potentially significant constitutional problem. That provision would require the United States Court of Federal Claims ("CFC") to review on the merits certain claims previously brought against the United States that were dismissed for failure to satisfy the then-applicable statute of limitations, where those claims would have satisfied the new statute of limitations set forth in the bill. This provision would appear to apply to a CFC dismissal that had been appealed to the United States Court of Appeals for the Federal Circuit. In some instances, this provision would appear to require reopening of final judgments of the Federal Circuit and, to that extent, it would appear to violate Article 3 of the Constitution.

In *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995), the Supreme Court struck down a similar provision, one that changed the applicable limitations period in securities cases and allowed cases dismissed under the old limitations period to be reinstated under the new period. The Court held that "[w]hen retroactive legislation requires its own application in a case already finally adjudicated," Congress exceeds its power under the Constitution. *Id.* at 225. As applied to Federal Circuit decisions that have become final, section 2(c) seems to violate the constitutional rule set forth in *Plaut*. It is true that cases predating *Plaut* suggest that Congress may waive the res judicata effect of claims brought against the United States without running afoul of separation-of-powers principles, *see United States v. Sioux Nation*, 448 U.S. 371, 397 (1980); *Plaut*, 514 U.S. at 230-31, but, in light of *Plaut*, we are not confident that those cases suffice to establish the constitutionality of section 2(c). We therefore recommend that section

2(c) be amended to make clear that it applies only to cases that have not become final judgments, thus rendering the bill immune from constitutional challenge under *Plaut*.

H.R. 4581 would amend section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d) ("Trails Act"), by establishing a new point when a claim against the United States would "first accrue" for purposes of starting the six-year clock for filing a takings claim in the CFC"). *See* 28 U.S.C. § 2501 (statute of limitations for CFC cases). The plaintiffs in these suits typically are landowners whose predecessors-in-interest conveyed (or had condemned) an interest to a railroad company, generally in the late 1800s or early 1900s, for the operation of a railroad across the property. The Trails Act allows these railroad rights-of-way to be "railbanked" and preserved for future rail use and, in the interim, to be used for trails as an alternative to abandonment. This is accomplished by the Surface Transportation Board's ("STB") issuance of a Notice of Interim Trail Use ("NITU"). Under the law of some states, but for the issuance of a NITU, the railroad's property interest would be deemed "abandoned."

Recently, the courts have made clear when the six-year clock begins to run for these takings claims. In *Caldwell v. United States*, 391 F.3d 1226 (Fed. Cir. 2004), *cert. denied*, 126 S. Ct. 366 (2005), the Federal Circuit established a "single, bright-line rule" that a Trails Act takings claim "first accrues" with issuance of "the NITU [because it] is the triggering event that blocks any reversionary interests from ... vesting." *Accord, Barclay v. United States*, 443 F.3d 1368, 1373 (Fed. Cir. 2006). Thus, the Federal Circuit gives clear direction that a Trails Act takings claim accrues upon the issuance of the NITU by the STB. The Federal Circuit is the only circuit court with appellate jurisdiction to consider Fifth Amendment takings claims, and there is no contrary precedent from the Supreme Court.

We believe *Caldwell* and *Barclay* were correctly decided. Indeed, the United States advocated in favor of using NITU issuance as the accrual event in both cases. Courts have been clear that only Federal action should trigger a takings claim against the United States. Here, the issuance of the NITU is the *only* relevant Federal action in Trails Act takings cases. Thus, we believe a contrary approach - such as found in H.R. 4581 - would be unnecessary and inconsistent with long-standing takings principles.

We note several other concerns with the bill. First, it would potentially create confusion. Parties involved in Fifth Amendment takings litigation benefit from uniformity in the law. Establishing a special test for a relatively small body of claims - particularly one not dependent on a federal action - could serve as a trap for attorneys and landowners who may be unaware that the general rule is not to be followed. We are unaware of any court decision that has established an accrual test similar to the one proposed in H.R. 4581.

Second, the bill would delay, and in some instances deny, takings relief to some claimants. While shifting the six-year "window" to bring suit may be intended to benefit a limited number of individuals whose claims would otherwise be time-barred, it also would likely

prevent some other landowners from achieving getting prompt resolution of their claims. Under H.R. 4581, these landowners would have to wait for the new accrual requirements to be met in their cases before they could bring suit. Moreover, landowners who had a claim on the date of the NITU would no longer have one under H.R. 4581, if they were divested of their property during the intervening time period. We are not aware of a principled basis for such disparate treatment.

In some situations, the bill could prevent some otherwise viable takings claims from ever reaching court. Section 2(a) of the bill would place a new condition on the right to bring a takings claim under the Trails Act, specifically that the railroad "in writing" convey an interest to the trail operator. Yet the condition may never be met in some situations because the Trails Act does not require such a written conveyance. The applicable regulations likewise contemplate that a trail operator need not acquire the corridor. The operator can merely use the rail corridor for interim trail use, as long as it assumes full responsibility for the corridor and agrees to railbanking. 49 C.F.R. § 1152.29(a).

Finally, the bill would result in different legal standards depending on whether the takings claim was filed in the Court of Federal Claims or a district court. H.R. 4581 applies to cases in the Court of Federal Claims (see Section 2(a)), and not to cases before district courts.[1] Creating different accrual requirements based on the court in which the claim is brought would not only add confusion, but it would invite forum shopping and inequitable results.

[1]The appropriate court for hearing Fifth Amendment takings claims is determined by the amount of compensation sought by the plaintiff. For claims in excess of $10,000, the CFC has exclusive jurisdiction. 28 U.S.C. § 1491. For claims of $10,000 or less, the CFC has concurrent jurisdiction with the Federal district courts. 28 U.S.C. § 1346(a)(2). In either instance, the applicable statute of limitations allows six years to bring a claim from when the claim "first accrues." *See* 28 U.S.C. § 2501 (CFC); 28 U.S.C. § 2401 (district court). Appeals of Fifth Amendment takings claims from either court are heard in the United States Court of Appeals for the Federal Circuit.

The Honorable Devin Nunes
Page 4

Thank you for the opportunity to present our views. If we can be of further assistance in this matter, please do not hesitate to contact this office. The Office of Management and Budget has advised us that from the perspective of the Administration's program, there is no objection to the submission of this letter.

Sincerely,

William E. Moschella
William E. Moschella
Assistant Attorney General

cc: The Honorable Donna M. Christensen
Ranking Member