# In the United States Court of Federal Claims

No. 07-271L
Filed: April 12, 2012

| | | |
|---|---|---|
| *    *    *    *    *    *    * | | |
| JACK LADD et al., | * | Rails-to-Trails Act; Fifth Amendment Takings; Notice of Interim Trail Use |
| | * | (NITU); Surface Transportation |
| Plaintiffs, | | Board; Application of State Property |
| | * | Law; Notice of Exemption; Notice of |
| v. | | Consummation; Statute of Limitations; |
| | * | Continuous Government Action; NITU |
| UNITED STATES OF AMERICA, | | Extension; Renegotiation for Trail Use; |
| | * | Renegotiation for Railway; Statutory |
| Defendant. | | Construction |
| | * | |
| *    *    *    *    *    *    * | | |

*Mark Fernlund Hearne, II*, Arent Fox, LLP, Clayton, MO, for plaintiffs.

*William James Shapiro*, Environment and Natural Resources Division, United States Department of Justice, Sacramento, CA, for defendant.


**ORDER AND OPINION**

**HODGES, Judge.**

      This rails-to-trails case is on remand from the Court of Appeals for the Federal Circuit with instructions to decide Fifth Amendment compensation for a temporary taking. *Ladd v. United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010), *reh'g denied*, 646 F.3d 910 (2011). We ruled in *Ladd I* that defendant did not effect a Fifth Amendment physical taking of plaintiffs' rights of reverter because the Government had no physical presence on plaintiffs' property. *Ladd v. United States*, 90 Fed. Cl. 221, 227 (2009), *rev'd*, 630 F.3d 1015.

      The Federal Circuit stated that applicable precedent is clear where the Surface Transportation Board issues a Notice of Interim Trail Use: a taking arises immediately upon issuance of the NITU. If the parties do not agree on a trail, this affects damages only and not liability; the taking is a

temporary estate for years.[1]

Defendant contends that we lack jurisdiction over several plaintiffs because the statute has run on their claims.  It seeks summary judgment as to the remaining plaintiffs because they have no property interests in the railroad corridor abutting their lands.  In response, plaintiffs cite the Federal Circuit's remand order stating that the trial court should calculate just compensation. The mandate leaves no room for us to consider legal issues, according to plaintiffs, as it assumes a temporary taking.

Appeals court precedent is clear that we lack jurisdiction to consider the claims of plaintiffs Heinzl, Castro, Windsor-Brown, Ladd, and Miller; the statute of limitations has run against their claims.  Plaintiff Lindsey has no property interest in the railroad corridor because the railroad owns the land at that point in fee simple.  The claims of plaintiffs Singletree Ranch and Miller Ranch Trust arose separately from the other plaintiffs, and they are not barred by the statute of limitations.  Those claims state valid temporary takings entitled to just compensation under the Fifth Amendment, according to the remand order.

## BACKGROUND

We ruled that a physical takings did not occur in this rails-to-trails case, where the Government did not have a physical presence on plaintiffs' land.  *Ladd I*, 90 Fed. Cl. at 227. The appeals court remanded "for a determination of the compensation owed to the appellants for the taking of the Southern Stretch and the Northern Stretch of railway line." *Ladd*, 630 F.3d at 1025. Upon remand, defendant moved to dismiss for lack of jurisdiction and for summary judgment on the issue of liability.

Defendant contends that some property owners have no underlying property interest in the railroad corridor.  Plaintiffs argue that the Federal Circuit's remand order states only that we should calculate damages for takings; this does not permit us to consider property interests at this juncture. However, the appeals court would not have ordered an assessment of the lands' value for Fifth Amendment purposes without sufficient trial court findings concerning plaintiffs' interest in the land taken.[2]

---

[1] As this case is reconsidered on remand, trail negotiations are no longer contemplated. We detect practically no likelihood that the issue will recur in the foreseeable future.  Defendant advises the court that negotiations are underway among rail companies to establish a new rail line across the easement currently owned by the San Pedro Railroad Operating Company.  This could mean that the right-of-way or easement for railroad purposes could remain valid, or again become valid.  In that event, even a temporary taking argument for plaintiffs would sound highly theoretical.

[2] The first Opinion did not address property interests of individual plaintiffs because we ruled that a physical taking by the Government could not occur without the Government's

**DISCUSSION**

Defendant argues for the first time in this proceeding that the statute of limitations bars five plaintiffs' claims.[3]  Plaintiffs respond that the Government cannot make such an argument now, having waived the statute of limitations by not raising it before.

