# In the United States Court of Federal Claims

No. 07-271L
Filed: March 14, 2013

\* \* \* \* \* \*

JACK LADD and               \*
MARIE LADD, et al.,

                                          \*        Rails-to-Trails Act; Fifth Amendment

               Plaintiffs,                 Takings; Notice of Interim Trail Use
                                          \*        (NITU); Temporary Takings; End Date;
               v.                                Consummation of Abandonment; Railroad
                                          \*        Use; Railbanking; Trail Use; Unencumbered
UNITED STATES OF AMERICA         Property Rights; Calculation of Damages
                                          \*

               Defendant.
                                          \*

\* \* \* \* \* \*

*Mark Fernlund Hearne, II*, Arent Fox, LLP, Clayton, MO, for plaintiffs.

*William James Shapiro*, Environment and Natural Resources Division, United States Department of Justice, Sacramento, CA, for defendant.

## ORDER AND OPINION

**HODGES, Judge.**

Plaintiffs sued the United States, alleging physical takings of their reversionary rights to railroad easements on their property. The easements had been reserved for railroad purposes by plaintiffs' grantors, and used for rail beds. San Pedro Railroad Operating Company, the owner of the easements, applied to the Surface Transportation Board for permission to abandon its tracks pursuant to the National Trails System Act, 16 U.S.C. § 1247(d), referred to here as "Rails-to-Trails Act" or the Trails Act.

The Board approved San Pedro's application, and issued a Notice of Interim Trail Use (NITU), pursuant to the Trails Act. The NITU authorized San Pedro to negotiate with private or civic groups to build recreational trails along its easements for railroad uses. Takings arise because easements used for trails by the general public do not comply with the railroad-use purposes of the easements that are common in most states. Therefore, the easements for trail use typically would revert to the landowners. The Trails Act blocks this reversion. The Court of Appeals for the Federal Circuit has ruled that issuance of a NITU by the Surface Transportation Board is the bright-line event

that announces a physical taking that may turn out to be permanent or temporary. *Ladd v. United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010); *Caldwell v. United States*, 391 F.3d 1226, 1234 (Fed. Cir. 2004) ("It is not unusual that the precise nature of the takings claim, whether permanent or temporary, will not be clear at the time it accrues.").

We ruled on remand last year that plaintiffs Singletree Ranch and Miller Ranch Trust are entitled to just compensation for temporary takings. *Ladd v. United States*, No. 07-271L, 2012 WL 6965717 (Ct. Cl. April 12, 2012). The April 2012 Opinion and Order directed the parties to obtain a joint appraiser to value plaintiffs' lands before and after the taking. The appraiser submitted various values based on conflicting assumptions provided by plaintiffs and defendant, however, because the parties could not agree on consistent instructions for the appraisal. The parties filed cross motions for partial summary judgment on the proper appraisal standards.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). When evaluating cross motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constrs., Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

This Order responds to the parties' cross motions for summary judgment. Damages for the taking are determined according to a "before and after" calculation. The joint appraiser should assume that before the taking, plaintiffs owned the subject property unencumbered by easements. After the taking, the property is valued as land encumbered by an easement for recreational trails and railbanking.

## I.

The Government agrees that damages should be calculated by applying before-and-after values to plaintiffs' property. However, it would appraise their property before the taking at a value that takes into account easements on their land for railroad purposes; the after-NITU values would be the same as those proposed by plaintiffs – as property burdened by easements for trail use and railbanking.[1] Plaintiffs contend that the before-takings values should reflect property not burdened by easements – that is, unencumbered property.