The statute of limitations is jurisdictional in this court.  A claim against the Government must be filed within six years after accrual.  28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."); *see also John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-37 (2008) (holding that the six-year statute of limitations is jurisdictional). Challenges to a court's subject matter jurisdiction can be brought and must be decided whenever they arise. RCFC 12(h)(3) ("If the court determines *at any time* that it lacks subject-matter jurisdiction, the court must dismiss the action.") (emphasis added).

The Court of Appeals for the Federal Circuit holds that takings in rails-to-trails cases occur, if at all, when the Government issues the first Notice of Interim Trail Use. *Barclay v. United States*, 443 F.3d 1368, 1375 (Fed. Cir. 2006); *see also Caldwell v. United States,* 391 F.3d 1226, 1234 (Fed. Cir. 2004).  Moreover*,* a taking claim ripens when the first NITU is issued, regardless when or whether the Government issues additional NITU's in the same case. *Ladd*, 630 F.3d at 1020-21 ("[T]akings law supplies a single bright-line rule for accrual." (quoting *Barclay*, 443 F.3d at 1378)).

Plaintiffs base their claims on a Notice of Interim Trail Use issued in 2006, which would give them until 2012 to file their Complaint.  However, a NITU affecting five of the plaintiffs' lands was issued in 1998, more than six years before they filed in 2007.  The 1998 NITU covered a 41.5-mile stretch of railroad corridor between Paul Spur and Charleston, Arizona.  Defendant issued the 1998 NITU in response to an application from San Pedro Trails, which intended to develop trails in the area.  San Pedro agreed with the railroad that the trail company would assume responsibility for management of the right-of-way, pay taxes on the land, and hold the railroad harmless from any liability arising from use of the trail by the public.

A NITU issued November 21, 2003, designated Cochise Trails as the new interim trail user and trail manager, and vacated the 1998 NITU.  The 2003 NITU also authorized the San Pedro Railroad Operating Company to acquire and operate the railroad lines from San Pedro and Southwestern Railway Operating Company.  San Pedro Railroad requested abandonment authority

---

physical presence on the land taken.  *See Ladd I*, 90 Fed. Cl. at 227.  Plaintiffs did not argue the case as a regulatory taking.  The appeals court stated, "[t]he government disputes the character of the property rights in this case.  For purposes of summary judgment, however, we must assume facts in favor of the appellants." *Ladd*, 630 F.3d at 1024, n.4.

[3] Plaintiffs subject to this argument are Heinzl, Castro, Windsor-Brown, the Ladd claimants, and Miller.

from the Surface Transportation Board in 2005 after its plans to restore a connection with the Mexican rail system did not materialize. The Board issued an Environmental Assessment[4] in 2006, followed by another new NITU.[5]   The 2006 NITU authorizes negotiation of a trail use agreement with an organization called Trust for Public Land.[6]

The statute of limitations began to run against the five plaintiffs when defendant issued the 1998 NITU, not the NITU filed in 2006.  By the time the five plaintiffs had filed taking claims in 2007, at least seven years had passed since they were legally on notice.  Even if one NITU expires before the next is issued, the first NITU remains the starting date for purposes of the statute of limitations.  *See Ladd*, 630 F.3d at 1020-21 ([A] series of NITU orders must be viewed as a single and continuous government action . . . any extensions or modifications of the original NITU are not separate compensable takings." (citing *Barclay*, 443 F.3d at 1375-76)).  Here, there was no gap between NITU's.  The claims of plaintiffs Heinzl, Castro, Windsor-Brown, Ladd, and Miller, are barred by the statute of limitations.

Plaintiffs' response is essentially that none of this matters because the Federal Circuit decided "implicitly" that the landowners have property interests in the corridor.  The appeals court issued a remand order that directs this court to assess damages for takings, plaintiffs note.  Such an implicit direction could be reasonable only if the Federal Circuit had made sufficient findings of fact and law to direct entry of judgment for the property owners.  We interpret the remand as a direction to consider plaintiffs' rights in the subject property, including the impact of limitations, if any.  As noted earlier, the statute of limitations may be raised at any time during the  proceedings.

## PLAINTIFFS' PROPERTY INTERESTS

This court's Order and Opinion will dismiss five plaintiffs whose time for filing claims expired before 2007.  The three property owners remaining are plaintiffs Lindsey, Singletree Ranch, and Miller Ranch Trust.  Defendant moved for summary judgment on liability as to these plaintiffs.  The Government contends that we can consider plaintiffs' allegations of fact to be true and still rule as a matter of law that they have no cognizable cause of action against the United States.  A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).

---

[4] This form, filed during the NITU process, included the following statement in reference to the corridor containing the five plaintiffs' property, "[s]ince August 17, 1998, this segment has been operated under an agreement for trail use/rail banking."