For appraisal purposes, plaintiffs' "right to unencumbered possession of the property" describes the values of their land before the taking, rather than "value as a railroad easement," as

---

[1] Defendant's preferred instructions to the joint appraiser were: "The before condition will assume that the railroad has never abandoned its easement over the railroad corridor. The railroad's easement existed before the federal taking; [t]he after condition will assume that the railroad easement continues to exist and that the United States imposed the possibility of a recreational trail, which has not yet been constructed and will not likely be constructed."

defendant suggests.[2]  Plaintiffs' reversionary interests are determined in this court by subtracting the value of plaintiffs' land with easements for recreational trails, from their land without easements – unencumbered property.  *See Ladd*, 630 F.3d at 1025 ("[T]he NITU forestalls or forecloses the landowners' right to unencumbered possession of the property.").  That value will be applied to the takings' duration and used to calculate damages.

Defendant also argued that the timing of state law abandonment vis-a-vis filing of the NITU should be taken into consideration in determining relative values. *See* defendant's instructions, n.1 ("The before condition will assume that the railroad has never abandoned its easement over the railroad corridor.  The railroad's easement existed before the federal taking . . . .").  For these purposes, however, the appeals court has held that the timing of state law abandonment is not a factor.  *See Presault v. United States,* 100 F.3d 1525, 1549 (Fed. Cir. 1996) ("[W]e find the question of abandonment is not the defining issue, since whether abandoned or not the Government's use of the property for a public trail constitutes a new, unauthorized, use.").  While no trail has been built on plaintiffs' land in this case, the NITU created a new easement for trail use and railbanking.  That use exceeded the scope of the prior easements for railroad purposes, according to state law.  Exceeding the scope of an easement is tantamount to abandonment. *See id.*

## II.

The Surface Transportation Board's issuance of a NITU marked the beginning of a taking.  *Ladd*, 630 F.3d at 1025 (quoting *Caldwell*, 391 F.3d at 1235).  Rulings in Trails Act cases are consistent in holding that permanent takings do not occur unless recreational trails are built along the former railroad-purpose easements, pursuant to provisions of the Trails Act. *See, e.g.*, *Caldwell*, 391 F.3d at 1234 ("[T]he NITU operates as a single trigger to several possible outcomes.  It may, as in this case, trigger a process that results in a permanent taking in the event that a trail use agreement is reached and abandonment of the right-of-way is effectively blocked." (citing *Preseault*, 100 F.3d at 1552)).  The Federal Circuit directed this court to calculate "the compensation owed to the [plaintiffs] for the taking . . . ." *Ladd*, 630 F.3d at 1025.  The only type of taking that remains for our purposes is the temporary taking.  This raises the issue of duration.

The beginning and ending dates of a temporary taking establish due compensation to the landowners. Compensation is the difference between the before and after-appraised values described above, applied to the length of time landowners were deprived of their reversionary interests.  The beginning date is clear, but the Federal Circuit's remand order did not show how just compensation should be calculated without a normal end date.  The facts of this case do not present an obvious choice.  Typically, a taking ends when landowners reacquire their property.  In this case, however,

---

[2] Defendant acknowledges case law measuring the value of takings as the difference between land encumbered by a trail-use easement and unencumbered land.  *See, e.g.*, *Whispell Foreign Cars, Inc. v. United States*, 106 Fed. Cl. 635 (2012); *Howard v. United States*, 106 Fed. Cl. 343 (2012); *Anna F. Nordhus Family Trust v. United States*, 106 Fed. Cl. 289 (2012); and *Macy Elevator, Inc. v. United States*, 105 Fed. Cl. 195 (2012).

that time has not occurred. We cannot know whether the property taken temporarily will return to plaintiffs in the foreseeable future.

Plaintiffs believe that their unencumbered use of the land has been taken permanently. In that situation, we would have no need of a ending date for the taking. That option appears to have been foreclosed by appeals court precedent described above. Defendant has proposed alternative ending dates for the purposes of valuing a temporary taking. For example, expiration of the most recent NITU is one suggestion. Another is expiration of the time allowed by law for the railroad to file a Notice of Consummation of Abandonment.