[5] This was the NITU that plaintiffs relied on as the trigger for their takings claims.  *See, e.g., Caldwell*, 391 F.3d at 1234 (holding that the taking occurs upon issuance of a NITU).

[6] The 2006 NITU does not reference the earlier NITU's.  Neither party raised a question about their possible impact on plaintiffs' claims until after the Circuit issued its remand order.

Settled law in this Circuit provides, "a Fifth Amendment taking occurs in Rails-to-Trails cases when government action destroys state-defined property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd*, 630 F.3d at 1019.  The Court of Appeals for the Federal Circuit provided this framework for analyzing liability in rails-to-trails cases:

> (1) [W]ho owned the strips of land involved, specifically did the Railroad . . .acquire only easements, or did it obtain fee simple estates; (2) if the Railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails; and (3) even if the grants of the Railroad's easements were broad enough to encompass recreational trails, had these easements terminated prior to the alleged taking so that the property owners at that time held fee simples unencumbered by the easements.

*Preseault v. United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996).

We apply state real property laws to make such decisions, including those governing the interpretation of deeds and other interests in land.  Controlling state law in this case is Arizona's.

The nature of a plaintiff's property interest is the first issue for a court to resolve in deciding whether just compensation is appropriate.  In rails-to-trails takings cases, property underlying the railroad corridor becomes important.  If a railroad has a fee simple interest in the land underlying its corridor, abutting landowners have no basis for claiming takings – the railroad can use its corridor for any conforming or non-conforming use it pleases, as any other fee title owner might.  In the language of takings jurisprudence, claimants cannot show that they possess a compensable ownership interest in the land alleged to have been taken. *See id.*

Arizona law states that a conveyance is presumed to be in fee simple unless it is limited to a lesser interest expressly in the granting clause or elsewhere in the deed.[7]  Ariz. Rev. Stat. § 33-432(A) ("Every estate in lands granted, conveyed or devised, although other words necessary at common law to transfer an estate in fee simple are not added, shall be deemed a fee simple if a lesser estate is not limited by express words . . . .").  We construe a deed in Arizona by "giv[ing] effect to the intent of the contracting parties.  If the instrument is unambiguous, the intent of the parties must be discerned from the four corners of the document." *Spurlock v. Santa Fe Pac. R.R. Co.*, 694 P.2d 299, 304 (Ariz. Ct. App. 1984).

---

[7] Some states provide that any real property conveyance to a railroad is presumed to be an easement and not a fee title.  The wording of an instrument transferring an interest in land to a railroad therefore may not be so important as here.  Arizona law does not include such a presumption.

Lindsey Property

The Lindsey family obtained its property rights by deed from the owners of a single tract that included the Lindsey lot and the property under the railroad corridor. The Lindseys' predecessor-in-title conveyed the corridor to the El Paso & Southwestern Railroad Company in fee simple. The relevant portion of the El Paso deed states consideration of $250 and this granting language: "[Grantor] does bargain, sell, grant, [and] convey . . . *in fee simple*, all that certain lot, piece or parcel of land . . . [to the railroad]." (emphasis added). The property granted is described as "[a] strip of land on the east side of the San Pedro River . . . for the relocation of the El Paso & Southwestern Railroad Company[8] . . . ."

The grantor's deed uses language that creates a fee simple estate in nearly every jurisdiction. It does not use the terms 'easement' or 'right-of-way.' The Lindseys own the land abutting the railroad corridor in fee, but they have no interest in the railroad corridor that the Government could have taken by forestalling state law abandonment.

Ranch Properties

The remaining plaintiffs are Singletree Ranch and Miller Ranch Trust. The railroad obtained its interest in the corridor abutting their lands pursuant to an 1875 Act of Congress. That Act conveyed easements to railroad companies while allowing ownership of the land under the railroad bed to remain in the hands of abutting landowners. *See Hash v. United States*, 403 F.3d 1308, 1313-18 (Fed. Cir. 2005) (holding that the patent holder, not the United States, held the reversionary interest[9] in land obtained by a railroad under the 1875 Act).

Plaintiffs Singletree Ranch and Miller Ranch Trust have neither of the problems that caused their fellow plaintiffs' claims to fail. They have undisputed fee simple interests in the land under the railroad corridor abutting their parcels. The NITU that caused a taking of their reversionary rights in the corridor was filed in 2006; so the statute of limitations is not an issue in their cases. Therefore, Singletree Ranch and Miller Ranch Trust own the land under the railroad corridor in fee simple, and they are entitled to just compensation according to the Federal Circuit's mandate, so long as the remaining *Preseault* factors are satisfied.