Using the date that the most recent NITU expired has some validity, in that the NITU is the only exercise of government involvement in the process, according to the Court of Appeals for the Federal Circuit. The NITU marks the taking's beginning. *See Caldwell*, 391 F.3d at 1233-34. While expiration of the NITU has logical appeal, the beginning and ending dates of a temporary taking would not necessarily derive from the same NITU. Typically, a NITU is extended more than once in the course of negotiations between the railroad and groups that would build trails along the easements. Moreover, new NITU's may be issued after previous NITU's expire. Despite that, the statute of limitations begins to run from the first NITU and cuts off any landowners who may be relying on a later NITU to start the six-year statute. *Barclay v. United States*, 443 F.3d 1368, (Fed. Cir. 2006) ("[T]he series of STB NITU orders must be viewed as part of a single and continuous government action rather than as new takings."). This uncertainty of application makes the NITU expiration date less than ideal as a time for closing a temporary taking. Furthermore, as the April 2012 Opinion discussed, using the expiration of a NITU as the closing date for a temporary taking but not to interrupt the running of the statute of limitations would result in a lack of parallel application to the Government and to the landowner, to the landowner's disadvantage.

Another date proposed by defendant is the deadline for filing a Notice of Consummation. The deadline for filing a Notice of Consummation is one year after the STB allows a railroad to move forward with abandonment of its tracks, September 24, 2012 in this case.[3] That event is subject to being extended, however, and it usually is extended more than once. A problem with this deadline as closing date is shown by the facts of this case. The Railroad requested numerous extensions before finally allowing the allotted time for abandonment to expire. It has not filed the Notice of Consummation that appears to be required by STB regulations. *See* 49 C.F.R. § 1152.29(e).[4]

Defendant's suggestion is that we use instead the date by which the Notice should have been

---

[3] *See* 49 C.F.R. §1152.29(e)(2) ("If, after 1 year from the date of service of a decision permitting abandonment, consummation has not been effected by the railroad's filing of a notice of consummation . . . the authority to abandon will automatically expire. In that event, a new proceeding would have to be instituted if the railroad wants to abandon the line.").

[4] Defendant represents that another railroad will now establish rail service on the line.

4

filed. This creates uncertainty of application, and like the NITU's expiration, lacks a definite time for affected lands to revert to their owners. Moreover, neither alternative establishes a time when the jurisdiction and control of the United States would end. A temporary taking cannot end while the Government remains capable of excluding plaintiffs from the easement property.

## CONCLUSION

The taking in this case must be a temporary one, for the reasons described here and in the April 2012 Opinion. The temporary taking ends when the San Pedro Railroad consummates abandonment and plaintiffs' reversionary interests revert to an unencumbered status. Alternatively, the taking may end when the Government shows that it has abandoned the taking, leaving no government claim to jurisdiction or control over the property.

We expect that the parties will use some values produced by the first appraiser to avoid duplication of efforts.[5] If the requested per diem amounts from the date of the April 2012 Opinion are acceptable to counsel, those amounts should be included as well.[6] The parties will direct the joint appraiser to provide before and after values in accordance with the rulings of this Order. When the parties have agreed on a joint appraisal, we will enter final judgment. Counsel will file a status report on or before March 29. Plaintiffs' motion for partial summary judgment is GRANTED. Defendant's motion is DENIED.

SO ORDERED.

                                                <u>s/Robert H. Hodges, Jr.</u>
                                                Robert H. Hodges, Jr.
                                                Judge

---

[5] We are aware that some of the appraisal numbers are viewed by plaintiffs as privileged information for the purpose of settlement. For that reason, we have not ordered that such numbers be used. Nonetheless, we encourage counsel to use the material gleaned from the first appraisal to the extent possible, for the sake of judicial efficiency.

[6] The April 2012 Opinion found a temporary taking given the facts of this case, with damages paid to the date of the Opinion, and leave for plaintiffs to return to this court for updated damages on a per diem basis. This would continue until the Railroad files a Notice of Abandonment or defendant shows that it has abandoned the taking.