---

[8] A description of the purpose for which a grant of property is made does not diminish a fee simple estate in Arizona. *See Lacer v. Navajo County*, 687 P.2d 404, 408-10 (Ariz. Ct. App. 1983) (holding that a description of purpose did not transform a fee simple grant into a fee subject to condition subsequent or a fee simple determinable).

[9] We use "reversionary interest," for convenience, and because the term has been adopted by most courts to describe the rights of a landowner who holds fee simple title to land subject to a railroad's easement. *See Hash*, 403 F.3d at 1313.

Scope of Easements and Abandonment

The second prong of the *Preseault* test requires a determination whether the easement obtained by the railroad was broad enough to allow for recreational trail use. *Preseault*, 100 F.3d at 1533. The Railroad obtained an easement for railroad purposes pursuant to the 1875 Act. Defendant argues that the NITU does not authorize a new use on the corridor and that no activity has occurred in this instance that could have exceeded the scope of a railroad purposes easement. By its argument that the NITU does not authorize a new use, defendant must mean no such new use has come to pass. Certainly, the Government's policy is to support and encourage such non-conforming uses.

Courts have found repeatedly in applying property laws of other states that railroad operations are different from the recreational trail use contemplated by 16 U.S.C. § 1247(d), "Interim use of railroad rights-of-way." The trail use authorized by the NITU exceeds the scope of the Railroad's 1875 Act easements.

The third question under the *Preseault* test is, if trail use is within the scope of the relevant easements, did the railroad abandon its easements prior to the NITU. *Preseault*, 100 F.3d at 1533. If the railroad had already abandoned its easement under Arizona law, the actions of the STB would be a taking because the land otherwise would have reverted to plaintiffs then.

Abandonment under Arizona law requires a showing of "an intention to abandon, together with an act or an omission to act by which such intention is apparently carried into effect." *City of Tuscon v. Koerber*, 313 P.2d 411, 418 (Ariz. 1957). Filing a request for a NITU is sufficient in many states to establish intent to abandon. The matter is not often reached in these cases because abandonment becomes important only if a court can find that trail use by the general public was an acceptable purpose according to the terms of the easement or right of way. The scope of easements analysis is determinative in this case.

DURATION OF TEMPORARY TAKINGS

The railroad in this case has not filed a Notice of Consummation of Abandonment or otherwise taken steps to complete abandonment under federal law. Defendant has raised the possibility that the railroad wants to reinstitute service along the line, or sell the easement to someone who will. The Surface Transportation Board extended the 180-day, July 2006 NITU applicable to the Ranches for thirty days, then allowed it to expire on February 21, 2007.[10] Since then, the STB has granted several extensions to the railroad to complete abandonment of the line by filing a Notice of Consummation. The routine extensions have assigned the lands of Singletree and Miller on the "Northern Stretch" a limbo status. The Rails-to-Trails Act provides that abandonment

---

[10] The period for negotiation was 210 days.

of the corridor is not complete until the Notice of Consummation is filed.[11]  The current extension for filing a Notice of Consummation of Abandonment expires on July 26, 2012.[12]

Filing a NITU results in a physical taking irrespective of whether a trail has been built on the property.  *Ladd*, 630 F.3d at 1025.  However, the Court of Appeals for the Federal Circuit ruled that a physical taking without a trail could be a temporary taking in this case, an estate for years.  *See id.*  The NITU signals the beginning of a taking by the Government, but so far we do not have the taking's end.  Where no trail is in place when the court calculates just compensation, and the railroad has not filed a Notice of Consummation, we must have some means to assume an end for appraisal purposes.

The railroad has not reached agreement with a trail operator qualified under the statute to build a trail.  No trail exists and none is proposed.  The last NITU expired years ago, but the Government has granted a number of extensions for the Railroad to consummate abandonment.  The rails-to-trails statute gives the railroad an option to consummate abandonment upon expiration of a NITU, but otherwise does not make clear what happens with no trail and no consummation.  49 C.F.R. § 1152.29.  The process begun by issuing a NITU can end only when the railroad files a Notice of Consummation of Abandonment. *See id.*  The railroad has not done so.

Abandonment of the railroad easement by the federal regulatory process and expiration of the NITU do not always occur on the same date, as is evident from the situation here.  Because abandonment has not occurred, and the STB still retains jurisdiction of plaintiffs' property, the temporary taking has not ended.[13]

The Government contends that a temporary taking lasts only so long as the period of negotiation provided by the NITU is in force, including any extensions.  Plaintiffs respond that they are being kept off of their land in perpetuity, and that a permanent taking has occurred.[14]  They point

---

[11] Defendant has argued that the railroad alone can file a Notice of Consummation, and therefore the matter is out of the Government's hands.

[12] *See* 49 C.F.R. § 1152.29(e)(2) ("A railroad that receives authority from the Board to abandon a line . . . shall file a notice of consummation with the Board to signify that it has exercised the authority granted and fully abandoned the line.").

[13] If the statute provided that expiration of the NITU and abandonment were one and the same, the process of calculating just compensation would be relatively straightforward.  For example, if expiration of the final NITU without an extension were a statutory alternative to Consummation of Abandonment, just compensation for a temporary taking would be calculated for the time between the first NITU and expiration of the final NITU.

[14] Persuasive arguments can be made either that a permanent taking has occurred, assuming that issuance of a NITU marks the beginning of the taking, or that plaintiffs have not

out that the statute of limitations continues to run through a series of NITU's, even where some have expired and left gaps.  Because of this precedent, we have barred five Constitutional claims in this case. Meanwhile, defendant argues that the taking stops when the negotiation period for a NITU expires – even though the Government maintains jurisdiction until the Notice of Consummation is filed.  A series of NITU's is one continuing government action.  *See Barclay*, 443 F.3d at 1375 ("[A] series of STB NITU orders must be viewed as part of a single and continuous government action rather than as new takings.").[15]  The Surface Transportation Board retains jurisdiction over the land, and plaintiffs continue to be prevented from enjoying their reversionary interests.  The Court of Appeals for the Federal Circuit has not ruled that the Government is entitled to the best of both worlds by naming the expiration date of a NITU as the end of a temporary taking, but not for interrupting the running of a statute of limitations.

Defendant remains in control of the railroad corridor abutting plaintiffs' lands as this Opinion and Order is issued.  *See Barclay*, 443 F.3d  at 1374 ("Until the [STB] issues a certificate of abandonment, the railway property remains subject to the [STB's] jurisdiction, and state law may not cause a reverter of the property." (quoting *Preseault v. ICC*, 853 F.2d 145, 150 (2d Cir. 1988))).[16]  The estate of years taken by defendant does not end so long as the Government remains in control of the subject property. *Id.* at 1376 ("So long as abandonment was not consummated, the STB retained jurisdiction over the right-of-way.").

## CONCLUSION

Plaintiffs Singletree Ranch and Miller Ranch Trust are entitled to compensation for a temporary taking.  Counsel will agree on an appraiser who will calculate the value of a temporary taking given a beginning date of July 26, 2006.  The appraisal will include a total value ending on the date of this Order and a daily factor for determining value at a later date if necessary.  If or when the

---

suffered a taking at all.  If a trail is built ultimately, the land remains subject to STB jurisdiction in that termination of the trail requires filing with the STB and starting again with the abandonment process.  If a trail is not built during the STB's jurisdiction, and a Notice of Consummation is not filed, the corridor may be sold to another railroad or reestablished by the same railroad.  In that circumstance, it is not clear what the landowners will have lost or had taken.

[15] The Court reasoned that "the new NITU in substance merely extended the original NITU," despite a gap between the expiration of one 180-day NITU negotiation period and the issuance of a second NITU.  *Barclay*, 443 F.3d at 1376.

[16] *But see Farmers Cooperative Co. v. United States*, 98 Fed. Cl. 797 (2011), *reconsideration denied*, 100 Fed. Cl. 579 (2011), where the court ruled that a temporary taking ended at the expiration of the most recent NITU.

Railroad files a Notice of Consummation of Abandonment, the value will be recalculated by applying that date.  This court will retain jurisdiction to enter judgment on that basis.

The Government's motion to dismiss the claims of plaintiffs Heinzl, Castro, Windsor-Brown, Ladd, and Miller, for lack of subject matter jurisdiction is GRANTED.  The Clerk of Court will dismiss those plaintiffs from the Complaint. The Government's motion for summary judgment as to the Lindsey family for lack of a compensable property interest is GRANTED.  The Clerk of Court will dismiss the Lindseys from the Complaint.

The Government's motion for summary judgment as to plaintiffs Singletree Ranch and Miller Ranch Trust is DENIED.  The parties will agree to a schedule for obtaining an appraiser to determine value according to the terms of this Order.  If they cannot agree on an appraiser, they will contact the court to schedule a hearing to decide on alternative means of appraisal jointly acceptable to the parties.  Counsel will advise the court of the schedule by status report no later than April 26, 2012.

IT IS SO ORDERED.

<u>s/Robert H. Hodges, Jr.</u>
Robert H. Hodges, Jr.
Judge